Sheila R. Schwager, ISB No. 5059
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 W. Main Street, Suite 200
P.O. Box 1617
Boise, ID 83701-1617
Telephone: 208.344.6000
Facsimile: 208.954.5261
Email: sschwager@hawleytroxell.com

Andrew J. Schoulder (*pro hac*)
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: 212.318.3030
Email: andrew.schoulder@nortonrosefulbright.com

Attorneys for Rabo AgriFinance LLC

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re | Chapter 11 |
| MILLENKAMP CATTLE, INC., *et al.*, | Case No. 24-40158 (NGH) |
| Debtors.[1] | (Joint Administration Requested) |

### RABO AGRIFINANCE LLC'S OMNIBUS OBJECTION TO (I) EMERGENCY MOTION AUTHORIZING USE OF CASH COLLATERAL; AND (II) EMERGENCY MOTION AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND GRANTING ADEQUATE PROTECTION

---

[1]    The Debtors in the Chapter 11 Cases along with the last four digits of their respective tax identification number or registration number in the applicable jurisdiction are: Millenkamp Cattle, Inc. (3892); Idaho Jersey Girls LLC (4467); East Valley Cattle, LLC (8613); Millenkamp Properties, L.L.C. (4003); Millenkamp Properties II LLC (7719); Millenkamp Family LLC (8279); Goose Ranch, LLC (N/A); Idaho Jersey Girls Jerome Dairy LLC (3431); Black Pine Cattle LLC (N/A); and Millenkamp Enterprises LLC (N/A). The location of the Debtors' service address for purposes of the Chapter 11 Cases is 471 N 300 W., Jerome, Idaho 83338.

Rabo AgriFinance, LLC, in its capacity as agent and lender ("**RAF**"), files this objection to the (i) *Emergency and Continuing Motion for Interim and Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection and Setting a Final Hearing* [Docket No. 22] (the "**Cash Collateral Motion**"), and (ii) *Emergency Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to Obtain Post-Petition Financing; (B) Granting Adequate Protection to Pre-Petition Secured Creditors; and (C) Setting a Final Hearing* [Docket No. 24] (the "**DIP Motion**" and together with the Cash Collateral Motion, the "**Financing Motions**"), and together with the Financing Motions, the "**Motions**"),[2] filed by the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), and in support thereof, states as follows:

## PRELIMINARY STATEMENT[3]

1.      June 1, 2022, is and was the Maturity Date for the RLOC Facility.  RAF has given the Debtors twenty-two (22) months since that date to provide the promised refinancing in excess of $89 million of senior secured *matured* debt.  Initially, RAF granted a long-term forbearance that provided in excess of eight (8) months based on the the Debtors' representations that was sufficient time to execute the refinancing.  The Debtors did not provide such financing.  During this time, RAF made in excess of $16 million of protective advances to address the Debtors' constant inability to maintain positive cash flow on a steady state basis.  When the Debtors were unable to put forth a solution of their own, RAF made numerous proposals to de-lever the Debtors' balance sheet, some of which included new money funding.  The Debtors rejected those offers, and in some cases did not respond altogether.  While the months passed, the RLOC Collateral

---

[2]   Capitalized terms used but not defined in this objection shall have the meanings ascribed to them in the applicable Motion.

[3]   Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them elsewhere in the objection.

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 2

continued to decline in value. Based on the Debtors' own Borrowing Base Certificates, in just one year, the RLOC Collateral has declined in value by at least $18 million between March 31, 2023 and February 29, 2024 ("**Declining Borrowing Base**"). Attached hereto as **Exhibit 1** is a true and correct copy of the applicable Borrowing Base Certificates.

      2.     After twenty-two months of the RLOC Facility having matured, the Debtors have submitted a debtor-in-possession financing proposal that does not seek to adequately protects RAF's interests, but seeks to deeply subordinate RAF's interests and rights. Given the matured nature of the RLOC Facility, RAF believes that equity requires a heightened level of scrutiny as to its interests with respect to the proposed DIP Facility and use of Cash Collateral. In summary, and as discussed in greater detail below:

- *No Equity Cushion in the RLOC Collateral.* The Debtors are attempting to manufacture an equity cushion where one does not exist by consolidating 2022 real estate appraisals with unsupported valuations of the RLOC Collateral, together with Mr. Millenkamps's layperson's opinions on those values. To get to this result, the Debtors ignore the lien and priority structure that exists vis-à-vis RAF's interest in the RLOC Collateral (where it has a first priority security interest) and the real estate collateral, which is subject to MetLife's first mortgage and the restrictive subordination provisions of the Second Intercreditor Agreement. This approach ignores the deterioration in the value of the RLOC Collateral. The Debtors have not proffered any evidence that there is an equity cushion, let alone $35 million of equity cushion in the RLOC Collateral, nor can they. Based on the Declining Borrowing Base the evidence is to the contrary. Consequently, the proposed priming liens would materially impair (and not adequately protect) RAF's interests in the RLOC Collateral.

- *No Realistic Plan for Repayment.* Over a four week period, the Debtors have prepared three separate 13-week budgets with one, dated February 23, 2024, showing that the Debtors do not have a need for any financing, another, dated March 22, 2024, showing the need for approximately $22 million of financing, and the budget attached to the Financing Motions reflecting a $35 million need. The Debtors lack material financial controls and the disparity in these budgets calls into question whether the proposed DIP Financing adequately protects RAF's interest in the RLOC Collateral and the Cash Collateral. Likewise, the Debtors provided RAF with long-term projections that rely on overly optimistic projections. Attached hereto as **Exhibit 2**, is true and correct copy of the Debtors' Long Term Projections. Given the Debtors' historical inability to maintain steady state positive cash flow, there are serious concerns with respect to the Debtors' ability to

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 3

repay the proposed DIP Facility, particularly given the usurious fees. Indeed, Mr. Millenkamp's Declaration does not provide any explanation as to how he intends to improve profitability.

- ***Excessive Fees.*** The fees for the proposed DIP Facility are excessive and off-market. The Debtors are proposing to incur approximately $7,000,000 to $8,251,408 in fees under the DIP Facility. In light of the Debtors' historical cash flow issues, the incurrence of these fees is incomprehensible and detrimental to the estates. Attached hereto as **<u>Exhibit 3</u>** is a true and correct copy of a comparison of the Sandton Priming DIP Facility and the RAF proposed DIP Facilty, which itemizes the proposed fees.

3.      The Debtors' Financing Motions are void of reference to the events dating back to on or about August 9, 2021—the first instance of an identifiable conversion of RAF's cash collateral, the occurrence of the Maturity Date of the RLOC Facility on June 30, 2022, or the appointment of a receiver by the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada. The omission of this history is important in its own right. Notably, these events include multiple occurrences of conversion of RAF's cash collateral between August 2021 and August 2023, which exceed $10,161,000, in the aggregate, of identifiable prohibited uses. RAF uncovered the Debtors' prohibited use of substantial steer-sale proceeds in August 2023 and, to date, has not been able to identify the exact amount of the Debtors' conversion, due t to the lack of transparency and disclosure.

4.      Despite this history, for the 22 months following the Maturity Date of the RLOC Facility (*i.e.*, June 30, 2022) up until the Petition Date, RAF has continued to attempt to work in good faith with the Debtors to facilitate a turnaround while preserving the well-being of the Debtors' livestock. Indeed, while certain of the Debtors' creditors have sought to repossess cattle feed and farm equipment and others have continued to collect millions of dollars in principal and interest without a single missed payment, RAF has increased its exposure despite a deteriorating and declining borrowing base by making in excess of $16 Million in new money protective advances between April 2023 and prior to the commencement of the Receivership Action. Most

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II) MOTION TO APPROVE POSTPETITION FINANCING - 4

recently, RAF increased its exposure by making $5.8 million of new money protective advances, in the aggregate, including a $2 million protective advance as recent as March 27, 2024 (collectively, the "**Receivership Advances**").  The Receivership Advances were made pursuant to that certain Financial Support Agreement, dated as of February 19, 2024 (as amended, the "**FSA**"), entered into between RAF and the Receiver on behalf of the Debtors and the non-Debtor affiliates subject to the Receivership, pursuant to the Stipulated Receiver Order.  Under Section 2.03 of the FSA, RAF is expressly authorized to apply Milk Receivables to the outstanding Protective Advances.  Accordingly, during the Receivership, when Milk Receivables were received they were applied to the obligations and then if the Receiver requested protective advances under the terms of the Stipulated Receiver Order, RAF submitted such protective advances to the Receiver[4].  A true and correct copy of the FSA is attached hereto as **Exhibit 4** and incorporated by reference.

5.    As set forth further herein, RAF remains committed and willing to continue to contribute to a chapter 11 process that maximizes value for all stakeholders.  However, the RLOC Facility is approaching the two-year anniversary of the expiration of the Maturity Date without the Debtors providing a viable turnaround plan for repaying the Lenders during that time.  Indeed, the Debtors do not have sufficient liquidity to do so.  Any further delays jeopardize the well-being of the Debtors' livestock and potential recoveries for RAF and other creditors.  Accordingly, RAF respectfully submits that in the accordance with the Bankruptcy Code, the use of RAF's cash collateral should be conditioned on narrowly tailored protections set forth herein.

---

[4] The Debtors state in the Cash Collateral Motion that RAF has refused to release the Milk Receivables to the Debtors absent an interim order approving the use of cash collateral and seeks such cash collateral as part of the motion.  That is a mis-statement by the Debtors. RAF informed the Debtors that it was not providing the receivables to the Receiver, nor had the Receiver requested an advance.  Indeed, as RAF has done throughout the Recivership, it applied the $4,148,372.81 to the obligations.  There are no current Milk Receivables in RAF's possession.

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 5

59797.0002.17016364.2

## BACKGROUND

### A. The RLOC Facility and RAF's Relationship with the Debtors

6.      On or about April 21, 2021, the Debtors and certain nob-Debtor affiliates—including William "Bill" Millenkamp and Susan "Susie" Millenkamp—executed and delivered to RAF, as agent for the secured lenders (the "**Lenders**"), that certain Third Amended and Restated Loan and Security Agreement, consisting of, *inter alia*, a loan in the original principal sum of $91,000,000 (the "**RLOC Agreement**" and, together with all notes and other documents evidencing or related to the loan, each as amended, the "**RLOC Documents**" and the related credit facility, the "**RLOC Facility**"), which provided the Debtors with financing to support their dairy operations.[5] Under the RLOC Facility, the Debtors granted to RAF, as agent, a security interest to and in substantially all of Debtors' (and certain of their affiliates') personal property, excluding their real property (the "**RLOC Collateral**" or the "**Collateral**"), but including, among other interests, all Accounts; Farm Products (including, but not limited to) Livestock, Payment Intangibles, Deposit Accounts, Commodity Contracts, and notably, the Debtors' inventory, which consists of (in part) milk, other dairy products, and certain receivables from the sales of the Debtors' milk and other dairy products (the "**Milk Receivables**").

7.      The first signs of the Debtors' declining financial situation were brought to light on or about September 2021 when the conversion of approximately $10 million of RAF's cash collateral was discovered, where the Debtors established an escrow and surety bonds for the benefit

---

[5]     The RLOC Agreement replaced an existing financing arrangement between the Debtors and the Lenders dated as of September 18, 2018, which had previously replaced a financing arrangement that had been in place between the Debtors and the Lenders since December 30, 2015.

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 6

59797.0002.17016364.2

of certain litigants.[6] Following that discovery, RAF engaged in extensive negotiations to address the Debtors' situation, including the declining borrowing base and missed interest payments.

8.        On June 1, 2022, the Maturity Date occurred but RAF continued to work with the Debtors towards a consensual solution.  It was during the course of these negotiations, on June 3, 2022, that the Debtors, without consent of the Lenders, paid a capital call in the amount of approximately $161,000 to a non-Debtor entity, KANS LLC, in which the Debtors own an interest. The payment to KANS LLC became the second known and identified conversion of the Lenders' cash collateral.

9.        Effective October 20, 2022, the RLOC Agent agreed to a forbearance of the Maturity Date default, as well as other material defaults, providing time and protective advances to preserve the collateral value (and well-being of the Debtors' livestock) and for the Debtors to position themselves for a transaction to repay the outstanding matured loan, as they represented. During this period, the Debtors were not subject to any enforcement actions by the RLOC Agent or any other lender.  Nevertheless, the Debtors cash flow was insufficient to support ordinary course operations requiring the RLOC Agent to make a $1 million protective advance on April 12, 2023, for the purpose of purchasing feed.  On July 1, 2023, the Forbearance Agreement expired by its terms after the Debtors failed to refinance the RLOC Facility after an eight (8) month

---

[6] In his Declaration, Mr. Millenkamp asserts that he received verbal approval for the prohibited use of $10 million of RAF's Cash Collateral.  Notwithstanding the incredulous nature of Mr. Millenkamp's sworn statement that RAF would verbally approve the use of $10 million, Mr. Millenkamp's allegation is inconsistent with a record that dates back approximately three (3) years.  In the Forbearance Agreement, the Debtors expressly acknowledged that the use of the $10 million was prohibited by the RLOC Agreement and constituted a default thereunder.  Forbearance Agreement, Section 2(r), Exhibit 3.  Further, in connection with the Receivership Action, the Debtors and Mr. Millenkamp stipulated to the occurrence of the defaults identified in the Forbearance Agreement, which included the conversion of $10 million of RAF's Cash Collateral.  Exhibit 4, Stipulated Facts ¶ 11.  Yet, for the first time in approximately three (3) years, Mr. Millenkamp now asserts that he received verbal approval from Mr. Charles Hopkins.

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 7

forbearance period, as agreed.  Attached hereto as **Exhibit 5**, is a true and correct copy of the Forbearance Agreement.

10.     Despite this failing, the RLOC Agent did not terminate the Forbearance Agreement and continued attempts to support the Debtors' efforts in reliance on the Debtors' representations that a commitment from a reputable agribusiness lender was imminent. During this period, RAF experienced increasingly significant challenges in obtaining the Debtors' cooperation and then, on August 10, 2023, discovered that the Debtors had been converting cash collateral from the sale of the Lenders' secured livestock.  Specifically, the Debtors did not deposit steer sale proceeds into a designated control account and instead used those proceeds without RAF's consent and in violation of the RLOC Agreement.  Notably, in his Declaration, Mr. Millenkamp omitted these events when stating that "[i]n August of 2023, RAF began sweeping steer and cull cow proceeds and has continually done so to the present date. Since August 2023 RAF has swept over $25 million and has failed to revolve the money" Docket No. 26, ¶ 57.  In actuality, due to the overt conversion, RAF terminated the forbearance agreement and began enforcing its rights under the Uniform Commercial Code to prevent any further deterioration and conversion of its collateral. If RAF had applied the proceeds as asserted, RAF's current exposure would be less than the $89 million. Instead, and as the Debtors know, RAF applied the majority of the proceeds against the accrued interest that could have been avoided if the Debtors had repaid the RLOC Facility at the stated Maturity Date.

11.     Even after these events and the forbearance termination, RAF continued to provide the Debtors with additional time and protective advances so the Debtors could achieve what again they continued to represent was an imminent refinancing of the RLOC Facility.  However, after an additional five months, no such refinancing materialized.  RAF further made multiple offers to

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 8

provide financing to enable the Debtors to restructure earlier under voluntary cases commenced under chapter 11 of the Bankruptcy Code or otherwise. The Debtors rejected those offers. As there was no evidence of any ability to pay off or refinance the matured RLOC Facility, it became necessary for RAF to move to appoint a receiver to attempt to protect and preserve the Debtors' livestock and dairy operations[7].

### B. Overview of the Receivership Action

12.    On January 22, 2024, RAF, as agent for the Lenders, commenced the Receivership Action against each of the Debtors and certain of their non-Debtor affiliates, including Bill Millenkamp and Susie Millenkamp. Within the Receivership Action, RAF filed its *Motion for Appointment of Receiver* (the "**Receiver Motion**") and accompanying documents, seeking the appointment of Matthew McKinlay, a member of CFO Solutions, L.L.C. d/b/a Ampleo, as receiver (the "**Receiver**") pursuant to Idaho Code §§ 8-601A(2) and 8-601(6).

13.    On January 29, 2024, MetLife filed its *Motion for Leave to Intervene*, which the State Court granted without opposition by RAF or the Debtors, and its *Objection to Verified Petition for Appointment of Receiver and Motion for Appointment of Receiver* (the "**MetLife Objection**"). The Debtors also filed an *Objection to Verified Petition for Appointment of Receiver and Motion for Appointment of Receiver* (the "**Defendants' Objection**"). The State Court set the matter for an evidentiary hearing on February 9, 2024. Before the hearing, the Debtors, RAF, and MetLife filed the *Stipulated Facts and Exhibits for Receivership Hearing, February 9, 2024* (the

---

[7] A more detailed look of a description of the events leading up to the Petition Date is set forth in the *Verified Petition for Appointment of Receiver* (the "**Verified Petition**") filed in the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada (the "**State Court**") under case number CV01-24-01156 (the "**Receivership Action**").

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 9

"**Stipulated Facts**") in the State Court. A true and correct copy of the Stipulated Facts is attached hereto as **Exhibit 6** and incorporated herein by reference.

14. On February 9, 2024, at the evidentiary hearing to consider RAF's request to appoint the Receiver, the Debtors and RAF announced to the State Court that they had negotiated and obtained an agreement for a stipulated order appointing the Receiver (the "**Stipulated Receiver Order**"). MetLife, however, pressed its objection.

15. On February 14, 2024, after the evidentiary hearing, the State Court announced its decision on the Receiver Motion via an oral ruling, and determined that the Receiver would be appointed, pursuant to the Stipulated Receiver Order, as amended by the State Court in its oral comments at the hearing. Specifically, the State Court found, among other things, that "there are cattle, dairy cows, [and] other assets that are in danger of being harmed, [or] lost if they are not properly fed and taken care of, and also other assets if not properly maintained during the course of these proceedings[,]" [pg. 48] and, therefore, found grounds for the Receiver's appointment under Idaho Code § 8-601A(2). The State Court did not take a position, at the time, concerning whether the Receiver could file a bankruptcy on behalf of any of the Debtors. Additionally, the State Court overruled the MetLife Objection as to the appointment and rejected MetLife's interpretation of the First Intercreditor Agreement.

16. Consistent with the State Court's oral decision, on February 15, 2024, the State Court entered the *Order Appointing Receiver* (the "**Receivership Order**"). A true and correct copy of the Receivership Order is attached hereto and incorporated by reference as **Exhibit 7**, p.5. The Receivership Order appointed the Receiver as the receiver over the Debtors and certain non-Debtor affiliates. *Id.* at 5. Among other things, the Receivership Order gave the Receiver the powers and duties to investigate and take possession and management of the Receivership Assets

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 10

(as defined in the Receivership Order). *Id.* Notably, the Receivership Order gave Mr. Millenkamp

the ability to continue as the Debtors' business operator with (i) exclusive management control of

the day-to-day operations, and (ii) the exclusive right to file a bankruptcy petition on behalf of any

of the Debtors, for a period of sixty (60) days from the date of the Receivership Order (such period,

the "**Exclusive Period**"). *Id.* at 12. The Receivership Order further provided that, upon the

expiration of the Exclusive Period, the Receiver would thereafter take control over the Debtors'

businesses. *Id.* The Receivership Order further provided that within five (5) business days of the

Receivership Order, the Receiver would be provided access to requisite information, records,

personal property, and real property of the Debtors. *Id.* at 13-17. Finally, again among other

things, the Receivership Order gave the Receiver the power and authority to file voluntary petitions

under chapter 11 of the Bankruptcy Code at the conclusion of the Exclusive Period. *Id.* at 26.

17.       On March 18, 2024, the Receiver filed in the Receivership Action a *Status Report
and Renewed Request for Entry of Revised Receivership Order on Emergency Motion* (the

"**Emergency Motion**"), and set this for hearing on March 20, 2024. In the Emergency Motion,

the Receiver stated that the Receivership Order was not being complied with and that the Debtors

(including Mr. Millenkamp) were preventing the Receiver from doing his job. As such, the

Receiver sought to amend the Receivership Order to clarify the Debtors' obligations thereunder.

The Debtors responded to the Emergency Motion, via their *Defendants' Status Report* filed on

March 19, 2024, contesting the claims in the Emergency Motion.

18.       On March 20, 2024, the State Court held a hearing on the Emergency Motion and

a status hearing on the Receivership Action, generally. At the hearing, the Receiver noted that he

was not being given access to bank accounts and records, among other things, and asked that the

Receivership Order be amended to allow the Receiver to file a bankruptcy petition on April 5,

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 11

2024, in the event that the Debtors did not file by that time.  At the hearing, the State Court ordered and directed that the Receiver be promptly given access to bank accounts, records, and the Debtors' facilities.  The State Court further concluded, on the record, that it had determined that, under Idaho law, the Receiver has the ability to file a bankruptcy petition for all or any of the Debtors[8] and set the matter over for another status hearing.

19.    On March 26, 2024, the Receiver filed in the Receivership Action a *Second Updated Status Report and Renewed Request for Entry of Revised Receivership Order*.  In this filing, the Receiver noted improved access to the bank accounts, records, and facilities of the Debtors, but set forth the liquidity problems and sought a revised Receivership Order allowing the Receiver to file a bankruptcy for any or all of the Debtors before the expiration of the Exclusive Period.  On March 27, 2024, the State Court held a hearing on the status.  The State Court held that due to the continuing liquidity issues and other problems he would terminate the Debtors' exclusivity period as of April 3rd if the Debtors had not filed bankruptcy, thereby permitting the Receiver to file.

**C.  The Chapter 11 Cases, the Financing Motions, and the Proposed Adequate Protection**

20.    Throughout the Receivership Action, RAF and its professionals continued to engage with the Debtors and their professionals regarding potential restructuring alternatives and the Debtors' imminent chapter 11 cases.  In mid-March, after a two-day, in-person meeting between RAF and the Debtors, there appeared to be a consensus of a potential restructuring, that would, among other things, inject $35 million of debtor-in-possession financing.  Additionally, RAF proposed entry into a restructuring support agreement that would facilitate an exit from

---

[8]    At the February 14, 2024 hearing, the State Court had reserved its decision on whether the Receiver was authorized to file a petition for bankruptcy relief for the Debtors under applicable state law.

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 12

chapter 11 in four (4) months, de-leverage the Debtors' balance sheet, provide the Debtors an additional thirty (30) months to repay the RLOC Facility, allow Mr. Millenkamp to potentially retain his equity interests and operational roles, and implement financial controls to help the Debtors avoid future liquidity crises.[9]

21.    Despite RAF's best efforts, however, just days before the Petition Date, the Debtors provided RAF with a draft Cash Collateral Motion that indicated they did not anticipate finalizing a restructuring support agreement or other definitive documentation (including a proposed debtor-in-possession financing) before they sought bankruptcy relief. The absence of these arrangements is significant as the agreements implemented a number of important controls and protections intended to prevent further deterioration of the RLOC Collateral and repeated violations of RAF's rights. Such controls and reporting would also potentially benefit the estate from the historical liquidation issues.

22.    On the Petition Date, each of the Debtors filed voluntary petitions for chapter 11 relief with the Court and, contemporaneously, filed various "first day" motions, including the Cash Collateral Motion and the DIP Motion. Although the Debtors state they believe they have RAF's consent in both Financing Motinos, *such consent was never sought*. Indeed the first that RAF knew of the proposed DIP Financing terms was the filing, late the afternoon of April 2nd. Further, the Debtors are being disingenuous if it is their conention that they thought that RAF would consent to what is an attempt to prime the undersecured, depreciating, RLOC Collateral.

---

[9]    Prior to that meeting, to demonstrate its commitment to a consensual restructuring, RAF delivered, in draft, a comprehensive restructuring support agreement and debtor in possession financing agreement. Immediately following those meetings, between March 15 and March 19, RAF delivered revised agreements reflecting the outcome of the meetings.

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 13

59797.0002.17016364.2

23.     The Debtors, through the Financing Motions, seek the Court's approval of (i) postpetition financing of $15 million in the interim and an addition $20 million on a final basis, secured by first-priority priming liens and security interests in all of the Debtors' assets, and require the payment of up to $8,251,408 in non-market fees to the DIP Lender (the "**Priming DIP Facility**"), and (ii) the Debtors' continued use of RAF's cash collateral on an interim basis pending entry of a final order.  In exchange for the priming of RAF's liens and the use of its cash collateral, the Debtors propose to provide RAF and the Lenders with the following adequate protection: (i) an equity cushion, (ii) replacement liens, (iii) interest payments at the non-default rate, (iv) "financial and other reporting" in compliance with the proposed order and applicable law, (v) maintenance of insurance on the Debtors' assets, and (vi) a superpriority claim under Bankruptcy Code section 507(b), to the extent of any diminution in the value of RAF's interest in its collateral, subject and subordinate to the Carve-Out.

## OBJECTION

24.     Through the Financing Motions, the Debtors request relief that further diminishes the value of RAF's interest in the RLOC Collateral.  The Debtors cannot provide sufficient adequate protection to permit the priming of RAF's prepetition liens *and* allow the continued use RAF's cash collateral.  Moreover, as set forth below, since March 14, 2024, the Debtors have been in possession of a competing proposal from RAF.  After reviewing the proposed financing summarized in the Motion, RAF, through this Objection, is submitting a competing proposal that would provide the capital the Debtors are seeking, avoid a protracted and costly priming fight, and provide a path toward a viable exit plan at a far lower cost to the estates and their creditors.  For the reasons set forth herein, RAF respectfully requests that the Court deny the Financing Motions.

A. **The DIP Motion should be denied as the Debtors cannot demonstrate that the Priming DIP Facility satisfies the requirements for approval under Bankruptcy Code section 364(d).**

25.     Under Bankruptcy Code section 364(d)(1), the Debtors cannot obtain "postpetition financing on a superpriority, secured, and priming basis . . .," unless they "establish: (1) that they are unable to obtain credit otherwise; (2) that the transaction is within the Debtors' business judgment; and (3) that the interests of primed lienholders are adequately protected." *In re Yellowstone Mountain Club, LLC*, No. 08-61570-11, 2008 WL 5875547, at *7 (Bankr. D. Mont. Dec. 17, 2008). As set forth herein, RAF respectfully submits that the Debtors have failed to carry their burden to demonstrate, among other things, that (i) RAF is adequately protected for the further diminution in the value of the RLOC Collateral due to the imposition of priming liens under the proposed Priming DIP Facility and (ii) the terms and conditions of the Priming DIP Facility are fair, reasonable, or otherwise comply with the Bankruptcy Code.

i.     **Bankruptcy Code section 364(d) requires the Debtors to prove that RAF is adequately protected.**

26.     When a debtor proposes to prime a secured creditor's existing liens or use a secured creditor's collateral, the Bankruptcy Code requires that the debtor provide the secured creditor with adequate protection of its interests in that collateral unless the secured creditor consents. *See* 11 U.S.C. §§ 361, 362, 363, 364. The Debtors must demonstrate that their proposed use of the RLOC Collateral will not reduce the value of RAF's interest and, if it does, that the proposed adequate protection will compensate RAF for the diminution in value. 11 U.S.C. §§ 361, 363; *In re Las Vegas Monorail Co.*, 429 B.R. 317, 326 (Bankr. D. Nev. 2010); *see In re Glassstream Boats, Inc.*, 110 B.R. 611, 613 (Bankr. M.D. Ga. 1990); *see also In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3rd Cir. 1994); *In re Mosello*, 195 B.R. 277, 287-288 (Bankr. S.D.N.Y. 1996). Adequate protection is a flexible concept and may be provided in the form of

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 15

cash payments, additional or replacement liens, or such other relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." *In re Hollister*, 628 B.R. 154, 158 (Bankr. C.D. Cal. Mar. 8, 2021) (citing 11 U.S.C. § 361). Courts have held that proposed adequate protection is the indubitable equivalent of a secured creditor's interest in property if "there is no reasonable doubt but that the [creditor] will receive the full value of what it bargained for when it made the contract with the debtor." *In re Cady*, No. 06-00502, 2007 WL 2215384, *3 (Bankr. D. Idaho July 30, 2007) (citing *In re Wiersma*, 03.1 I.B.C.R. 42, 49 (Bankr. D. Idaho 2003);[10] *see also In re November 2005 Land Inv'rs*, LLC, 636 Fed. App'x at 726.

27.    Moreover, as a general principle, the Bankruptcy Code recognizes the primacy of prepetition contractual liens and seeks to preserve the financial interests created thereby. *Mosello*, 195 B.R. at 287. The ability to prime an existing lien under Bankruptcy Code Section 364(d) is extraordinary, as it displaces bargained-for rights, and should not be approved except as a last resort. *See In re Den-Mark Construction, Inc.*, 406 B.R. 683, 688 (E.D.N.C. 2009); *In re Planned Systems, Inc.*, 78 B.R. 852, 861 (Bankr. S.D. Ohio 1987) (secured creditor to be primed "is entitled to constitutional protection for its bargained-for property interest"). The fact that a secured creditor may be protected, in part, by the existence of an equity cushion is not, by itself, sufficient to adequately protect a prepetition creditor whose bargained for rights may be diminished by the granting of a priming lien to a DIP lender. *See In re Stoney Creek Technols.*, 364 B.R. 882, 891 (Bankr. E.D. Pa. 2007) *(citing In re Timber Products, Inc.,* 125 B.R. 433, 436 n.11 (Bankr. W.D.

---

[10]    While *In re Cady* discussed the indubitable equivalent standard with respect to confirmation, courts in the Ninth Circuit have found "there is every reason to construe the same words to mean the same thing in both § 361 and § 1129 because both sections address how to assure that the present economic values of secured claims are not adversely affected." *In re Hollister*, 628 B.R. at 158.

Pa. 1990); *see also Swedeland,* 16 F.3d at 567 n.17 ("We do not, however, imply. . . that a creditor

no matter how great its security can be adequately protected without receiving additional collateral

or guarantees if the creation of a superpriority lien decreases its security"). To prove that an equity

cushion will provide adequate protection to secured creditors to be primed by postpetition

financing, the debtor must prove, among other things, that the equity cushion will exist into the

future as the full postpetition loan is advanced to the debtor. *In re Packard Square*, 574 B.R. 107,

121 (Bankr. E.D. Mich. 2017). Priming liens granted in connection with postpetition financing

cannot substantially increase the risk of the prepetition lender to provide security for the

postpetition lender. *See In re Windsor Hotel, L.L.C.*, 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003).

### ii. The Debtors have not demonstrated that there is any "equity cushion" in the RLOC Collateral.

28.    The Debtors assert that RAF is adequately protected through, among other things,

an "equity cushion" on its collateral and, "solely to the extent of any diminution in value,"[11]

replacement liens and superpriority administrative expense claims. The unstated proposition,

however, is that RAF's interest in the Debtors' assets would only diminish when the purported

equity cushion is exhausted. The only evidence that the Debtors offer are purported "asset values"

from their unaudited financial statements, [12] real-estate appraisals from 2022, and Mr.

Millenkamp's lay opinion that based on "the passage of time since the appraisals, and additional

improvements that have been made to some of the properties, I estimate the property values have

increased since 2022, with a total 2024 aggregate property value of approximately

---

[11]    DIP Motion ¶ 27.

[12]    *See* Millenkamp Decl. ¶ 38 ("As of the date of this Declaration, the Debtors' consolidated unaudited financial statement reflected total assets of approximately $643,000,000 ($493 million real property; $150 million personal property) and total liabilities of approximately $339,000,000 (Metlife $181 million; RAF $92 million; Conterra $19 million; A/P $47 million).").

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 17

$493,000,000.00."[13]  The DIP Motion further treats the Debtors and the assets on a consolidated basis, arguing that "the value of the collateral is approximately $643 million, which provides more than a 20% equity cushion for the Prepetition Secured Lenders, . . . ."  The Debtors' analysis ignores that RAF and the other Prepetition Secured Lenders have different interests in different collateral pools, and that an equity cushion in one collateral pool does not protect a secured creditor's interest in any other collateral pool.

29.     The Debtors' assets can be divided into at least four distinct collateral pools: (i) unencumbered property (if any), (ii) MetLife's real-estate collateral, (iii) the RLOC Collateral (including any Milk Receivables), and (iv) the Conterra collateral (*i.e.*, the "German Dairy").  The Debtors should not be able to prime RAF's interests in, or to use, the RLOC Collateral unless there is an equity cushion in the RLOC Collateral.  Self-serving declarations aside, the Debtors have not provided any reliable evidence that there is *any* equity cushion in the RLOC Collateral.  Based upon the Borrowing Base Certificates, the evidence is to the contrary.

30.     Even if there *were* an equity cushion in the RLOC Collateral, courts have adopted a holistic approach to determine whether it provides sufficient adequate protection, analyzing all relevant facts "with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time," and the prospects for the successful reorganization of the debtor's affairs through a plan of reorganization. *See In re YL West 87th Holdings I LLC*, 423 B.R. at 441-42.

---

[13]     *Id.* at ¶ 40.

31.     Here, the Debtors cannot credibly argue that the proposed Priming DIP Facility would not materially increase RAF's exposure and impermissibly saddle RAF and the other secured lenders with significantly increased risk.

### iii. The Priming DIP Facility further demonstrates that the Debtors cannot manage their finances and adequately protect RAF's interests.

32.     As detailed herein and in the Receivership Action, although the Debtors are good operators, they have a proven inability to manage their finances. The Debtors' history of missed targets, empty promises, and misuse of collateral—combined with their business's sensitivity to fluctuations in milk prices—provides little confidence in their ability to avoid a default under the Priming DIP Facility. Indeed, the Debtors' actions over the past few weeks, combined with the materials filed (or not yet filed, as the case may be) with the DIP Motion, provide material and concerning issues with the Debtors' financial reporting.

33.     *First*, in connection with RAF's efforts to develop a viable exit plan with the Debtors, RAF has been provided with or otherwise received no fewer than ***three different budgets*** in the past month. The first budget was filed by the Debtors in the Receivership Action on or about February 23, 2024. A true and correct copy of the Receivership Action Budget is attached hereto as **Exhibit 8**, which is incorporated herein by reference. The second budget was shared with RAF on March 22, 2024. A true and correct copy of the March 22, 2024 Budget is attached hereto as **Exhibit 9**, which is incorporated herein by reference. The third budget was filed with the DIP Motion (attached as Exhibit B thereto) as the Debtors' proposed "DIP Budget." Each of these budgets paints a different picture of the Debtors' cash flows and financial condition:

- The first budget, filed just weeks ago in the Receivership Action, in substance, asserted that the Debtors ***did not*** need ***any*** additional financing. Just two weeks later, the Debtors' mid-March 2024 budget asserted a need for an additional ***$22 million*** in financing to consummate a four-month chapter 11 process. And now, just one week later, the Debtors

filed the DIP Motion requesting an additional *$35 million* in postpetition financing (that, when fees are taken into account, will likely be closer to *$45 million*).

34.    ***Second***, in the past few weeks the Debtors also provided RAF with projections in connection with their efforts to negotiate a consensual restructuring that would have provided for RAF to be paid off within two-and-a-half years *after* exiting bankruptcy. Those projections were, in RAF's view, aggressively optimistic. As noted in the Millenkamp Declaration, the Debtors' business is sensitive to fluctuations in milk prices, which like any other commodity, can be volatile. For any industrial dairy business to succeed, it must be able to accurately forecast and adjust for market risk. The Debtors' projections, however, were built on unjustifiable milk prices through 2026. RAF is one of the world's leading agricultural lenders. RAF analyst reports are relied upon across all sectors of the agricultural industry. In the view of RAF, the Debtors' milk-price assumptions ***far exceed*** anything that RAF has seen in the industry so far. Just as one example, the Debtors are projecting average milk prices from March to July 2024 of US 21.42/cwt whereas analyst are projecting milk prices of USD 20.16/cwt, resulting in the Debtors projecting on average USD 1.26/cwt higher than analyst projections.

35.    ***Third***, the Debtors have been in a post-maturity default under the RLOC Facility for nearly ***two years*** already. Since that time, RAF's exposure has steadily increased as time and time again, RAF provided protective advances wherein the Debtors would assert emergency liquidity issues as to the operations and health of the Livestock, where all the while, RAF's collateral position has continued to erode. Indeed, based on information in RAF's possession (including the Debtors' own Borrowing Base Certificates), RAF's borrowing base has eroded by no less than $18 million between March 2023 and February 2024. The proposed Priming DIP Facility will further deplete RAF's interest on a dollar-for-dollar basis.

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 20

36.     As discussed below, the Priming DIP Facility is uncommonly expensive.  Although the total commitment purports to be $35 million, after taking into account the out-of-market rate and fees, the proposal could require the Debtors' to pay an additional *$7 million*, or if the renewal extension is exercised, *$8.25 million*.  Moreover, nothing in the DIP Motion or any of the Debtors' other filings reference a viable exit plan or go-forward business plan that might return the business to profitability.  Given the Debtors long history of failing to set and meet realistic financial goals, it is speculative whether the Debtors will be able to repay the Priming DIP Facility, all to the detriment of the estate and creditors.  The chapter 11 process provides debtors with tools designed to foster a fresh start and maximize value for stakeholders, that process is not meant to erode on secured creditors' bargained-for rights, and create substantial risk while failing to provide a correlative benefit to the estates.

### iv. The Debtors have not demonstrated that the Priming DIP Facility's terms are fair and reasonable and that they have otherwise complied with the Bankruptcy Code.

37.     In order to obtain a Priming DIP Facility under section 364(d), the Debtors must establish that they were unable to obtain the necessary credit by any method other than granting a nonconsensual priming lien.  *See* 11 U.S.C. § 364(d)(1)(A).  A "bankruptcy court must make its decision as to how extensive the debtor's unsuccessful efforts to obtain credit must be on a case-by-case basis; there is no duty to seek credit from every possible lender, but debtor must make an effort to establish that debtor is unable to obtain credit otherwise."  *See e.g., In re Reading Tube Industries,* 72 B.R. 329 (Bankr. E.D. Pa. 1987); *see also In re 495 Cent. Park Ave. Corp.,* 136 B.R. 626, 630–31 (Bankr. S.D.N.Y. 1992) ("Section 364(d)(1) does not require the debtor to seek alternate financing from every possible lender.  However, the debtor must make an effort to obtain credit without priming a senior lien"); *In re Stacy Farms,* 78 B.R. 494, 498 (Bankr. S.D. Ohio

1987) (holding that a debtor failed to carry its burden under Section 364(d) where there was no evidence that the debtor had applied for loans from institutions other than its pre-petition senior lender and the proposed priming lender).

38.    Here, the Debtors have not shown the Priming DIP Facility's terms are better than available alternatives or otherwise in the best interests of the estates.  Because the Debtors have not yet filed either a credit agreement or a proposed order, it is difficult for RAF and other parties in interest to fully analyze the Priming DIP Facility's potential consequences to their respective interests or the estates.  Some things, however, are evident:

- *Excessive Interest & Fees.*  As noted above, the Priming DIP Facility is expensive.  The DIP Motion discloses a non-default interest rate of 15% and a suite of fees and expense reimbursements that could add millions in superpriority claims over the course of these cases.  RAF submits that the proposed interest, fees, and other costs far exceed the cost of other, better alternatives available to the Debtors.  *See* Exhibit 2.

- *No Commitment to Exit.*  The Debtors reference a *potential* conversion of the Priming DIP Facility to an "exit facility."  Nevertheless, the Debtors have not presented an exit strategy, and the proposed DIP Lender has *not committed* to actually converting to an exist facility.  Instead, the terms state, "Lender will *consider* converting some or all of the DIP to an exit financing facility in conjunction with an emergence from Chapter 11 (*subject to terms agreeable to Lender and Lender's internal approvals*)."

- *Immediate Diminution of Value.*  Based on the limited disclosures in the DIP Motion, it appears that the priming liens under the Priming DIP Facility will be effective immediately upon entry of the interim order, rather than upon the entry of a final order as required under Appendix I of the Local Rules

- *Unclear Marketing Process.*  Although the Debtors indicate that they "reached out to their secured lenders and other potential lenders" and that they received three financing proposals" and that they believe the Priming DIP Facility is "superior in multiple respects to the other proposals," they provide no facts for that conclusion.  The Debtors, in fact, *did not even mention* that the Debtors negotiated near-final documentation with RAF around a proposed exit plan and related postpetition financing that would have provided treatment for unsecured creditors and allowed the Debtors to (i) repay any DIP facility with asset-sale proceeds, and (ii) convert the RLOC Facility into an exit note payable within two-and-a-half years after the plan's effective date.  The creditors of the estate are entitled to understand the basis for that conclusion.

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 22

If the few disclosed terms of the Priming DIP Facility—in particular the high fees and costs—are indicative of its undisclosed terms, the costs to creditors will likely outweigh any benefit to the estates. Moreover, in light of the Debtors' assertions regarding the value of their assets and business (which Mr. Millenkamp estimates at approximately $800 million), it is difficult to believe that a high-cost, high-risk priming DIP facility from a third party lender is the ***only*** financing available and that they were unable to obtain "such credit otherwise." 11 U.S.C. § 364(d)(1)(A). As the Debtors' acknowledge in the DIP Motion, priming fights are "distracting and costly . . . with potentially sever consequences for the Debtors, their estates, and creditors."[14] Yet, the Debtors chose to risk a priming fight with ***all*** of its secured lenders, with the terms of the proposed DIP Finacing.

39.    The Debtors are entitled to exercise their reasonable business judgment, but it has to be in furtherance of their fiduciary duties to creditors. Based on the brief information in the Debtors' filings and the lack of credible supporting evidence, there is no justification for the $35 million of additional secured debt onto the Debtors' already over-levered balance sheet, or otherwise demonstrate that the Priming DIP Facility is reasonably calculated to enhance recoveries to the Debtors' other creditor constituencies.

### v. RAF's Postpetition Financing Proposal is superior to the Priming DIP Facility.

40.    As discussed above, RAF and the Debtors negotiated a near-final restructuring support agreement and term sheet, DIP credit agreement, and interim DIP order. Yet, just days before the Petition Date, the Debtors and their professionals largely "disengaged" and, apparently, opted to pursue the Priming DIP Facility despite its comparatively costly terms. Nevertheless, as

---

[14]    DIP Motion ¶ 52.

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 23

RAF has demonstrated since the RLOC Facility matured in June 2022, it is committed to attempting to find a reasonable, value-maximizing exit plan for the Debtors, their estates, and their stakeholders. To that end, RAF submits those certain terms set forth on the attached **Exhibit 10**, which for convenience directly compares such offered terms to those of the Priming DIP Facility.

41.    In light of the above proposal, as well as the Debtors' inability to provide sufficient adequate protection, RAF submits that the Debtors cannot carry their burden under Bankruptcy Code section 364(d) and, respectfully requests that the Court deny the DIP Motion.

**B.   The Cash Collateral Motion should be denied as the Debtors cannot satisfy the requirements for continued use of RAF's cash collateral under Bankruptcy Code section 363(c).**

42.    In addition to the DIP Motion, the Debtors filed the Cash Collateral Motion, which seeks interim and final authorization to continue using RAF's cash collateral during the chapter 11 cases.

43.    Under Bankruptcy Code section 363(c)(2), the Debtors may not use RAF's cash collateral unless: (i) RAF consents, or (ii) the Court enters an order authorizing such use. *See* 11 U.S.C. § 363(c)(2); *Freightliner Mkt. Dev. Corp. v. Silver Wheel Freightlines, Inc.*, 823 F.2d 362, 368-69 (9th Cir. 1987) (finding that implied consent is insufficient to satisfy the requirements of section 363(c)(2)).[15] "[W]hen a creditor opposes a proposed use of cash collateral, the guiding inquiry is whether its security interests are 'adequately protected.'" *In re Proalert, LLC*, 314 B.R. 436, 442 (B.A.P. 9th Cir. 2004); *see In re MRI Beltline Indus., L.P.,* 476 B.R. 917, 925 (Bankr. N.D. Tex. 2012) (finding that "the parties requesting court approval to use cash collateral over the secured creditor's objection must prove there is adequate protection for that creditor."). As

---

[15]    Bankruptcy Code section 363(c)(4) further requires the Debtors to segregate and account for any cash collateral in its possession, custody, or control. *See* 11 U.S.C. § 363(c)(4).

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II) MOTION TO APPROVE POSTPETITION FINANCING - 24

discussed above, "[t]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy." *Swedeland*, 16 F.3d at 564; *see also In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006) ("The purpose of adequate protection is to assure that the lender's economic position is not worsened because of the bankruptcy case.").

### i. The Debtors cannot demonstrate that RAF is adequately protected for the continued use of its cash collateral.

44.    As set forth above, the Debtors have not—and cannot—adequately protect RAF's interests in the Debtors' assets, including RAF's cash collateral. The Debtors and RAF have a long-standing relationship, but RAF is ready to bring that relationship to a reasonable and mutually beneficial conclusion. RAF and its professionals have worked in good faith throughout the prepetition period to attempt to find a consensual, value-maximizing restructuring alternative despite the Debtors' resistance (and, at times, malfeasance). The Debtors have been in default for nearly two years. During that time, the Debtors were given every opportunity to address their operational and related financial issues and to otherwise find a solution, which has not come to fruition despite multiple representations to the contrary. Further, during that time they have been surviving solely by liquidity provided through RAF's "protective advances."

45.    The Debtors have also failed to show that RAF's interest in its cash collateral are adequately protected as required under Bankruptcy Code section 363(c). Indeed, the Debtors' proposed adequate protection offers RAF ***nothing*** of value. RAF already has senior liens on the RLOC Collateral,[16] RAF is already entitled to financial and other reporting (that it struggles to

---

[16]    RAF's security interest in the RLOC Collateral is continuing pursuant to Bankruptcy Code section 552(b). *See also In re Hari Ram, Inc.*, 507 B.R. 114, 125 (Bankr. M.D. Pa. 2014) (finding the offer of a replacement lien to be "meaningless" where the creditor "already has a lien on these assets" pursuant to a continuing security interest in revenues under Bankruptcy Code section 552(b)); *In re Pac. Lifestyle Homes, Inc.*, No. 08-45328, 2009 WL

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II) MOTION TO APPROVE POSTPETITION FINANCING - 25

timely collect and reconcile), and RAF is already protected by the Debtors' insurance policies (which the Debtors are required to maintain in any event). Moreover, the payment of RAF's interest only prevents its claim from growing, it does nothing to protect against the erosion of RAF's collateral position. The proposed adequate protection is, in effect, little more than the Debtors' "promise" to maintain the status quo. The only way to ensure that RAF receives adequate protection for the use of its cash collateral is to make sure that the Debtors cannot use chapter 11 to go back to "business as usual." The Debtors need to embrace real financial controls and guardrails, and take immediate steps toward a value-maximizing transaction (whether through a chapter 11 plan, a sale of assets, or otherwise).

### ii. RAF cannot consent to the use of its cash collateral unless the Debtors provide the Minimum Adequate Protection Package or other negotiated protections.

46.    As stated above, RAF continues to support the Debtors' efforts to consummate a value-maximizing transaction and, if adequately protected, would consent to the use of its cash collateral subject to an agreed upon budget. RAF respectfully submits that, under the circumstances, adequate protection of its interests in cash collateral requires, at a minimum, the following (collectively, the "**Minimum Adequate Protection Package**"):

---

688908, at *10 (Bankr. W.D. Wash. Mar. 16, 2009) (finding replacement lien on proceeds of a sale to be inadequate where the "Lenders' deed of trust already extended to the sale proceeds of its collateral . . ."). As the Debtors state, "all of [their] cash" is RAF's cash collateral. The RLOC Collateral includes all of the Debtors' personal property, including pledged livestock and farm products (which, under Idaho law, include milk from dairy cows), which benefit from funding provided by RAF under or in connection with the RLOC Agreement. For example, when the Debtors acquired dairy cows, such livestock became part of RAF's Collateral. Then, when the Debtors milk those cows, that milk is a "product" of pledged livestock, subject to RAF's lien; and when that milk is sold to the Debtors' third-party milk purchasers, that collateral is transformed into an account receivable and becomes part of RAF's Collateral. And, finally, when the Debtors collected on those accounts receivable, the cash proceeds become RAF's cash collateral. *See, e.g., In re Hollie*, 42 B.R. 111, 119 (Bankr. M.D. Ga. 1984) (finding that, when a creditor has a prepetition interest in dairy cattle, products, and proceeds, under section 552(b) the creditor retains its lien on postpetition milk proceeds); *see also In re Dettman*, 84 B.R. 662 (applying *Hollie* and finding that creditor had security interest in post-petition proceeds of grapevines that existed pre-petition).

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 26

- ***Borrowing Base Protection***. In the event the weekly borrowing base certificates to be delivered by Debtors to the DIP Lenders during any period of two (2) consecutive weeks show a reduction in the amount of the Borrowing Base Excess relative to the preceding calendar week, Debtors shall promptly establish a cash reserve (which may be funded with funds borrowed under the Priming DIP Facility) in an amount not less than the aggregate decrease in the amount of the Borrowing Base Excess. Such cash reserve shall be held for the benefit of the Pre-Petition RLOC Secured Parties for distribution on the effective date of the Debtors' plan of reorganization

- ***Weekly Budget and Clear Termination Rights.*** Given the Debtors' historical cash flow and liquidity issues, RAF needs reasonable detailed weekly budgets (subject to its review and approval),with actual cash disbursements not to exceed 110% of budgeted cash disbursements (measured weekly on a cumulative basis from the Petition Date) and with actual cash receipts not be to less than 90% of budgeted cash receipts (measured weekly on a cumulative basis from the Petition Date), with no administrative claims in excess of an amount mutually determined by RAF and the Debtors.

- ***Segregation of Steer-Sale Proceeds.*** RAF has a first-priority security interest in all of the Debtors' livestock. RAF has identified a number of instances in which the Debtors have sold steers and converted the proceeds. RAF's interest in the Debtors' steers cannot be adequately protected unless the proceeds of any steer sales are set aside and escrowed.

## C. The Financing Motions Violate the Local Bankruptcy Rules.

47.     Local Bankruptcy Rule 4001-1(a)(9) requires a "statement of whether or not the debtor proposes any provision contained in the Guidelines Regarding Motions to Use Cash Collateral or Obtain Credit . . . other than the provisions which normally approved by the court (under subsection (a) of the Guidelines, and if so, the provisions shall be clearly identified." The reason they have to clearly articulated is that certain provisions "are [approved] rarely, if ever, on an interim basis" and approval following final hearing is dependent on adequate notice and cause being show." LBR, Appendix I.

48.     In the Cash Collateral Motion, the Debtors failed to provide the requisite representation and identification to the Court and the creditors, as required by the LBR. The relief requested in the Motion includes at least one instance of a violation, which is subsection (b) of the Guidelines. Namely, the Cash Collatral Motion provides, at paragraph 35, "[p]rovisions that carve

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II) MOTION TO APPROVE POSTPETITION FINANCING - 27

out administrative expenses that do not treat all such expenses equally on a pro rata basis[,]." This violates the Appendix I at (b)(15).

49.    As to the DIP Motion, the Debtors again omit the required representations as to whether the proposed terms violate any provisions of Appendix I. Further, and again, the relief requested in the DIP Motion includes multiple provisions that appear in subsection (b) of the Guidelines, which are disfavored by the Court. Notably, the proposed order granting the DIP Motion has not been filed to this point, which fails to provide the creditors the actual terms the estate is subjected to and to determine wether they are subject to Appendix I(b). Further the DIP Motion includes multiple Appendix I (b) issues that should have been highlighted by the Debtors for the Court and creditors, which require further scrutiny. Specifically, and importantly to RAF, the Motion seeks to prime its prepetition lien in favor of the DIP Lender. RAF is not a party to this agreement and thus this relief sought in the Motion implicates Appendix I (b)(5). *See* DIP Motion at 19. Additionally, the DIP Motion provides that section 506(c) shall not apply to the DIP Liens, implicating Appendix I (b)(6). *See id.* Further, the DIP Motion appears to set up administrative expenses that are not treated equally with others on a pro rata basis, implicating Appendix I (b)(15). *See id.* at 19-20 and at 21. Further, the DIP Motion appears to provide a lien on Bankruptcy Code recoveries, implicating Appendix I (b)(12). *See id.* at 20. Finally, while there may be others, the Motion provides that a dispute over the DIP Liens would be resolved in the jurisdiction of New York, rather than this Court, implicating Appendix I (b)(18). *See id.* at 41.

## **RESERVATION OF RIGHTS**

50.    RAF reserves all rights with respect to the Motions, each of the Debtors' other "first day" motions, and all relief requested therein, including its right to supplement this objection and

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 28

to appear, be heard, and submit evidence in connection with any interim or final hearings in respect of any such motions and related matters.

WHEREFORE, for the reasons described above, including, but not limited to, the Debtors' failure to meet their burden under Bankruptcy Code sections 363(c) and 364(d) in respect of the Financing Motions, RAF respectfully requests that the Court (i) deny the Financing Motions and order that the Debtors not use or in any way dissipate RAF's interest in the RLOC Collateral and (ii) deny the First Day Motions unless the applicable proposed orders are revised to protect RAF's interest in the RLOC Collateral.

Dated: April 3, 2024

HAWLEY TROXELL ENNIS & HAWLEY LLP

Sheila R. Schwager, ISB No. 5059
Attorneys for Rabo AgriFinance LLC

OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II)
MOTION TO APPROVE POSTPETITION FINANCING - 29

59797.0002.17016364.2

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of April, 2024, I electronically filed the foregoing OMNIBUS OBJECTION TO (I) MOTION TO USE CASH COLLATERAL AND (II) MOTION TO APPROVE POSTPETITION FINANCING with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to those identified in the CM/ECF system for this matter, at the time this document was filed, including the following persons:

| | |
|---|---|
| Matthew T. Christensen | mtc@johnsonmaylaw.com |
| Krystal R. Mikkilineni | Krystal.mikkilineni@dentons.com |
| Tirzah R. Roussell | Tirzah.roussell@dentons.com |
| U.S. Trustee | Ustp.region18.bs.ecf@usdoj.gov |
| Heidi Buck Morrison | heidi@racineolson.com |
| David A. Coleman | david@colemanjacobsonlaw.com |
| Jon B. Evans | Evans.jb@dorsey.com |
| Kimbell D. Gourley | kgourley@idalaw.com |
| Daniel C. Green | dan@racineolson.com |
| Scott C. Powers | spowers@spencerfane.com |
| Janine Patrice Reynard | janine@averylaw.net |
| Sheila Rae Schwager | sschwager@hawleytroxell.com |
| Brent Russel Wilson | bwilson@hawleytroxell.com |
| Zachary Fairlie | zfairlie@spencerfance.com |
| John O'Brien | jobrien@spencerfane.com |
| Gery W. Edson | gedson@gedson.com |

Sheila R. Schwager