# EXHIBIT 4

Execution version

# FINANCIAL SUPPORT AGREEMENT

This **FINANCIAL SUPPORT AGREEMENT** (this "Agreement") is entered as of February 19, 2024 by and among RABO AGRIFINANCE LLC, a Delaware limited liability company, as Agent ("RAF") and MILLENKAMP CATTLE, INC., an Idaho corporation, IDAHO JERSEY GIRLS LLC, an Idaho limited liability company, EAST VALLEY CATTLE, LLC, an Idaho limited liability company, MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company, MILLENKAMP PROPERTIES II, LLC, an Idaho limited liability company, MILLENKAMP FAMILY LLC, an Idaho limited liability company, GOOSE RANCH LLC, an Idaho limited liability company, IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company, BLACK PINE CATTLE LLC, an Idaho limited liability company, MILLENKAMP ENTERPRISES, LLC, an Idaho limited liability company, SUSAN MILLENKAMP AS TRUSTEE of the WJM 2012 Trust, WILLIAM MILLENKAMP AS TRUSTEE of the SJM 2012 Trust, WILLIAM JOHN MILLENKAMP and SUSAN JO MILLENKAMP (collectively, the "Receivership Entities").

## RECITALS

**WHEREAS**, the Receivership Entities are party to that certain Third Amended and Restated Loan and Security Agreement dated as of April 21, 2021 (as amended, modified, supplemented, renewed or restated at any time and from time to time, the "Loan Agreement") by and among the Receivership Entities, the financial institutions from time to time party thereto (the "Lenders"), and RAF, in its capacity as Agent for the Lenders and other Secured Parties, as Sole Lead Arranger, and as a Lender.

**WHEREAS**, on January 22, 2024, RAF filed its Verified Petition for Appointment of Receiver (the "Petition") in the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada (the "Court"), Case No. CV01-24-01156, pursuant to which RAF applied to the Court for the appointment of CFO Solutions, LLC d/b/a Ampleo ("Ampleo"), to serve as a receiver in regard to the estates (the "Receivership Estate") of the Receivership Entities.

**WHEREAS**, the Court held a hearing on the Petition on February 9, 2024 (the "Hearing").

**WHEREAS**, the Receivership Entities have agreed to a settlement with RAF to address certain of RAF's requests for relief under the Petition.

**WHEREAS**, following the conclusion of the Hearing, an existing corporate representative of the Receivership Entities advised RAF of a previously undisclosed need for up to $11 million of emergency funding needed to provide feed and other essential assets and services for the proper care of the Cattle owned by one or more the Receivership Entities in support of the Receivership Entities' operations in the ordinary course of its business.

**WHEREAS**, on February 16, 2024, the Court entered its Order Appointing Receiver (the "Order") pursuant to which the Court appointed Ampleo to serve as receiver for the Receivership Estate.

**WHEREAS**, RAF has agreed to enter into this Agreement in order to provide up to $4.5 million of financing (the "Emergency Funding Amount") to support the Receivership Entities' business operations, subject to the terms and conditions set forth below.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained, the Parties hereto agree as follows:

138911998.9

# ARTICLE I
# DEFINITIONS

Section 1.01 <u>Defined Terms</u>.  As used in this Agreement, capitalized terms used and not otherwise defined in this Agreement shall have the meanings ascribed to such terms in the Loan Agreement.  In addition, the following terms have the meanings specified below:

(a) "<u>Bankruptcy Code</u>" means the United States Bankruptcy Code or any other law, whether state or federal, now or hereafter existing, for the relief of debtors.

(b) "<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required to close under the applicable laws of the states of Idaho or Missouri, or are in fact closed in the states of Idaho or Missouri.

(c) "<u>Financial Support Budget</u>" means the projected annualized operating budget for the Receivership Entities for the immediately following period of not less than [thirteen (13)] weeks, as prepared by Ampleo (or such other Person as may be acceptable to RAF, in its sole and absolute discretion) based upon operating data obtained from Receivership Entities and other sources where the use of a budget is appropriate, setting forth, *inter alia*, dates and estimated amounts of Milk Payments owed to any or all of the Receivership Entities (without regard to any collateral assignments thereof), and which budget shall otherwise be in form and substance satisfactory to RAF.

(d) "<u>Funded Vendor</u>" means a vendor or other creditor of a Receivership Entity designated by the Receivership Entities in a request for advance to receive any of the proceeds of a Protective Advance.

(e) "<u>Funding Account</u>" means, as designated by Ampleo from time to time by written notice to RAF:  (i) account numbers 614010029, 7568123, 210203206 and 456188879 at Mechanics Bank (the "<u>Depositary Bank</u>") in the name of Millenkamp Cattle, Inc., which account is (and shall at all times be) subject to the Deposit Account Control Agreement (the "<u>Funding Account DACA</u>") among the Depositary Bank, Millenkamp Cattle, Inc., an Idaho corporation, and RAF; (ii) such other deposit account as may be proposed by the Receivership Entities and be acceptable to RAF and which account shall be subject to a deposit account control agreement for the benefit of RAF in form and substance satisfactory to RAF; or (iii) a deposit account in the name of, or otherwise controlled by, Ampleo at a financial institution acceptable to RAF.

(f) "<u>Initial Funded Vendors</u>" means :  Land View, Inc., Viterra, MWI Animal Health and certain other vendors to be identified by the Receivership Entities and approved by RAF. The amounts to be received by each such vendor appears opposite its name in the table below:

| Initial Funded Vendor | Payment Amount |
|---|---|
| **Land View, Inc.** | $2,000,000 |
| **Viterra** | $750,000 |
| **MWI Animal Health** | $750,000 |
| **To be identified** | $1,000,000 |

2

138911998.9

(g) "Liabilities" shall have the meaning set forth in the Loan Agreement and, for the avoidance of doubt, shall be deemed to be inclusive of the Protective Advances hereunder.

(h) "Milk Agreements" means any and all agreements to which any or all of the Receivership Entities are a party with respect to sales of milk to any of Glanbia Foods Inc. or Innovative Food Solutions U.S.A., LLC.

(i) "Milk Payments" means all payments (as represented by checks or other forms of payment issued from time to time for the benefit of any or all of the Receivership Entities) for the sale of milk or other dairy products by any or all of the Receivership Entities under any or all of the Milk Agreements.

(j) "Parties" means RAF and the Receivership Entities and their successors and permitted assigns.

(k) "Person" means any natural person, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, entity, party or governmental authority.

(l) "Protective Advance" means any of the Initial Productive Advance and any Subsequent Protective Advance.

Section 1.02 Rules of Construction. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified and (b) any reference herein to any law shall be construed as referring to such law as amended, modified, or codified or, in whole or in part, and in effect from time to time.

## ARTICLE II
## FUNDING AND REPAYMENT OF THE PROTECTIVE ADVANCES

Section 2.01 Protective Advances.

(a) RAF agrees to make an advance in an amount not to exceed the Emergency Funding Amount (the "Initial Protective Advance") to the Receivership Entities on the date which is not more than one (1) Business Day after the date on which the conditions set forth in Section 4.01 and Section 4.02 have been fully satisfied by the Receivership Entities or waived by RAF. Upon repayment of the Initial Protective Advance in full by the Receivership Entities and the payment of any accrued but unpaid interest on the Liabilities as may be payable in accordance with the terms of the Order and the Loan Agreement, amounts representing the Initial Protective Advance may be reborrowed pursuant to Section 2.01(b) upon satisfaction of the applicable conditions precedent set forth in this Agreement.

(b) From and after the date the Receivership Entities shall have repaid the Initial Protective Advance in full, and the payment of any accrued but unpaid interest on the Liabilities as may be payable in accordance with the terms of the Order and the Loan Agreement, RAF agrees to make one or more advances in an aggregate amount outstanding not to exceed the Emergency Funding Amount (each, a "Subsequent Protective Advance") to the Receivership Entities.

3

138911998.9

Subsequent Protective Advances shall be made not later than noon Central Time one (1) Business Day after the date on which the conditions set forth in Section 4.01, Section 4.02 and Section 4.03 have been fully satisfied by the Receivership Entities or waived by RAF. Amounts representing the Subsequent Protective Advances may be reborrowed upon satisfaction of the applicable conditions precedent set forth in this Agreement.

(c)    RAF may make a separate advance to the Funding Account (or to such other deposit account as Ampleo may designate in writing to RAF) in an amount not to exceed $300,000 for the payment of Ampleo's fees and expenses (including attorneys' fees) in accordance with the terms of the Order. Such advance shall constitute a Protective Advance hereunder; *provided, however*, that such Protective Advance may not be reborrowed. Any further advance in respect of such fees and expenses shall be subject to RAF's review and approval of a suitable update of the Financial Support Budget as delivered by or on behalf of the Receivership Entities in accordance with Section 3.02.

(d)    RAF shall wire the amount of the Initial Protective Advance and any Subsequent Protective Advance on the proposed date of such advance to the Funding Account.

Section 2.02 *Use of Proceeds*. The Receivership Entities shall use the proceeds of the Protective Advances: (a) for the payment of amounts owed to Funded Vendors in accordance with the then current Financial Support Budget and as identified by the Receivership Entities in any written request for a Protective Advance pursuant to Section 4.02 or Section 4.03; or (b) for the payment of Ampleo's fees and expenses in accordance with the terms of the Order.

Section 2.03 *Repayment of Protective Advances*.

(a)    RAF shall apply any cash proceeds received by RAF in respect of the Collateral Assignments of Milk Contracts for the benefit of RAF pertaining to the Receivership Entities' Milk Agreements and Milk Payments with Glanbia Foods Inc. and Innovative Food Solutions U.S.A. to the repayment of the then outstanding Protective Advances and accrued interest on the Liabilities in accordance with the terms of the Loan Agreement and the Order. In the event RAF receives any cash proceeds in respect of the Collateral Assignments of Milk Contracts which were properly payable to MetLife, RAF will promptly remit such funds to MetLife in the form received by RAF. At such time(s) as the Protective Advances and accrued interest on the Liabilities in accordance with the terms of the Loan Agreement and the Order shall have been paid in full, RAF shall release any additional Milk Payments to the Receivership Entities or to whomever shall be lawfully entitled thereto.

(b)    The Receivership Entities may prepay any or all of the Protective Advances at any time. Any prepayment by the Receivership Entities shall be accompanied by the payment of any accrued and unpaid interest and fees then due and payable under the Loan Agreement and the Order.

(c)    On the Termination Date (as defined below), this Agreement shall terminate and the Receivership Entities shall (i) repay all of the Protective Advances and (ii) pay all accrued and unpaid interest and fees then due and payable under the Loan Agreement and the Order.

(d)    Any cash proceeds and payments properly received by RAF pursuant to clauses (a) or (b) above shall be applied first to pay the principal balance of the Protective Advances and second to pay accrued and unpaid interest and fees then due and payable under the Loan Agreement and the Order.

138911998.9

## ARTICLE III
## FINANCIAL SUPPORT BUDGET; COLLATERAL MATTERS

Section 3.01 <u>Financial Support Budget</u>.  On or prior to February 23, 2024, the Receivership Entities shall deliver to RAF a draft of the Financial Support Budget for RAF's review and approval.  Upon RAF's written approval, such draft shall become the Financial Support Budget.  In the event RAF shall not approve the draft delivered by the Receivership Entities, RAF shall identify specific objections and RAF and the Receivership Entities shall negotiate in good faith to address any objections raised by RAF.

Section 3.02 <u>Updates to Financial Support Budget</u>.  On or prior to the last Business Day of each calendar week, the Receivership Entities shall provide an update to the Financial Support Budget, (a) taking into account operating income received and operating expenses incurred, (b) identifying variances from the projected amounts set forth in the previously delivered Financial Support Budget and (c) itemizing disbursements from (and the then balance of) the Funding Account.  Each update to the Financial Support Budget shall be in form and substance satisfactory to RAF.  Each proposed update to the Financial Support Budget, upon RAF's written approval, shall become the Financial Support Budget.

Section 3.03 <u>Expenditures</u>.  Other than expenditures of the Initial Protective Advance which may be made prior to RAF's receipt and approval of the Financial Support Budget, the Receivership Entities shall not make any expenditures in its capacity as the receiver for the Receivership Estate other than in accordance with the then current Financial Support Budget.

Section 3.04 <u>Titled Vehicles</u>.  On the date hereof or such later date as RAF may agree, the Receivership Entities shall provide to RAF a list of all of the Receivership Entities' vehicles registered under the laws of the State of Idaho (or any other state) and such other information as may be necessary or desirable to enable RAF to comply with the requirements of the Idaho Code and any other applicable state law in order to perfect RAF's Liens on such vehicles.

Section 3.05 <u>Accounting of Cattle Sales</u>.  On or prior to March 1, 2024, RAF shall have received from the Receivership Entities an accounting, in form and substance satisfactory to RAF, of all steer sales and culled cow sales during the period commencing on January 1, 2023 and ending on February 9, 2024.

## ARTICLE IV
## CONDITIONS TO EFFECTIVENESS AND THE PROTECTIVE ADVANCE

Section 4.01 <u>Conditions to Effectiveness</u>.  This Agreement shall not become effective until the date on which each of the following conditions is satisfied by the Receivership Entities or waived by RAF:

(a) RAF shall have received counterparts of this Agreement signed by the Receivership Entities and RAF.

(b) RAF and the Receivership Estate shall have jointly activated certain of RAF's rights in respect of the Collateral Assignments of Milk Contracts pertaining to the Receivership Entities' Milk Agreements and Milk Payments with Glanbia Foods Inc. and Innovative Food Solutions U.S.A.

(c) The Receivership Entities shall have certified to RAF (via electronic mail or such other means as may be acceptable to RAF): (i) that the Funding Account is open and available for use by or on behalf of the Receivership Entities; (ii) in the event the Funding Account is in the

5

138911998.9

name of one or more of the Receivership Entities, that the applicable deposit account control agreement is in full force and effect, binding upon the Receivership Entities and enforceable by RAF, and (iii) the names and titles of each authorized signatory of the Funding Account.

(d) The form of Borrowing Base Certificate shall have been amended, in form and substance satisfactory to RAF, to include a release of RAF and each of the Lenders and all of their respective affiliates and all of the directors, officers, employees, attorneys, agents, successors and assigns thereof of all claims, demands, actions or causes of action (known and unknown) arising out of or in any way relating to this Agreement, the Loan Agreement and the other Financing Agreements and the transactions contemplated thereunder.

(e) The representations and warranties of the Receivership Entities set forth in this Agreement shall be true and correct in all material respects.

Section 4.02 <u>Conditions to Initial Protective Advance</u>.  In addition to the conditions set forth in Section 4.01, the obligation of RAF to make the Initial Protective Advance is subject to the satisfaction of the following conditions by the Receivership Entities or waiver of any such condition(s) by RAF:

(a) RAF shall have received:  (i) a Borrowing Base Certificate computed as of December 31, 2023; and (ii) an updated count of the Receivership Entities' Cattle assets of all types, including calves, heifers, steers, cows and bulls as of a date acceptable to RAF.

(b) RAF shall have received from the Receivership Entities:  (i) a written request for the Initial Protective Advance, which request shall identify the Initial Funded Vendors and shall confirm the amount to be received by each such Initial Funded Vendor as set forth in the definition thereof; and (ii) suitable documentation from each Initial Funded Vendor evidencing such Initial Funded Vendor's agreement to stay any claims, actions, lawsuits or other proceedings in respect of nonpayment by the Receivership Entities for a period of not less than sixty (60) days, which documentation may be conditioned upon the applicable Initial Funded Vendor's receipt of payment of the respective amount described in the Receivership Entities' request for the Initial Protective Advance.  Such written request for advance shall be in form and substance satisfactory to RAF.

(c) In the event the Funding Account is held by one or more of the Receivership Entities, the Receivership Entities shall have taken all necessary action to cause the appropriate officers of Ampleo (as designated by Ampleo) to be added as authorized signatories on the Funding Account.

Section 4.03 <u>Conditions to Subsequent Protective Advances</u>.  In addition to the conditions set forth in Section 4.02, the obligation of RAF to make any subsequent Protective Advance is subject to the satisfaction of the following conditions by the Receivership Entities or waiver of any such condition(s) by RAF:

(a) RAF shall have received repayment in full in cash of the Initial Protective Advance and the payment in cash of any accrued but unpaid interest on the Liabilities as may be payable in accordance with the terms of the Order and the Loan Agreement.

(b) RAF shall have received from the Receivership Entities:  (i) a written request for the subsequent Protective Advance, which request shall include a list of all of the applicable Funded Vendors and the amount to be received by each such Funded Vendor; and (ii) suitable documentation from each Funded Vendor evidencing such Funded Vendor's agreement to stay any claims, actions, lawsuits or other proceedings in respect of nonpayment by the Receivership Entities

6

for a period of not less than sixty (60) days, which documentation may be conditioned upon the applicable Funded Vendor's receipt of payment of the respective amount described in the Receivership Entities' request for the Initial Protective Advance. Such written request for advance shall be in form and substance satisfactory to RAF.

(c) RAF shall have received an updated Borrowing Base Certificate.

(d) RAF shall have received an updated count of the Receivership Entities' Cattle assets of all types, including calves, heifers, steers, cows and bulls, calculated as of a date acceptable to RAF prior to the date of such Protective Advance request, and which shall be prepared in good faith by Ampleo based upon the best available information.

(e) RAF shall have received from the Receivership Entities an accounting, in form and substance satisfactory to RAF, of all steer sales and culled cow sales during the period commencing on the date of the last such accounting delivered by the Receivership Entities to RAF and ending on the Friday immediately preceding the date of such Protective Advance request.

(f) The Receivership Entities shall have granted to RAF, in a manner satisfactory to RAF in its absolute discretion, a perfected security interest in all commercial tort claims the Receivership Entities may then have against MetLife Real Estate Lending LLC, a Delaware limited liability company ("MetLife"), Hiram Finney and Clear Creek.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Section 5.01 Receivership Entities Representations. Each of the Receivership Entities represents and warrants to RAF that:

(a) Such Receivership Entity has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder; and

(b) The execution of this Agreement by its representative whose signature is set forth at the end of this Agreement has been duly authorized by all necessary action (corporate or otherwise).

Section 5.02 RAF Representations. RAF hereby represents and warrants to the Receivership Entities that:

(a) RAF has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder; and

(b) The execution of this Agreement by its representative whose signature is set forth at the end of this Agreement has been duly authorized by all necessary corporate action.

## ARTICLE VI
## TERMINATION

Section 6.01 Termination Date. Unless earlier terminated pursuant to the terms of this Agreement, this Agreement shall terminate on April 16, 2024 or such later date as the Parties may mutually agree in writing

Section 6.02 <u>Early Termination by RAF</u>.  RAF may terminate this Agreement without cause upon thirty (30) calendar days written notice to the Receivership Entities. In the event of termination pursuant to this clause, the Receivership Estate shall pay Ampleo on a pro-rata basis, any compensation then due and payable for any services completed by Ampleo pursuant to the Order up to and including the date of such termination.

Section 6.03 <u>Termination Upon Breach</u>.  The Receivership Entities or RAF may terminate this Agreement, effective immediately upon written notice to the other Party, if the other party materially breaches this Agreement, and such breach is incapable of cure, or with respect to a material breach capable of cure, the other party does not cure such breach within 10 Business Days after receipt of written notice of such breach.

Section 6.04 <u>Termination upon Termination of Ampleo Appointment or Receivership Estate</u>.  This Agreement shall terminate automatically upon:  (a) the termination for any reason of Ampleo's appointment as the receiver of the Receivership Estate; or (b) any termination of the Receivership Estate.

Section 6.05 <u>Termination in Connection with Chapter 11 Proceedings</u>.  This Agreement shall terminate automatically upon the commencement of any proceedings of any or all of the Receivership Entities under Chapter 11 of the Bankruptcy Code.

Section 6.06 <u>Challenge to Order</u>.  RAF may terminate this Agreement, effective immediately upon written notice to the Receivership Entities, in the event the Order shall fail to be in full force and effect, including by the entry of an order (a) reversing or vacating the Order, (b) amending or modifying the Order in a manner that is adverse to RAF without the consent of RAF, or (c) staying for a period in excess of seven (7) days the Order.

Section 6.07 <u>Survival</u>.  The terms and conditions of this clause and Article V, Article VII, Article VIII, and Article IX shall survive the expiration or termination of this Agreement.

# ARTICLE VII
# REMEDIES

In the event either party breaches this Agreement, the other party may exercise all rights and remedies available to it at law or in equity. Any equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

# ARTICLE VIII
# ASSIGNMENT

The Receivership Entities shall not assign any rights or delegate or subcontract any obligations under this Agreement without RAF's prior written consent. Any assignment in violation of the foregoing shall be deemed null and void. RAF may freely assign its rights and obligations under this Agreement at any time. Subject to the limits on assignment stated above, this Agreement will inure to the benefit of, be binding on, and be enforceable against each of the parties hereto and their respective successors and assigns.

# ARTICLE IX
# MISCELLANEOUS

Section 9.01 <u>No Partnership</u>.  This Agreement shall not be construed to create any association, partnership, joint venture, employment, or agency relationship between the Receivership Entities and RAF for any purpose.  None of the Receivership Entities has the authority (and shall not hold itself out

8

as having authority) to bind RAF and the Receivership Entities shall not make any agreements or representations on RAF's behalf without RAF's prior written consent in each instance.

Section 9.02 Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth on the signature page of this Agreement (or to such other address that may be designated by the receiving party from time to time in accordance with this Section). All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees prepaid), email, or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only if: (a) the receiving party has received the Notice; and (b) the party giving the Notice has complied with the requirements of this Section.

Section 9.03 Incorporation by Reference. The provisions of Section 10.5 of the Loan Agreement are incorporated herein by this reference as if fully set forth in this Agreement.

Section 9.04 Governing Law. This Agreement will be governed by, interpreted and enforced in accordance with the laws of the State of Idaho.

Section 9.05 Entire Agreement. This Agreement, together with any other documents incorporated herein by reference and related exhibits and schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

Section 9.06 Amendments; Waivers. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto, and any of the terms thereof may be waived, only by a written document signed by each party to this Agreement or, in the case of waiver, by the party or parties waiving compliance.

Section 9.07 Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

Section 9.08 Execution in Counterparts. This Agreement may be executed in multiple counterparts and by electronic signature, each of which shall be deemed an original and all of which together shall constitute one instrument.

[Signature Pages follow]

138911998.9

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed by their respective authorized signatories hereunto duly authorized as of the date first above written.

**RABO AGRIFINANCE LLC**

By: */s/ Michael Hayes*
Name: Michael Hayes
Title: VP

14767 North Outer 40 Road
Suite 400
Chesterfield, MO 63017
Attn: Mike Hayes
Email: mike.hayes@raboag.com

With a copy to:

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Attn: Andrew J. Schoulder
Email:
 Andrew.schoulder@nortonrosefulbright.com

[signatures continue on following page]

[signature page to Financial Support Agreement]

**MILLENKAMP CATTLE, INC.**
**IDAHO JERSEY GIRLS LLC**
**EAST VALLEY CATTLE, LLC**
**MILLENKAMP PROPERTIES, L.L.C.**
**MILLENKAMP PROPERTIES II, LLC**
**MILLENKAMP FAMILY LLC**
**GOOSE RANCH LLC**
**IDAHO JERSEY GIRLS JEROME DAIRY LLC**
**BLACK PINE CATTLE LLC**
**MILLENKAMP ENTERPRISES, LLC**
**SUSAN MILLENKAMP AS TRUSTEE OF THE WJM 2012 TRUST**
**WILLIAM MILLENKAMP AS TRUSTEE of THE SJM 2012 TRUST**
**WILLIAM JOHN MILLENKAMP**
**SUSAN JO MILLENKAMP**

By:   CFO SOLUTIONS, LLC,
      d/b/a Amplēo

By: _____
Name: Matt McKinlay
Title: Managing Partner

Solely in its capacity as the receiver for each of the foregoing Receivership Entities

13601 W. McMillan Road, #102
PMB 320
Boise, ID 83713
Attn: Matt McKinlay
Email: mmckinlay@ampleo.com

With a copy to:

Parsons Behle & Latimer
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Attn: Brian M. Rothschild
Email: BRothschild@parsonsbehle.com

[signature page to Financial Support Agreement]