Sheila R. Schwager, ISB No. 5059
Brent R. Wilson, ISB No. 8936
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 W. Main Street, Suite 200
P.O. Box 1617
Boise, ID 83701-1617
Telephone: 208.344.6000
Facsimile: 208.954.5261
Email: sschwager@hawleytroxell.com
        bwilson@hawleytroxell.com

Andrew J. Schoulder (admitted pro hac vice)
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: 212.318.3030
Email: andrew.schoulder@nortonrosefulbright.com

Attorneys for Rabo AgriFinance LLC

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re | Chapter 11 |
| MILLENKAMP CATTLE, INC., *et al.,* | Case No. 24-40158 (NGH) |
| Debtors.[1] | (Joint Administration Requested) |

**SECOND SUPPLEMENT TO RABO AGRIFINANCE LLC'S OMNIBUS OBJECTION TO (I) EMERGENCY MOTION AUTHORIZING USE OF CASH COLLATERAL; AND (II) EMERGENCY MOTION AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND GRANTING ADEQUATE PROTECTION; AND OBJECTION TO NOTICE OF PREFERRED POST-PETITION FINANCING PROPOSED**

---

[1] The Debtors in the Chapter 11 Cases along with the last four digits of their respective tax identification number or registration number in the applicable jurisdiction are: Millenkamp Cattle, Inc. (3892); Idaho Jersey Girls LLC (4467); East Valley Cattle, LLC (8613); Millenkamp Properties, L.L.C. (4003); Millenkamp Properties II LLC (7719); Millenkamp Family LLC (8279); Goose Ranch, LLC (N/A); Idaho Jersey Girls Jerome Dairy LLC (3431); Black Pine Cattle LLC (N/A); and Millenkamp Enterprises LLC (N/A). The location of the Debtors' service address for purposes of the Chapter 11 Cases is 471 N 300 W., Jerome, Idaho 83338.

Rabo AgriFinance, LLC, in its capacity as agent and lender ("**RAF**"), hereby files this Second Supplement to RAF's *Omnibus Objection to (I) Emergency Motion Authorizing Use of Cash Collateral (Dkt. 22); and (II) Emergency Motion Authorizing the Debtors to Obtain Post-Petition Financing and Granting Adequate Protection (Dkt. No. 24);* filed as Docket No. 81 on April 3, 2024, as supplemented by the Supplement thereto filed on April 4, 2024 (Dkt. No. 99) (the "**First Supplement**" and collectively, the "**Objection**"), and in objection to that *Notice of Preferred Post-Petition Financing Proposal (Dkt. No. 120)* (the "**Priming DIP Facility Notice**"), as as follows:[2]

On April 6, 2024, the Debtors filed the Priming DIP Facility Notice, indicating their intent to pursue the Court's approval of a revised version of the proposed Priming DIP Facility (the "**Revised Priming DIP Facility**"). As part of the process described to this Court for evaluating proposals, parties were directed to submit offers to the Debtors by noon mountain standard time on April 5, 2024, with the Debtors being required to designate the preferred proposal by April 7, 2024. It is unclear what process, the Debtors exercised in fulfilling their fiduciary duties in seeking and evaluating such financing. The Revised Priming DIP Facility, however, is demonstrably worse for the estates and their creditors.

As will be discussed below, the Revised Priming DIP Facility is not only worse than the original Priming DIP Facility, but it fails to compete with the proposal initially submitted by Coöperatieve Rabobank U.A., New York Branch ("**Rabobank**") and included in RAF's Objection (the "**Alternative Rabobank Proposal**"), the amended Alternative Rabobank Proposal included in the First Supplement, the further amended Alternative Rabobank Proposal included in this Second Supplement (**<u>Exhibit C</u>**), or even the proposal made by RAF before the Petition Date and referenced in the Objection.[3] Notably, despite the Debtors' fiduciary duties and representations to

---

[2]    Capitalized terms used but not defined in this second supplement to the Objection shall have the meanings ascribed to them in the Objection.

[3]    As set forth in the Objection, the Debtors neglected to disclose that, as of March 13, 2024, they were in possession of a DIP financing agreement (instead of a term sheet) for up to $35 million along with a fully drafted restructuring support agreement (instead of having no plan) that contemplated an exit from chapter 11 within four months from the Petition Date. The proposal would have enabled the Debtors to repay the RLOC Facility over 2.5 years,

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 2

this Court with respect to a process for selecting a proposal that is in the best interests of the estates, the Debtors have not engaged in any negotiations with Rabobank regarding any version of the Alternative Rabobank Proposals. Indeed, Rabobank's reduction in pricing and elimination of restrictive covenants (that remain in the proposal of Sandton Capital Partners LP "**Sandton**"), since the bankruptcy filing, were made by Rabobank of its own volition, and not because of any request by the Debtors.

The Debtors' decision to accept the Revised Priming DIP Facility not only fails to satisfy statutory requirements under the Bankruptcy Code, but also highlights a systemic issue that has existed for over two years that RAF raised in the Objection and the Receiver Action—the Debtors are not financially responsible and the lack of transparency will irreparably harm the estates and creditors unless the Revised Priming DIP Facility is denied and appropriate relief granted. For close to two years, the Debtors have been unable to repay the *matured* and still-outstanding RLOC Facility, or articulated a plan or proposal for doing so in the future. The situation became so dire that RAF was forced to initiate the Receivership Action in Idaho state court. Despite historical year-over-year losses and material erosion in RAF's position through the liquidation of collateral, the Debtors, in their business judgment, have now decided to increase the amount of the proposed priming debt from $35 million to $45 million without any business rationale, plan for repayment, corresponding budget, or credit agreement.

To underscore the need for concern, the Debtors have provided RAF no fewer than three materially different budgets in recent weeks. Just two weeks ago, the Debtors reported to RAF that they would need approximately $22 million to run a *four-month* bankruptcy process, and now, the Debtors purport to need *$25 million* in the *first five weeks* of these cases and *$45 million* over the course of a nine-month case based—*not* on the Debtors' analysis of their cash need—but their

---

implemented an independent board of directors to provide controls and oversight, and required the appointment of a plan administrator to ensure that trade vendors were paid on time and that the Debtors did not revert to the practices of building up in excess of $20 million of operating payables to the detriment of trade creditors.

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 3

proposed DIP lender's "belief." As of the filing of this Second Supplement, the Debtors still have not filed a budget supporting this "belief."

The Debtors' continue the lack of transparency. Indeed, the Debtors are seeking to make **$4 million** of critical vendor payments to a non-Debtor entity that is 50% owned by Mr. Millenkamp—H&M Custom, LLC. *See* DIP Budget at p. 16. Yet, the Debtors do not disclose Mr. Millenkamp's ownership interest in the bod of his first day declaration, the critical vendor motion, the DIP Motion, or the Cash Collateral Motion. Instead, the relationship is buried in an organizational chart attached as an exhibit to the first day declaration. *See* Millenkamp Decl. Ex A.

If the DIP Motion is approved and the Debtors are allowed to incur another $45 million of secured debt (plus $4.970 Million in fees and interest for the first nine months and as much as $7.357 Million if the Debtors exercise the renewal option) in the first months of these cases, or $25 Million (exclusive of fees and interests in the first few weeks alone, the estates may never recover and the Debtors' may not be able to emerge from bankruptcy as a viable, profitable business.

It is for these very type of reasons that this jurisdiction enacted Local Bankruptcy Rule 4001.01 and Appendix I, which expressly mandates that the Debtors identify whether the Debtors are proposing any provisions contained in the Guidelines Regarding Motions to Use Cash Collateral or to Obtain Credit, and to clearly identify those provisions. LBR 4001.1. Significantly, the Guidelines expressly state that "*The following provisions are approved, rarely, <u>if ever</u>, on an interim basis,*" which includes "*provisions that prime the liens and/or security interests of secured creditors who are not parties to the agreement, unless consented to by the affected creditor.*" Appendix I, (b)(5) (emphasis supplied). Not only have the Debtors failed to comply with the local rule, but they *seek to utilize $25 Million Dollars* on an interim basis and have failed to provide any basis for priming the liens of RAF and the other secured creditors on an interim basis, where such terms are "rarely, if ever" approved.

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 4

For the reasons set forth herein and in the Objection, RAF respectfully requests that the Court deny the DIP Motion so that these cases and the Revised Priming DIP Facility are not used to worsen creditors, including RAF. Further, RAF respectfully submits that the Debtors have failed to provide RAF the requisite adequate protection for the use of the cash collateral. Accordingly, RAF respectfully requests that the Debtors Financial Motions be denied.

### A. The Debtors Cannot Carry Their Burden to Demonstrate that the Proposed Revised Priming DIP Facility Satisfies the Requirements of Bankruptcy Code Section 364.

1.      Bankruptcy Code section 364(d)(1) governs the incurrence of senior secured debt or "priming" loans. Pursuant to section 364(d)(1), the Court may, after notice and a hearing, authorize the Debtors to incur debt secured by a senior or equal lien *only* if the Debtors "establish: (1) that they are unable to obtain credit otherwise; (2) that the transaction is within the Debtors' business judgment; and (3) that the interests of primed lienholders are adequately protected." *In re Yellowstone Mountain Club, LLC*, No. 08-61570-11, 2008 WL 5875547, at \*7 (Bankr. D. Mont. Dec. 17, 2008); 11 U.S.C. § 364(d)(1). Under section 364(d), the Debtors have the burden of proving that, among other things, the terms of the proposed transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender." *See, e.g., In re L.A. Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011). The Debtors also have the burden of demonstrating that "the relief requested is an appropriate exercise of the debtor's business judgment." *U.S. Bank Trust N.A. v. Am. Airlines, Inc. (In re AMR Corp.)*, 485 B.R. 279, 287 (Bankr. S.D.N.Y. 2013), *aff'd*, 730 F.3d 88 (2d Cir. 2013). The business-judgment standard requires that the proposed Revised Priming DIP Facility be (a) the product of a fair, arm's-length process and (b) on the best available terms. *See, e.g., In re Mid-State Raceway, Inc.*, 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005).

59797.0007.17028896.2

2. RAF respectfully submits that the Debtors cannot meet these burdens.

### i. The Revised Priming DIP Facility is a "stopgap" to administrative insolvency

3. The Debtors' balance sheet is already overleveraged. Yet, with dwindling collateral values from the liquidation of at least $10 million of steers to fund losses,[4] increasing operational costs, and a sensitivity to market volatility, the Debtors propose to incur $45 million in new, third-party priming secured debt, plus at least $4.970 million in fees and interest, when they have not demonstrated the ability to repay the $90 million RLOC Facility for close to two years. It is unclear how adding more debt, that seeks to prime existing secured lenders, will provide a net benefit to the estates or otherwise improve the Debtors' prospects of a successful reorganization. Instead of taking accountability for any of the financial problems (or related operating issues), the Debtors have opted to blame RAF and their other secured lenders for the current financial issues. In his declaration, Mr. Millenkamp complains, "While [RAF] continued to squeeze Millenkamp Cattle of its working capital, it collected not only its interest, but also its default interest and attorney's fees. Had [RAF] simply revolved the monies that Millenkamp Cattle generated from its steers and cull cows, Millenkamp would have been able to pay all its bills in the ordinary course." Millenkamp Decl. ¶ 59. Yet, after the Debtors *defaulted* on their *matured* obligation to repay over $90 million on June 1, 2022, RAF ceased to have any obligation to "revolve" any loans to the Debtors. Further, had the Debtors repaid the loans they would not have been required to pay default interest and attorney's fees under the terms of the loan documents that Mr. Millenkamp and the Debtors negotiated (with the aid of their professionals) and executed, in order to borrow $91 million from RAF to grow the Debtors' dairy business.

4. Putting aside the Debtors' attempts to deflect responsibility, the facts tell a different story:

---

[4] As noted in the Objection, in August 2023, RAF discovered that the Debtors had been diverting steer sale proceeds instead of depositing such amounts into a control account in violation of RAF's specific instructions. To date, RAF has not been able to obtain the necessary data to determine the full extent of this conversion despite numerous requests. Further, based on the Debtors' Borrowing Base Certificates there was at least $18 million of collateral erosion in the twelve (12) months between March 31, 2023 and February 29, 2024.

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 6

- In the course of the nine-month period measured by the Debtors' Borrowing Base Certificates dated May 31, 2023 and December 31, 2023, accounts payable increased from $24 million to $41 million, the Debtors expended $20 million of mezzanine financing, and liquidated approximately $10 million of steers and/or culled cows pledged to RAF to fund losses. Copies of the applicable Borrowing Base Certificates are attached hereto and incorporated by reference herein as **Exhibit A**.

- The Debtors' DIP Budget reflects an operating cash burn of approximately $9.081 million for the first five months of their chapter 11 cases (effectively $1.8 million per month), and approximately $21.794 million on an annualized basis. See DIP Budget at p. 3.

- The Debtors' Leverage Ratio as of the Petition Date would increase from 126x to 145x as a result of the Revised Priming DIP. FTI Consulting, RAF's financial advisor, has conducted a preliminary analysis of the Debtors' overleverage and potential losses, which is attached hereto an incorporated by reference herein as **Exhibit B.**[5]

- The Debtors' projections rest on unjustified expectations and assumptions, particularly as it relates to projected milk prices. As stated in the Objection, the Debtors' projections were built on unjustifiable milk prices through 2026. RAF is one of the world's leading agricultural lenders, and its analyst reports are relied upon across all sectors of the agricultural industry. For example, the Debtors are projecting average milk prices from March to July 2024 of $21.42/cwt whereas RAF's analysts are projecting milk prices of $20.16/cwt, resulting in the Debtors projecting on average $1.26/cwt higher than analyst projections.

- As discussed below, the Debtor's Budget relies on the wholesale liquidation of $11.232 million of cattle subject to RAF's liens in order to fund losses.

5.    Under the above circumstances, the Revised Priming DIP Facility is fatal for the estates. Nothing in the DIP Motion, the Millenkamp Declaration, or any of the Debtors' other filings supply any credible argument—let alone evidence—that they will be able to return to profitability during or after the chapter 11 cases, or that they can withstand the added burden of the Revised Priming DIP Facility. Indeed, as of the filing of this Second Supplement, the Debtors have not filed an updated budget supporting Sandton's "belief" that the estates require a $45 million facility.

6.    Courts have denied proposed priming DIP financings under similar circumstances. The bankruptcy court's decision in *In re Stoney Creek Technologies, LLC* is particularly

---

[5]    On April 7, 2024, RAF, through its attorneys, requested the referenced budget and certain financial information to assist RAF in its analysis. Notwithstanding that the information is of a type that should be readily available to the Debtors, RAF still has not receive such information as of the filing of this Second Supplement.

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 7

instructive. *See, e.g., In re Stoney Creek Techs., LLC*, 364 B.R. 882 (Bankr. E.D. Pa. 2017). In *Stoney Creek*, the debtor sought approval of a priming $1.5 million postpetition financing facility from a new, third-party lender, as well as the use of the prepetition secured lender's cash collateral. The debtor argued that the priming facility was needed to "jumpstart production and achieve profitability," and further that the prepetition lender's interests were adequately protected by a "substantial equity cushion" based on appraisals and expert opinions offered by the debtor. Despite the apparent equity cushion in certain of the collateral, the bankruptcy court denied the DIP motion and request to use cash collateral. In denying the debtor's motion, the court observed, *inter alia*, that the debtor "has historically been unable to generate profits," and, as such, "was challenged to demonstrate how that circumstance would be altered by the proposed DIP Loan." 364 B.R. at 892. The court also found that the terms of the proposed financing were "amorphous" and did not clearly commit the lender to fund anything beyond an initial $500,000 loan. Even if the court gave "credence to the [debtor's] speculative projections," it was "clear that the [proposed financing] will not shore up the floundering enterprise" as the debtor could not account "for how the loan [would] be repaid" at maturity. *Id.* at 893. The court further held that:

> [T]he purpose of § 364(d) is to promote a reorganization of the enterprise. By allowing an infusion of new debt, it seeks to facilitate a plan that will inure to the benefit of all creditors and the estate. While 364(d) only requires that the interest of the existing secured creditor be protected, it is not unmindful of the interests of other creditors and that is the reason that the statutory analysis focuses on whether the prospects of a reorganization are realistic. . . . Where as here, there does appear to be an equity cushion, unsecured creditors have the prospects of a meaningful distribution in a liquidation. To squander that value by permitting money to be lent into a company with no history or proven ability to be profitable would be unwise.

*Id.* at 895. In *Stoney Creek*, there was no realistic prospect of reorganization or any credible plan to address the debtor's ongoing financial issues. Thus, the court found "the [proposed financing was] a stopgap measure that [would] not restore [d]ebtor to economic health before it [matured],

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 8

if at all." *Id.* at 892. As a result, the court concluded that the prepetition lender was not adequately protected and the requirements of Bankruptcy Code section 364(d) had not been satisfied.

7.      The Idaho Bankruptcy courts have similarly denied proposed priming DIP financings where a debtor's evidence was insufficient under section 364(d). For example, in *In re Tamarack Resort, LLC*, the debtor sought the Idaho bankruptcy court's approval of a proposed priming DIP financing and continued use of cash collateral. Several lienholders, some of whom held liens on only a subset of the debtor's assets, objected. The debtor failed to provide evidence sufficient to demonstrate that the lienholders were adequately protected or that section 364(d) had otherwise been satisfied. The debtor could not demonstrate that it actually shopped for financing ("Not only was there inadequate proof of those efforts actually being made, [the CEO] testified that there was a $3,000,000 DIP financing possibility that was lost because [the proposed DIP agent] wished to control the lending"), submitted evidence of value on only an aggregate basis and that was otherwise "unclear and widely variable," and, based on that evidence, the debtor appeared "headed for a default" under the proposed financing's milestones. While the debtor argued that lienholders were adequately protected by the "likelihood of increased fair market value, and a protection against loss of existing value" if the financing was approved, the bankruptcy court found that "[d]efault could erase that alleged protection, and the higher the risk of default, the more speculative the protection." Accordingly, the bankruptcy court denied the debtor's motion.

8.      RAF submits that the same result should apply in these cases. Given the Debtors' likely losses coupled with the prospect of a contentious, nine-month or longer chapter 11 process, the approval of the Revised Priming DIP Facility risks potential administrative insolvency.

9.      The terms of a proposed DIP financing are not evaluated in a vacuum. *See In re Sharon Steel Corp.*, 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993) (observing that, when evaluating adequate protection, it is improper to look at valuation of assets in a vacuum). Courts do not mechanically apply the requirements set forth in Bankruptcy Code section 364(d), they evaluate proposed financings on a case-by-case basis in light of all applicable circumstances. *See In re Yellowstone Mountain*, 2008 WL 5875547, at *8. Here, the available facts, including the Debtors'

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 9

own filings, suggest that the Debtors are heading toward yet another default. There is no plan to stem the Debtors' ongoing losses or to propose a feasible plan of reorganization. The Revised Priming DIP Facility will make matters worse. The proposed financing is, at best, "a short term plan that will enable [the Debtors] to resuscitate [their] anemic operations at the cost of [RAF, a primed creditor] and with no reasonable prospects of a long term solution." *Stoney Creek*, 364 B.R. at 882.

10.     Under the circumstances of these cases, RAF submits that the terms of the proposed Revised Priming DIP Facility are not fair and reasonable and, therefore, RAF respectfully requests that the DIP Motion be denied.

**ii.      The Debtors ignored less expensive, less-restrictive alternative financing proposals to the detriment of the estates and creditors.**

11.     Under Bankruptcy Code section 364(d)(1)(A), the Court may authorize the Debtors to borrow money with priming liens "*only if*" they are "unable to obtain such credit otherwise." 11 U.S.C. § 364(d)(1)(A) (emphasis added). To comply with section 364(d)(1)(A), the Debtors "must demonstrate that no suitable alternative financing is available from other sources." *In re Shubh Hotels Pittsburgh, LLC*, No. 312, 2011 WL 7145601, at *2 (Bankr. W.D. Pa. Feb. 1, 2011) (citing *Suntrust Bank v. Den-Mark Constr., Inc.*, 406 B.R. 683, 689 (E.D.N.C. 2009)); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 (courts only begin to consider the terms of financing "once unavailability of less intrusive credit has been shown . . . ."). The Debtors are unable to satisfy this requirement.

12.     As discussed above, RAF, through the Objection, attached the Alternative Rabobank Proposal that offered the Debtors a superior alternative to the Priming DIP Facility that remains superior to even the Revised Priming DIP Facility. As originally proposed, the Alternative Rabobank Proposal:

- Offered a $32 million financing commitment for the same duration and on substantially similar or better terms;

- Reduced the fees and interest expense by as much as $2.722 Million to $2.273 Million, less than the Priming DIP Facility;

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 10

- Allocated 2/3 of the priming liability on the Pre-Petition MetLife Real Estate Collateral and 1/3 on the RLOC Collateral, which not only achieved an equitable allocation, but would have the effect of mitigating litigation as to the equity cushion on the real estate cushion;

- Granted priming liens only after the entry of a final order whereas the Priming DIP Facility (and Revised Priming DIP Facility) require such liens immediately upon entry of the interim order;

- Excluded avoidance actions from the DIP Collateral; and

- Required that the Debtors file an acceptable plan of reorganization within seven (7) months from the Petition Date, subject to an extension option, in order to minimize the length and cost of the chapter 11 cases.

However, the Debtors made no effort to engage Rabobank in any type of negotiation to benefit the estates after receiving this proposal.

13.    In the First Supplement, RAF attached a modified version of the Alternative Rabobank Proposal.  As a result of the modifications, the proposed Alternative Rabobank Proposal—which was already less expensive and the least onerous available to the Debtors, significantly improved the benefits that would be provided to the estates by further reducing interest and fees to between $4.467 million and $5.035 million less than the Priming DIP Facility. Again, neither the Debtors nor their advisors made a single outreach effort to negotiate the terms of this proposal.

14.    On  April 5, 2024, RAF provided the Debtors with a further refined Alternative Rabobank Proposal that enhanced the benefits to the states by:

- Increasing the commitment to $35 million;

- Further reducing interest and fees to between $5.053 million and $4.766  million less than the Priming DIP Facility; and

- Removing the requirement for the Debtors to maintain a minimum of $1.5 million of cash.

15.    Without ever having spoken to Rabobank, the Debtors selected the Revised Priming DIP Facility.  In connection with this Second Supplement, RAF has included a further modified

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 11

Alternative Rabobank Proposal—which is less expensive than any of Rabobank's prior proposals and imposes materially less costs on the estates than the Revised Priming DIP Facility. Attached hereto as **Exhibit C** is a true and correct copy of the further modified Alternative Rabobank Proposal. A full comparison between the Revised Priming DIP Facility and the most recent Alternative Rabobank Proposal is attached hereto and incorporated by reference herein as **Exhibit D.**

16.     The Alternative Rabobank Proposal further offers better terms for the estates and their existing stakeholders. Prior to the hearing, RAF will provide a draft debtor-in-possession credit agreement that is based on the existing RLOC Agreement, but has been modified to provide for more favorable benefits to the estates. As of the filing of this Second Supplement, the Debtors still have not filed a draft or the proposed version of the credit agreement for the Revised Priming DIP Facility despite having filed the DIP Motion on April 2, 2024.

17.     RAF is also intimately familiar with the Debtors' business, their finances, and their unique (as well as industry-wide) challenges; RAF has spent nearly two years attempting to support the Debtors' operations and already holds both senior (on the RLOC Collateral) and junior (on the Pre-Petition MetLife Real Estate Collateral) positions in the Debtors' capital structure. Accordingly, RAF's interests are generally aligned with the Debtors' estates and their largest economic stakeholders. Sandton, by comparison, currently has no "skin in the game" and, through the Revised Priming DIP Facility, seeks to consume no less than $50 million in value that should be allocated among the Debtors' existing creditors. Moreover, in the absence of any suggested exit plan, installing Sandton at the top of the Debtors' capital structure would set the stage for unnecessary, value-destructive litigation if the Debtors are unable to negotiate a consensual chapter 11 plan.

18.     After the first-day hearing in these cases, RAF hoped that the Debtors and their insiders would constructively work with the parties to develop and accept the "highest-and-best" DIP financing proposal available. Unfortunately, that is not what happened. Instead, the Debtors refused to engage with RAF and instead accepted Sandton's "belief" that the Debtors required $45

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 12

million of priming debt on top of an already over-leveraged balance sheet, without even filing a budget with the proposal, to support the belief that $25 million should be advanced on a priming basis during the interim period (without a budget), accepted that Sandton should receive higher fees and interest at the expense of the estates even though the Debtors were in possession of less expensive proposals, and accepted Sandton's requirement to maintain $1.5 million of cash as a reserve. The lack of any negotiation or process in light of the Debtors' choice raises significant concerns. The Debtors do not support their business judgment with any budget, credit agreement, or analysis as to how the Debtors arrived at their decisions when better proposals existed, all to the peril of the bankruptcy estates.

### iii. As set forth in the Objection, the Debtors cannot adequately protect RAF's interest in the RLOC Collateral.

19.    As set forth in the Objection, the Debtors cannot adequately protect RAF's interest in the RLOC Collateral. Consequently, RAF respectfully requests that the Court deny the DIP Motion.

20.    "Priming is extraordinary relief requiring a strong showing that the loan to be subordinated is adequately protected. Bankruptcy judges are required to grant Section 364(d) financing only upon a tangible demonstration of adequate protection." *In re LTAP US, LLLP*, No. 10-14125 (KG), 2011 WL 671761, at *3 (Bankr. D. Del. Feb. 18, 2011) (citations omitted). Because priming has grave consequences to the creditor that is being primed, courts must be "particularly cautious when evaluating whether the subordinated creditor is adequately protected." *Stoney Creek*, 364 B.R. at 890 (citation and internal quotation marks omitted). Here, however, the Debtors have not allowed either parties in interest *or* the Court to evaluate the proposed Revised Priming DIP Facility or its consequences for the estates and creditors, including RAF, in not filing the DIP Credit Agreement or other financing documents, or otherwise shared those terms with competing DIP lenders. Rather, the Debtors seek to incur $25 million of financing during the interim period on a priming basis based on only a term sheet. Thus, significantly, what is lacking is any information, let alone adequate information, to evaluate the impact of the proposed

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 13

financing, despite the high burden the Debtors face. This demonstrates the Debtors' inability to maintain financial controls and lack of planning. On that basis alone, RAF submits that the DIP Motion should be denied. *See, e.g., In re Grupo HIMA San Pablo, Inc.*, 2023 WL 5498101 (Bankr. D.P.R. Aug. 24, 2023) (denying DIP financing and priming of secured creditor based, in part, on a lack of financial information to support adequate protection of the primed creditor). As noted in the Objection, the Debtors' unsupported speculations regarding potential asset values are not enough to support the "extraordinary" relief they requested. *See, e.g., In re Windsor Hotel, L.L.C.*, 295 B.R. 307 (Bankr. C.D. Ill. 2003) (denying DIP financing due, in part, to the debtor's prediction of a "historically high" increase in hotel-occupancy rates to support an adequate protection argument). The Debtors, in fact, have proven to be unreliable in respect of their own financial performance. *In re Hollister*, 628 B.R. 154 (Bankr. C.D. Cal 2021) (denying DIP financing priming lien based, in part, on the debtor's questionable projections on sale of estate assets impacting an alleged equity cushion, which the debtor asserted would provide the primed creditor the "indubitable equivalent" of its primed lien), aff'd, No. 21-55380, 2021 WL 6124757 (9th Cir. Dec. 28, 2021); *see also, e.g., In re Tempe Land Co., LLC*, 2009 WL 1211622 (Bankr. D. Ariz. May 1, 2009) (denying DIP financing priming lien on an "indubitable equivalent" adequate protection basis, noting that the court was not persuaded by the debtor's projections of an increase in value of the property secured by the primed liens, and noting that the DIP loan proposed proceeds were to largely go to lender fees and interest reserves, which did not benefit the project securing the loans).

21.    As discussed above and in the Objection, in the past two months alone, the Debtors have shared or otherwise published three budgets. In those budgets, the Debtors' projected financing needs have gone from roughly *$0.00* in February 2024, to *$22 million* in mid-March 2024, to *$19.3 million* as of the Petition Date, and now to roughly *$45 million* just one week later. *See* Priming DIP Facility Notice at p. 5 (stating that "[Sandton] *believes, based on the most recent DIP budget,* that the total required DIP loan could reach $45 million.") (emphasis added). Despite the Debtors' erratic reporting and forecasting, they now insist, with no evidence, that RAF has an

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 14

"equity cushion" in the RLOC Collateral. *See* DIP Motion ¶ 27. Yet, the Debtors' own records revealed the Declining Borrowing Base discussed in the Objection (*i.e.*, the $18 million decline in RLOC Collateral value shown through the Debtors' Borrowing Base Certificates). Even if there were an equity cushion in the RLOC Collateral—and there is not—the Debtors must show that it is sufficiently stable to provide RAF with adequate protection of its interests in these chapter 11 cases. *See In re Packard Square*, 574 B.R. 107, 121 (Bankr. E.D. Mich. 2017) (noting that, to prove an equity cushion will provide adequate protection to primed creditors, a debtor must prove the equity cushion will exist into the future as the full postpetition loan is advanced); *In re Shaw Industries, Inc.*, 300 B.R. 861 (Bankr. W.D. Pa. 2003) (denying a priming financing despite equity cushion in excess of proposed financing because equity was rapidly eroding due to significant losses); *In re Timber Products, Inc.*, 125 B.R. 433, 440 (Bankr. W.D. Pa. 1990) ("The equity cushion is inadequate because of the unlikelihood that Debtors will meet projections, the accrual of interest which will erode the cushion, and the [collateral's] depreciation in value over time."); *In re Sharon Steel Corp.*, 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993) ("Where an equity cushion is insufficient in size or likely to erode, it cannot, standing alone, constitute adequate protection."). The Debtors, again, have failed to make that showing. Right now, under the Revised Priming DIP Facility, the only comfort that the Debtors have offered regarding their exit plan rests on a statement (not an obligation) that Sandton will "***consider*** converting ***some or all*** of the DIP to an exit financing facility. . . ." DIP Priming Facility Notice at p. 5 (emphasis added); *see Stoney Creek*, 364 B.R. at 893 (considering the DIP lender's non-commitment to continue funding and finding that the initial funding would provide "no conceivable benefit" and, in fact, would be a detriment if the lender refused to fund). "[I]t is one thing for a debtor to obtain a priming lien to improve the collateral, or to make adequate protection payments while pursuing a feasible exit strategy, but it is another thing for [a debtor] to propose [a] Priming Loan with no[ ] such protections." *Hollister*, 628 B.R. at 159.

22.    Additionally, the Debtors' proposed filed DIP Budget (attached as Exhibit C to the DIP Motion) showed that they planned to ***liquidate*** RAF's interest in the RLOC Collateral, not

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 15

preserve it. The proposed DIP Budget, under the line item "Net Cattle Sales Receipts," revealed that the Debtors intend to prime RAF's interest in livestock (and related products and proceeds) and reallocate approximately *$11.2 million* in steer-sale proceeds for use in the Debtors' operating budget *without* providing RAF with replacement collateral. Each time a steer is sold and the Debtors use RAF's cash collateral in their operations, RAF's collateral pool erodes on a dollar-for-dollar basis and RAF is forced bear the risk of the Debtors' operational deficit without compensation in the form of adequate protection. Under these circumstances, the Debtors must be able to give RAF something *more* than what it already has, but instead, they have offered *less*. *See, e.g., In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 565 (3rd Cir. 1994) (offering secured creditor collateral to which it is already entitled did not provide increased protection). For that reason, as a condition to the Debtors' use of cash collateral RAF is requesting, among other items, that the Court require the Debtors to deposit all proceeds from the sale of RAF's livestock collateral into a reserve account for the benefit of RAF, and to be distributed to RAF in connection with a plan of reorganization, plan of liquidation, or similar arrangement or disposition.

23.     Moreover, in considering whether adequate protection is sufficient, courts may evaluate the risk of a debtor's financing as well as its plans for repayment in light of operational history and the relevant market. *In re Timber Products, Inc.*, 125 B.R. 433, 440 (Bankr. W.D. Pa. 1990) (finding that debtors had fail to carry burden on adequate protection as to oversecured creditor when repayment "was speculative in light of the absence of an operating history and is inconsistent with industry averages and performances.") (internal citations omitted). As mentioned above, the Debtors have not demonstrated a realistic plan for repaying the Revised Priming DIP Facility, let alone any adequate protection obligations it might incur during these chapter 11 cases. In this instance, the Debtors have been operating at a deficit for at least the last calendar year and relying on protective advances from RAF to keep the livestock fed and vetted while RAF's borrowing base continued to erode. As outlined in the Millenkamp Declaration, the dairy industry has been experiencing "historically low milk prices and historically high feed prices." Millenkamp Decl. ¶ 54. In light of the Debtors' operating history and industry trends,

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 16

absent additional adequate protection, the Financing Motions should be denied. *In re Shaw Industries, Inc.*, 300 B.R. 861, 863-64 (Bankr. W.D. Pa. 2003) (denying proposed financing where the debtors' industry was in an unprecedented downturn, debtors were operating at a loss, and structural issues in the industry were unlikely to abate in the near future).

24.     The only way for the Court and other parties in interest to determine the Debtors' real value—and, therefore, what might constitute sufficient adequate protection of RAF's interests—is to begin a marketing process.  For the past two years the Debtors have denied RAF's request to engage an investment banker and to explore a parallel processes (*i.e.*, to pursue both a potential refinancing and a sale process) to maximize stakeholder value.  Now that the Debtors are in chapter 11, the Debtors are to be guided by their fiduciary duties, which require an undivided loyalty and exclusive allegiance to the estates' creditors.

25.     The Bankruptcy Code does not support depriving RAF of the rights it bargained for in connection with making a $91 million senior secured loan by dramatically increasing its exposure and risk on recoveries.  *See, e.g., In re Swedeland Dev. Group, Inc.,* 16 F.3d 552, 567 (3rd Cir. 1994) ("Congress did not contemplate that a secured creditor could find its position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects."); *Suntrust Bank v. Den-Mark Const., Inc.*, 406 B.R. 683 (E.D.N.C. 2009) (priming financing denied when creditor's interest was "unjustifiably jeopardized" when its collateral position declined with each collateral sale and creditor would be forced to turn to its least valuable collateral for repayment); *In re Sharon Steel Corp.*, 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993) ("While the present value of a debtor's assets may be sufficient to constitute adequate protection, a debtor's future operational plans may result in a rapid deterioration of the collateral."); *In re Shaw Industries, Inc.*, 300 B.R. 861 (Bankr. W.D. Pa. 2003) (inappropriate to foist debtor's inherently risky prospects onto primed creditors).

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 17

59797.0007.17028896.2

**B. The Cash Collateral Motion Should Be Denied As RAF Does Not Consent To The Use Of Its Cash Collateral And The Debtors Cannot Satisfy The Requirements Of Bankruptcy Code Section 363(c).**

26.     In addition to the above, the Debtors must demonstrate that their proposed use of the RLOC Collateral, including any cash collateral, will not reduce the value of RAF's interest therein and, if it does, that the proposed adequate protection will compensate RAF for the diminution in value.  11 U.S.C. §§ 361, 363; *In re Las Vegas Monorail Co.*, 429 B.R. 317, 326 (Bankr. D. Nev. 2010); *see In re Glassstream Boats, Inc.*, 110 B.R. 611, 613 (Bankr. M.D. Ga. 1990); *see also In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3rd Cir. 1994); *In re Mosello*, 195 B.R. 277, 287-288 (Bankr. S.D.N.Y. 1996).  The Debtors, however, have not filed any supplement to the Cash Collateral Motion or provided any other assurances that RAF's interests in the RLOC Collateral, including any cash collateral, will provide it with the minimal adequate protection requested in the Objection.[6]  In light of the above, RAF cannot consent to the use of its cash collateral.  Accordingly, as set forth in the Objection, the Debtors have failed to satisfy their burden to demonstrate that RAF would be adequately protected if the Debtors were to continue using cash collateral.  *See In re MRI Beltline Indus., L.P.*, 476 B.R. 917, 925 (Bankr. N.D. Tex. 2012) (finding that "the parties requesting court approval to use cash collateral over the secured creditor's objection must prove there is adequate protection for that creditor.").

**C.     Any Replacement Liens On Any Postpetition Milk Receivables Should Flow Exclusively To RAF.**

27.     To the extent Debtors' proposed Interim DIP Order grants replacement liens in the Milk Receivables, such replacement liens should flow exclusively to RAF. As a result of RAF's security interest in Debtors' cattle, RAF has a continuing security interest in the post-petition Milk Receivables by virtue of Bankruptcy Code section 552(b). *See, e.g., In re Hollie*, 42 B.R. 111, 119

---

[6]     Notably, authority cited by the Debtors supports RAF's position that mere replacement liens may constitute adequate protection.  In *Owens-Corning Fiberglas Corp. v. Ctr. Wholesale, Inc.*, the Ninth Circuit observed that ***additional*** property might constitute adequate protection, but ultimately found that a junior creditor had ***not*** been adequately protected for the use of its cash collateral where the debtor was authorized to erode that security interest by selling off the inventory and paying the proceeds to the senior priming DIP lender.  759 F.2d 1440 (9th Cir. 1985).

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 18

(Bankr. M.D. Ga. 1984) (finding that, when a creditor has a prepetition interest in dairy cattle, products, and proceeds, under section 552(b) the creditor retains its lien on postpetition milk proceeds); *see also In re Dettman,* 84 B.R. 662 (applying *Hollie* and finding that creditor had security interest in post-petition proceeds of grapevines that existed pre-petition). MetLife, however, has a security interest solely in the milk itself, not the cattle, and thus MetLife's security interest in the Milk Receivables is extinguished when the last of the pre-petition milk is sold. *See* 11 U.S.C. § 552(a); *In re Trans-Texas Petroleum Corp.*, 33 B.R. 67, 69 (Bankr. N.D. Tex. 1983). ("Once a bankruptcy case is filed § 552 of the Bankruptcy Code abrogates the effect of all pre-petition security interests in subsequently acquired property except those security interests in proceeds to the extent recognized by applicable state law."). To the extent the Debtors purport to grant post-petition liens in the Milk Receivables to MetLife, such grant diminishes RAF's collateral position and requires additional adequate protection..

WHEREFORE, for the reasons set forth in the Objection (as supplemented), the Financing Motions should be denied because the Debtors have failed to satisfy the applicable requirements set forth in the Bankruptcy Code, and the Local Bankruptcy Rules, including, without limitation, the improper request to prime the secured creditors' collateral during the interim period and the Debtors' obligation to provide sufficient adequate protection of RAF's interests in the Debtors' assets. Furthermore, to the extent that the Court is inclined to grant the Financing Motions, RAF respectfully requests that any resulting order be revised consistent with the Objection and the arguments herein, including provisions that (i) provide RAF with at least the Minimum Adequate Protection Package; (ii) grant replacement liens in postpetition Milk Receivables solely in favor of RAF and Conterra, subject to their respective priorities as of the Petition Date, and further ensure that any post-petition Milk Receivables liens flow exclusively to RAF in accordance with the Bankruptcy Code; and (iii) ensure any liens and claims granted in respect of the Revised Priming DIP Facility are junior to RAF's liens and claims in respect of the RLOC Collateral.

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 19

59797.0007.17028896.2

Dated: April 8, 2024

HAWLEY TROXELL ENNIS & HAWLEY LLP

Sheila R. Schwager, ISB No. 5059
Attorneys for Rabo AgriFinance LLC

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 20

59797.0007.17028896.2

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 8th day of April, 2024, I electronically filed the FOREGOING SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION **TO (I) EMERGENCY MOTION AUTHORIZING USE OF CASH COLLATERAL; AND (II) EMERGENCY MOTION AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND GRANTING ADEQUATE PROTECTION; AND OBJECTION TO NOTICE OF PREFERRED POST-PETITION FINANCING PROPOSED** with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to those identified in the CM/ECF system for this matter, at the time this document was filed, including the following persons:

| | |
|---|---|
| Matthew T. Christensen | mtc@johnsonmaylaw.com |
| Krystal R. Mikkilineni | krystal.mikkilineni@dentons.com |
| Tirzah R. Roussell | tirzah.roussell@dentons.com |
| U.S. Trustee | ustp.region18.bs.ecf@usdoj.gov |
| Heidi Buck Morrison | heidi@racineolson.com |
| David A. Coleman | david@colemanjacobsonlaw.com |
| Jon B. Evans | evans.jb@dorsey.com |
| Kimbell D. Gourley | kgourley@idalaw.com |
| Daniel C. Green | dan@racineolson.com |
| Scott C. Powers | spowers@spencerfane.com |
| Janine Patrice Reynard | janine@averylaw.net |
| Sheila Rae Schwager | sschwager@hawleytroxell.com |
| Brent Russel Wilson | bwilson@hawleytroxell.com |
| Zachary Fairlie | zfairlie@spencerfance.com |
| John O'Brien | jobrien@spencerfane.com |
| Gery W. Edson | gedson@gedson.com |
| Aaron Bell | abell@evanskeane.com |
| Brian Faria | brian@sawtoothlaw.com |
| Robert A. Faucher | rfaucher@hollandhart.com |
| Matthew W. Grimshaw | matt@grimshawlawgroup.com |
| Karen Lloyd | klloyd@grsm.com |
| James Justin May | jjm@johnsonmaylaw.com |
| Rhett Michael Miller | rmiller@magicvalley.law |
| Robert E. Richards | robert.richards@dentons.com |

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 21

59797.0007.17028896.2

Holly Roark                                   holly@roarklawboise.com

Evan Thomas Roth                              evan@sawtoothlaw.com

Meredith Leigh Thielbahr                      mthielbahr@grsm.com

John F. Kurtz, Jr.                            jfk@kurtzlaw.com

And any others receiving cm/ecf notices

Sheila R. Schwager

SECOND SUPPLEMENT TO RAF'S OMNIBUS OBJECTION – 22

# EXHIBIT

# A



**BORROWING BASE CERTIFICATE**
**Millenkamp Cattle et al**
**December 31, 2023**

| BORROWING BASE (CATTLE): | Collateral Value | Advance Percentage | Lending Value |
|---|---|---|---|
| Eligible Dairy Cattle | $ 82,004,896 | 75% | $ 61,503,672.00 |
| Eligible Cattle other than Dairy Cattle (Steers) | $ 17,326,353 | 75% | $ 12,994,765 |
| Eligible Cattle other than Dairy Cattle (Cows) | 2,500,000 | 75% | 1,875,000 |
| Subtotal | $ 101,831,249 | | $ 76,373,437 |
| *less* Producer Payables (Cattle) | $ 934,050 | 100% | $ 934,050 |
| Other | | 100% | - |
| Subtotal | $ 934,050 | | $ 934,050 |
| **TOTAL HERD VALUE** | $ 100,897,199 | | $ 75,439,387 |

| BORROWING BASE (OTHER THAN CATTLE): | Collateral Value | Advance Percentage | Lending Value |
|---|---|---|---|
| Eligible Inventory | $ 36,552,408 | 75% | $ 27,414,306.00 |
| Eligible Prepaid Expenses | - | 80% | - |
| Eligible Accounts Receivable | 6,214,566 | 80% | 4,971,652.65 |
| Eligible Growing Crop Investment | 3,857,439 | 100% | 3,857,439 |
| Eligible Deposit Accounts | - | 100% | - |
| Eligible Margin Accounts | - | 100% | - |
| Eligible Milk Accounts | 13,092,170 | 100% | 13,092,170 |
| Subtotal | $ 59,716,583 | 100% | $ 49,335,568 |
| *less* Producer Payables (other than Cattle) | $ 41,958,372 | 100% | $ 41,958,372 |
| Other adjustments | | 100% | - |
| Subtotal | 41,958,372 | | 41,958,372 |
| **TOTAL FEED VALUE** | $ 17,758,211 | | $ 7,377,196 |

| | Collateral Value | | Lending Value |
|---|---|---|---|
| Total Collateral | $ 118,655,410 | | $ 82,816,583 |
| Total lines outstanding | | | $ 85,902,890 |
| | | | $ 85,902,890 |

| | | |
|---|---|---|
| **TOTAL COLLATERAL MARGIN / DEFICIT** | $ | (3,086,307) |
| **TOTAL COLLATERAL ADVANCE RATE** | | 72.40% |



**BORROWING BASE CERTIFICATE**
**Millenkamp Cattle et al**
**May 31, 2023**

| BORROWING BASE (CATTLE): | Collateral Value | Advance Percentage | Lending Value |
|---|---|---|---|
| Eligible Dairy Cattle | $  81,646,808 | 75% | $ 61,235,106.00 |
| Eligible Cattle other than Dairy Cattle (Steers) | $  24,101,714 | 75% | $  18,076,286 |
| Eligible Cattle other than Dairy Cattle (Cows) | 2,500,000 | 75% | 1,875,000 |
| Subtotal | $  108,248,522 | | $  81,186,392 |
| *less*   Producer Payables (Cattle) | $  718,780 | 100% | $  718,780 |
| Other | | 100% | - |
| Subtotal | $  718,780 | | $  718,780 |
| **TOTAL HERD VALUE** | $  107,529,742 | | $  80,467,612 |

| BORROWING BASE (OTHER THAN CATTLE): | Collateral Value | Advance Percentage | Lending Value |
|---|---|---|---|
| Eligible Inventory | $  18,422,694 | 75% | $ 13,817,020.50 |
| Eligible Prepaid Expenses | - | 80% | - |
| Eligible Accounts Receivable | 4,635,749 | 80% | 3,708,599.00 |
| Eligible Growing Crop Investment | 7,862,337 | 100% | 7,862,337 |
| Eligible Deposit Accounts | - | 100% | - |
| Eligible Margin Accounts | 118,739 | 100% | 118,739 |
| Eligible Milk Accounts | 12,946,291 | 100% | 12,946,291 |
| Subtotal | $  43,985,809 | 100% | $  38,452,986 |
| *less*   Producer Payables (other than Cattle) | $  24,485,415 | 100% | $  24,485,415 |
| Other adjustments | | 100% | - |
| Subtotal | 24,485,415 | | 24,485,415 |
| **TOTAL FEED VALUE** | $  19,500,394 | | $  13,967,571 |

| | Collateral Value | | Lending Value |
|---|---|---|---|
| Total Collateral | $  127,030,136 | | $  94,435,182 |
| Total lines outstanding | | | $  86,396,630 |
| | | | $  86,396,630 |
| **TOTAL COLLATERAL MARGIN / DEFICIT** | | | $  8,038,552 |
| **TOTAL COLLATERAL ADVANCE RATE** | | | 68.01% |

_Willam J. Millenkamp - President_

7-14-2023
Date

_Walter Popiel - CRO_

7/14/2023
Date

**DAIRY INVENTORY REPORT**
**Millenkamp Cattle et al**
**May 31, 2023**

**Rabo AgriFinance**

| Description of Cattle | Number | AFCID Established Value Per Head | Total Value | | |
|---|---|---|---|---|---|
| Milking Cows | 35,698 | 1,400 | 49,977,200 | Accounts P | Amount |
| Dry Cows | 5,104 | 1,400 | 7,145,600 | Dealer | Amount |
| Heifers Springing 18 mos + | 4,653 | 1,500 | 6,979,500 | A/P - Cattle | 718,780 |
| Heifers 14-17 mos | 5,060 | 1,250 | 6,325,000 | | - |
| Open Heifers 6-13 mos | 8,536 | 925 | 7,895,800 | | |
| Heifer Calves 0-5 mos | 7,676 | 433 | 3,323,708 | Total | 718,780 |
| Verbal Heifers | 0 | 322 | | Other | |
| Company Cattle | 8,031 | | 15,201,288 | | |
| Pasture Cattle | 16,166 | | 8,900,426 | | |
| Fat Steers | 0 | 0 | 0 | | |
| Beef Cows | 2,500 | 1,000 | 2,500,000 | Total | - |
| | 93,424 | | | | |
| | | Total Herd Collateral | 108,248,522 | | |

| | | | | A/R Other | |
| | | | | Various Custom | 4,635,749 |
| | | | | | - |
| | | | | | 4,635,749 |

| Feed Description | Tons | Cost/Ton | Total Cost | | |
|---|---|---|---|---|---|
| Silage | | | | | |
| Haylage/Triticale | 32,463 | $ 158.12 | 5,133,030 | | |
| Corn Silage | 94,052 | $ 93.77 | 8,819,404 | | |
| | | | | Dealer | Amount |
| | | Total | 13,952,434 | A/P - Feed | 24,485,415 |
| | | | | Additional | - |
| Hay & Other Feed | | | | | |
| Dairy Hay | 1,913 | $ 250.81 | 479,900 | Total | 24,485,415 |
| Feeder Hay | 1,450 | $ 218.73 | 317,117 | | |
| Straw big bales | 6,185 | $ 140.20 | 867,233 | | |
| Straw small bales | - | $ - | - | | |
| Commodities and other | 5,020 | | 2,806,010 | Demand Deposit Accounts | 0 |
| | | Total | 4,470,260 | Milk A/R (Glanbia) | $ 12,946,291 |
| | | Total Feed | 18,422,694 | Brokerage Account | $ 118,739 |
| | | | | Total | $ 13,065,030 |
| Prepaid Feed | | Dealer | Amount | | |
| | | | - | | |
| | | Fessenden Farms | - | | |
| | | Triple B Farms | - | | |
| | | Total | - | | |
| Cash Investment in Growing Crops | | | 7,862,337 | | |
| | | Total | 7,862,337 | | |
| | | Total Feed Collateral | 26,285,031 | | |

# EXHIBIT

# B

**Millenkamp Cattle**
**Illustrative Leverage and FCCR Analysis**

### Leverage Summary *($ in millions)*

| | Amount Outstanding | Leverage | |
| | as of Petition Date (1) | FY23 | Est. FY24 |
|---|---|---|---|
| Rabo RLOC | $92 | 2.5x | 39.8x |
| MetLife Loans | 181 | 5.0x | 78.3x |
| Conterra Mortgage | 3 | 0.1x | 1.1x |
| **Total First Lien Debt** | **$276** | **7.6x** | **119.2x** |
| Conterra Mezz. Debt | 17 | 0.5x | 7.1x |
| **Total Secured Debt as of the Petition Date** | **$292** | **8.1x** | **126.3x** |
| | | | |
| Incremental Proposed DIP Facility | 45 | 1.2x | 19.5x |
| **Total Debt incl. Proposed DIP Facility** | **$337** | **9.3x** | **145.8x** |
| (-) Cash | (1) | N/A | N/A |
| **Total Net Debt incl. Proposed DIP Facility** | **$336** | **9.3x** | **145.3x** |

### What does debt need to be to achieve lev. Ratios (2)

| 6.0x | 6.5x | 7.0x | 7.5x | 8.0x |
|---|---|---|---|---|
| $216 | $235 | $253 | $271 | $289 |

### What does EBITDA need to be to achieve lev. Ratios (3)

| 6.0x | 6.5x | 7.0x | 7.5x | 8.0x |
|---|---|---|---|---|
| $56 | $52 | $48 | $45 | $42 |

| **Operating CF FY24 Annualized** | **($15)** |
|---|---|
| (+) Rabo P&I | 9 |
| (+) MetLife P&I | 18 |
| (+) Conterra P&I | 0 |
| (-) AP - Adjustment | (10) |
| **Est. FY24 EBITDA** | **$2** |

### Fixed Charge Coverage Summary *($ in millions)*

| **FY23 EBITDA (4)** | **$36** |
|---|---|
| (-) Capex (4) | (1) |
| **EBITDA less Capex** | **$35** |
| Total FY23 Cash Debt Service (4) | 39 |
| **Fixed Charge Coverage Ratio** | **0.9x** |

(1) Per paragraph 38 of the First Day Declaration
(2) Assuming FY23 EBITDA of $36M
(3) Assuming Net Debt incl. Proposed DIP Facility of $336M
(4) From the Company's provided December financial reporting

# EXHIBIT

# C

| | |
|---|---|
| **Secured Creditors:** | Rabo AgriFinance LLC, as Agent ("RAF")<br>Metropolitan Life Insurance Company and MetLife Real Estate Lending LLC (collectively "MetLife")<br>Conterra Agricultural Capital LLC ("Conterra") |
| **Lender:** | Coöperatieve Rabobank U.A., New York Branch ("DIP Lender") |
| **Borrowers:** | Millenkamp Cattle, Inc., East Valley Cattle, LLC, Idaho Jersey Girls Jerome Dairy LLC, Millenkamp Enterprises LLC, MIllenkamp Properties II LLC, Millenkamp Properties LLC, Goose Ranch LLC, Black Pine Cattle LLC, Millenkamp Family LLC, and Idaho Jersey Girls, LLC (collectively, the "Borrower"). |
| **DIP Facility:** | Senior delayed draw term loan facility in an aggregate principal amount of up to $35 million (the "DIP Loan Commitment"), with the priority as described by the header "Security and Priority" below, provided that, prior to the entry of the Final Order, only up to $15 million (the "Interim Funding Amount") will be made available by the DIP Lender. |
| **Use of Proceeds:** | The DIP Loan will be available to the Borrowers to fund each Borrower's expenses in accordance with the Budget attached to the DIP Financing Motion as Exhibit C. The Budget shall be agreed to by the Borrowers and the DIP Lender and will include, without limitation, budgeted professional fees. |
| **Funding Dates:** | • **Initial Draw, $15 million**, available on the entry of the Interim Order approving the DIP Loan on an interim basis.<br><br>• **Additional Draws of an Additional $20 million**. Available for up to 9 months (subject to extension), subject to mutually agreed Restructuring Milestones. Minimum Additional Draws of $5 million and subject to a 7-day advance notice. |

| Maturity: | The DIP Lender will be entitled to immediate repayment of all outstanding obligations under the DIP Facility on the earliest of (the "Repayment Date"): |
|---|---|
| | (a) the effective date of the plan of reorganization or closing on a sale of all or a material portion of the Borrowers' assets; |
| | (b) 45 days from the entry of the Interim Order in the event the Bankruptcy Court shall not have entered the Final Order; |
| | (c) 7 months from the entry of the Interim Order in the event the Debtors shall not have filed a confirmable plan of reorganization with the Bankruptcy Court that is reasonably acceptable to the DIP Lender and provides for, among other things, the payment of the DIP Loan in full in cash on the effective date of the plan of reorganization; and |
| | (d) 9 months from the entry of the Interim Order, subject to extension as set forth below (for a total of up to 12 months from the date of origination). |
| **Prepayment:** | The DIP Loan will be prepayable in full or in part by the Borrowers on one or more occasions.  There will be a mandatory repayment of the DIP Loan upon the sale of any assets outside of the ordinary course of business or the Budget.. |
| **Loan Interest Rates and Fees:** | The DIP Loan interest rates and fees will be as follows:<br>(i)  Issuance Fee: issuance fee of 1.0% on the Initial Draw and each Additional Draw, which fee will be earned and payable on the date of each draw (Issuance Fee will be capitalized on the balance of the DIP Loan).<br>(ii)  Cash Interest: None.<br>(iii)  PIK Interest: PIK interest at 6.5% per annum on the outstanding Principal Amount, which shall be added to the Principal Amount on a monthly basis. PIK'ed interest will not be counted against draw limits for any of the contemplated draws.<br>(iv)  Exit Fee:  exit fee of 0.75% on the total drawn amount. Such exit fees will be earned on the date of the applicable draw and payable on the earlier to occur of the date: (a) the DIP Loan is required to be repaid in full; and (b) the DIP Loan is paid in full or in part prior (on a pro rata basis) to the Repayment Date.<br>(v)  Default Interest Rate:  During the occurrence and continuance of an Event of Default, the PIK |

<table>
<tr><td></td><td colspan="2">Interest rate will increase by 200 b.p.</td></tr>
</table>

| | | |
|---|---|---|
| | (vi) | <u>Renewal Fee</u>:  If the DIP Loan is not repaid on or before the Repayment Date, time being of the essence, the Borrowers will pay to the DIP Lender, in addition to all other amounts as set forth in this Term Sheet, a renewal fee of 1.0% of the Total Principal Amount, which shall extend the Repayment Date by an additional 3 months (the Renewal Fee will be capitalized on the balance of the DIP Loan at the time of extension).  Borrowers shall be entitled to one (1) 3-month extension period at the Repayment Date (based on mutually agreed Restructuring Milestones). |
| | (vii) | <u>Unused Fee</u>: None. |
| | (viii) | <u>Minimum Multiple of Invested Capital</u>:  None. |
| **Revenue and Operating Milestones:** | None. | |
| **Collateral Security and Priority:** | The DIP Loan shall be secured by the DIP Liens, which shall be granted in the DIP Credit Documents and approved by the Bankruptcy Court in the DIP Orders, on the existing and after-acquired real property and personal, tangible and intangible, assets of the Borrowers including, without limitation, all cash, cash equivalents, bank deposit and securities accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, general intangibles, investment property, supporting obligations, tax refunds, securities, franchise rights, letter of credit rights, commercial tort claims, causes of action and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds, patents, tradenames, trademarks, copyrights, intellectual property and all substitutions, accessions and proceeds of such intellectual property, wherever located, including insurance or other proceeds (the "<u>DIP Collateral</u>").  The DIP Liens (other than the DIP Liens granted pursuant to section 364(d)(1) of the Bankruptcy Code) shall be effective and perfected as of the Petition Date upon entry of the Interim DIP Order, without need for any additional filings or documentation, except to the extent requested by the DIP Lender in its sole discretion.  The DIP Liens granted pursuant to section 364(d)(1) of the Bankruptcy Code shall be effective and perfected as of the Petition Date upon entry of the Final Order, without need for any additional filings or documentation, except to the extent requested by the DIP Lender in its sole discretion. | |

| | |
|---|---|
| | The DIP Liens securing the DIP Loan shall, pursuant to section 364(d)(1) of the Bankruptcy Code, be valid, perfected, continuing, enforceable, non-avoidable first priority liens and security interests on the DIP Collateral and shall prime all other liens and security interests on the DIP Collateral, including any liens and security interests in existence on the Petition Date, and any other current or future liens granted on the DIP Collateral, including any adequate protection or replacement liens granted on the DIP Collateral (the "Primed Liens").  Notwithstanding anything herein to the contrary, the DIP Liens shall be (i) senior to the Prepetition MetLife Liens but only to the extent of the MetLife Primed Portion and (ii) senior to the Prepetition RLOC Liens but only to the extent of the RLOC Primed Portion. |
| | The term "MetLife Primed Portion" means an amount equal to the product of (i) the DIP Facility, multiplied by (ii) a fraction, the numerator of which is the aggregate Pre-Petition MetLife Obligations and the denominator of which is the sum of the Pre-Petition MetLife Obligations and the Pre-Petition RLOC Obligations.  The term "RLOC Primed Portion" shall mean an amount equal to the product of (i) the total DIP Facility, multiplied by (ii) a fraction, the numerator of which is the aggregate Pre-Petition RLOC Obligations and the denominator of which is the Pre-Petition MetLife Obligations and the Pre-Petition RLOC Obligations. |
| | Except with respect to the Carve-Out, the DIP Liens shall not be subject to surcharge under section 506(c) or any other provision of the Bankruptcy Code. |
| | The DIP Loan shall, pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Chapter 11 Cases of each Borrower (the "DIP Superpriority Claims"), which DIP Superpriority Claims in respect of the DIP Facility shall have priority over any and all claims against the Borrowers. |
| **Adequate Protection:** | (1) Adequate protection payments, (2) replacement lien, (3) preservation of Debtors' equity cushion through continuous maintenance of real property and (4) super priority expenses of administration for any proven Diminution of Value, as follows:

First, use of DIP Facility proceeds and Cash Collateral in accordance with the Budget to provide adequate protection payments equivalent to post-petition, non-default interest on the outstanding balances of (1) RAF; (2) MetLife; and (3) |

Conterra, for the Debtors following the closing of the DIP Facility. Adequate protection payments and other advances under the DIP Facility will be subject to compliance with minimum liquidity or maximum Budget variance financial covenants and the absence of any other Default or Event of Default which has not been cured to the extent provided in the DIP Facility.

Second, to the extent of the Diminution of Value of the interest of the Pre-Petition Secured Lenders in the Prepetition Collateral, the Debtors propose to provide replacement liens. The Prepetition Secured Lenders shall have, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, additional and replacement security interests and Liens in the DIP Collateral, which shall be junior only to the Carve Out and the DIP Liens securing the DIP Loan. Proceeds of Prepetition Replacement Liens shall be allocated amongst Prepetition Secured Lenders in accordance with the terms of the Intercreditor Agreements.

Third, to preserve the prepetition value of the Debtors real property and improvements, the Debtors will use DIP Facility proceeds and Cash Collateral in accordance with the Budget and in the ordinary course to continue to maintain all of the pre-petition real property securing the Debtors' obligations due to the Prepetition Secured Lenders in good repair.

Fourth, to the extent of the Diminution of Value of the allowed interests of the Prepetition Secured Lenders in the Prepetition Collateral, the Prepetition Secured Lenders shall have an allowed superpriority administrative expense claim (the "Prepetition Superpriority Claim"), which shall have priority (except with respect to (i) the DIP Liens, (ii) the DIP Superpriority Claim, and (iii) the Carve Out), in the Chapter 11 Cases under section 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non- consensual Lien, levy, or attachment. Other than the DIP Liens, the DIP Superpriority Claim, and the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or

| | |
|---|---|
| | otherwise, that have been or may be incurred in the Chapter 11 Cases will be senior to, prior to, or on parity with the Prepetition Superpriority Claim (for purposes hereof, such liens will be deemed part of the ''<u>Prepetition Replacement Liens</u>''). |
| **Carve-Out:** | The DIP Liens, DIP Superpriority Claim the Prepetition Liens, the Prepetition Replacement Liens, and the Prepetition Superiority Claims are subordinate only to the following (collectively, the "<u>Carve-Out</u>"): |
| | (i)    all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code *plus* interest at the statutory rate; |
| | (ii)   all reasonable and documented fees and expenses incurred by a trustee under Bankruptcy Code section 726(b), in an aggregate amount not to exceed $250,000; and |
| | (iii)  to the extent allowed by the Court at any time, whether by interim order, procedural order or otherwise (unless subsequently disallowed), all unpaid fees and expenses (the "<u>Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to Bankruptcy Code sections 327, 328, or 363 or by the Committee, pursuant to Bankruptcy Code sections 328 and 1103 (collectively, the "<u>Professional Persons</u>"). |
| **Covenants:** | Affirmative, negative, and other financial and operational covenants customary for transactions of this type, including:<br><br>• Minimum cash balance: None.<br>• Maximum capital expenditures.<br>• No dividends or any other upstream payments.<br>• No change of control, except as may be permitted under applicable provisions of the Bankruptcy Code, including, but not limited to Sections 363 or 1129 of the Bankruptcy Code.<br>• Maintenance of appropriate insurances and having the Lender as a beneficiary of such insurance policies.<br>• Limitations on additional debt, guarantees, and hedging arrangements, including the subordination of all intercompany indebtedness.<br>• Limitations on liens and further negative pledges.<br>• Limitations on sales, transfers, and other dispositions of assets, except as may be permitted under applicable provisions of the Bankruptcy Code, including, but not |

| | |
|---|---|
| | limited to Sections 363 or 1129 of the Bankruptcy Code. <br> • Limitations on loans and investments. <br> • Limitations on creating new subsidiaries or becoming a general partner in any partnership. <br> • Limitations on transactions with affiliates except as permitted. <br> • Actual cash disbursements shall not exceed 110% of budgeted cash disbursements (measured weekly on a cumulative basis from the Petition Date) as reflected in the Budget and actual cash receipts shall not be less than 90% of budgeted cash receipts (measured weekly on a cumulative basis from the Petition Date) as reflected in the Budget. <br> • Limitations on administrative expense claims in excess of an amount mutually determined by the DIP Lender and the Debtors. <br> • Plan of Reorganization to be filed with the Bankruptcy Court within 7 months of entry of the Interim Order. |
| **Conditions:** | The obligation of the DIP Lender to make available the DIP Facility shall be subject to the satisfaction (or waiver by the DIP Lender, in its sole and absolute discretion) of the following conditions: <br> (a) The DIP Credit Documents shall have been executed and delivered by each party thereto, in form and substance satisfactory to the DIP Lender; <br> (b) The Petition Date shall have occurred, and each Borrower shall be a debtor and debtor in possession; <br> (c) The Interim Order shall have been entered, authorizing and approving the making of the loans in the amounts consistent with those set forth in the "DIP Facility" section above and the granting of the superpriority claims and liens and other liens referred to under the heading "Security and Priority" (such order, the "<u>Interim Order</u>" and together with the Final Order, the "<u>DIP Orders</u>"), which Interim Order shall not have been vacated, reversed or stayed in any respect. |
| **Representations and Warranties:** | Usual and customary representations and warranties, including organization in good standing, validity of agreements, tax status, compliance with law, and operational and financial disclosures. |
| **Events of Default:** | Events of Default will include, in addition to other such events customarily found in transactions similar to the DIP Loan: <br> • Payment defaults. <br> • Covenant defaults. <br> • Representation or warranty breaches. |

| | |
|---|---|
| | Among other remedies, upon the occurrence of an Event of Default, the DIP Lender may accelerate all of the DIP Facility obligations. |
| **Expenses:** | The Borrowers will be responsible for the DIP Lender's out of pocket fees and expenses incurred by the Lender to put the DIP Facility in place, to manage the DIP Loan, and to enforce the terms of the DIP Facility (absent an event of default) in accordance with the Budget. |
| **Contingencies:** | None.  Due diligence complete. |

59797.0007.17031373.1

# EXHIBIT

# D

*$ in actual amounts*

## Summary of Interest & Fees

| Term | Sandton | Conterra | Rabobank | Var. to Rabo (Fav. / ((Unfav.)) Sandton | Conterra |
|---|---|---|---|---|---|
| Commitment | $ 45,000,000 | $ 35,000,000 | $ 35,000,000 | $ (10,000,000) | $ - |
| Interim Commitment | 25,000,000 | 15,000,000 | 15,000,000 | (10,000,000) | - |
| Maturity | 9 months | 9 months | 9 months | - | - |
| Maturity Extension | 3 months | 3 months | 3 months | - | - |
| Interest (PIK) | 12.50% Fixed | SOFR + 9.00% | 6.50% Fixed | 6.00% | 7.84% |
| Default Rate | 2.00% | 2.00% | 2.00% | - | - |
| *Fees:* | | | | | |
| *Issuance Fee* | *1.50%* | *2.00%* | *1.00%* | *0.50%* | *1.00%* |
| *Exit Fee* | *1.50%* | *1.00%* | *0.75%* | *0.75%* | *0.25%* |
| *Renewal Fee (if applicable)* | *1.50%* | *2.00%* | *1.00%* | *0.50%* | *1.00%* |
| *Unused Fee* | *1.00%* | *2.00%* | *-* | *1.00%* | *2.00%* |

## Implied Interest & Fee Cost:

| | Sandton | Conterra | Rabobank | Var. to Rabo (Fav. / ((Unfav.)) Sandton | Conterra |
|---|---|---|---|---|---|
| **No Renewal Scenario (9 month case):** | | | | | |
| Issuance Fee (1) | $ 675,000 | $ 700,000 | $ 350,000 | $ 325,000 | $ 350,000 |
| Exit Fee (2) | 675,000 | 350,000 | 262,500 | 412,500 | 87,500 |
| Unused Fee (3, 5, 6) | 65,385 | 121,154 | - | 65,385 | 121,154 |
| PIK Interest Expense (4, 5, 6) | 3,555,527 | 3,062,693 | 1,337,750 | 2,217,777 | 1,724,942 |
| **Total** | **$ 4,970,912** | **$ 4,233,846** | **$ 1,950,250** | **$ 3,020,662** | **$ 2,283,596** |
| Minimum Cash Covenant | 1,500,000 | 1,500,000 | - | 1,500,000 | 1,500,000 |
| **Total Including Minimum Cash** | **$ 6,470,912** | **$ 5,733,846** | **$ 1,950,250** | **$ 4,520,662** | **$ 3,783,596** |
| **Renewal Scenario (12 month case):** | | | | | |
| Issuance Fee (1) | $ 675,000 | $ 700,000 | $ 350,000 | $ 325,000 | $ 350,000 |
| Exit Fee (2) | 675,000 | 350,000 | 262,500 | 412,500 | 87,500 |
| Unused Fee (3, 5, 6) | 65,385 | 121,154 | - | 65,385 | 121,154 |
| PIK Interest Expense (4, 5, 6) | 5,267,162 | 4,620,801 | 1,993,751 | 3,273,411 | 2,627,050 |
| Renewal Fee (7) | 675,000 | 700,000 | 350,000 | 325,000 | 350,000 |
| **Total** | **$ 7,357,546** | **$ 6,491,955** | **$ 2,956,251** | **$ 4,401,295** | **$ 3,535,703** |
| Minimum Cash Covenant | 1,500,000 | 1,500,000 | - | 1,500,000 | 1,500,000 |
| **Total Including Minimum Cash** | **$ 8,857,546** | **$ 7,991,955** | **$ 2,956,251** | **$ 5,901,295** | **$ 5,035,703** |

Footnotes:

1. Issuance fees are calculated as the issuance fee percentage multiplied by the total commitment amount.

2. Exit fees are calculated as the exit fee percentage multiplied by the total commitment amount.

3. Unused fees are calculated on a weekly basis as the unused fee percentage multiplied by the current total unused balance of the DIP financing. Unused fees are capitalized on the outstanding balance of the DIP financing on a monthly basis.

4. PIK interest expenses are calculated on a weekly basis as the PIK interest percentage multiplied by the current total balance of the DIP financing. PIK interest expenses are capitalized on the outstanding balance of the DIP financing on a monthly basis. Conterra PIK Interest Rate assumes a 1 month SOFR of 5.34%.

5. Assumes the remaining balance at 8/11/24 is drawn the next day for purposes of calculating the Unused Fee and Interest Expense.

6. Sandton financing assumes $25M is funded in week 1. Conterra and Rabobank financings assume $15M funded in week 1 with additional draws in $5M increments as needed based on the DIP Budget.

7. Renewal fees are calculated as the renewal fee percentage multiplied by the total commitment amount.