Sheila R. Schwager, ISB No. 5059
Brent R. Wilson, ISB No. 8936
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 W. Main Street, Suite 200
P.O. Box 1617
Boise, ID 83701-1617
Telephone:  208.344.6000
Facsimile:  208.954.5261
Email: sschwager@hawleytroxell.com
          bwilson@hawleytroxell.com

Andrew J. Schoulder (*pro hac vice*)
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone:  212.318.3030
Email: andrew.schoulder@nortonrosefulbright.com

Attorneys for Rabo AgriFinance LLC

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re | Chapter 11 |
| MILLENKAMP CATTLE, INC., *et al.*, | Case No. 24-40158 (NGH) |
| Debtors.[1] | (Joint Administration Requested) |

**SUPPLEMENT TO RABO AGRIFINANCE LLC'S SECOND SUPPLEMENT TO RABO
AGRIFINANCE LLC'S OMNIBUS OBJECTION TO (I) EMERGENCY MOTION**

---

[1]    The Debtors in the Chapter 11 Cases along with the last four digits of their respective tax identification number
or registration number in the applicable jurisdiction are: Millenkamp Cattle, Inc. (3892); Idaho Jersey Girls LLC
(4467); East Valley Cattle, LLC (8613); Millenkamp Properties, L.L.C. (4003); Millenkamp Properties II LLC
(7719); Millenkamp Family LLC (8279); Goose Ranch, LLC (N/A); Idaho Jersey Girls Jerome Dairy LLC (3431);
Black Pine Cattle LLC (N/A); and Millenkamp Enterprises LLC (N/A).  The location of the Debtors' service
address for purposes of the Chapter 11 Cases is 471 N 300 W., Jerome, Idaho 83338.

SUPPLEMENT TO RABO AGRIFINANCE LLC'S SECOND SUPPLEMENT TO RABO
AGRIFINANCE LLC'S OMNIBUS OBJECTION TO (I) EMERGENCY MOTION
AUTHORIZING USE OF CASH COLLATERAL; AND (II) EMERGENCY MOTION
AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND
GRANTING ADEQUATE PROTECTION; AND OBJECTION TO NOTICE OF PREFERRED
POST-PETITION FINANCING PROPOSED (Dkt. No. 131) - 1

**AUTHORIZING USE OF CASH COLLATERAL; AND (II) EMERGENCY MOTION AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND GRANTING ADEQUATE PROTECTION; AND OBJECTION TO NOTICE OF PREFERRED POST-PETITION FINANCING PROPOSED (Dkt. No. 131)**

Rabo AgriFinance LLC, in its capacity as agent and lender ("**RAF**"), hereby files this Supplement, as an appendix, to RAF's *Second Supplement to Rabo AgriFinance LLC's Omnibus Objection to (I) Emergency Motion Authorizing Use of Cash Collateral; and (II) Emergency Motion Authorizing the Debtors to Obtain Post-Petition Financing and Granting Adequate Protection; and Objection to Notice of Preferred Post-Petition Financing Proposed (Dkt. No. 131)*, filed by RAF on April 8, 2024.

Filed with this Supplement is the following:

| | |
|---|---|
| Senior Secured Super-Priority Debtor-in-Possession Credit Agreement Between Coöperatieve Rabobank U.A., New York Branch as Sole Lead Arranger, Agent and as a Lender and Millenkamp Cattle, Inc., Idaho Jersey Girls LLC, East Valley Cattle, LLC, Millenkamp Properties, L.L.C., Millenkamp Properties II, LLC, Millenkamp Family LLC, Goose Ranch LLC, Idaho Jersey Girls Jerome Dairy LLC, Black Pine Cattle LLC, | Exhibit A |

SUPPLEMENT TO RABO AGRIFINANCE LLC'S SECOND SUPPLEMENT TO RABO AGRIFINANCE LLC'S OMNIBUS OBJECTION TO (I) EMERGENCY MOTION AUTHORIZING USE OF CASH COLLATERAL; AND (II) EMERGENCY MOTION AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND GRANTING ADEQUATE PROTECTION; AND OBJECTION TO NOTICE OF PREFERRED POST-PETITION FINANCING PROPOSED (Dkt. No. 131) - 2

| MillenKamp Enterprises LLC (**DRAFT – 04/08/2024**) | |
|---|---|
| Covenants Pertaining to Cash Collateral Use | Exhibit B |

Dated: April 8, 2024

HAWLEY TROXELL ENNIS & HAWLEY LLP

/s/ Brent R. Wilson

_____
Brent R. Wilson, ISB No. 8936
Attorneys for Rabo AgriFinance LLC

SUPPLEMENT TO RABO AGRIFINANCE LLC'S SECOND SUPPLEMENT TO RABO
AGRIFINANCE LLC'S OMNIBUS OBJECTION TO (I) EMERGENCY MOTION
AUTHORIZING USE OF CASH COLLATERAL; AND (II) EMERGENCY MOTION
AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND
GRANTING ADEQUATE PROTECTION; AND OBJECTION TO NOTICE OF PREFERRED
POST-PETITION FINANCING PROPOSED (Dkt. No. 131) - 3

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 8th day of April, 2024, I electronically filed the foregoing SUPPLEMENT TO RABO AGRIFINANCE LLC'S SECOND SUPPLEMENT TO RABO AGRIFINANCE LLC'S OMNIBUS OBJECTION TO (I) EMERGENCY MOTION AUTHORIZING USE OF CASH COLLATERAL; AND (II) EMERGENCY MOTION AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND GRANTING ADEQUATE PROTECTION; AND OBJECTION TO NOTICE OF PREFERRED POST-PETITION FINANCING PROPOSED (Dkt. No. 131) with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to those identified in the CM/ECF system for this matter, at the time this document was filed, including the following persons:

| | |
|---|---|
| Matthew T. Christensen | mtc@johnsonmaylaw.com |
| Krystal R. Mikkilineni | Krystal.mikkilineni@dentons.com |
| Tirzah R. Roussell | Tirzah.roussell@dentons.com |
| U.S. Trustee | ustp.region18.bs.ecf@usdoj.gov |
| Heidi Buck Morrison | heidi@racineolson.com |
| David A. Coleman | david@colemanjacobsonlaw.com |
| Jon B. Evans | Evans.jb@dorsey.com |
| Kimbell D. Gourley | kgourley@idalaw.com |
| Daniel C. Green | dan@racineolson.com |
| Scott C. Powers | spowers@spencerfane.com |
| Janine Patrice Reynard | janine@averylaw.net |
| Sheila Rae Schwager | sschwager@hawleytroxell.com |
| Brent Russel Wilson | bwilson@hawleytroxell.com |
| Zachary Fairlie | zfairlie@spencerfance.com |
| John O'Brien | jobrien@spencerfane.com |
| Gery W. Edson | gedson@gedson.com |
| Aaron Bell | abell@evanskeane.com |
| Brian Faria | brian@sawtoothlaw.com |
| Robert A. Faucher | rfaucher@hollandhart.com |
| Matthew W. Grimshaw | matt@grimshawlawgroup.com |

SUPPLEMENT TO RABO AGRIFINANCE LLC'S SECOND SUPPLEMENT TO RABO AGRIFINANCE LLC'S OMNIBUS OBJECTION TO (I) EMERGENCY MOTION AUTHORIZING USE OF CASH COLLATERAL; AND (II) EMERGENCY MOTION AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND GRANTING ADEQUATE PROTECTION; AND OBJECTION TO NOTICE OF PREFERRED POST-PETITION FINANCING PROPOSED (Dkt. No. 131) - 4

59797.0007.17033803.1

| Karen Lloyd | klloyd@grsm.com |
| James Justin May | jjm@johnsonmaylaw.com |
| Rhett Michael Miller | rmiller@magicvalley.law |
| Robert E. Richards | robert.richards@dentons.com |
| Holly Roark | holly@roarklawboise.com |
| Evan Thomas Roth | evan@sawtoothlaw.com |
| Meredith Leigh Thielbahr | mthielbahr@grsm.com |
| John F. Kurtz, Jr. | jfk@kurtzlaw.com |
| And any others receiving cm/ecf notices | |

/s/ Brent R. Wilson
Brent R. Wilson

SUPPLEMENT TO RABO AGRIFINANCE LLC'S SECOND SUPPLEMENT TO RABO
AGRIFINANCE LLC'S OMNIBUS OBJECTION TO (I) EMERGENCY MOTION
AUTHORIZING USE OF CASH COLLATERAL; AND (II) EMERGENCY MOTION
AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND
GRANTING ADEQUATE PROTECTION; AND OBJECTION TO NOTICE OF PREFERRED
POST-PETITION FINANCING PROPOSED (Dkt. No. 131) - 5

# EXHIBIT

# A

*Norton Rose Fulbright Draft (4/8/2024)*

**SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
CREDIT AGREEMENT**

**BETWEEN**

**COÖPERATIEVE RABOBANK U.A., NEW YORK BRANCH**

**AS SOLE LEAD ARRANGER, AGENT AND AS A LENDER**

**AND**

**MILLENKAMP CATTLE, INC.,
IDAHO JERSEY GIRLS LLC,
EAST VALLEY CATTLE, LLC,
MILLENKAMP PROPERTIES, L.L.C.,
MILLENKAMP PROPERTIES II LLC,
MILLENKAMP FAMILY LLC,
GOOSE RANCH LLC ,
IDAHO JERSEY GIRLS JEROME DAIRY LLC,
BLACK PINE CATTLE LLC,
MILLENKAMP ENTERPRISES LLC**

**DATED AS OF APRIL ___, 2024**

**TABLE OF CONTENTS**

**Page**

1       DEFINITIONS ......................................................................................................... 2

    1.1       General Definitions ........................................................................................ 2
    1.2       Accounting Terms ......................................................................................... 24
    1.3       Other Terms Defined in the Code .................................................................. 24
    1.4       Interpretation ................................................................................................ 24

2       LOANS, PAYMENT, PREPAYMENT, PURPOSE, FEES, ACCOUNTS,
    TERMINATION, AND CONTRIBUTION ............................................................ 24

    2.1       Delayed Draw Term Loans ............................................................................ 24
    2.2       Payment of Principal and Interest; Default Rate; Voluntary Overadvances and
            Extensions ..................................................................................................... 25
    2.3       Prepayment ................................................................................................... 26
    2.4       Purpose ......................................................................................................... 27
    2.5       Fees ............................................................................................................... 27
    2.6       Debtors' Loan Account .................................................................................. 28
    2.7       Account Review ............................................................................................ 28
    2.8       Termination of Agreement ............................................................................ 28
    2.9       Contribution Agreement ................................................................................ 28

3       CONDITIONS TO LOANS ................................................................................... 29

    3.1       Approval of Agent's Counsel ........................................................................ 29
    3.2       Compliance ................................................................................................... 29
    3.3       Documentation .............................................................................................. 29
    3.4       Inspections .................................................................................................... 29
    3.5       Liens ............................................................................................................. 29
    3.6       Fees ............................................................................................................... 29
    3.7       Know Your Customer Requirements .............................................................. 30
    3.8       Financing Orders ........................................................................................... 30
    3.9       Other Bankruptcy Court Orders ..................................................................... 30
    3.10     Vendor Agreements ....................................................................................... 30

4       SECURITY ........................................................................................................... 30

    4.1       Security Interests and Liens .......................................................................... 30
    4.2       Endorsement by Agent .................................................................................. 32
    4.3       Delivery of Warehouse Receipts to Agent ..................................................... 32
    4.4       Preservation of Collateral and Perfection of Security Interests ...................... 32
    4.5       Loss of Collateral .......................................................................................... 33
    4.6       Collection of Accounts; Power of Attorney .................................................... 33
    4.7       Account Covenants ........................................................................................ 33
    4.8       Account Records and Verification Rights ...................................................... 33
    4.9       Notice to Account Debtors ............................................................................ 34
    4.10     Collateral Records ......................................................................................... 34
    4.11     Special Collateral .......................................................................................... 34
    4.12     Remittance of Proceeds to Agent ................................................................... 34
    4.13     Safekeeping of Collateral .............................................................................. 34
    4.14     Changes in Locations of Collateral ................................................................ 34
    4.15     Sales and Use of Collateral ........................................................................... 34

|  | 4.17 | Trademark License | 35 |
| 5 |  | REPRESENTATIONS AND WARRANTIES | 35 |
|  | 5.1 | Defaults and Disputes | 35 |
|  | 5.2 | Defaults and Disputes | 35 |
|  | 5.3 | Licenses, Patents, Copyrights, Trademark sand Trade Names | 35 |
|  | 5.4 | Other Liens on Collateral | 35 |
|  | 5.5 | Location of Assets; Chief Executive Office | 36 |
|  | 5.6 | Tax Liabilities | 36 |
|  | 5.7 | Indebtedness and Producer Payables | 36 |
|  | 5.8 | Other Names | 36 |
|  | 5.9 | Structure and Affiliates | 36 |
|  | 5.10 | Environmental Matters | 36 |
|  | 5.11 | Existence | 37 |
|  | 5.12 | Authority | 37 |
|  | 5.13 | Binding Effect | 37 |
|  | 5.14 | Correctness of Financial Statements | 37 |
|  | 5.15 | Employee Controversies | 37 |
|  | 5.16 | Compliance with Laws and Regulations | 37 |
|  | 5.17 | Account Warranties | 38 |
|  | 5.18 | Inventory Warranties | 38 |
|  | 5.19 | Reserved | 38 |
|  | 5.20 | Pension Reform Act | 38 |
|  | 5.21 | Margin Security | 38 |
|  | 5.22 | Investment Company Act Not Applicable | 39 |
|  | 5.23 | Full Disclosure | 39 |
|  | 5.24 | Intellectual Property | 39 |
|  | 5.25 | Water Rights | 39 |
|  | 5.26 | Orders | 39 |
|  | 5.27 | Bankruptcy Cases | 40 |
|  | 5.28 | Agreed Budget | 40 |
|  | 5.29 | Survival of Warranties | 40 |
| 6 |  | AFFIRMATIVE COVENANTS | 40 |
|  | 6.1 | Financial and Other Information | 41 |
|  | 6.2 | Conduct of Business | 41 |
|  | 6.3 | Maintenance of Collateral, Chief Executive Office, Equipment List | 42 |
|  | 6.4 | Liability Insurance | 42 |
|  | 6.5 | Property Insurance | 42 |
|  | 6.6 | Benefit Plans | 43 |
|  | 6.7 | Notice of Suit, Adverse Change in Business or Default | 43 |
|  | 6.8 | Use of Proceeds | 43 |
|  | 6.9 | Books and Records | 43 |
|  | 6.10 | Arm's Length Dealing | 44 |
|  | 6.11 | Treasury Management | 44 |
|  | 6.12 | Further Assurances | 44 |
|  | 6.13 | Agreed Budget; Capital Expenditures | 44 |
|  | 6.14 | Milestones | 45 |
| 7 |  | NEGATIVE COVENANTS | 45 |
|  | 7.1 | Encumbrances | 46 |

| | 7.2 | Consolidations, Mergers or Acquisitions | 46 |
|---|---|---|---|
| | 7.3 | Deposits, Investments, Advances or Loans | 46 |
| | 7.4 | Indebtedness | 46 |
| | 7.5 | Guaranties and Other Contingent Obligations | 47 |
| | 7.6 | Disposition of Property | 47 |
| | 7.7 | Loans to, Investments in, and Transactions with Affiliates | 47 |
| | 7.8 | Amendment of Organizational Documents; Subsidiaries; Fiscal Year | 47 |
| | 7.9 | Distributions in Respect of Equity, Prepayment of Debt, and Compensation | 48 |
| | 7.10 | Continuity of Management | 48 |
| | 7.11 | Use of Names or Trademarks | 48 |
| | 7.12 | Chapter 11 Claims | 48 |
| | 7.13 | Revision of Orders; Application to Bankruptcy Court | 48 |
| 8 | | DEFAULT AND RIGHTS AND REMEDIES | 48 |
| | 8.1 | Liabilities | 48 |
| | 8.2 | Rights and Remedies | 49 |
| | 8.3 | Waiver of Demand | 49 |
| | 8.4 | Waiver of Notice | 49 |
| | 8.5 | Notices of Defaults | 50 |
| | 8.6 | Credit Bids | 50 |
| 9 | | AGENT AND AGENCY | 50 |
| | 9.1 | Authorization and Action | 50 |
| | 9.2 | Agent's Reliance, Etc. | 51 |
| | 9.3 | Agent as a Lender, Affiliates | 51 |
| | 9.4 | Non-Reliance on Agent and Other Lenders | 51 |
| | 9.5 | Indemnification | 51 |
| | 9.6 | Successor Agent | 52 |
| | 9.7 | Verification of Borrowing Notices | 52 |
| | 9.8 | Titles | 52 |
| | 9.9 | Erroneous Payments | 53 |
| 10 | | MISCELLANEOUS | 54 |
| | 10.1 | Timing of Payments | 54 |
| | 10.2 | Attorneys' Fees and Costs | 54 |
| | 10.3 | Expenditures by Agent | 55 |
| | 10.4 | Agent's Costs and Expenses as Additional Liabilities | 55 |
| | 10.5 | Claims and Taxes; Release | 56 |
| | 10.6 | Custody and Preservation of Collateral | 57 |
| | 10.7 | Inspection | 57 |
| | 10.8 | Examination of Banking Records | 57 |
| | 10.9 | Governmental Reports | 57 |
| | 10.10 | Reliance by Agent and the Lenders | 57 |
| | 10.11 | Parties | 58 |
| | 10.12 | Applicable Law; Severability | 58 |
| | 10.13 | SUBMISSION TO JURISDICTION; WAIVER OF BOND AND TRIAL BY JURY | 58 |
| | 10.14 | Application of Payments: Waiver | 58 |
| | 10.15 | Marshaling | 59 |
| | 10.16 | Section Titles | 59 |
| | 10.17 | Continuing Effect | 59 |

| 10.18 | No Waiver | 59 |
| 10.19 | Notices | 59 |
| 10.20 | Regulatory Changes | 60 |
| 10.21 | Payments Set Aside | 61 |
| 10.22 | Taxes | 61 |
| 10.23 | Assignments and Participation | 64 |
| 10.24 | Maximum Interest | 66 |
| 10.25 | Additional Advances | 67 |
| 10.26 | Loan Agreement Controls | 67 |
| 10.27 | Obligations Several | 67 |
| 10.28 | Pro Rata Treatment | 67 |
| 10.29 | Confidentiality and Information | 68 |
| 10.30 | Independence of Covenants | 68 |
| 10.31 | Amendments and Waivers. | 68 |
| 10.32 | Replacement of a Lender | 69 |
| 10.33 | Representations by the Lenders | 70 |
| 10.34 | Counterparts and Electronic and Facsimile Signatures | 70 |
| 10.35 | Set-off | 70 |
| 10.36 | PATRIOT Act Information | 71 |
| 10.37 | Binding Effect | 71 |
| 10.38 | Administrative Debtor | 71 |
| 10.39 | No Advisory or Fiduciary Responsibility | 71 |
| 10.40 | FINAL AGREEMENT | 71 |
| 10.41 | ACKNOWLEDGEMENT AND CONSENT TO BAIL-IN OF EEA FINANCIAL INSTITUTIONS | 72 |

## LIST OF SCHEDULES AND EXHIBITS

### SCHEDULES:

| | | |
|---|---|---|
| Schedule A | - | Commitments |
| Schedule B | - | Agreed Budget |

### EXHIBITS:

| | | |
|---|---|---|
| Exhibit 1A | - | Form of Note |
| Exhibit 1B | - | Form of Assignment and Acceptance |
| Exhibit 2A | - | List of Closing Documents |
| Exhibit 2B | - | List of Post-Closing Documents |
| Exhibit 5A | - | Disclosure Schedule |
| Exhibit 5B | - | Organizational Chart |
| Exhibit 6A | - | Compliance Certificate |

## SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This Senior Secured Super-Priority Debtor-in-Possession Credit Agreement (as amended, modified, supplemented, renewed or restated from time to time, the "**Agreement**") is made as of April ___, 2024, by and among MILLENKAMP CATTLE, INC., an Idaho corporation ("**Millenkamp Cattle**"), IDAHO JERSEY GIRLS LLC, an Idaho limited liability company ("**Idaho Jersey**"), EAST VALLEY CATTLE, LLC, an Idaho limited liability company ("**East Valley Cattle**"), MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company ("**Millenkamp Properties**"), MILLENKAMP PROPERTIES II LLC, an Idaho limited liability company ("**Millenkamp Properties II**"), MILLENKAMP FAMILY LLC, an Idaho limited liability company ("**Millenkamp Family**"), GOOSE RANCH LLC, an Idaho limited liability company ("**Goose Ranch**"), IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company ("**Idaho Jersey Jerome**"), BLACK PINE CATTLE LLC, an Idaho limited liability company ("**Black Pine**"), and MILLENKAMP ENTERPRISES LLC, an Idaho limited liability company ("**Millenkamp Enterprises**"), each being a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (Millenkamp Cattle, Idaho Jersey, East Valley Cattle, Millenkamp Properties and Millenkamp Properties II, Millenkamp Family, Goose Ranch, Idaho Jersey Jerome, Black Pine, Millenkamp Enterprises are each individually referred to as a "**Debtor**" and collectively, the "**Debtors**"), the financial institutions listed on the signature pages hereof and each other financial institution that may hereafter become a party hereto in accordance with the provisions hereof (collectively, the "**Lenders**" and individually, a "**Lender**") and COÖPERATIEVE RABOBANK U.A., NEW YORK BRANCH, in its capacity as Agent for the Lenders and other Secured Parties (in such capacity, the "**Agent**"), as Sole Lead Arranger, and as a Lender.

## RECITAL

WHEREAS, on April 2, 2024 (the "**Petition Date**"), the Debtors voluntarily commenced cases (collectively, the "**Bankruptcy Cases**" and each individually, a "**Bankruptcy Case**") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Idaho, Southern Division (Boise) (the "**Bankruptcy Court**");

WHEREAS, the Debtors continue to operate the Debtors' businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Debtors have requested that the Lenders make available to the Debtors for the purposes specified in this Agreement a senior secured, super-priority debtor-in-possession credit facility in an aggregate principal amount of up to $35,000,000, pursuant to which the Lenders will provide delayed draw term loans which may be drawn by way of cash advances;

WHEREAS, the Lenders are willing to provide such financing only if all of the Liabilities under the Financing Agreements, and all other obligations of the Debtors owing to the Agent and the Lenders are secured by (i) pursuant to 11 U.S.C. § 364(c)(2), first priority Liens on all Collateral (as defined herein) that was not encumbered by valid, binding, perfected, continuing, enforceable, and non-avoidable Liens as of the Petition Date; (ii) pursuant to 11 U.S.C. §364(d)(1), first priority priming Liens on all other Collateral[1], and (iii) pursuant to 11 U.S.C. § 364(c)(3) (subject to and subordinate only to the Carve-Out), Liens on all tangible and intangible Pre-Petition and post-petition property of the Debtors and their estates that on or as of the Petition Date, is subject to either (a) valid, binding, perfected, continuing, enforceable, and non-avoidable, Permitted Pre-Petition Senior Liens, or (b) valid, binding, continuing, enforceable, and

---

[1] Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (i) senior to the Pre-Petition MetLife Liens but only to the extent of the MetLife Primed Portion, (ii) senior to the Pre-Petition RLOC Liens but only to the extent of the RLOC Primed Portion, (iii) senior to any Adequate Protection Liens on DIP Collateral and (iv) not subordinate to any liens, security interests, or mortgages that are avoided and preserved for the benefit of the Debtors and their Estate under 11 U.S.C. § 551.

non-avoidable Permitted Pre-Petition Senior Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by 11 U.S.C. § 546(b), which shall be (x) immediately junior and subordinate to any such Permitted Pre-Petition Senior Liens, (y) senior to the Liens and the Adequate Protection Liens on all Pre-Petition Collateral subject to such Permitted Pre-Petition Senior Liens;

WHEREAS, the Debtors' business is a mutual and collective enterprise and the Debtors believe that the loans and other financial accommodations provided to the Debtors under this Agreement will enhance the aggregate borrowing powers of the Debtors and facilitate the administration of the Bankruptcy Cases and their loan relationship with the Agent and the Lenders, all to the mutual advantage of the Debtors;

WHEREAS, each of the Debtors acknowledge that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Debtors as provided in this Agreement; and

WHEREAS, the Agent's and the Lenders' willingness to extend financial accommodations to the Debtors as more fully set forth in this Agreement and the other Financing Agreements is done solely as an accommodation to the Debtors and at the Debtors' request and in furtherance of the Debtors' mutual and collective enterprise.

**NOW, THEREFORE,** in consideration of the foregoing and of the terms and conditions contained in this Agreement, and of any loans or extensions of credit or other financial accommodations at any time made to or for the benefit of the Debtors by Agent and the Lenders, Debtors, Agent and the Lenders agree as follows:

## 1    DEFINITIONS.

**1.1    General Definitions.**  When used herein, the following capitalized terms shall have the meanings indicated, whether used in the singular or the plural:

"**Acceptable Plan**" shall mean any Plan of Reorganization (a) the provisions of which are in form and substance reasonably satisfactory to the Required Lenders or (b) which provides (i) for the Full Satisfaction of the Liabilities upon confirmation or effectiveness of such plan and (ii) market standard exculpations, indemnities and releases in favor of the Agent, the Lenders, the other Secured Parties, and their respective related parties in such capacities (as reasonably determined by Agent).

"**Acceptable Plan Effective Date**" shall mean the occurrence of the effective date of the Acceptable Plan according to its terms.

"**Account Debtor**" shall mean any Person that is obligated on or under an Account or a General Intangible.

"**Accounts**" shall mean all of Debtors' present and future rights to payment for Inventory or other Goods sold or leased or for services rendered, which rights are not evidenced by Instruments or Chattel Paper, regardless of whether such rights have been earned by performance and any other "accounts" (as defined in the Code).

2

["**Actual Capital Expenditures Amount**"] means the sum of all capital expenditures made by the Debtors during the relevant period of determination which corresponds to the capital expenditures identified in the Agreed Budget.[2]

"**Actual Total Cash Disbursements** " means the sum of all disbursements, expenses and payments made by the Debtors during the relevant period of determination which corresponds to the disbursements, expenses and payments identified on a line-by-line basis described under the heading "Total Cash Disbursements" in the Agreed Budget, as determined in a manner consistent with the Agreed Budget.

"**Actual Total Cash Receipts**" means all cash or other collections received by the Debtors from operations which correspond to the cash and other collections identified by the line item under the heading "Total Cash Receipts" in the Agreed Budget, as determined in a manner consistent with the Agreed Budget.

"**Adequate Protection Liens**" shall have the meaning set forth in the Order.

"**Administrative Debtor**" shall have the meaning set forth in Section 10.38.

"**Affiliate**" shall mean any Person:  (a) that directly or indirectly, through one or more trusts or other intermediaries, controls or is controlled by, or is under common control with, one or more of the Debtors; (b) that directly or beneficially owns or holds ten percent (10%) or more of any class of the voting Equity Interest of one or more of the Debtors; (c) ten percent (10%) or more of the voting Equity Interest of which is owned directly or beneficially or held by one or more of the Debtors; or (d) that is a director, officer, manager, agent or employee of one or more of the Debtors.

"**Agent**" shall have the meaning set forth in the preamble to this Agreement and shall include any successor to Agent that has been appointed in accordance with Section 9.6.

"**Agreed Budget**" means the budget attached to [the DIP Financing Motion as Exhibit C], as the same shall be updated, modified or supplemented from time to time as provided in Section 6.13(a).

"**Agreed Budget Variance Report**" means a report provided by the Debtors to Agent:  (a) showing, in each case, a line-item by line-item comparison of (i) the Actual Total Cash Disbursements to the Budgeted Total Cash Disbursements for the most recently ended Cumulative Period and (ii) the Actual Total Cash Receipts to the Budgeted Total Cash Receipts for the most recently ended Cumulative Period (in each case, as provided in Section 6.13(b), as applicable), noting therein the variances from the applicable budgeted amounts set forth for such period in the Agreed Budget, and shall include explanations for all material variances (including whether such variance is permanent in nature or timing related); and (b) which includes an analysis demonstrating the Debtors are in compliance with the budget covenants set forth in Section 6.13, and (c) which is certified by a Responsible Officer of the Debtors. The Agreed Budget Variance Report shall be in a form, and shall contain supporting information, satisfactory to Agent.

"**Agreement**" shall have the meaning set forth in the introduction.

"**Alias**" shall mean singularly and "Aliases" shall mean collectively any former names, current names, future names, trade names, assumed business names, or variations of names (whether intentional, unintentional, mistaken, or accidental) used or acknowledged by any Debtor for any purpose, whether or not such names are disclosed on Part 8 of Exhibit 5A.  Reference in this Agreement, any Financing Agreement, or any other Agreement by or between one or more of the Debtors and Agent, including any of

---

[2] NTD:  Subject to receipt and review of final budget.

3

Agent's affiliates, to any Alias for any Debtor shall mean at any time the proper legal name for such Debtor(s).

"**Anti-Corruption Laws**" shall mean all laws, rules, and regulations of any jurisdiction applicable to Debtors or their Subsidiaries from time to time concerning or relating to bribery or corruption.

"**Assignee**" shall have the meaning set forth in Section 10.23(a).

"**Assignment and Acceptance**" shall have the meaning set forth in Section 10.23(a).

"**Available Amount**" shall mean, at any time, an amount equal to (a) the Commitments *minus* (b) the aggregate principal amount of the Loan Liabilities (exclusive of any PIK Interest and any fees capitalized in accordance with Section 2.5).

"**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bank Products**" means any of the following services or facilities extended to Debtors by Agent or any Lender or any of Agent or any Lender's affiliates: (a) credit cards; (b) cash management, including controlled disbursement services, automatic clearing house transfer of funds and overdrafts; and (c) products, facilities and services extended under Swap Contracts with a Person that is a Lender or any affiliate of a Lender at the time of execution of the Swap Contract.

"**Bank Products Agreements**" means all documents and agreements relating to Bank Products.

"**Bank Products Obligations**" means, with respect to any Person, all obligations, liabilities, reimbursement obligations, fees, or expenses owing by such Person pursuant to or evidenced by a Bank Product Agreement and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising.

"**Bankruptcy Cases**" shall have the meaning specified in the recitals to this Agreement.

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended, modified, succeeded or replaced from time to time.

"**Bankruptcy Court**" shall have the meaning specified in the recitals to this Agreement.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plans**" shall have the meaning set forth in Section 5.20.

"**Board of Governors**" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

["**Budgeted Capital Expenditures Amount**"] means the amount of budgeted capital expenditures set forth in the Agreed Budget during the relevant period of determination.[3]

"**Budgeted Total Cash Disbursements**" means the sum of the line items contained in the Agreed Budget under the heading "Total Cash Disbursements" during the relevant period of determination.

"**Budgeted Total Cash Receipts**" means the line item contained in the Agreed Budget under the heading "Total Cash Receipts" during the relevant period of determination.

"**Business Day**" shall mean any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the applicable laws of the states of Idaho or Missouri, or are in fact closed in the states of Idaho or Missouri, excluding a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States Government securities.

"**Capital Lease**" shall mean any lease of property by a Person as lessee that is capitalized on the balance sheet of such Person.

"**Carve-Out**" shall have the meaning assigned to such term in the Orders.

"**Cash Collateral**" shall have the meaning assigned to such term in the Orders.

"**Cash Collateral Order**" means that certain (a) *Order Granting Debtors' Emergency Motion for Authorization to use Cash Collateral and to Schedule a Final Hearing* entered by the Bankruptcy Court on April [__], 2024 and (b) solely with respect to the use of Cash Collateral described therein, the Orders.

"**Cash Management Order**" means any order of the Bankruptcy Court entered in the Bankruptcy Cases, together with all extensions, modifications and amendments thereto, consistent with the Orders and in form and substance satisfactory to Agent, which among other matters authorizes Debtors to maintain their existing treasury, depository, purchase card, and other cash management arrangements (as set forth in the Pre-Petition Loan Agreement) or such other arrangements as shall be acceptable to Agent.

"**Change**" shall have the meaning set forth in Section 10.20.

"**Change of Control**" shall mean (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), of Equity Interests representing more than ten percent (10%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of any Debtor; (b) a change of any member, manager, officer, or director of any Debtor, unless, in the case of changes of officers or directors, a majority of the officers or directors existing on the Closing Date shall remain; or (c) the acquisition of direct or indirect Control of any Debtor by any Person or group.

"**Claim**" shall have the meaning set forth in the Bankruptcy Code.

"**Closing Date**" shall mean the date on which all applicable conditions set forth in Section 3 are satisfied or waived in accordance with this Agreement.

---

[3] NTD: Subject to receipt and review of final budget.

"**Code**" shall mean the Uniform Commercial Code as in effect in the State of Idaho provided however, if in connection with any Lien, the laws of any other jurisdiction would govern the perfection or enforcement of such Lien, the "Code" shall mean the Uniform Commercial Code as in effect in such jurisdiction with respect to such Lien.

"**Collateral**" means the "DIP Collateral", as such term is defined in the Orders and shall include any and all real or personal property on which Agent may at any time have a Lien pursuant to the Orders or that otherwise secures or is intended to secure the Liabilities, including, without limitation, all now owned or hereafter acquired assets and property, whether real or personal, of the Debtors, including, without limitation, all Pre-Petition Collateral, all assets and property pledged under this Agreement, and all cash, and investment of such cash, inventory, account receivables, including intercompany accounts (and all rights associated therewith), other rights to payment, whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investments property, deposit accounts, "core concentration accounts," "cash collateral accounts," any bank accounts, and in each case all amounts on deposit therein, (or credited thereto) from time to time, equity interests (including all of the equity interests of any of the Debtors and/or foreign subsidiaries), security accounts, security entitlements, securities, commercial tort claims, books, records, plants, equipment, farm products (including crops grown, growing, or to be grown, livestock, born or unborn, supplies used or produced in the Debtors' operations, and products of crops, dairy cattle, or livestock in their unmanufactured state), general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property (whether or not such real property constituted Pre-Petition Collateral), fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copy rights, trademarks, tradenames, and other intellectual property, all licenses therefore, and all proceeds, rents, profits, products, and substitutions if any, of any of the foregoing.

"**Commitment**" means with respect to each Lender on any date, the commitment of such Lender on such date to make Loans in accordance with the terms of this Agreement, expressed as an amount representing the maximum principal amount of such Loans, as such commitment may be reduced or increased from time to time in accordance with Section 10.23, and as all such amounts may be reduced or terminated from time to time pursuant to Sections 2.3(b), 2.8, or 8.1; and "**Commitments**" shall mean collectively, the aggregate of the Commitments for all the Lenders.  The initial amount of such Lender's Commitment is set forth on Schedule A or in the Assignment and Acceptance pursuant to which such Lender shall have assumed it Commitment, as applicable.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

"**Compliance Certificate**" shall have the meaning set forth in Section 6.1(a).

"**Consolidated**" shall mean, in connection with any definition, financial report or financial covenant, the combination of the applicable Persons, together with their Subsidiaries.

"**Conterra**" means Conterra Agricultural Capital, LLC, an Iowa limited liability company.

"**Conterra Intercreditor Agreement**" means that certain Intercreditor and Subordination Agreement dated as of October 20, 2022 (including any and all amendments and supplements thereto) by and between the Pre-Petition Agent and Conterra.

"**Control**" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") as applied to any Person, shall mean the possession, directly or indirectly,

of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Control Agreements**" shall mean, collectively, those control agreements in form and substance reasonably acceptable to Agent entered into among (a) the depository institution maintaining any deposit account, (b) a Debtor, and (c) Agent, pursuant to which Agent obtains control (within the meaning of the applicable provision of the Code) over such deposit account.

"**Cumulative Period**" means the rolling four-week period most recently ended on the latest Friday occurring prior to the delivery of the applicable Agreed Budget Variance Report.

"**Debtor**" or "**Debtors**" shall have the meaning specified in the preamble to this Agreement.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States, any applicable State thereof or other applicable jurisdictions from time to time in effect.

"**Default**" shall mean the occurrence or existence of:  (a) an event which, through the passage of time or the service of notice or both, would (assuming no action is taken by Debtors or any other Person to cure the same) mature into a Matured Default; or (b) an event which requires neither the passage of time nor the service of notice to mature into a Matured Default.

"**Default Period**" shall mean the period of time commencing at the beginning of the first Business Day after the delivery of a "Notice of Default" to Agent in accordance with Section 8.5 and continuing until the Default or Matured Default described therein is cured or waived, as the case may be, in accordance with the terms of this Agreement.

"**Default Rate**" shall have the meaning set forth in Section 2.2(d).

"**Defaulting Lender**" shall mean any Lender, as determined by Agent, that has (a) defaulted on any obligation under this Agreement (including but not limited to its obligation to fund Loans or purchases of participations in respect thereof, as applicable), or reimbursement of expenses or amounts due with respect to indemnity claims, in each case when due and in Immediately Available Funds, (b) notified Debtors, Agent, or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations (i) under this Agreement or (ii) under other agreements in which it is obligated to extend credit unless, in the case of this clause (ii), such obligation is the subject of a good faith dispute, (c) failed, within one Business Day after request by Agent, to confirm that it will comply with the terms of this Agreement, or (d) (i) become or is insolvent or has a parent company that has become or is insolvent, (ii) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, or (iii) become the subject of a Bail-In Action; provided, that a Lender shall not become a Defaulting Lender solely as the result of (x) the acquisition or maintenance of an ownership interest in such Lender or a Person controlling such Lender or (y) the exercise of control over a Lender or a Person

controlling such Lender, in each case, by a Governmental Authority or an instrumentality thereof. Agent shall give prompt written notice to Debtors and the Lenders of any determination that a Lender is a Defaulting Lender. Notwithstanding the cure or remediation of the events causing a Defaulting Lender to become a Defaulting Lender, a Defaulting Lender shall remain a Defaulting Lender until such time, if any, as Agent in its sole and absolute discretion determines that such Defaulting Lender is no longer a Defaulting Lender and Agent gives written notice of such determination to Debtors and the Lenders. The terms of this Agreement that specify a different treatment of a Defaulting Lender, shall become effective on the date of the written notice from Agent that a Defaulting Lender has become a Defaulting Lender, and shall cease to be effective on the date of the written notice from Agent that a Defaulting Lender is no longer a Defaulting Lender. For example, but not by way of limitation, a commitment fee or a letter of credit fee shall cease to accrue in favor of a Defaulting Lender on the date of such notice that a Defaulting Lender has become a Defaulting Lender, and such accrual shall recommence on the date of such notice that a that a Defaulting Lender is no longer a Defaulting Lender, respectively.

"**Deposit Accounts**" shall mean, (a) all deposit accounts (as defined in the Code) of Debtors, as applicable, now or hereafter maintained with any of Agent's affiliates, and (b) deposit accounts (as defined in the Code) at other banks or financial institutions acceptable to Agent and as identified or described in a Control Agreement.

"**DIP Financing Motion**" means the *Emergency Motion of Debtors for Interim and Final Orders (a) Authorizing the Debtors to Obtain Post-Petition Financing; (b) Granting Adequate Protection to Pre-Petition Secured Creditors; and (c) Setting a Final Hearing* filed with the Bankruptcy Court on April 2, 2024 seeking an order of the Bankruptcy Court authorizing, among other things, the Debtors to enter into a senior secured, super-priority debtor-in-possession financing facility.

"**DIP Liens**" shall have the meaning set forth in the Order.

"**DIP Superpriority Claims**" shall have the meaning set forth in the Order.

"**Distributions**" shall mean at any time and for any applicable period with respect to Debtors on an aggregated and Consolidated basis, all dividends, distributions, or other payments (whether in cash, securities, or other property) with respect to any Equity Interest.

"**Documents**" shall mean any and all warehouse receipts, bills of lading or similar documents of title relating to Goods in which one or more of the Debtors at any time has an interest and any other "documents" (as defined in the Code).

"**Dollars**" and "**$**" shall mean lawful currency of the United States of America.

"**ECP**" means an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act or any regulations promulgated thereunder and the applicable rules issued by the Commodity Futures Trading Commission or the SEC.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

139697745.3

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Environmental Laws**" shall have the meaning set forth in Section 5.10.

"**Equipment**" shall mean any and all Goods, other than Inventory, (including without limitation, equipment, machinery, motor vehicles, implements, tools, parts and accessories) that are at any time owned by Debtors, together with any and all accessions, parts and appurtenances thereto and any other "equipment" (as defined in the Code).

"**Equity Interest**" means, with respect to any Person, any and all shares, interests, rights to purchase, warrants, options, participations, or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), if such Person is a limited liability company, membership interests, if such Person is a trust, the beneficial interest thereunder, and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such Person, whether outstanding on the date hereof or issued on or after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**ERISA**" shall have the meaning set forth in Section 5.20.

"**Erroneous Payment**" shall have the meaning assigned to it in Section 9.9(a).

"**Erroneous Payment Subrogation Rights**" shall have the meaning assigned to it in Section 9.9(d).

"**Essential Vendors**" include, but shall not be limited to, utilities, farmers, feed vendors, veterinary supply and service providers, necessary equipment lessors, and any other vendor (a) the non-payment of which could be expected to disrupt Debtors' operations (in Agent's reasonable judgment) or (b) having the statutory or contractual right to place a lien on Debtors' assets .

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Excess**" shall have the meaning set forth in Section 10.24.

"**Excluded Accounts**" shall mean deposit accounts of any Debtor, as applicable, exclusively used for payroll, payroll taxes, and other employee wage and benefit payments to or for the benefit of the Debtors' employees and identified to Agent by Debtors.

"**Excluded Swap Obligation**" means, with respect to any Debtor, any Specified Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Debtor of, or the grant by such Debtor of a security interest to secure, such Specified Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Debtor's failure for any reason to constitute an ECP at the time the guarantee of such Debtor or the grant of such security interest becomes or would become effective with respect to such Specified Swap Obligation. If a Specified

9

Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Specified Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"**Excluded Taxes**" shall mean, in the case of Agent and each Lender, (a) Taxes imposed on its overall net income, franchise Taxes, and branch profits Taxes imposed on it, by the respective jurisdiction under the laws of which Agent or such Lender is incorporated or is organized or in which its principal executive office is located, (b) in the case of a Non-U.S. Lender, any withholding tax that is imposed on amounts payable to such Non-U.S. Lender pursuant to the laws in effect at the time such Non-U.S. Lender becomes a party to this Agreement, except in each case to the extent that, pursuant to Section 10.22(a), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto, or is attributable to the Non-U.S. Lender's failure to comply with Section 10.22(f), and (c) any U.S. federal withholding taxes imposed by FATCA.

"**Extension Notice Date**" shall have the meaning set forth in Section 2.2(h).

"**Farm Products**" shall mean all personal property of Debtors used or for use in farming or livestock operations, including without limitation, seed and harvested or un-harvested crops of all types and descriptions, whether annual or perennial and including trees, vines and the crops growing thereon, native grass, grain, feed, feed additives, feed ingredients, feed supplements, fertilizer, hay, silage, crop residues, supplies (including without limitation, chemicals, veterinary supplies and related Goods), livestock of all types and descriptions (including without limitation, the offspring of such livestock and livestock in gestation) and any other "farm products" (as defined in the Code).

"**FATCA**" shall mean Sections 1471 through 1474 of the IRC, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), and any current or future regulations or official interpretations thereof.

"**Federal Funds Rate**" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate and (b) 0%.

"**Final Order**" means, collectively, the order of the Bankruptcy Court entered in the Bankruptcy Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be substantially in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order into a final order and authorize the approval of the DIP Loans and such other modifications satisfactory in form and substance to the Agent and the Required Lenders and each other Lender or percentage of Lenders that would have a right to consent to such modifications in accordance with Section 10.31, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, the making of the Loans, and/or the performance by any Debtor of any of their respective obligations under any of the Financing Agreements shall not be the subject of a presently effective stay pending such appeal (unless Agent waives such requirement), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Agent and the Required Lenders and each other Lender or percentage of Lenders that would have a right to consent to such modifications in accordance with Section 10.31.

"**Final Order Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

139697745.3

"**Financial Statements**" shall mean all financial information delivered to Agent from time to time, which shall be in the form required under Section 5.14 and which shall include the financial information required to be delivered to Agent in accordance with Section 6.1.

"**Financing Agreements**" shall mean this Agreement and all agreements, instruments and documents related to this Agreement, including without limitation, and all security agreements, loan agreements, notes, letter of credit applications, letters of credit, guarantees, mortgages, deeds of trust, subordination agreements, pledges, powers of attorney, consents, waivers, assignments, contracts, notices, leases, financing statements and all other written matter at any time executed by, on behalf of or for the benefit of Debtors and delivered to Agent, together with all amendments and all agreements and documents referred to therein or contemplated thereby and all Bank Products Agreements.

"**First Day Pleadings**" means the first-day pleadings that the Debtors determine are necessary and desirable to file in the Bankruptcy Cases, each of which shall be in form and substance satisfactory to the Agent, to the extent not approved, on a final basis, by the Bankruptcy Court prior to the date hereof.

"**Fully Satisfied**" or "**Full Satisfaction**" means, as of any date, that on or before such date:

(a)     with respect to the Loans: (i) the principal of and interest accrued to such date on the Loans shall have been paid in full in cash, (ii) all fees, expenses, and other amounts then due and payable (other than contingent amounts for which a claim has not been made) shall have been paid in full in cash and (iii) the Commitments shall have expired or irrevocably been terminated; and

(b)     with respect to the Bank Products Obligations and Swap Obligations: (i) all termination payments, fees, expenses, and other amounts then due and payable under the related Bank Products Agreements or Swap Contracts shall have been paid in full in cash, and (ii) unless otherwise waived by the applicable provider of Bank Products or the Lender to which such Swap Obligations are owed, all contingent amounts which could be payable under the related Bank Products Agreements or Swap Contracts shall have been secured by: (A) the grant of a first-priority, perfected Lien on cash in an amount at least equal to 105% of the amount of such contingent amounts or (B) the issuance of a letter of credit in form and substance reasonably acceptable to the applicable provider of Bank Products or the Lender to which such Swap Obligations are owed and in an amount at least equal to 105% of the amount of such contingent obligations and issued by an issuing bank reasonably satisfactory to such applicable provider of Bank Products or the Lender to which such Swap Obligations are owed; provided, however, Agent shall be entitled to assume no amounts are due under any Bank Products Agreement or Swap Contract unless such Lender that provides Bank Products or is owed any Swap Obligations has notified Agent in writing of the amount of any such liability owed to it at least five (5) Business Days prior to such distribution, termination, or release.

"**Funds Request**" shall mean a written request in form and substance acceptable to Agent (and shall include any standing funds request set forth in any designation of bank account, sweep agreement, or any other similar or related agreement between Debtors and Agent) given by Debtors to Agent, signed by a Responsible Officer of Debtors, and which shall be made no later than Noon Central Time not less than seven (7) days prior to the Business Day of any such requested Loan (or such shorter period as may be acceptable to Agent in respect of the Initial Draw).

"**GAAP** "shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, or in such

other statements by such other entity as may be in general use by significant segments of the accounting profession, which are applicable to the circumstances as of the date of determination.

"**General Intangibles**" shall mean all of Debtors' present and future right, title and interest in and to any customer deposit accounts, deposits, rights related to prepaid expenses, chose in action, causes of action and all other intangible personal property of every kind and nature (other than Accounts), including without limitation, Payment Intangibles, beneficial interests in trusts, corporate or other business records, inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, goodwill, registrations, copyrights, licenses, franchises, customer lists, tax refunds, tax refund claims, customs claims, guarantee claims, contract rights, membership interests, partnership interests, Equity Interests, cooperative memberships or patronage benefits, obligations payable to Debtors for capital stock or other claims against any Owners, rights to any government subsidy, set aside, diversion, deficiency or disaster payment or payment in kind, milk bases, brands and brand registrations, Commodity Credit Corporation storage agreements or contracts, leasehold interests in real and personal property, Water Rights, and any security interests or other security held by or granted to Debtors to secure payment by any Account Debtor of any of the Accounts, and any other "general intangibles" (as defined in the Code).

"**Governmental Authority**" shall mean any nation, government, or Indian tribe, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including without limitation, any arbitration panel, any court, any commission, any agency or any instrumentality of the foregoing.

"**Governmental Requirement**" shall mean any material law, statute, code, ordinance, order, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement of any federal, state, county, municipal, parish, provincial, tribal, or other Governmental Authority or any department, commission, board, court, agency or any other instrumentality of any of them (including any of the foregoing that relate to environmental standards or controls and occupational safety and health standards or controls).

"**Highest Lawful Rate**" means, with respect to each Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged, or received with respect to the Notes or on other amounts, if any, payable to such Lender pursuant to this Agreement or any other Financing Agreement, under laws applicable to such Lender which are presently in effect, or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"**Immediately Available Funds**" shall mean funds with good value on the day and in the city in which payment is received.

"**Indemnified Taxes**" shall mean Taxes imposed on or with respect to any payment made by or on account of any obligation of any Debtor, respectively, under any Financing Agreement, other than Excluded Taxes and Other Taxes.

"**Initial Draw**" shall have the meaning set forth in Section 2.1.1.

"**Intercreditor Agreements**" shall mean at any time, (i) the Conterra Intercreditor Agreement, (ii) the MREL 2018 Intercreditor Agreement, (iii) the MetLife 2022 Intercreditor Agreement and (iv) any other intercreditor agreement or agreements between Agent and any other creditors with respect to any Collateral.

139697745.3

"**Interim Order**" means the order of the Bankruptcy Court entered in the Bankruptcy Cases after an interim hearing in form and substance satisfactory to the Agent and the Lenders, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Agent (and each other Lender or percentage of Lenders that would have a right to consent to such modifications in accordance with Section 10.31) which, among other matters but not by way of limitation, (i) authorizes Debtors to execute and perform under the terms of this Agreement and the other Financing Agreements, (ii) authorizes Loans during the period after the date on which the Interim Order is entered by the Bankruptcy Court and prior to the Final Order Date in the amounts and on the terms set forth herein, and (iii) grants the DIP Superpriority Claims and the Liens on the assets of Debtors referred to herein and in the other Financing Agreements.

"**Inventory**" shall mean any and all Goods which shall at any time constitute "inventory" (as defined in the Code) or Farm Products of Debtors, wherever located (including without limitation, Goods in transit and Goods in the possession of third parties), or which from time to time are held for sale, lease or consumption in Debtors' business, furnished under any contract of service or held as raw materials, work in process, finished inventory or supplies (including without limitation, packaging and/or shipping materials).

"**Investments**" shall have the meaning set forth in Section 7.3.

"**IRC** "shall mean the Internal Revenue Code of 1986, as amended, as at any time in effect, together with all regulations and rulings thereof or thereunder issued by the Internal Revenue Service.

"**Junior DIP Lien**" shall have the meaning set forth in Section 4.1(a)(iii).

"**Liabilities**" means the "DIP Obligations" as defined in the Orders and shall include any and all liabilities, obligations and indebtedness of Debtors to the Secured Parties of any and every kind and nature, at any time owing, arising, due or payable and howsoever evidenced, created, incurred, acquired or owing, whether primary, secondary, direct, contingent, fixed or otherwise (including without limitation Bank Products Obligations, PIK Interest, fees, charges and obligations of performance, including Erroneous Payment Subrogation Rights) and whether arising or existing under this Agreement or any of the other Financing Agreements or by operation of law, provided, that with respect to any affected Debtor that guaranties or is otherwise liable for the Liabilities, "Liabilities" shall exclude all Excluded Swap Obligations.

"**Lien**" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, option, levy, execution, attachment, garnishment, hypothecation, assignment for security, deposit arrangement, encumbrance, charge, security interest, or other preferential arrangement in the nature of a security interest of any kind or nature whatsoever, on or of such asset, and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease, or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"**Loan Account**" shall have the meaning set forth in Section 2.6.

"**Loan Liabilities**" shall mean all of the Liabilities excluding only the Bank Products Obligations.

"**Loans**" means the Initial Draw and the loans made by the Lenders pursuant to Section 2.1.2 of this Agreement.

"**Marks**" shall mean all marks or names owned or licensed by the Debtors that are used or are hereafter used on or in connection with Inventory.

"**Matured Default**" shall mean the occurrence or existence of any one or more of the following events:

(a)        (i) Debtors fail to pay any principal pursuant to any of the Financing Agreements (other than the Bank Products Agreements) on or before three (3) Business Days after the date such principal becomes due, or (ii) Debtors fail to pay any interest pursuant to any of the Financing Agreements (other than the Bank Products Agreements) on or before ten (10) Business Days after such interest becomes due;

(b)        Debtors fail to pay any of the Liabilities (other than the Liabilities referred to in the foregoing clause (a) above) on or before thirty (30) days after such Liabilities become due or are declared due;

(c)        Debtors fail or neglect to perform, keep or observe any of the covenants, conditions, promises or agreements contained in Section 6.1, 6.2(a), 6.2(c), 6.2(d), 6.4, 6.5, 6.6, 6.8, 6.9 or 7;

(d)        Debtors fail or neglect to perform, keep or observe any of the covenants, conditions, promises or agreements contained in this Agreement or in any of the other Financing Agreements (other than those covenants, conditions, promises and agreements referred to or covered in the foregoing clauses (a), (b) and (c)), and such failure or neglect continues for more than thirty (30) days after such failure or neglect first occurs, provided, however, that such grace period shall not apply, and a Matured Default shall be deemed to have occurred and to exist immediately if such failure or neglect may not, in Agent's reasonable determination, be cured by Debtors during such thirty (30) day grace period;

(e)        the Available Amount, as calculated in accordance with the definition thereof, results in a negative amount;

(f)        any warranty or representation at any time made by or on behalf of Debtors in connection with this Agreement or any of the other Financing Agreements is untrue or incorrect in any material respect, or any schedule, certificate, statement, report, financial data, notice, or writing furnished at any time by or on behalf of any Debtor to Agent or any other Lender is untrue or incorrect in any material respect on the date as of which the facts set forth therein are stated or certified;

(g)        after the Petition Date, one or more judgments for the payment of money (excluding any orders entered with respect to the First Day Pleadings or any order fixing the amount of any claim in the Bankruptcy Cases) in excess of $100,000.00 is rendered against any Debtor and such judgment remains unsatisfied or un-discharged and in effect for thirty (30) consecutive days without a stay of enforcement or execution, or any action not in violation of the automatic stay applicable under section 362 of the Bankruptcy Code shall be legally taken by a postpetition judgment creditor to attach or levy upon any assets of the Debtors to enforce such judgment;

(h)        any Debtor is enjoined, restrained, or in any way prevented by the order of any court or any administrative or regulatory agency or by the termination or expiration of any permit or license, from conducting all or any material part of any of its business affairs and within ten (10) days of the effective date of such restraint on any of its business affairs such Debtor has not obtained a release, termination or other approval which permits such Debtor to engage in all material parts of any of its business affairs;

14

(i)       except as may be permitted under Sections 363 or 1129 of the Bankruptcy Code, a Change of Control shall have occurred;

(j)       the Bankruptcy Court shall enter an order dismissing any of the Bankruptcy Cases which does not contain a provision for termination of all Commitments and payment in full in cash of all Liabilities upon entry thereof;

(k)       the Bankruptcy Court shall enter an order with respect to any of the Bankruptcy Cases without the express prior written consent of Agent (and with respect to any provisions that affect the rights or duties of Agent), (i) to revoke, reverse, stay, modify, supplement or amend any of the Interim Order or the Final Order in a manner adverse to the Lenders or Agent or (ii) to permit, unless otherwise contemplated by the Interim Order or the Final Order, any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the administrative priority of the Secured Parties' claims in respect of the Liabilities (other than the Carve-Out);

(l)       any Debtor shall make an application for an order described in clause (k) above or any such application shall be made by a Person other than the Debtors and such application is not contested by the Debtors in good faith or the relief requested is not withdrawn, dismissed or denied within forty-five (45) days after the filing;

(m)       the Bankruptcy Court shall enter an order denying or terminating the use of Cash Collateral, and the Debtors have not obtained use of Cash Collateral (consensually or non-consensually);

(n)       the Bankruptcy Court shall enter an order with respect to any of the Bankruptcy Cases, or any of the Debtors shall have filed or supported a motion or other pleading for entry of an order, (i) to revoke, reverse, stay, vacate, terminate, extend, rescind or seek reconsideration of any provision of the Cash Management Order or the Cash Collateral Order without the prior written consent of the Agent, (ii) to modify, supplement or amend any provision of the Interim Order, the Final Order or this Agreement without the prior written consent of the Agent and the affected Lenders, (iii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any of the Debtors, equal or superior to the priority of the Lenders in respect of the Liabilities, subject only to the extent of the Carve-Out, (iv) to grant or permit the grant of a Lien on the Collateral that is senior to or pari passu with the Liens on such Collateral securing the Liabilities, (v) to permit charging of any of the Collateral under Section 506(c) of the Bankruptcy Code against the Secured Parties or (vi) without the prior written consent of the Required Lenders, to authorize financing for any of the Debtors under Section 364 of the Bankruptcy Code (other than the transactions contemplated by this Agreement) unless such financing is expressly permitted hereunder or such order contemplates the Full Satisfaction of the Liabilities upon consummation thereof;

(o)       the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to a holder or holders of any Lien (other than a holder or holders of a Lien ranking senior in priority to the Liens securing the Loans) or a Lien on any part of the Collateral securing the Loans to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such Collateral or the Equity Interests in any Debtor or permit any such third parties to exercise other remedies that would have a material adverse effect);

(p)     the Bankruptcy Court shall enter an order with respect to any of the Bankruptcy Cases (or any of the Debtors shall file an application or motion or pleading for entry of or in support of an order) (i) appointing a Chapter 7 trustee, or a Chapter 11 trustee under Section 1104 of the Bankruptcy Code (unless Agent consents to the appointment of the trustee), (ii) appointing an examiner (other than a fee examiner) or receiver with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under Section 1106(b) of the Bankruptcy Code, (iii) dismissing any of the Bankruptcy Cases or converting any of the Bankruptcy Cases under Section 1112 of the Bankruptcy Code or otherwise to a case under Chapter 7 of the Bankruptcy Code or (iv) providing for the disposition without Agent's consent of all or a material portion of any of the assets of any Debtor, any Equity Interest of any Debtor, or any material business line of the Debtors either through a sale under Section 363 of the Bankruptcy Code, through a confirmed Plan of Reorganization or otherwise except:  (1) as otherwise permitted by the Orders; (2) pursuant to a transaction that is permitted (and subject to any mandatory prepayment obligations (as applicable)) under this Agreement; or (3) pursuant to a transaction that provides for the Full Satisfaction of the Liabilities and the Total Pre-Petition Secured Debt;

(q)     the period pursuant to Section 1121 of the Bankruptcy Code during which the Debtors have the exclusive right to file a Plan of Reorganization or solicit acceptance thereof expires or an order shall have been entered by the Bankruptcy Court terminating or reducing such period, unless such termination or reduction is consented to by the Agent (or in each case any of the Debtors shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Debtor) any other Person's motion to, have such an order entered, in each case unless the Agent consents to such action);

(r)     after the date hereof, any of the Debtors shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Debtor or by oral argument) any other person's motion to: (i) disallow in whole or in part any of the Liabilities arising under (x) this Agreement or any other Financing Agreement or (y) the Pre-Petition Loan Agreement (or any such order is entered), or (ii) challenge the validity and enforceability of the Liens or security interests granted or confirmed herein or in the Interim Order or the Final Order in favor of Agent or the Lenders or any of their Affiliates;

(s)     any material provision of the Interim Order or the Final Order shall for any reason cease to be valid or binding or enforceable against any of the Debtors, or any of the Debtors or any other Subsidiary of the Debtors shall so state in writing; or any of the Debtors or any other Subsidiary of the Debtors shall commence or join in any legal proceeding to contest in any manner that the Interim Order or the Final Order constitutes a valid and enforceable agreement, or any of the Debtors or any other Subsidiary of the Debtors shall commence or join in any legal proceeding to contest the validity or perfection of any of the Liens in favor of the Lenders, or any of the Debtors shall commence or join in any legal proceeding to assert that it has no further obligation or liability under the Interim Order or the Final Order;

(t)     any Debtor fails or neglects to comply with any provision of the Final Order or the Interim Order, as applicable;

(u)     the Bankruptcy Court enters any order granting any super-priority claim that is *pari passu* with or senior to those of the Secured Parties or any Lien that is senior to the Liens securing the Liabilities, other than in accordance with the Order;

16

(v)    any Debtor or any of their Affiliates files any motion or other request with the Bankruptcy Court seeking authority consummate a sale of material assets constituting Collateral outside the ordinary course of business without Agent's prior written consent;

(w)    any of the Debtors shall make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or debt arising prior to the Petition Date other than payments authorized by the Bankruptcy Court in respect of the Interim Order, the Final Order or by any other orders entered by the Bankruptcy Court in amounts consistent with the Agreed Budget;

(x)    the Bankruptcy Court enters an order that is adverse in any material respect to the rights and remedies of Agent or the Lenders in their capacities as such under this Agreement or in any of the Chapter 11 Cases;

(y)    the Debtors or any of their Affiliates, or any person claiming by or through the Debtors or any of their Affiliates, obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of Agent or the Lenders in each case relating to this Agreement, in each case other than as permitted by the Order;

(z)    the Bankruptcy Court shall enter an order confirming a Plan of Reorganization or liquidation in any of the Bankruptcy Cases (or the Bankruptcy Court shall enter an order approving a disclosure statement related to such plan) other than an Acceptable Plan, or any of the Debtors or any of their Subsidiaries shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan;

(aa)    any Debtor voluntarily or involuntarily dissolves or is dissolved, terminates or is terminated; or

(bb)    any Debtor shall consolidate or combine with any other Person except to the extent expressly permitted by Section 7.2.

"**Maturity Date**" shall mean as applicable the earliest of the following:

(a)    the effective date of a Plan of Reorganization filed in the Bankruptcy Cases that is confirmed pursuant to an order of the Bankruptcy Court;

(b)    May ___, 2024[4] if the Final Order has not been entered by the Bankruptcy Court by such date;

(c)    the Interim Order or the Final Order, as applicable, ceases to be in full force and effect for any reason;

(d)    the acceleration of the Liabilities or termination by the Agent or the Required Lenders of the Commitments;

(e)    the date the Bankruptcy Court dismisses any of the Bankruptcy Cases or converts any of the Bankruptcy Cases to a Chapter 7 case;

---

[4] NTD:  insert date which is 45 days after entry of the Interim Order.

(f)    the Debtors shall lose access to the use of cash collateral in accordance with the Order, subject to any applicable remedies notice period; and

(g)    the Scheduled Maturity Date.

"**MetLife**" means, collectively, MLIC and MREL or individually, as the context may require, MLIC or MREL.

"**MetLife 2022 Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of September 18, 2018 by and among the Pre-Petition Agent, MREL and MLIC, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**MetLife Primed Portion**" means an amount equal to the product of (i) the aggregate Commitments, multiplied by (ii) a fraction, the numerator of which is the aggregate Pre-Petition MetLife Secured Obligations and the denominator of which is the Total Pre-Petition Senior Secured Debt.

"**MREL 2018 Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of September 18, 2018 by and between the Pre-Petition Agent and MREL, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Milestones**" shall have the meaning set forth in Section 6.14.

"**MLIC**" means Metropolitan Life Insurance Company, a New York corporation.

"**Mortgaged Property**" means any real property and leasehold interests described in the Mortgages, together with all related interests including, without limitation, improvements, Water Rights, grazing leases and permits, easements, rights of way, access or use permits, crossing agreements, and other agreements or rights useful or necessary for the full use, enjoyment, and operation of the Mortgaged Property including, without limitation, those relating to access, irrigation, or water delivery.

"**Mortgages**" means each mortgage, leasehold mortgage, deed to secure debt, deed of trust, leasehold deed of trust, or similar agreement in form and substance acceptable to Agent executed at any time by any Debtor in favor of Agent for the benefit of the Lenders and the Secured Parties.

"**MREL**" means MetLife Real Estate Lending LLC, a Delaware limited liability company.

"**Non-U.S. Lender**" means any Lender that is not a U.S. Person.

"**Note**" and "**Notes**" shall have the meaning set forth in Section 2.1.1.

"**Notice of Default**" shall have the meaning set forth in Section 8.5.

"**OFAC**" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control, and any successor thereto.

"**Order**" means, as the context may require, the Interim Order or the Final Order, whichever is then applicable.

"**Organizational Documents**" shall mean, with respect to any Person (a) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (b) in the case of any limited liability company, the certificate or articles of formation and operating agreement (or similar documents) of such Person, (c) in the case of any limited partnership, the certificate of formation

and limited partnership agreement (or similar documents) of such Person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such Person, (e) in the case of a trust, the trust agreement (or other similar document), (f) in any other case, the functional equivalent of the foregoing, and (g) any shareholder, voting trust, or similar agreement between or among any holders of Equity Interests of such Person.

"**Other Taxes**" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Financing Agreement.

"**Owner**" shall mean any Person who holds Equity Interests in any Debtor.

"**PATRIOT Act**" shall mean the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended from time to time, and any successor statute.

"**Payment Recipient**" shall have the meaning assigned to it in Section 9.9(a).

"**Permitted Distributions**" shall mean Distributions as are necessary to pay any amounts due as a result of income tax liability passed through to any Owner.

"**Permitted Pre-Petition Senior Liens**" have the meaning set forth in the Order.

"**Person**" shall mean any natural person, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, entity, party or Governmental Authority.

"**Petition Date**" shall have the meaning specified in the recitals to this Agreement.

"**PIK Interest**" means interest on the Loans that is paid in kind (and not in cash) and added to the principal balance of the Loans in accordance with Section 2.2(c).

"**Plan of Reorganization**" means a plan of reorganization with respect to the Debtors pursuant to the Bankruptcy Cases.

"**Pre-Petition**" means the time period ending immediately prior to the filing of the Bankruptcy Cases on the Petition Date.

"**Pre-Petition Agent**" has the meaning set forth in the definition of Pre-Petition Loan Agreement.

"**Pre-Petition Collateral**" means the Pre-Petition MetLife Collateral, the Pre-Petition Conterra Collateral and the Pre-Petition RLOC Collateral.

"**Pre-Petition Conterra Collateral**" means the real and personal property of the Debtors encumbered by the Pre-Petition Conterra Liens.

"**Pre-Petition Conterra Documents**" has the meaning set forth in the Order.

"**Pre-Petition Conterra Liens**" means the Liens in favor of Conterra as described in the Pre-Petition Conterra Documents.

"**Pre-Petition Conterra Real Estate Collateral**" has the meaning set forth in the Order.

139697745.3

"**Pre-Petition Loan Agreement**" means that certain Third Amended and Restated Loan and Security Agreement dated as of April 21, 2021 by and among Debtors, Rabo AgriFinance LLC, as agent (the "**Pre-Petition Agent**"), and the financial institutions from time to time party thereto as lenders, together with all amendments, modifications, and supplements thereto.

"**Pre-Petition MetLife Collateral**" means the real and personal property of the Debtors encumbered by the Pre-Petition MetLife Liens.

"**Pre-Petition MetLife Liens**" means the Liens in favor of MetLife as described in the Pre-Petition MetLife Loan Documents.

"**Pre-Petition MetLife Loan Documents**" means: (a) that certain Promissory Note A, dated as of September 26, 2018, in the original principal amount of $106,000,000 made by William John Millenkamp, Susan Jo Millenkamp, East Valley Cattle, Idaho Jersey Jerome, Goose Ranch, Millenkamp Properties, Millenkamp Cattle and Millenkamp Family; (b) that certain Promissory Note B, dated as of September 26, 2018, in the original principal amount of $59,400,000 made by William John Millenkamp, Susan Jo Millenkamp, East Valley Cattle , Idaho Jersey Jerome, Goose Ranch, Millenkamp Properties, Millenkamp Cattle and Millenkamp Family; (c) that certain Promissory Note C, dated as of April 15, 2020, in the original principal amount of $13,000,000 made by William John Millenkamp, Susan Jo Millenkamp, East Valley Cattle, Idaho Jersey Jerome, Goose Ranch, Millenkamp Properties, Millenkamp Cattle, Millenkamp Family and Millenkamp Properties II; (d) that certain Promissory Note D, dated as of April 21, 2021, in the original principal amount of $17,954,226 made by William John Millenkamp, Susan Jo Millenkamp, East Valley Cattle, Idaho Jersey Jerome, Goose Ranch, Millenkamp Properties, Millenkamp Cattle, Millenkamp Family and Millenkamp Properties II; (e) that certain Promissory Note E, dated as of April 21, 2021, in the original principal amount of $15,978,409 made by William John Millenkamp, Susan Jo Millenkamp, East Valley Cattle, Idaho Jersey Jerome, Goose Ranch, Millenkamp Properties, Millenkamp Cattle, Millenkamp Family and Millenkamp Properties II; (f) that certain Promissory Note, dated as of March 12, 2019, in the original principal amount of $5,508,350 made by William John Millenkamp, Susan Jo Millenkamp, East Valley Cattle, Idaho Jersey Jerome, Goose Ranch, Millenkamp Properties, Millenkamp Cattle, Millenkamp Family, Millenkamp Properties II and Idaho Jersey (together with the Promissory Notes described in clauses (a) through (e), the "**Pre-Petition MetLife Notes**"); (g) the 2018 Mortgage (as such term is defined in the MetLife 2022 Intercreditor Agreement); (h) the 2019 Mortgage (as such term is defined in the MetLife 2022 Intercreditor Agreement); and (i) all other documents evidencing, securing, or executed in connection with the loans evidenced by the Pre-Petition MetLife Notes.

"**Pre-Petition MetLife Notes**" has the meaning set forth in the definition of Pre-Petition MetLife Loan Documents.

"**Pre-Petition MetLife Real Estate Collateral**" has the meaning set forth in the Order.

"**Pre-Petition Real Estate Collateral**" means the Pre-Petition RLOC Real Estate Collateral, the Pre-Petition Conterra Real Estate Collateral and the Pre-Petition MetLife Real Estate Collateral.

"**Pre-Petition RLOC Collateral**" means the "Collateral" as defined in the Pre-Petition Loan Agreement and shall include, without limitation, the Pre-Petition RLOC Real Estate Collateral.

"**Pre-Petition RLOC Liens**" means the Liens on certain real property and personal property owned by the Debtors and securing the Pre-Petition RLOC Obligations.

"**Pre-Petition RLOC Obligations**" means the "Liabilities" as defined in the Pre-Petition Loan Agreement.

"**Pre-Petition RLOC Real Estate Collateral**" has the meaning set forth in the Order.

"**Pre-Petition RLOC Second Mortgage**" means that certain Mortgage, Assignment of Rents, Security Agreement, and Fixture Filing (Second Priority) dated as of October 20, 2022 by William John Millenkamp, Susan Jo Millenkamp, East Valley Cattle, Idaho Jersey Jerome, Goose Ranch, Millenkamp Properties, Idaho Jersey, Millenkamp Cattle, Millenkamp Family and Millenkamp Properties II to and in favor of Pre-Petition Agent.

"**Pre-Petition RLOC Secured Parties**" means the "Secured Parties" as defined in the Pre-Petition Loan Agreement.

"**Prior Week**" means, as of any date of determination, the immediately preceding week ended on a Sunday and commencing on the prior Monday.

"**Producer Payables**" shall mean all amounts at any time payable by the Debtors for the production, purchase, transport, storage, shelter, feeding, or other maintenance of Collateral or otherwise payable by the Debtors with respect to Collateral including, without limitation, the amount of all Liens (other than those in favor of Agent for the benefit of the Secured Parties) on and any offsets and contra accounts relating or pertaining to such Collateral.

"**Pro Rata Percentage**" shall mean with respect to any Lender, a fraction (expressed as a percentage), the numerator of which shall be the amount of such Lender's Commitment or Commitments, respectively, and the denominator of which shall be the aggregate amount of all corresponding Commitments of the Lenders, respectively, as adjusted from time to time in accordance with Section 10.23, which percentages shall be applicable even in the event that the commitments of the Lenders to make Loans have been suspended or terminated in accordance with the terms of this Agreement.

"**Real Property Collateral**" means the "DIP Collateral Real Property", as such term is defined in the Order.

"**Replacement Candidate**" shall have the meaning as set forth in Section 10.32.

"**Required Lenders**" shall mean at any time there are more than two Lenders, (a) provided that at least two Lenders are not a Defaulting Lender, at least two Lenders holding in the aggregate more than fifty percent (50%) of the aggregate amount of all of the Lenders' Commitments, excluding the Commitment of any Defaulting Lender, which percentage shall be applicable even in the event that the commitments of the Lenders to make Loans have been suspended or terminated in accordance with the terms of this Agreement, provided, (b) if all Lenders except one Lender are Defaulting Lenders, then "**Required Lenders**" shall mean the Lender that is not the Defaulting Lender, and (c) in the event that all Lenders are Defaulting Lenders, then "**Required Lenders**" shall mean at least two Lenders holding in the aggregate more than fifty percent (50%) of the aggregate amount of all of the Lenders' Commitments, not excluding the Commitment of any Defaulting Lender, which percentage shall be applicable even in the event that the commitments of the Lenders to make Loans have been suspended or terminated in accordance with the terms of this Agreement. In the event there are two Lenders, then "**Required Lenders**" shall mean (a) if neither Lender is a Defaulting Lender, both of the Lenders, (b) if one of the Lenders is a Defaulting Lender, the Lender that is not the Defaulting Lender, and (c) if both of the Lenders are a Defaulting Lender, both of the Lenders.

"**Responsible Officer**" means either William John Millenkamp or Susan Jo Millenkamp. Any document delivered hereunder that is signed by a Responsible Officer of any Person shall be conclusively

21

presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Person and such Responsible Officer shall be presumed to have acted on behalf of such Person.

"**Risk-Based Capital Guidelines**" shall have the meaning as set forth in Section 10.20.

"**RLOC Primed Portion**" shall mean an amount equal to the product of (i) the aggregate Commitments, multiplied by (ii) a fraction, the numerator of which is the aggregate Pre-Petition RLOC Secured Obligations and the denominator of which is the Total Pre-Petition Senior Secured Debt.

"**Sanctioned Country**" shall mean, at any time, any country or territory which is itself the subject or target of any comprehensive Sanctions.

"**Sanctioned Person**" shall mean, at any time, (a) any Person or group listed in any Sanctions-related list of designated Persons maintained by OFAC or the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state, (b) any Person or group operating, organized or resident in a Sanctioned Country, (c) any agency, political subdivision or instrumentality of the government of a Sanctioned Country, or (d) any Person 50% or more owned, directly or indirectly, by any of the above.

"**Sanctions**" shall mean economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"**Scheduled Maturity Date**" means January 2, 2025, subject to extension as set forth in Section 2.2(h).

"**Secured Parties**" shall mean Agent and its affiliates including, without limitation, Rabo AgriFinance LLC, a Delaware limited liability company, the Lenders, and any other Person to whom the Liabilities may be owing.

"**Securities Act**" shall have the meaning as set forth in Section 10.33.

"**Self-Prepared**" shall mean, for an applicable financial statement of a Person, such financial statement is prepared by that Person and not compiled, reviewed or audited by a certified public accountant approved by Lender.

"**Sole Lead Arranger**" shall mean Coöperatieve Rabobank U.A., New York Branch acting in its capacity as the sole lead arranger for this Agreement.

"**Specified Swap Obligation**" means, with respect to any Debtor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

"**Subsidiary**" of a Person (other than an individual) means a business entity of which 50% or more a majority of the Equity Interests having ordinary voting power for the election of directors, governing body, or management are at the time beneficially owned, or the management of which is otherwise Controlled, directly, or indirectly by that Person. Unless otherwise specified, all references to a "Subsidiary" or to "Subsidiaries" shall refer to any and all such Subsidiaries of such Person.

"**Swap Contract**" shall mean (a) any and all interest rate swap transactions, basis swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency options, spot contracts or any other similar transactions of any of the foregoing (including, but without limitation, any options to enter into any of the foregoing), and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., or any International Foreign Exchange Master Agreement for the purpose of limiting the mark risk of holding currency, a security, or a commodity in either the cash or futures market.

"**Swap Obligation**" shall mean, with respect to any Debtor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Taxes**" shall mean any and all present or future taxes, duties, levies, imposts, deductions, fees, assessments, charges or withholdings, and any and all liabilities with respect to the foregoing, including interest, additions to tax and penalties applicable thereto.

"**Total Pre-Petition Senior Secured Debt**" means the sum of (a) the Pre-Petition RLOC Secured Obligations plus (b) Pre-Petition MetLife Secured Obligations.

"**UETA**" shall have the meaning as set forth in Section 10.34.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the IRC.

"**U.S. Tax Compliance Certificate**" shall have the meaning set forth in Section 10.22(f)(ii)(B)(3).

"**Water Rights**" shall mean all of Debtors' right, title and interest in all water (including any water inventory in storage), water rights, water permits, water entitlements, water transfers, other rights to water and other rights to receive water, and all other rights to divert, deliver, use, apply, drain, or store water of every kind and description that serve the Mortgaged Property, including, without limitation, (i) the groundwater on, under, pumped from or otherwise available to the Mortgaged Property, whether as a result of groundwater rights, contractual rights or otherwise; (ii) the right to remove and extract any such groundwater including any permits, rights or licenses granted by any Governmental Authority or agency and any rights granted or created by any easement, covenant, agreement or contract with any person or entity; (iii) any rights to which the Mortgaged Property is entitled with respect to surface water, whether such right is appropriative, riparian, prescriptive, contractual or otherwise and whether or not pursuant to permit, certificate of water rights, or other governmental authorization, or the right to store any such water; (iv) any water, water right, water allocation, distribution right, delivery right, water storage right, or other water-related entitlement appurtenant or otherwise applicable to the Mortgaged Property by virtue of the Mortgaged Property being situated within the boundaries of any district, agency or other governmental entity or within the boundaries of any private water company, mutual water company or other non-governmental entity; (v) any drainage rights appurtenant or otherwise applicable to the Mortgaged Property; (vi) all rights, including contractual rights, to divert, transport, carry, allocate or otherwise deliver water or any of the foregoing rights from or to the Mortgaged Property by any means, wherever located; (vii) any shares (or any rights under such shares) of any private water company, mutual water company or other non-governmental entity pursuant to which Debtors or the Mortgaged Property may receive any of the rights referred to in clauses (i) through (vi) above.

139697745.3

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.2     **Accounting Terms**.   Any accounting terms used in this Agreement which are not specifically defined in this Agreement shall have the meanings customarily given them in accordance with GAAP, as consistently applied as of the date of this Agreement.

1.3     **Other Terms Defined in the Code**.  All other terms contained in this Agreement (which are not specifically defined in this Agreement) shall have the meanings set forth in the Code to the extent the same are used or defined therein.

1.4     **Interpretation**.  With reference to this Agreement and each other Financing Agreement, unless otherwise specified herein or in such other Financing Agreement:  (a) the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined; whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms; the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; the word "will" shall be construed to have the same meaning and effect as the word "shall"; unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Financing Agreement), (ii) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (iii) the words "herein", "hereof", and "hereunder", and words of similar import when used in any Financing Agreement, shall be construed to refer to such Financing Agreement in its entirety and not to any particular provision thereof, (iv) unless otherwise specified, all references in any Financing Agreement to Sections, Exhibits, and Schedules shall be construed to refer to Sections of, and Exhibits, and Schedules to, the Financing Agreement in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, (vi) any table of contents, captions and headings are for convenience of reference only and shall not affect the construction of this Agreement or any other Financing Agreement, and (vii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights; and (b) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

2     **LOANS, PAYMENT, PREPAYMENT, PURPOSE, FEES, ACCOUNTS, TERMINATION, AND CONTRIBUTION**.

2.1     **Delayed Draw Term Loans**.  Subject to all of the terms and conditions contained in this Agreement, Agent and the Lenders severally and not jointly agree to make the following extensions of credit to or for the benefit of Debtors:

2.1.1     Initial Draw.  On the Closing Date, each Lender having a Commitment severally agrees to make a Loan to Debtors in accordance with a Funds Request in an aggregate principal amount of Fifteen Million Dollars ($15,000,000) (the "**Initial Draw**").

139697745.3

**2.1.2**    <u>Subsequent Advances</u>.  On and after the Final Order Date, each Lender having a Commitment severally agrees to make a Loan to Debtors from time to time on any one or more Business Days from and after the Final Order Date through and including the Business Day preceding the Maturity Date in accordance with a Funds Request in an aggregate principal amount that will not result in (a) such Lender's Pro Rata Percentage of the principal balance of the then outstanding Loans (exclusive of PIK Interest and fees capitalized pursuant to <u>Section 2.5</u>), exceeding such Lender' Commitment or (b) the aggregate principal balance of the then outstanding Loans (exclusive of PIK Interest and fees capitalized pursuant to <u>Section 2.5</u>), exceeding the total Commitments.  Loans shall be evidenced by and repayable in accordance with the terms of Debtors' promissory notes to each of the Lenders having a Commitment ("**Notes**"), the form of which is attached as Exhibit 2A.  Amounts representing Loans that have been repaid by Debtors may not be reborrowed.

**2.1.3**    <u>Funds Requests</u>.  Promptly following its receipt of a Funds Request, Agent shall provide notice thereof to each Lender having a Commitment.  Each Funds Request shall be for a Loan in an aggregate principal amount of Five Million Dollars ($5,000,000); <u>provided</u> that if at such time the unused Commitments aggregate less than Five Million Dollars ($5,000,000), a Funds Request may be in an aggregate amount that is equal to the entire unused balance of the Commitments.

**2.2**    <u>**Payment of Principal and Interest; Default Rate; Voluntary Overadvances and Extensions**</u>.

(a)    Debtors shall pay the principal amount outstanding under the Loans (inclusive of any PIK Interest and fees capitalized pursuant to Section 2.5) on the Maturity Date.

(b)    The Loans shall bear interest at a rate per annum equal to the lesser of (i) six and one-half percent (6.5%), and (ii) the Highest Lawful Rate.  Interest shall accrue on the unpaid principal amount of the Loans from the date of such Loan thereunder until such principal amount shall be paid in full.

(c)    Commencing on May 1, 2024 and on the first day of every calendar month thereafter (each, an "**Interest Payment Date**"), Debtors shall pay interest on the Loans in kind at the interest rate determined pursuant to <u>Section 2.2(b)</u>, including (if applicable) interest at the Default Rate, by capitalization as additional principal and not in cash, which payments shall constitute PIK Interest.  PIK Interest (i) shall be compounded and shall be added to and increase, and shall thereafter constitute and be considered a portion of, the aggregate outstanding principal balance of the Loans on and as of the Interest Payment Date it otherwise would have been paid, and (ii) shall bear interest at the interest rate determined pursuant to <u>Section 2.2(b)</u>, including (if applicable) interest at the Default Rate.  After the capitalization of any PIK Interest, the aggregate principal amount of the Loans outstanding at any time shall be comprised of (x) the aggregate original principal amount of the Loans and (y) the aggregate amount of PIK Interest through such time (as each such amount may be decreased as a result of any prepayment pursuant to <u>Section 2.3(b)</u>.  Any interest paid in the form of PIK Interest shall be deemed paid when due for all purposes of this Agreement and the other Financing Agreements.  In the event of any repayment or prepayment of the Loans, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment.  To the extent not previously paid, all PIK Interest shall be due and payable in full on the Maturity Date.  Upon the request of any Lender(s), Debtors shall issue to such Lender(s) a new Note, duly executed and delivered by Debtors, evidencing Debtors' obligation to pay the increased principal amount of each such Lender's Loans resulting from interest capitalization pursuant to this Section 2.2(c).

(d)    After the occurrence of a Matured Default, any and all amounts due hereunder, under the Notes or under any other Financing Agreement, whether for principal, interest (to the extent permitted by applicable law), fees, expenses or otherwise, shall bear interest, payable on demand, at a rate per annum (the "**Default Rate**") equal to the lesser of (i) the otherwise applicable rate plus two percent (2.00%) per annum, and (ii) the Highest Lawful Rate.

(e)    All computations of interest pursuant to this Section 2.2 shall be made by Agent with respect to all Loans on the basis of a year of 360 days, unless the foregoing would result in a rate exceeding the Highest Lawful Rate, in which case such computations shall be based on a year of 365 or 366 days, as the case may be. Interest with respect to all Loans, whether based on a year of 360, 365 or 366 days, shall be charged for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest is payable.   Each determination by Agent of an interest rate shall be conclusive and binding for all purposes, absent manifest error.

(f)    All payments of principal and interest shall be made without demand by an Agent initiated (i) Loan or (ii) debit to a Deposit Account, each pursuant to any preauthorization provided by Debtors to Agent.

(g)    One Hundred Percent (100%) of the Lenders, acting together in their sole and absolute discretion, may elect to make Loans to Debtors in excess of the amounts available pursuant to the terms of this Agreement, and any such Loans shall also be governed by the terms hereof. One Hundred Percent (100%) of the Lenders shall also have the option, in their sole discretion and without any obligation to do so, to extend the Maturity Date for the making of any Loans, in which event Agent shall give notice to Debtors pursuant to <u>Section 10.19</u>.

(h)    Subject to compliance with each of the conditions set forth in this <u>subsection (h)</u>, in the event Debtors shall not have Fully Satisfied the Liabilities on or prior to _____, 202__, Debtors shall have the option to extend the Scheduled Maturity Date to April ___, 2025[5].  Debtors may exercise such option only be delivery of written notice to Agent on or prior to _____, 202__ (the "**Extension Notice Date**").  In the event that:  (i) Debtors shall have delivered such written notice on or prior to the Extension Notice Date; and (ii) Debtors shall be in compliance with each of the then applicable Milestones, (iii) all representations and warranties contained in this Agreement shall be true on and as of the Extension Notice Date as if such representations and warranties had been made on and as of such date, (iv) no Default or Matured Default shall have occurred and be continuing or shall exist on the Extension Notice Date or at any time on or prior to the occurrence of then Scheduled Maturity Date (without giving effect to this extension option), and (v) Debtors' shall have paid the Renewal Fee in accordance with <u>Section 2.5(c)</u>, the Scheduled Maturity Date shall be extended to April ___, 2025[6] and Agent and Debtors shall execute an acknowledgement of the extension of Scheduled Maturity Date to evidence same.

**2.3    <u>Prepayment</u>**.

(a)    Debtors may at any time terminate the Commitments in accordance with Section 2.3(b).

(b)    Following not less than five (5) Business Days' written notice to Agent, Debtors may terminate the Commitments (a) in full by payment in full of the Loan Liabilities, and (b) in

---

[5] NTD:  Insert date which is 12 months after the date the Bankruptcy Court enters the Interim Order.
[6] NTD:  Insert date which is 12 months after the date the Bankruptcy Court enters the Interim Order.

139697745.3

the case of a partial termination, by payment of the Loan Liabilities to the extent necessary to cause the Available Amount to be not less than zero. Any partial reduction of Commitments pursuant to this Section 2.3(b) shall result in a pro-rata reduction of the Commitment for each Lender having a Commitment.[7]

    **2.4**    **Purpose**. The Loans shall be used to fund each Debtors' expenses in accordance with the Agreed Budget. Notwithstanding anything to the contrary in this Section 2.4, no part of the proceeds of the Loans and other credit extensions under this Agreement and the other Financing Agreements or Cash Collateral shall be used to prosecute, investigate or for proceedings to, contest the claims of the Secured Parties or Pre-Petition RLOC Secured Parties or the liens in favor of the Secured Parties or Pre-Petition RLOC Secured Parties that secure the Liabilities or Pre-Petition RLOC Obligations, or prevent, hinder or delay any of the Agent's or the Lenders', or Pre-Petition RLOC Secured Parties' enforcement or realization upon any of the Collateral or collateral securing the Pre-Petition RLOC Obligations. No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any of the regulations of the Board of Governors, including Regulations T, U and X, or in violation of Sections 5.21 or 6.8.

    **2.5**    **Fees**.

        (a)    Issuance Fee. Debtors shall pay to Agent, for the ratable benefit of the Lenders, an issuance fee (the "**Issuance Fee**") in the amount of one percent (1.0%) of the principal amount of each Loan, which fee will be deemed to be earned and due and payable on the date of the advance of such Loan. Debtors shall pay the Issuance Fee in kind by capitalization as additional principal and not in cash. The Issuance Fee (i) shall be added to and increase, and shall thereafter constitute and be considered a portion of, the aggregate outstanding principal balance of the Loans on and as of the date of the applicable Loan, and (ii) shall bear interest at the interest rate determined pursuant to Section 2.2(b), including (if applicable) interest at the Default Rate.

        (b)    Exit Fee. Debtors shall pay to Agent, in cash for the ratable benefit of the Lenders, an exit fee in the amount of three quarters of one percent (0.75%) of the aggregate principal amount of the Loans made pursuant to Section 2.1, which fee shall be fully earned on the date each such Loan (including the Initial Draw) is made and shall be due and payable on the earlier to occur of (i) the Maturity Date and (ii) the date any or all of the Loans are prepaid (calculated on a pro rata basis) prior to the Maturity Date.

        (c)    Renewal Fee. In the event Debtors exercise their option to extend the Scheduled Maturity Date pursuant to Section 2.2(h), Debtors agree to pay to Agent for the ratable benefit of the Lenders a renewal fee (the "**Renewal Fee**") equal to one percent (1%) of the aggregate principal amount of the Loans, which fee will be deemed to be earned and due and payable on January 2, 2025. Debtors shall pay the Renewal Fee in kind by capitalization as additional principal and not in cash. The Renewal Fee (i) shall be added to and increase, and shall thereafter constitute and be considered a portion of, the aggregate outstanding principal balance of the Loans on and as of January 2, 2025, and (ii) shall bear interest at the interest rate determined pursuant to Section 2.2(b), including (if applicable) interest at the Default Rate.

        (d)    Calculation and Payment of Fees. The fees payable under this Section 2.5 which are based on an annual percentage rate shall be calculated by Agent on the basis of a 360-day year, for the actual days (including the first day but excluding the last day) occurring in the period for which such fee is payable. Each determination by Agent of fees payable under this Section 2.5

---

[7] NTD: Discuss partial termination.

shall be conclusive and binding for all purposes, absent manifest error. Each of the Fees payable under this Section 2.5 shall be fully earned on the date payable and shall be made without demand by an Agent-initiated (i) Loan or (ii) debit to a Deposit Account, each pursuant to any preauthorization provided by Debtors to Agent.

(e)    Fees Not Interest.  The fees described in this Agreement represent compensation for services rendered and to be rendered separate and apart from the lending of money or the provision of credit and do not constitute compensation for the use, detention, or forbearance of money, and the obligation of Debtors to pay each fee described herein shall be in addition to, and not in lieu of, the obligation of Debtors to pay interest, other fees described in this Agreement, and expenses otherwise described in this Agreement.  Fees shall be payable when due in Dollars and in Immediately Available Funds.  All fees shall be non-refundable.

**2.6    Debtors' Loan Account**.  Agent shall maintain a loan account ("**Loan Account**") on its books in which shall be recorded: (a) all Loans made by Agent to Debtors pursuant to this Agreement; (b) all receipts and disbursements from and to the other Lenders; (c) all payments made by Debtors; and (d) all other appropriate debits and credits as provided in this Agreement, including without limitation, all receipts of cash proceeds of collateral, fees, charges, expenses and interest.  All entries in Debtors' Loan Account shall be made in accordance with Agent's customary accounting practices as in effect from time to time.  Debtors promise to pay the amount reflected as owing by and under the Loan Account and all other obligations hereunder as such amounts become due or are declared due pursuant to the terms of this Agreement.

**2.7    Account Review**.  All Loans to Debtors, and all other debits and credits provided for in this Agreement, shall be evidenced by entries made by Agent in its internal data control systems showing the date, amount and reason for each such debit or credit, and such entries shall be rebuttable presumptive evidence of the amounts due and owing Agent and the Lenders by Debtors.  Debtors shall monitor the Loan Account and, absent manifest errors or omissions and adjustments made by Agent in its discretion, such Loan Account shall be presumed correct and binding upon Debtors and shall constitute an account stated unless, within ninety (90) days after any transaction is posted to the Loan Account, Debtors shall deliver to Agent written objection specifying the error or errors, if any, with respect to any posted transaction.

**2.8    Termination of Agreement**.  Subject to and in accordance with Section 8.1 and subject to the restrictions of the Bankruptcy Code, Agent shall have the right, without notice to Debtors except as specifically set forth in this Agreement, to terminate the Commitments immediately upon a Matured Default.  In addition, the Commitments shall be deemed immediately terminated and all outstanding principal and accrued and unpaid interest thereunder shall be immediately due and payable, without notice to Debtors, on the Maturity Date.  In the event the Commitments are terminated, the remainder of this Agreement shall remain in full force and effect until the payment in full of the Liabilities.  This Agreement shall terminate when the Commitments have terminated and the Liabilities (other than contingent indemnification obligations) have been indefeasibly paid in full.

**2.9    Contribution Agreement**.  As an inducement to Agent and the Lenders to make Loans and extend credit to each Debtor, each Debtor agrees to indemnify and hold the other harmless from and each shall have a continuing right of contribution against each other Debtors, if and to the extent that a Debtor makes or is caused to make disproportionate payments of the Liabilities in excess of that Debtor's Proportionate Share (as defined below), from dispositions of its assets or otherwise.  These indemnification and contribution obligations shall be unconditional and continuing obligations of each Debtor and shall not be waived, rescinded, modified, limited or terminated in any way whatsoever without the prior written consent of Agent and the Lenders, in their sole discretion.  For purposes hereof, the Proportionate Share of a Debtor shall mean a fraction, in which the numerator is the net worth of a Debtor (defined as the fair

28

salable value of its assets minus its liabilities, other than the Liabilities and its contribution obligations hereunder) on the date of the determination with regard to such payments and the denominator is the Consolidated net worth of every Debtor (as so defined) on such date.

**3**      **CONDITIONS TO LOANS**.

     Notwithstanding any other provisions to the contrary contained in this Agreement, the making Loans under this Agreement shall be conditioned upon the following, except as provided otherwise in accordance with this Agreement:

     **3.1**      **Approval of Agent's Counsel**.  As of each Loan, all legal matters, if any, shall have been reviewed by and shall be satisfactory to Agent's counsel.

     **3.2**      **Compliance**.  As of the making of each Loan, (a) all representations and warranties contained in this Agreement shall be true on and as of the date of the making of such Loan as if such representations and warranties had been made on and as of such date, (b) no Default or Matured Default shall have occurred and be continuing or shall exist, and (c) the making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

     **3.3**      **Documentation**.

     (a)      Prior to the Initial Draw, Debtors shall have executed and delivered or caused to be executed and delivered to Agent all of the documents listed on the List of Closing Documents set forth on Exhibit 3A, all in form and substance acceptable to Agent.

     (b)      On or before dates indicated, Debtors shall have executed and delivered or caused to be executed and delivered to Agent the documents listed on the List of Post-Closing Documents set forth on Exhibit 3B in form and substance reasonably acceptable to Agent.  Debtors' failure to execute and deliver or have executed and delivered the Post-Closing Documents identified on Exhibit 3B on or before the dates indicated (subject to extension in the discretion of Agent) shall constitute a Matured Default.

     (c)      As of the making of each Loan, Agent shall have received, in form and substance satisfactory to Agent, all other documents, information, and other preconditions required (i) under this Agreement or any other Financing Agreement or (ii) applicable law.

     **3.4**      **Inspections**.  As of the making of each Loan , Agent shall have received, in form and substance satisfactory to Agent, any inspection reports required (a) under this Agreement or any other Financing Agreement or (b) applicable law.

     **3.5**      **Liens**.  As of the making of each Loan, Agent shall have received satisfactory evidence that all Liens granted to Agent for the benefit of the Secured Parties are valid, enforceable, properly perfected, and prior to the rights and interests of all other Persons, except as set forth in the Orders.

     **3.6**      **Fees**.  Evidence that the Debtors shall have paid all accrued fees and expenses of the Agent and the Lenders, including (unless waived by the Agent) the reasonable fees, charges and disbursements of Norton Rose Fulbright US LLP and Hawley Troxell Ennis & Hawley LLP, counsel to the Agent, FTI Consulting, as financial adviser, in each case, in connection with the negotiation, preparation, execution, and delivery of the Financing Agreements (directly to such counsel if requested by Agent or the applicable Lender) to the extent invoiced prior to the Closing Date, plus such additional amounts of such fees, charges, and disbursements as shall constitute its reasonable estimate of such fees, charges, and disbursements

29

incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Debtors and the Agent).

**3.7** **Know Your Customer Requirements**.  (a) All documents, certificates, and other information reasonably requested in writing (which may be via e-mail) by each Lender pursuant to Section 5.16 and (b) a Beneficial Ownership Certification in relation to the Debtors (with applicable exemption noted thereon), in each case prior to the Closing Date.

**3.8** **Financing Orders**.

(a)     With respect to the Initial Draw, the Interim Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been (i) stayed, vacated, reversed or rescinded, and any appeal of such order shall not have been timely filed and a stay of such order pending appeal shall not be presently effective or (ii) without the prior written consent of the Agent and the Required Lenders (given in their sole discretion), revised, amended or modified. The Debtors shall be in compliance in all respects with the Interim Order.

(b)     With respect to the advance of any Loans under Section 2.1.2 of this Agreement, the Final Order, shall be in full force and effect, and shall not have been (i) stayed, vacated, reversed or rescinded, and any appeal of such Order shall not have been timely filed or, if such Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by Debtors of any of their obligations under any of the Financing Agreements shall be the subject of a presently effective stay pending appeal, and (ii)(A) with respect to the Interim Order, without the prior written consent of Agent (and each other Lender or percentage of Lenders that would have a right to consent to such modifications, given in their sole discretion, revised, amended or modified or (B) with respect to the Final Order, without the prior written consent (not to be unreasonably withheld or delayed) of Agent (and each other Lender or percentage of Lenders that would have a right to consent to such modifications, revised, amended or modified.

**3.9** **Other Bankruptcy Court Orders**.  The Cash Management Order, the Cash Collateral Order and all other "first day orders" or other orders to be entered on or prior to the Closing Date, including all payments approved by the Bankruptcy Court in any such orders, shall be reasonably satisfactory in form and substance to Agent in all respects, shall have been entered by the Bankruptcy Court, and shall not have been (i) stayed, vacated, reversed or rescinded or (ii) without the prior written consent of Agent, revised, amended or modified (not to be unreasonably withheld).

Agent shall notify Debtors and Lenders of the Closing Date, and such notice shall be conclusive and binding. Each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**3.10** **Vendor Agreements**.  Debtors shall not have entered into, or made any payment in respect of, any agreements with any one or more of their Essential Vendors or otherwise entered into any agreement to pay, or made on a post-petition basis any payment in respect of, any prepetition trade obligations except pursuant to an order of the Bankruptcy Court and with the prior written consent of Agent in each instance.

# 4    **SECURITY**.

**4.1** **Security Interests and Liens**.

139697745.3

(a)     Effective immediately upon entry of the Interim Order (or the Final Order, where specified below), and subject to the Carve-Out, and as set forth in the Interim Order (or the Final Order, when applicable), all of the Liabilities of each Debtor are authorized by each Order and shall, subject to the Carve-Out, at all times be secured by:

(i)     Liens On Unencumbered Property.  Pursuant to Bankruptcy Code section 364(c)(2), valid, enforceable, perfected and non-avoidable first priority Liens on all Collateral (other than, for the avoidance of doubt, Avoidance Actions, as such term is defined in the DIP Financing Motion) that was not encumbered by valid, enforceable, perfected and non-avoidable Liens as of the Petition Date;

(ii)     Liens Priming Certain Pre-Petition Secured Parties Liens. Effective immediately upon entry of the Final Order, pursuant to 11 U.S.C. §364(d)(1), first priority priming liens on and security interests in all other DIP Collateral (the "DIP Priming Liens"); provided, however, that notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (w) senior to the Pre-Petition MetLife Liens but only to the extent of the MetLife Primed Portion, (x) senior to the Pre-Petition RLOC Liens but only to the extent of the RLOC Primed Portion, (y) senior to any Adequate Protection Liens on DIP Collateral and (z) not subordinate to any liens, security interests, or mortgages that are avoided and preserved for the benefit of the Debtors and their Estate under 11 U.S.C. § 551; and

(iii)     Liens Junior To Certain Other Liens. Pursuant to 11 U.S.C. § 364(c)(3), (subject to and subordinate only to the Carve-Out) liens on and security interests in and upon all tangible and intangible Pre-Petition and post-petition property of the Debtors and their Estates that on or as of the Petition Date, is subject to either (x) valid, binding, perfected, continuing, enforceable, and non-avoidable, Pre-Petition Permitted Senior Liens, or (y) valid, binding, continuing, enforceable, and non-avoidable Pre-Petition Permitted Senior Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Pre-Petition Date, as permitted by 11 U.S.C. § 546(b), which shall be (x) immediately junior and subordinate to any such Pre-Petition Permitted Senior Liens, (y) senior to the Pre-Petition Liens and the Adequate Protection Liens on all Pre-Petition Collateral subject to such Pre-Petition Permitted Senior Liens.  Further, the Liabilities shall also be secured pursuant to 11 U.S.C.§ 364(c)(3), by a valid, binding, continuing, enforceable, and non-avoidable fully perfected security interests (subject to and subordinate only to the Carve-Out) in and liens upon the Pre-Petition MetLife Collateral and Pre-Petition RLOC Collateral, which security interest and liens shall be subordinate only to the Pre-Petition MetLife Liens and Pre-Petition RLOC Liens, respectively, and otherwise senior to all or any other liens and security interests (the "**Junior DIP Lien**").

Without limiting (i-iii) above, the DIP Liens shall not be (x) subject or subordinate to or made *pari passu* with (1) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their Estates under 11 U.S.C. § 551, (2) unless otherwise provided for in the DIP Financing Agreements, the Interim Order, or any other liens or security interests arising after the Petition Date, including,  without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court, for any liability of the Debtors, or (3) any intercompany or affiliate liens of the Debtors or security interests of the Debtors; or (y) subordinated to or made *pari passu* with any other lien or security interest under 11 U.S.C. §§ 363 or 364.

(b)      Effective immediately upon entry of the Order and as set forth more fully in the Order, the DIP Liens shall (or, as applicable, shall continue to) secure all of the Liabilities and shall not, without the consent of Agent, be made subject or subordinate to, or *pari passu* with, (A) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551, (B) any Lien arising on or after the Petition Date (but shall be subject to the Carve-Out) or (C) any other Lien under Bankruptcy Code section 363 or 364 or otherwise, other than to the Carve-Out or to the extent expressly provided herein, by any court order heretofore or hereafter entered in the Chapter 11 Cases.

(c)      Upon (and at all times after) the entry, and subject to the terms, of each of the Interim Order and the Final Order, each such Order shall be effective to create in favor of the Agent, for the benefit of the Secured Parties, a legal, valid, enforceable and perfected Lien on the Collateral of the Debtors and proceeds thereof.

(d)      Upon (and at all times after) the entry, and subject to the terms, of each of the Interim Order and the Final Order, each such Order and the Financing Agreements is sufficient to provide the DIP Superpriority Claims and Liens on the Collateral of the Debtors described in, and with the priority provided in, Section 4.1(a) hereof.

**4.2      Endorsement by Agent**.  Each Debtor authorizes Agent to endorse in such Debtor's name any item, however received by Agent, representing payment on or other proceeds of any of the Collateral.

**4.3      Delivery of Warehouse Receipts to Agent**.  In the event that Inventory becomes the subject of a negotiable or nonnegotiable warehouse receipt, said warehouse receipt shall, at Agent's request, be promptly delivered to Agent with such endorsements and assignments as are necessary to vest title and possession in Agent. Provided that a Matured Default does not then exist and would not be created thereby, Agent shall return such warehouse receipts to Debtors within two (2) Business Days of Debtors' request, but only for purposes of negotiation, delivery or exchange in the ordinary course of Debtors' business, and provided, however, that Debtors shall comply with such terms and conditions as required by Agent to secure the return to Agent of the proceeds of such warehouse receipts, where such return of proceeds would be required in accordance with Debtors' obligations to Agent under the Financing Agreements.

**4.4      Preservation of Collateral and Perfection of Security Interests**.  Agent is authorized to file UCC-1 financing statements and amendments thereto in accordance with the Code.  Debtors shall execute and deliver to Agent, concurrently with the execution of this Agreement and at any time hereafter, all financing statements, fixture filings, effective financing statements, and all other documents (and pay the cost of filing or recording the same in all public offices deemed necessary by Agent), as Agent may reasonably request, in a form satisfactory to Agent, to perfect, keep perfected, protect and preserve the security interest in the Collateral granted by Debtors to Agent. Agent is hereby irrevocably authorized to file (and sign on behalf of Debtors, if necessary) UCC financing statements, fixture filings, effective financing statements on the Collateral at the time of this Agreement or from time to time hereafter. Each Debtor further agrees that (a) an electronic, carbon, photographic, or other reproduction of a financing statement is sufficient as a financing statement and (b) such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as Agent may determine, in its sole reasonable discretion, is necessary, advisable or prudent to ensure that the perfection of the security interest in the Collateral granted to Agent herein, including, without limitation, describing such property as "all assets of the debtor whether now owned or hereafter acquired and wheresoever located, including all accessions thereto and proceeds thereof."  Notwithstanding the foregoing, Agent shall not perfect on the Closing Date any security interest in any Equipment which is titled, however Agent reserves the right to perfect a security interest in

32

such Equipment at such time and in such manner as Agent may reasonable determine and Debtors shall cooperate and assist Agent in perfecting such security interest as Agent may reasonably request.

       **4.5**    **Loss of Collateral**.  Debtors shall immediately notify Agent of any material loss or decrease in value of the Collateral.

       **4.6**    **Collection of Accounts; Power of Attorney**.  Debtors, at Agent's demand, shall take all reasonable steps, including without limitation, the placement of such designations on invoices as may be appropriate, to cause all Account Debtors to make all payments to Debtors for Debtors' prompt deposit in the Deposit Accounts identified on Schedule 4.6.  After and during the continuance of a Matured Default, each Debtor agrees, upon Agent's written demand, to establish a lockbox into which Account Debtors shall make payments to be applied to the Liabilities pursuant to Section 10.14.  Upon and during the continuance of a Matured Default, each Debtor designates, makes, constitutes and appoints Agent (and all Persons designated by Agent) as such Debtor's true and lawful attorney-in-fact, with power, in such Debtor's or Agent's name, to: (a) demand payment of Accounts; (b) enforce payment of Accounts by legal proceedings or otherwise; (c) exercise all of such Debtor's rights and remedies with respect to proceedings brought to collect an Account; (d) sell or assign any Account upon such terms, for such amount and at such time or times as Agent deems advisable; (e) settle, adjust, compromise, extend or renew any Account; (f) discharge and release any Account; (g) take control in any manner of any item of payment or proceeds of any Account; (h) prepare, file and sign such Debtor's name upon any items of payment or proceeds and deposit the same to Agent's account on account of the Liabilities; (i) endorse such Debtor's name upon any Chattel Paper, Document, Instrument, invoice, warehouse receipt, bill of lading, or similar Document or agreement relating to any Account or any other Collateral; (j) sign such Debtor's name on any verification of Accounts and notices to Account Debtors; (k) prepare, file and sign such Debtor's name on any proof of claim in bankruptcy or similar proceeding against any Account Debtor; and (l) do all acts and things which are necessary, in Agent's sole discretion, to sell, transfer or otherwise obtain the proceeds of any Collateral or otherwise to fulfill such Debtor's obligations under this Agreement or any of the Financing Agreements. The foregoing power of attorney is coupled with an interest and is therefore irrevocable.

       **4.7**    **Account Covenants**.  Debtors shall: (a) promptly upon Debtors' learning thereof, inform Agent, in writing, of any material delay in Debtors' performance of any of Debtors' obligations to any Account Debtor or of any assertion of any material claims, offsets or counterclaims by any Account Debtor; (b) not permit or agree to any extension, compromise or settlement or make any change or modification of any kind or nature in excess of $250,000.00 with respect to any Account without the prior written consent of Agent; and (c) promptly upon Debtors' learning thereof, furnish to and inform Agent of all material adverse information relating to the financial condition of any Account Debtor if Accounts attributable to such Account Debtor aggregate in excess of $250,000.00.

       **4.8**    **Account Records and Verification Rights**.  Each Debtor represents and warrants to and covenants with the Lenders that such Debtor now keeps and at all times shall keep correct and accurate records relating to the Accounts and the financial and payment records of the Account Debtors, all of which records shall be available upon demand during such Debtor's usual business hours to any of Agent's officers, employees or agents; provided that so long as no Default or Matured Default has occurred and is continuing, Agent shall give reasonable prior notice of any such demand.  Following and during the continuance of a Default or Matured Default, any of Agent's officers, employees or agents shall have the right at any time, in Agent's name, in the name of a fictional nominee or in the name of Debtors, to verify the validity, amount or any other matter relating to any Accounts, by mail, telephone, email or otherwise. Debtors shall promptly notify Agent of any amounts that are in dispute for any reason in excess of $250,000.00 which are due and owing from an Account Debtor.

**4.9**    **Notice to Account Debtors**.  Agent shall (upon the direction of the Required Lenders) at any time or times upon and during the continuance of a Matured Default, and without prior notice to Debtors, notify any or all Account Debtors that the Accounts have been assigned to Agent and that Agent has been granted a security interest therein and may direct any or all Account Debtors to make all payments upon the Accounts directly to Agent or to a lockbox to be established pursuant to Section 4.6.

**4.10**    **Collateral Records**.  Each Debtor represents and warrants to and covenants with the Lenders that such Debtor now keeps and at all times shall keep correct and accurate records itemizing and describing the kind, type, quality, quantity, and location of Inventory, such Debtor's costs and selling prices of Inventory, and daily withdrawals and additions of Inventory, all of which records shall be available on demand during such Debtor's usual business hours to any of Agent's officers, employees or agents; provided that so long as no Default or Matured Default has occurred and is continuing, Agent shall give Debtors reasonable prior notice of any such demand.

**4.11**    **Special Collateral**.  Immediately upon Debtors' receipt thereof and upon Agent's request, Debtors shall (except as provided for in Section 4.3 with regard to warehouse receipts) deliver or cause to be delivered to Agent, with such endorsements and assignments as are necessary to vest title and possession in Agent, all Chattel Paper, Instruments and Documents which Debtors now own or which Debtors may at any time acquire. Debtors shall promptly mark all copies of such Chattel Paper, Instruments and Documents to show that they are subject to Agent's security interest.

**4.12**    **Remittance of Proceeds to Agent**.  Except as to the receipt of proceeds of Collateral in the ordinary course of business and except as otherwise provided in Section 6.5 with regard to certain insurance proceeds, in the event any proceeds of any Collateral shall come into the possession of Debtors (or any of its Owners, directors, officers, managers, members, employees, agents or any Persons acting for or in concert with Debtors), Debtors or such other Person shall receive, as the sole and exclusive property of Agent, and as trustee for Agent, all monies, checks, notes, drafts and all other payments for and/or other proceeds of Collateral, and promptly at Agent's request to Debtors, Debtors shall remit the same (or cause the same to be remitted), in kind, to Agent or to such agent or agents (at such agent's or agents' designated address or addresses as are appointed by Agent for that purpose, to be applied to the Liabilities pursuant to Section 10.14.

**4.13**    **Safekeeping of Collateral**.  Subject to the requirements of applicable law, Agent shall not be responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage to the Collateral; (c) any diminution in the value of the Collateral; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency or any other Person relating to the Collateral.  All risk of loss, damage, destruction or diminution in value of the Collateral shall be borne by Debtors.

**4.14**    **Changes in Locations of Collateral**.  Debtors shall not relocate any Collateral without first providing Agent not less than five (5) days prior written notice, other than (a) Inventory in transit and sales of Inventory in the ordinary course of business, (b) relocations of Collateral to a location disclosed to Agent, (c) relocations to a third party bailee, subject to a collateral access agreement, (d) temporary location in the ordinary course of business of Equipment in the possession and under the control of Debtors and in connection with routine maintenance and repair thereof, and (e) dispositions permitted under Section 7.6.

**4.15**    **Sales and Use of Collateral**.  Except as set forth in this Section 4.15 or in Section 7.6, Debtors shall not sell, lease, transfer or otherwise dispose of any Collateral.  So long as there shall not have occurred and be continuing a Matured Default, Inventory may be sold, stored and shipped by Debtors in the ordinary course of Debtors' business, but shall not otherwise be taken or removed from Debtors' premises or approved third party locations, except for raw materials or work in process for the purpose of conversion into finished Goods.  Upon and during the occurrence of a Matured Default and if Agent so

34

notifies Debtors in writing, no Collateral shall be sold or taken or removed from Debtors' premises or approved third party locations, except with the prior written consent of Agent and upon payment of an amount equivalent to the value of the Collateral to be sold or removed, such amounts to be paid to Agent to be applied upon the Liabilities.  So long as a Matured Default shall not have occurred and be continuing, Collateral may be used by Debtors in the ordinary course of Debtors' business, subject to Agent's continuing security interest.  Upon and during the continuation of a Matured Default and if Agent so notifies Debtors in writing, Collateral shall not be used except with the prior written consent of Agent.

**4.17    Trademark License**.  Each Debtor grants to Agent and Agent accepts for the term of this Agreement a non-exclusive world-wide royalty-free license to use the Marks on or in connection with the marketing, distribution and sale of Inventory after and during the continuance of a Matured Default, subject to the terms of this Agreement.  Such license shall be granted as of the Closing Date with respect to any Marks existing on such date and thereafter on and as of such time or times that such Debtor creates or acquires any Marks.  Debtors shall not assign any right, title or interest in and to any of the Marks without the prior written consent of Agent, but may grant non-exclusive licenses to use the Marks in the ordinary course of its business.

## 5    REPRESENTATIONS AND WARRANTIES.

Each Debtor represents and warrants to Agent and the Lenders that:

**5.1    Defaults and Disputes**.  Other than the Bankruptcy Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of Debtors, threatened against or affecting Debtors (i) as to which there is a reasonable probability of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to be materially adverse to Debtors' financial condition, results of operations or business or (ii) that involve this Agreement.

**5.2    Defaults and Disputes**.  Other than defaults arising out of Debtors' commencement of the Bankruptcy Cases, Debtors are not in default under any contract, lease or commitment to which Debtors are a party or by which Debtors are bound except those defaults which are not, in the aggregate, materially adverse to Debtors' financial condition, results of operations or business.  Debtors know of no dispute relating to any contract, lease, or commitment except those disputes which are not, in the aggregate, materially adverse to Debtors' financial condition, results of operations or business.

**5.3    Licenses, Patents, Copyrights, Trademark sand Trade Names**.  There is no action, proceeding, claim or complaint pending or, to Debtors' knowledge, threatened to be brought against Debtors by any Person which could reasonably be expected to jeopardize any of Debtors' interest in any of Debtors' patents, copyrights, trademarks, trade names, applications or licenses, except those which are not, in the aggregate, materially adverse to Debtors' financial condition, results of operations or business.

**5.4    Other Liens on Collateral**.  Except as permitted under Section 7.1, all of the Collateral is free and clear of all Liens.  No Goods held by Debtors on consignment or under sale or return contracts have been represented to be Collateral and no amounts receivable by Debtors in respect of the sale of such Goods (except markups or commissions which have been fully earned by Debtors) have been represented to be Collateral.  All Producer Payables arising after the Petition Date which are due and owing to suppliers of any of the Collateral have been paid when due (and in any event not later than sixty (60) days after the invoice date), other than those being contested in good faith by Debtors, and no Person to whom such Producer Payables are owed has demanded turnover of any Collateral or proceeds thereof.  Debtors have adequate procedures in place to insure that Collateral purchased by Debtors is free of security interests in favor of Persons other than Agent in accordance with the Federal Food Security Act, the Packers and

Stockyards Act, the Perishable Agricultural Commodities Act, and any all other similar federal or state laws applicable to Debtors under which Persons other than Agent could lawfully assert security interests in the Collateral. Debtors will furnish, at Agent's request, the names and addresses of all Persons who supply Inventory to Debtors or who deliver Goods to Debtors on consignment or under sale or return contracts.

   **5.5**  **Location of Assets; Chief Executive Office**. The chief executive office of Debtors is located at 471 North 300 West, Jerome, Idaho 83338 and Debtors' assets are all located in the locations set forth on Part 5 of <u>Exhibit 5A</u> as updated from time to time by Debtors. As of the execution of this Agreement, the books and records of Debtors and all Debtors' Chattel Paper and records of account are located at the chief executive office of Debtors. If Debtors shall intend to make any change in the location of its chief executive office, Debtors shall notify Agent at least thirty (30) days prior to such change.

   **5.6**  **Tax Liabilities**. Debtors have filed all federal, state and local tax reports and returns required by any law or regulation to be filed by Debtors and have either duly paid all taxes, duties and charges indicated to be due on the basis of such returns and reports or have made adequate provision for the payment thereof, and the assessment of any material amount of additional taxes in excess of those paid and reported is not reasonably expected. The reserves for taxes reflected on Debtors' balance sheets are adequate in amount for the payment of all liabilities for all taxes (whether or not disputed) of Debtors accrued through the date of such balance sheet. There are no material unresolved questions or claims concerning any tax liability of Debtors.

   **5.7**  **Indebtedness and Producer Payables**. Except as contemplated by this Agreement and as disclosed on the Financial Statements, Debtors have no other indebtedness, contingent obligations or liabilities, outstanding bonds, letters of credit or acceptances to any other Person or loan commitments from any other Person, other than accounts payable and Producer Payables incurred in the ordinary course of business.

   **5.8**  **Other Names**. Debtors have not been known by or used any names other than the Aliases disclosed on Part 8 of <u>Exhibit 5A</u>, which list identifies all Aliases of each Debtors which are used now or have been used within the past five (5) years.

   **5.9**  **Structure and Affiliates**. Debtors' organizational structure is completely and accurately depicted by the organizational chart set forth on <u>Exhibit 5B</u>. No Debtor has any Affiliates, other than its directors, officers, trustees, agents and employees; those Persons disclosed on Part 9 of <u>Exhibit 5A</u>; and those Persons disclosed on <u>Exhibit 5B</u> as updated from time to time by Debtors. The legal relationships of each Debtors to each such Affiliate are accurately and completely described on <u>Exhibit 5B</u>.

   **5.10**  **Environmental Matters**. (a) Debtors have not received any notice to the effect, or have any knowledge, that any of their real property or their operations are not in compliance with any of the requirements of applicable federal, state, local, and tribal environmental, health and safety statutes and regulations ("**Environmental Laws**") or are the subject of any federal, state, or tribal investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment, which noncompliance or remedial action could have a material adverse effect on the business, operations, assets or conditions (financial or otherwise) of Debtors; (b) there have been no releases of hazardous materials at, on or under Debtors' real property that, singularly or in the aggregate could have a material adverse effect on the business, operations, assets or conditions (financial or otherwise) of Debtors; (c) there are no underground storage tanks, active or abandoned, including without limitation petroleum storage tanks, on or under Debtors' real property that, singularly or in the aggregate could have a material adverse effect on the business, operations, assets or conditions (financial or otherwise) of Debtors; (d) Debtors have not directly transported or directly arranged for the transportation of any hazardous material to any location which is listed or proposed for listing on the National Priorities List

139697745.3

pursuant to CERCLA or on any similar state list or which is the subject of federal, state, local, or tribal enforcement actions or other investigations which may lead to material claims against Debtors for any remedial work, damage to natural resources or personal injury, including without limitation, claims under CERCLA; and (e) no conditions exist at, on or under Debtors' real property which, with the giving of notice, would rise to any material liability under any Environmental Laws.

**5.11** **Existence**. Each Debtors is duly organized and in good standing under the laws of its state of organization and is duly qualified to do business and is in good standing in all states where such qualification is necessary, except for those jurisdictions in which the failure so to qualify would not, in the aggregate, have a material adverse effect on Debtors' financial condition, results of operations or business.

**5.12** **Authority**. Subject to entry of the Order, the execution and delivery by Debtors of this Agreement and by Debtors, as applicable, of all of the other Financing Agreements and the performance of Debtors' obligations hereunder and thereunder, as applicable: (a) are within Debtors' limited liability company, corporate, partnership, trust, or other applicable entity powers; (b) have been duly authorized; (c) do not contravene the terms of Debtors' Organizational Documents; (d) are not in contravention of any law or laws, or of the terms of any material indenture, agreement or undertaking to which Debtors is a party or by which Debtors or any of their property is bound; (e) do not require any consent, registration or approval of any Governmental Authority or of any other Person, except such consents or approvals as have been obtained or will be obtained on or prior to the date when necessary, and filings contemplated hereby and by the other Financing Agreements; (f) do not contravene any material contractual restriction or Governmental Requirement binding upon Debtors; (g) will not, except as contemplated or permitted by this Agreement or any other Financing Agreements, result in the imposition of any Lien upon any property of Debtors under any existing indenture, mortgage, deed of trust, loan or credit agreement or other material agreement or instrument to which Debtors are a party or by which Debtors or any of their property may be bound or affected; and (h) are not in violation of any material agreements with and/or any duties or obligations to any Owner.

**5.13** **Binding Effect**. Subject to entry of the Order, this Agreement and all of the other Financing Agreements set forth the legal, valid and binding obligations of Debtors, as applicable, and are enforceable against Debtors, as applicable, in accordance with their respective terms.

**5.14** **Correctness of Financial Statements**. The Financial Statements delivered from time to time by Debtors to Agent and the Lenders present fairly the financial condition of Debtors and have been prepared in accordance with GAAP consistently applied. Since the date of the most recent Financial Statements delivered to Agent and the Lenders, there has been no material adverse change in the financial condition or operations of Debtors ((a) other than (i) the filing of the Bankruptcy Cases, (ii) those events, conditions and circumstances related and/or leading up to and customarily resulting from the commencement of the Bankruptcy Cases (including defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement of the Bankruptcy Cases) and (iii) any reduction in payment terms by suppliers and vendors relating to or resulting from the commencement of the Bankruptcy Cases and (b) taking into account the effect of the automatic stay under the Bankruptcy Code).

**5.15** **Employee Controversies**. Except as set forth on Exhibit 5A, there are no controversies pending or to Debtors' knowledge threatened between Debtors or any of their employees, other than employee grievances arising in the ordinary course of Debtors' business or which are not, in the aggregate, materially adverse to Debtors' financial condition, results of operations or business.

**5.16** **Compliance with Laws and Regulations**. Debtors are in compliance with all Governmental Requirements relating to their business operations and assets, except for violations of

37

Governmental Requirements which would not have a material adverse effect on the value of the Collateral or Agent and the Lenders' interest in any of the Collateral and, in the aggregate, would not have a material adverse effect on Debtors' financial condition, results of operations or business. Debtors, their respective officers and employees, and to the knowledge of Debtors the directors and agents of Debtors, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of Debtors, or to the knowledge of Debtors any of their respective directors, officers or employees is a Sanctioned Person. No Loan, use of proceeds or other transactions contemplated hereby will violate Anti-Corruption Laws or applicable Sanctions. Neither the making of the Loans hereunder nor the use of the proceeds thereof will violate the PATRIOT Act, the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto or successor statute thereto. Debtors are in compliance in all material respects with the PATRIOT Act. Debtors shall provide such information and take such actions as are reasonably requested by Agent or the Lenders in order to assist Agent or the Lenders in maintaining compliance with the PATRIOT Act or other Governmental Requirements applicable to Agent or the Lenders.

**5.17** **Account Warranties**. (a) Except as disclosed to Agent from time to time in writing, all Accounts which are reflected on Debtors' Financial Statements are genuine, in all respects what they purport to be, have not been reduced to any judgment, are evidenced by executed agreements, contracts or documents, and represent undisputed, bona fide transactions completed in accordance with the terms and conditions of any related document; (b) the Accounts have not been pledged, sold or assigned to any Person other than Agent; and (c) except as disclosed to Agent from time to time in writing, Debtors have no knowledge of any fact or circumstance which would impair the validity or collectability of any of the Accounts that, in the aggregate, are material in amount.

**5.18** **Inventory Warranties**. (a) Except for Goods covered by Documents which have been delivered to Agent, and except as promptly disclosed to Agent from time to time in writing, and except as permitted under Section 4.14 or Section 7.6, all Inventory is located on the premises described in Section 5.5 or is in transit; and (b) except as promptly disclosed to Agent from time to time in writing following the prompt review, testing and approval for use by Debtors, all Inventory shall be of good and merchantable quality, free from any defects or conditions which might materially and adversely affect the market value of such Inventory.

**5.19** **Reserved**.

**5.20** **Pension Reform Act**. No events, including without limitation, any "reportable event" or "prohibited transactions," as those terms are defined in the Employee Retirement Income Security Act of 1974 as the same may be amended from time to time ("**ERISA**"), have occurred in connection with any type of plan, arrangement, association or fund covered by ERISA in which any personnel of Debtors or an Affiliate which is under common control with Debtors (within the meaning of applicable provisions of the IRC) participate ("**Benefit Plans**"). The Benefit Plans are otherwise in compliance in all material respects with all applicable provisions of ERISA and the IRC and meet the minimum funding standards of ERISA and the IRC.

**5.21** **Margin Security**. Debtors do not own any margin security and none of the Loans advanced hereunder shall be used for the purpose of purchasing or carrying any margin securities or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase any margin securities or for any other purpose not permitted by Regulations T, U or X of the Board of Governors.

5.22    **Investment Company Act Not Applicable**.  Debtors are not an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

5.23    **Full Disclosure**.  All written factual information taken as a whole in the materials furnished by or on behalf of Debtors to Agent and the Lenders for purposes of or in connection with the transactions contemplated under this Agreement and the other Financing Agreements (other than forecasts or projections, other forward-looking information and information of a general economic or industry specific nature), does not contain any untrue statement of a material fact or omit to state any material fact necessary to keep the statements contained therein from being misleading as of the date of this Agreement, and thereafter as supplemented by information provided to Agent and the Lenders in writing pursuant to this Agreement; provided, that (a) as to budgets, financial projections and other financial information furnished to Agent and the Lenders by Debtors and to be delivered under this Agreement, Debtors represent only that such projections and information were prepared in good faith on the basis of information and assumptions that Debtors believed to be reasonable as of the date of such information and (b) as to written information supplied by third parties, the Debtors represent only that it is not aware of any material misstatement or omission therein.

5.24    **Intellectual Property**.  Debtors own or possess, or will be licensed or otherwise have the full right to use, all intellectual property that is necessary for the operation of their business as presently operated and, except as set forth in Part 3 of Exhibit 5A, Debtors are unaware of any conflict with the rights of others.  No product produced by Debtors infringes upon any intellectual property owned by any other Person and no claim or litigation is pending or to the knowledge of Debtors threatened against or affecting Debtors, contesting its right to sell or to use any product or material, in any case which could reasonably be expected to have a material adverse effect on the business, operations, Collateral, assets or condition (financial or otherwise) of Debtors.  To the best knowledge of Debtors, and except as set forth in Part 3 of Exhibit 5A, there is no violation by any Person of any right of Debtors with respect to any material patent, trademark, trade name, service mark, copyright or license owned or used by Debtors.

5.25    **Water Rights**.  The Mortgaged Property has, and will continue to have, the continuing, enforceable right to receive irrigation, stock, or other water from such sources, in such quantities, and at such times and locations as is reasonably satisfactory for the purposes of farming, packing, processing, and related operations without interruption and in such quantities, and at such times and locations as has been historically available to the Mortgaged Property.  Debtors has filed with all applicable Governmental Authorities all notices and other documents as required under applicable law in connection with the supply of water to and use of water upon the Mortgaged Property.  All Water Rights certificates, permits, and transfers for the appropriation and use of surface water and ground water for the Mortgaged Property are owned or controlled solely by Debtors.  The Water Rights are in full force and effect and all assessments, water charges and costs in connection therewith have been fully paid. Debtors have notified Agent of any transfers, modifications, amendments, notices, actions or notices of actions by any Governmental Authority, irrigation district, or water company with respect to the Water Rights.

5.26    **Orders**.

(a)    Debtors are in compliance with the terms and conditions of the Interim Order or the Final Order, as applicable.

(b)    The Interim Order, or at all times after the Final Order Date, the Final Order, is in full force and effect and has not been vacated, reversed, terminated, or rescinded or, without the prior written consent of Agent and the Lenders, given in their respective sole discretion, amended or modified.

(c)      No appeal of the Order shall have been filed, or, if the Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by Debtors of any of their obligations under any of the Financing Agreements shall be the subject of a presently effective stay pending appeal.  The Debtors, the Agent and the Lenders shall be entitled to rely in good faith upon the Order, notwithstanding objection thereto or appeal therefrom by any interested party.  Debtors, Agent, and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

**5.27**    **Bankruptcy Cases**.

(a)      The Bankruptcy Cases were commenced on the Petition Date in accordance with applicable laws and proper notice thereof was given for (i) the motion seeking approval of the Financing Agreements and the Interim Order and Final Order, (ii) the hearing for the entry of the Interim Order and (iii) following the entry of the Interim Order, the hearing for entry of the Final Order.  The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given as specified in the Interim Order or Final Order, as applicable.

(b)      Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the provisions of Article 8 and the applicable provisions of the Interim Order or the Final Order, as the case may be (and subject to any notice required hereunder or thereunder), upon the maturity (whether by acceleration or otherwise) of any of the Liabilities, the Agent and the Lenders shall be entitled to immediate payment of the Liabilities and to enforce the remedies provided for hereunder, under the Order or under applicable Laws, without further motion or application to, or order from, the Bankruptcy Court.

(c)      No order has been entered in any of the Bankruptcy Cases (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of an examiner (other than a fee examiner) or receiver having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code or (iii) to convert any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code or to dismiss any of the Bankruptcy Cases.

**5.28**    **Agreed Budget**.  The initial Agreed Budget attached to this Agreement as Schedule B, which was furnished to the Agent and the Lenders by the Debtors on or prior to the Closing Date, and each subsequent Agreed Budget delivered in accordance with Section 6.13, has been prepared in good faith, with due care and based upon assumptions the Debtors believe to be reasonable assumptions on the date of delivery of the then-applicable Agreed Budget.  To the knowledge of the Debtors, as of the Closing Date, no facts exist that (individually or in the aggregate) could reasonably be expected to result in any material change in the Agreed Budget.  The Debtors shall hereafter deliver to the Agent and the Lenders updates to the Agreed Budget in accordance with Section 6.13.

**5.29**    **Survival of Warranties**.  All representations and warranties contained in this Agreement or any of the other Financing Agreements shall survive the execution and delivery of this Agreement and shall continue to be true and correct (subject to the qualifications set forth therein) from the date of this Agreement until (a) Full Satisfaction of the Liabilities and (b) the Lenders shall cease to be committed to make Loans under this Agreement.

**6**      **AFFIRMATIVE COVENANTS**.

Each Debtor covenants and agrees that so long as any Liabilities remain outstanding, and (even if there shall be no Liabilities outstanding) so long as the Lenders remain committed to make Loans under this Agreement:

**6.1**    **Financial and Other Information**.    Except as otherwise expressly provided for in this Agreement, Debtors shall keep proper books of record and account in which full and true entries will be made of all dealings and transactions of or in relation to the business and affairs of Debtors, in accordance with GAAP consistently applied, and Debtors shall furnish or cause to be furnished to Agent (with copies to the other Lenders), from time to time and in a form acceptable to Agent, such information as Agent may reasonably request, including without limitation, the following:

(a)    Monthly Financial Statements and Compliance Certificates.    As soon as practicable and in any event within forty five (45) days after and as of the end of each month beginning with the month ending on February 29, 2024, (i) Self-Prepared Consolidated monthly statements of income and a balance sheet of Debtors for such month, all in reasonable detail and satisfactory in scope to the Agent and (ii) a compliance certificate prepared using the information furnished or to be furnished to Agent under Section 6.1 executed and certified as accurate by a Responsible Officer of the Administrative Debtor in substantially the form attached as Exhibit 6A ("**Compliance Certificate**");

(b)    Books and Records.    Promptly upon Agent's request and in any event within thirty (30) days after Agent's request (unless otherwise requested or permitted by Agent in its discretion), all books, records, data, information, statements, lists of property and accounts, budgets, forecasts, reports, yard sheets, or any other information pertaining to the condition, operations, business, taxation, or corporate affairs of Debtors as may be requested by Agent in its discretion including, without limitation, all financial, tax, and Organizational Documents and records of any kind or description, all in such form as required under this Agreement, as originally prepared, and/or as requested by Agent in its discretion;

(c)    Pleadings, Motions and Applications.    As soon as reasonably practicable in advance of filing, copies of all material pleadings, motions and applications to be filed by any of the Debtors in the Bankruptcy Cases;

(d)    Reports to Creditors' Committee.    As soon as reasonably practicable following such delivery, all written reports regularly delivered by any of the Debtors to any official or unofficial creditors' committee or their respective advisors in the Bankruptcy Cases;

**6.2**    **Conduct of Business**.    Except as contemplated by this Agreement, Debtors shall: (a) maintain their existence and maintain in full force and effect all licenses, bonds, franchises, leases, patents, contracts and other rights necessary to the conduct of their business; (b) continue in, and limit their operations to, the same general line of business as that presently conducted by them and other lines of business reasonably incidental thereto; (c) comply with all Governmental Requirements, except for such violations of Governmental Requirements which would not, in the aggregate, have a material adverse effect on their financial condition, results of operations or business; (d) comply with all Anti-Corruption Laws and applicable Sanctions; (e) keep and conduct their business separate and apart from the business of their Affiliates; and (f) otherwise do all things necessary to make or maintain the truth and accuracy of the representations and warranties set forth in Section 5 of this Agreement true and correct (subject to the qualifications set forth therein) at all times. Debtors shall pay each Essential Vendor on a current basis and in any event no later than thirty (30) days after the applicable invoice date. Debtors shall remit payments to their critical vendors in the amounts set forth in the Agreed Budget and shall cause each such critical vendor to release any and all liens, security interests or other encumbrances affecting any of Debtors' assets.

**6.3** **Maintenance of Collateral, Chief Executive Office, Equipment List**. Debtors shall keep their real estate, leaseholds, equipment and other fixed assets in good condition, repair and working order, normal wear and tear excepted, and (except as provided in Section 4.15) shall not allow any of the Collateral to be moved from the locations set forth in Section 5.5 (or to be placed on consignment) without the written consent of Agent, which consent shall not be unreasonably withheld. Debtors shall keep the Inventory in good and merchantable condition and shall, as applicable, clean, feed, shelter, store, secure, refrigerate, water, medicate, fumigate, fertilize, cultivate, irrigate, prune, process and otherwise maintain the Inventory in accordance with the standards and practices adhered to generally by others in the same businesses as Debtors. Debtors shall notify Agent not less than thirty (30) days prior to the relocation of Debtors' chief executive office. Debtors shall deliver to Agent promptly following Agent's request, descriptions, including without limitation, serial identification numbers if applicable, of all Equipment of Debtors that constitutes Collateral.

**6.4** **Liability Insurance**. Debtors shall maintain, at Debtors' expense, such liability insurance (including as applicable commercial general liability insurance, products liability insurance and workman's compensation insurance), in all material respects as is customarily carried by companies engaged in similar businesses and owning similar properties in localities where Debtors operate. All such policies of insurance shall be in form and with insurers reasonably acceptable to Agent and copies thereof, together with all amendments and schedules, or a certificate as to coverage thereunder, shall be provided to Agent within ten (10) days after Agent's reasonable request for the same.

**6.5** **Property Insurance**. Debtors shall bear the full risk of loss from any cause of any nature whatsoever in respect to the Collateral. Debtors shall keep all Collateral insured, with carriers, and in amounts, acceptable to Agent, against the hazards of fire, theft, collision, spoilage, hail, those covered by extended or all-risk coverage insurance and such others as may be required by Agent. Promptly following Agent's reasonable request, Debtors shall cause to be delivered to Agent the insurance policies or proper certificates evidencing the same. Such policies shall provide, at Agent's request and in a manner satisfactory to Agent, that any losses under such policies shall be payable first to Agent, for the ratable benefit of the Lenders, as Agent's interest may appear, excluding payment for losses or Collateral in which Agent does not have a first and senior Lien. Each such policy shall, at Agent's request, include a provision for written notice to Agent not less than thirty (30) days prior to any cancellation or expiration (or ten (10) days for non-payment of premium) and show Agent, as agent for the ratable benefit of the Lenders, as mortgagee and loss payee as provided in a form of loss payable endorsement in form and substance satisfactory to Agent. In the event of any loss covered by any such policy, the carrier named in such policy is directed by Debtors to make payment for such loss to Agent, for the ratable benefit of the Lenders, and not to Debtors, or to Debtors and Agent jointly. Where loss proceeds are less than $1,000,000.00 and provided that a Matured Default shall not have occurred and be continuing, Agent shall pay over such proceeds in kind to Debtors. Debtors make, constitute and appoint Agent (and all Persons designated by Agent) as Debtors' true and lawful agent and attorney-in-fact, with power to make, settle or adjust claims that are greater than $1,000,000.00 under such policies of insurance (provided, however, that so long as there shall not have occurred and be continuing a Matured Default, Agent shall consult with Debtors prior to finally making, settling or adjusting claims under such policies of insurance and will not settle such claims without Debtors' consent, which consent will not be unreasonably withheld). The foregoing power of attorney is coupled with an interest and is therefore irrevocable. If payment as a result of any insurance losses shall be paid by check, draft or other instrument payable to Debtors, or to Debtors and Agent jointly, Agent may endorse the name of Debtors on such check, draft or other instrument, and may do such other things as Agent may deem advisable to reduce the same to cash. All loss recoveries received and retained by Agent per the foregoing, on account of any such insurance shall be disbursed by Agent to Debtors for application of the costs of repair, rebuilding or replacement of the Collateral, provided Agent shall have determined, in the exercise of its reasonable credit judgment, that the following conditions have been or will be met: (a) the Collateral can be repaired or rebuilt to its prior condition or can be replaced with the

42

amount of such insurance proceeds, (b) the amount of such insurance proceeds, together with any equity funds of Debtors deposited by Debtors with Agent, shall be sufficient to complete such repair, rebuilding or replacement, and (c) no Matured Default shall have occurred and be continuing.  In the event that Agent determines, in the exercise of its reasonable credit judgment, that such conditions have not or will not be satisfied, Agent may apply and credit such insurance proceeds to the Liabilities in accordance with this Agreement.  Any unapplied surplus of insurance proceeds shall be paid by Agent to Debtors. Debtors shall pay to Agent, on demand, the amount of any deficiency in the Collateral reasonably determined by Agent to exist after the application of insurance proceeds to the Liabilities.  If Debtors fails to procure insurance as provided in this Agreement, or to keep the same in force, or fails to perform any of Debtors' other obligations hereunder, then Agent may, at Agent's option, and without obligation to do so, obtain such insurance and pay the premium thereon for the account of Debtors, or make whatever other payments Agent may deem appropriate to protect Agent's security for the Liabilities.  Any such payments shall be additional Liabilities, payable on demand and secured by the Collateral.   To the extent the provisions relating to insurance in any Mortgages are different from the provisions relating to insurance in this <u>Section 6.5</u>, the provisions relating to insurance in any such Mortgages shall be controlling with respect to the property covered thereby.

**6.6**      **Benefit Plans**.  Debtors shall: (a) keep in full force and effect any and all Benefit Plans which are presently in existence or may, from time to time, come into existence under ERISA, unless such Benefit Plans can be terminated without material liability to Debtors in connection with such termination (as distinguished from any continuing funding obligation); (b) make contributions to all Benefit Plans in a timely manner and in an amount sufficient to comply with the requirements of ERISA; (c) comply in all material respects with all requirements of ERISA which relate to such Benefit Plans; and (d) notify Agent immediately upon receipt by Debtors of any notice of the institution of any proceeding or other action relating to any Benefit Plans that would reasonably be expected to have a material adverse effect on Debtors or their financial condition.

**6.7**      **Notice of Suit, Adverse Change in Business or Default**.  Debtors shall, as soon as possible, and in any event within five (5) Business Days after Debtors' knowledge any of the following have occurred, give written notice to Agent of: (a) any proceeding being instituted or threatened in writing to be instituted by or against Debtors (other than the Bankruptcy Cases) in any federal, state, local, tribal, or foreign court or before any commission or other regulatory body (federal, state, local, tribal, or foreign) for which claimed damages exceed $500,000.00; (b) any material adverse change in the business, assets or condition, financial or otherwise of Debtors; and (c) the occurrence of any Default.

**6.8**      **Use of Proceeds**.  Debtors shall use Loans only for the purposes stated in Section 2.4 and for no other purpose.  Without limitation of the above provision, Debtors will not request any Loans, and Debtors shall not use, and Debtors shall ensure that its respective directors, officers, members, managers, employees and agents shall not use, any Loans (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or (ii) in any manner that would result in the violation of any applicable Sanctions.

**6.9**      **Books and Records**.  Debtors shall maintain proper books of record and account in accordance with GAAP consistently applied in which true, full and correct entries will be made of all their respective dealings and business affairs.  If any changes in accounting principles are hereafter required or permitted by GAAP and are adopted by Debtors with the concurrence of its independent certified public accountants and such changes in GAAP result in a change in the method of calculation or the interpretation of any provision of this Agreement, Debtors and the Required Lenders agree to amend any such affected terms and provisions so as to reflect such changes in GAAP with the result that the criteria for evaluating

139697745.3

Debtors' financial condition shall be the same after such changes in GAAP as if such changes in GAAP had not been made.

**6.10**    **Arm's Length Dealing**.  Debtors shall not enter into any transaction of any kind with any family member, Subsidiary, or Affiliate, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to Debtors, as applicable, as would be obtainable by Debtors at the time in a comparable arm's length transaction with a Person other than a family member, Subsidiary, or Affiliate.

**6.11**    **Treasury Management**.  Debtors shall maintain at all times a treasury management system with such Person and with such controls as are satisfactory to Agent, and as governed by agreements in form and substance acceptable to Agent.

**6.12**    **Further Assurances**.  Debtors shall, on or before the tenth (10th) day after written request therefor, do such acts and things, at its expense, as Agent in its discretion may deem necessary or advisable from time to time or as the Required Lenders may, acting by and through Agent, require in their discretion (a) to preserve, perfect and protect Agent and the Lenders' Liens on the Collateral, whether now owned or hereafter acquired, and (b) to preserve, perfect and protect the rights and remedies of Agent and the Lenders under this Agreement and the other Financing Agreements.

**6.13**    **Agreed Budget; Capital Expenditures**.

(a)    The use of Loans and other credit extensions by the Debtors under this Agreement and the other Financing Agreements shall be limited in accordance with the Agreed Budget (subject to variances permitted under Section 6.13(b)).  The initial Agreed Budget shall be in the form of Schedule B for the first thirteen (13) week period from the Petition Date (each such thirteen (13) week period, a "**Budget Period**"), and such initial Agreed Budget shall be approved by, and in form and substance satisfactory to the Agent and the Lenders (it being acknowledged and agreed that the initial Agreed Budget attached hereto as Schedule B is approved by and satisfactory to Agent and Lenders).  Within five (5) Business Days of the end of each Budget Period, Debtors shall deliver to Agent and the Lenders an updated budget (each, an "**Updated Budget**") covering the Budget Period that commences with the beginning of the week in which an Updated Budget is required to be delivered, consistent with the form, level of detail and line-items set forth in the initial Agreed Budget.  Each Updated Budget shall be required to be in form and substance satisfactory to Agent; provided that such Updated Budget shall, once delivered, be automatically deemed satisfactory and shall become the Agreed Budget if such Updated Budget has not been objected to by Agent in writing by 12:00 p.m. (New York City time) on the fifth Business Day after the delivery of such Updated Budget; provided, further, that until such time (or, in the event Agent has delivered an objection before such deadline, until such time as Debtors and Agent have agreed upon a revised Updated Budget), the then-current Agreed Budget shall remain in effect.  Each Agreed Budget and Updated Budget shall be prepared in good faith, with reasonable due care and based upon assumptions which Debtors believe to be reasonable at the time of delivery thereof.

(b)    Commencing with:

(i)    the period from the Petition Date through the fourth Friday thereafter and each Cumulative Period thereafter, Debtors shall not permit the Actual Total Cash Disbursements for the Cumulative Period to exceed one hundred ten percent (110.0%) of the Budgeted Total Cash Disbursements for such Cumulative Period;

44

(ii)    the period from the Petition Date through the fourth Friday thereafter, and each Cumulative Period thereafter, Debtors shall not permit the Actual Total Cash Receipts to be less than ninety percent (90%) of the Budgeted Total Cash Receipts as set forth in the Agreed Budget for such Cumulative Period; and

(iii)    the fiscal month of Debtors in which the Petition Date occurs, and on the last day of each fiscal month thereafter, the Debtors shall not permit the aggregate [Actual Capital Expenditures Amount] since the Closing Date and through the end of such fiscal month to exceed the aggregate [Budgeted Capital Expenditures Amount] for such period.

(c)    Agent and the Lenders (i) may assume that Debtors will comply with the Agreed Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay any unpaid expenses incurred or authorized to be incurred pursuant to any Agreed Budget.  The line items in the Agreed Budget for payment of interest, expenses and other amounts to Agent and the Lenders are estimates only, and Debtors remain obligated to pay any and all Liabilities in accordance with the terms of the Financing Agreements and the applicable Order regardless of whether such amounts exceed such estimates.  Nothing in any Agreed Budget shall constitute an amendment or other modification of any Financing Agreement or any of the borrowing restrictions or other lending limits set forth therein.

**6.14**    **Milestones**.  Debtors shall ensure that each of the milestones and related terms and conditions set forth below (collectively, the "**Milestones**") is achieved in accordance with the applicable timing referred to below (or by such later time as approved in writing by Agent, without further order of the Bankruptcy Court):

(a)    On or prior to April 16, 2024, the Bankruptcy Court shall have entered (x) the Interim Order, which shall be in full force and effect pending entry of the Final Order and shall not be stayed, vacated, or modified;

(b)    On or prior to May ___, 2024[8], the Bankruptcy Court shall have entered (x) the Final Order, which shall remain in full force and effect and shall not be stayed, vacated, or modified; (y) orders granting, on a final basis, all other applicable First Day Pleadings, and all such orders shall not be stayed, vacated, or modified, and each of the orders in the foregoing clauses (x) and (y) shall be in form and substance satisfactory to the Agent;

(c)    On or prior to November __, 2024[9], Debtors shall have filed an Acceptable Plan with the Bankruptcy Court; and

(d)    On or prior to January ___, 2025 (or April ___, 2025[10] in the event Debtors exercise the option to extend the Scheduled Maturity Date pursuant to Section 2.2(h)), the Acceptable Plan Effective Date shall have occurred.

# 7    **NEGATIVE COVENANTS**.

Each Debtor covenants and agrees that so long as any Liabilities remain outstanding, and (even if there shall be no Liabilities outstanding) so long as the Lenders remain committed to make Loans under

---

[8] NTD:  Insert date which is 45 days after entry of the Interim Order.
[9] NTD:  Insert date which is 7 months after entry of the Interim Order.
[10] NTD:  Insert dates which are 9 and 12 months (respectively) after entry of the Interim Order.

this Agreement (unless Agent, with the written approval of the Required Lenders, shall give Agent's prior written consent):

**7.1    Encumbrances**.  Except for those Liens in existence on the Petition Date, Debtors shall not create, incur, assume or suffer to exist any Liens of any nature whatsoever on or with regard to any of Debtors' assets (including, without limitation, the Collateral) other than: (a) Liens securing the payment of taxes, either not yet due or the validity of which is being contested in good faith by appropriate proceedings, and as to which Debtors shall, if appropriate under GAAP, have set aside on Debtors' books and records, as applicable, adequate reserves; (b) Liens securing deposits under workmen's compensation, unemployment insurance, social security and other similar laws, or securing the performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or securing indemnity, performance or other similar bonds for the performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or securing statutory obligations or surety bonds, or securing indemnity, performance or other similar bonds in the ordinary course of Debtors' business, which are not past due; (c) Liens in favor of Agent for the ratable benefit of the Lenders; (d) zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Debtors' real property, and other Liens on property which are subordinate to the Liens of Agent and the Lenders and which do not, in Agent's sole determination: (i) materially impair the use of such property, or (ii) materially lessen the value of such property for the purposes for which the same is held by Debtors; and (e) purchase money security interests securing amounts relating to items of Equipment (provided that no such purchase money security interests shall extend to or cover other property of Debtors other than the items of Equipment so acquired).

**7.2    Consolidations, Mergers or Acquisitions**.  Debtors shall not recapitalize, consolidate with, merge with, or otherwise acquire (including by the formation or acquisition of a subsidiary) all or substantially all of the assets or properties of any other Person.

**7.3    Deposits, Investments, Advances or Loans**.  Debtors shall not make or permit to exist deposits, investments, advances or loans in or to Affiliates or any other Person (collectively, "**Investments**") (other than Investments existing on the Closing Date and disclosed in Part 11 Exhibit 5A), except:  (a) deposit accounts that are Excluded Accounts or Deposit Accounts; (b) advances for travel and expenses to officers, managers, directors, employees, Owners or Affiliates as and when permitted by Section 7.7; (c) guarantees permitted pursuant to Section 7.5; (d) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business; or (e) deposits secured by Liens permitted under Section 7.1.

**7.4    Indebtedness**.  Except for the obligations and indebtedness presently in existence and reflected in Debtors' Financial Statements, Debtors shall not incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any obligations or indebtedness, direct or indirect fixed or contingent, including obligations under Capital Leases, except:  (a) the Liabilities; (b) trade obligations, Producer Payables and normal accruals in the ordinary course of Debtors' business not yet due and payable, or with respect to which Debtors is contesting in good faith the amount or validity thereof by appropriate proceedings, and then only to the extent that Debtors, as applicable, has set aside on its books adequate reserves, if appropriate under GAAP; (c) indebtedness in a principal amount not to exceed the amount set forth in the Agreed Budget and secured by Liens permitted under Section 7.1 or contingent obligations permitted under Section 7.5; (d) (i) indebtedness under Swap Contracts with any Lender or its affiliates (which will be secured in accordance with the terms of this Agreement), or (ii) indebtedness under Bank Products Agreements (which will be secured in accordance with the terms of this Agreement); (e) indebtedness in respect of insurance premiums, performance bonds, bid bonds, surety bonds or other similar obligations arising in the ordinary course of business, and any refinancings thereof to the extent not provided to secure the repayment of other indebtedness; (f) indebtedness arising from the honoring by a

46

bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; and (g) unsecured intercompany indebtedness not otherwise prohibited under this Agreement.

**7.5**    **Guaranties and Other Contingent Obligations**.  Except as permitted under Section 7.4, Debtors shall not guarantee, endorse or otherwise in any way become or be responsible for obligations of any other Person, whether by agreement to purchase the indebtedness of such Person or through the purchase of Goods, supplies or services, or maintenance of working capital or other balance sheet covenants or conditions, or by way of stock purchase, capital contribution, advance or loan for the purpose of paying or discharging any indebtedness or obligation of such Person or otherwise, except:  (a) for endorsements of negotiable Instruments for collection in the ordinary course of business; (b) that Debtors may indemnify their officers, directors, managers, and Owners to the extent permitted under each Debtors' Organizational Documents and the laws of the State in which each is organized; (c) that Debtors may indemnify title insurers under indemnity agreements to title insurers to cause such title insurers to issue title insurance policies to Debtors or Agent; (d) customary indemnity obligations arising in the ordinary course of transactions permitted by and consummated in accordance with this Agreement; and (e) guarantees of indebtedness under Section 7.4.

**7.6**    **Disposition of Property**.  Debtors shall not sell, lease, transfer or otherwise dispose of any Collateral except (a) as permitted by Section 4.15, (b) the disposition of obsolete, worn out or surplus Equipment and the sale of Inventory in the ordinary course of business; (c) the use or transfer of money or cash equivalents in a manner that is not prohibited by the terms of this Agreement; (d) Investments and distributions permitted, to the extent applicable, pursuant to 7.2, 7.3, 7.6, 7.7, and 7.9; (e) the license of intellectual property in the ordinary course of business; (f) operating leases or subleases entered into in the ordinary course of business and easements or rights of way granted to others which do not interfere in any material respect with the business of Debtors; (g) any surrender or waiver of contractual rights or claims in the ordinary course of business or in connection with settlement of litigation, subject to the Agent's consent; (h) dispositions, discounts or forgiveness of accounts receivable in the ordinary course of business or in connection with the collection or compromise thereof in each case in a manner consistent with past practice; (i) the sale, lease, or transfer or property or assets between or among Debtors not otherwise prohibited hereunder or under any other of the Financing Agreements; (j) disposition of assets subject to a casualty event; and (k) with Agent's consent, the disposition of all or a material portion of any of the assets of any Debtor, any Equity Interest of any Debtor, or any material business line of the Debtors through a sale under Section 363 of the Bankruptcy Code in accordance with procedures approved by Agent.  To the extent any Collateral is disposed of as expressly permitted by this Section 7.6 to any Person other than Debtors, Agent shall be permitted to take any actions deemed appropriate by Agent in order to effect the foregoing, including, without limitation, the release of any Liens on such Collateral.

**7.7**    **Loans to, Investments in, and Transactions with Affiliates**.  Except for advances for travel and expenses to Debtors' officers, directors, managers, general partners or employees in the ordinary course of their business, Debtors shall not make any loans to or investments in any Affiliates or Owners of Debtors.  Debtors shall not enter into any transaction of any kind with any Affiliate, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to Debtors as would be obtainable by Debtors, as applicable, at the time in a comparable arm's length transaction with a Person other than an Affiliate.

**7.8**    **Amendment of Organizational Documents; Subsidiaries; Fiscal Year**.  Debtors shall not (a) amend any Organizational Documents or (b) form any subsidiaries.  No Debtor shall change its fiscal year or any of the fiscal quarters or monthly accounting periods therein.

139697745.3

**7.9    Distributions in Respect of Equity, Prepayment of Debt, and Compensation**.  Debtors shall not directly or indirectly following and during the continuance of a Matured Default: (a) make any Distributions in respect of or redeem any of Debtors' Equity Interests, except Permitted Distributions, and (b) prepay any principal, interest or other payments on or in connection with any indebtedness of Debtors other than the Liabilities in accordance with this Agreement.

**7.10    Continuity of Management**.  Debtors shall not make any changes in the duties of key personnel of Debtors without Agent's prior written consent.

**7.11    Use of Names or Trademarks**.  Except as set forth in this <u>Section 7.11</u>, Debtors shall not use any trademarks or trade names with respect to Inventory except for such trademarks or trade names as have been properly licensed to Agent for the ratable benefit of the Lenders. Debtors may sell Inventory to customers using those customers' trademarks or trade names provided that:  (a) the customers are creditworthy, in the reasonable determination of Agent; and (b) the Inventory is covered by a purchase order from the customers (or is reasonably expected by Debtors to be covered by a purchase order from the customer within a commercially reasonable period in any case not to exceed 30 days of the date the Inventory is ready to be sold).

**7.12    Chapter 11 Claims**.  The Debtors shall not directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien that is *pari passu* with or senior to the claims or Liens, as the case may be, of the Agent and the Lenders against the Debtors hereunder, or apply to the Bankruptcy Court for authority so to do, except for the Carve-Out and Liens permitted to be senior pursuant to <u>Section 4.1</u>.

**7.13    Revision of Orders; Application to Bankruptcy Court**.  The Debtors shall not, nor shall it permit any Subsidiary to, directly or indirectly:

(a)    seek, consent to or suffer to exist (or support any Person that seeks) any modification, stay, vacation, reversal or amendment of the Interim Order or the Final Order except for any material substantive modifications and amendments agreed to in writing by Agent and the Required Lenders; <u>provided</u> that, any waiver, consent or amendment of any Order that is materially and disproportionately adverse in any respect to any Lender relative to any other Lender shall require the written consent of such adversely and disproportionately affected Lender in addition to the Agent and the Required Lenders; or

(b)    apply to the Bankruptcy Court for authority (or support any Person that seeks) to take any action prohibited by this <u>Article 7</u> (except to the extent such application and the taking of such action is conditioned upon the receiving the written consent of the Agent and the requisite applicable Lenders).

## 8    DEFAULT AND RIGHTS AND REMEDIES.

**8.1    Liabilities**.  Anything herein to the contrary notwithstanding including, without limitation, satisfaction of the conditions set forth in <u>Section 3.2</u>, it is understood that (i) no Lender shall have the individual right upon the occurrence of a Default or a Matured Default to terminate or suspend the funding of its Commitments or accelerate any Liabilities owed to it (such termination, suspension of funding and/or acceleration to occur, if at all, only upon action by Agent as provided in this Agreement), and (ii) no Lender shall have the right to individually enforce any Financing Agreement which is entered into with or for Agent, such enforcement residing with Agent as contemplated by the following <u>Section 8.2</u> of this Agreement and by the applicable provisions of the other Financing Agreements.

139697745.3

**8.2**    **Rights and Remedies**.  Upon the occurrence and during the continuance of any Matured Default, and at any time thereafter during the continuance of such event, Agent, on behalf of the Lenders, may, and at the direction of the Required Lenders shall, take any or all of the following actions at the same or different times, subject to any applicable notice period in the Orders, but without any action, approval, further order or application of the Bankruptcy Court, and without the requirement to give prior notice:

(a)    declare the Commitment of each Lender to make Loans to be terminated, reduced or otherwise restricted whereupon such commitments and obligations shall be terminated, reduced or restricted to the extent that any such commitment or obligation remains;

(b)    in the case of this clause (b), at the direction of the Required Lenders, declare the unpaid principal amount of all or any portion of the outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Financing Agreement to be immediately due and payable, without presentment, demand, protest or other notice of any kind (except any notice required by the Orders), all of which are hereby expressly waived by Debtors; and

(c)    subject to the proviso below, in the case of this clause (c), at the direction of the Required Lenders, exercise on behalf of itself and the Lenders, all rights and remedies available to it and the Lenders, including to enforce any and all Liens and security interests created pursuant to the Financing Agreements or exercise of any other rights or remedies with respect to the Collateral (including rights to set off or apply any amounts in any bank accounts that are a part of the Collateral);  provided that immediately upon the giving of any notice of the occurrence and continuance of a Matured Default by Agent in accordance with the Orders, (i) any obligation of each Lender to make Loans shall be suspended; (ii) Agent may block or limit withdrawals from any bank accounts that are a part of the Collateral (including, without limitation, by sending any control activation notices to depositary banks pursuant to any control agreement), (A) in accordance with the Agreed Budget and the Financing Agreements to fund payroll, make any required utilities payments and make any other critical payments necessary to continue operations, and (B) to satisfy the Carve-Out, (iii) except as otherwise expressly provided herein and in the Orders, Debtors shall deliver and cause the delivery of the proceeds of the Loans and any Collateral to Agent as provided herein; and (iv) Agent shall be permitted to apply such proceeds in accordance with the terms herein and in the Financing Agreements;

provided that immediately upon the giving of any notice of the occurrence and continuance of a Matured Default by Agent in accordance with the Orders, (w) any obligation of each Lender to make Loans shall be suspended; (x) Agent may block or limit withdrawals from any bank accounts that are a part of the Collateral (including, without limitation, by sending any control activation notices to depositary banks pursuant to any control agreement), (i) in accordance with the Agreed Budget and the Financing Agreements to fund payroll, make any required utilities payments and make any other critical payments necessary to continue operations, and (ii) to satisfy the Carve-Out, (y) except as otherwise expressly provided herein and in the Orders, the Debtors shall deliver and cause the delivery of the proceeds of the Loans and any Collateral to the Agent as provided herein; and (z) the Agent shall be permitted to apply such proceeds in accordance with the terms herein and in the Financing Agreements.

**8.3**    **Waiver of Demand**.  Debtors expressly waives demand, presentment, protest, and notice of nonpayment, notice of intent to accelerate and notice of acceleration. Debtors also waives the benefit of all valuation, appraisal and exemption laws.

**8.4**    **Waiver of Notice**.  Upon the occurrence and during the continuance of any Matured Default, Debtors waive, to the fullest extent permitted by applicable law, all rights to notice and hearing of

49

any kind prior to the exercise by Agent of Agent's rights to repossess the Collateral without judicial process or to replevy, attach or levy upon the Collateral.

**8.5**    **Notices of Defaults**.  Agent shall not be deemed to have knowledge of the occurrence of a Default or a Matured Default unless Agent has received written notice from a Lender or Debtors specifying such Default or Matured Default and stating that such notice is a "**Notice of Default**".  In the event that Agent obtains such knowledge of the occurrence of a Default or a Matured Default, Agent shall within three (3) Business Days thereafter, give notice thereof to the Lenders.  Agent shall (subject to 8.1 and 8.2) take such action with respect to such Default or Matured Default as may be directed by the Required Lenders; provided that, unless and until Agent shall have received the directions referred to in 8.1 and 8.2, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Matured Default as it shall deem advisable and in the best interest of the Lenders.

**8.6**    **Credit Bids**.  The Secured Parties hereby irrevocably authorize Agent, based upon the instruction of the Required Lenders, to (i) consent to, credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the United States Bankruptcy Code, including under Section 363 of the United States Bankruptcy Code, (ii) credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Code, including pursuant to Section 9-610 or 9-620 of the Code, or (iii) credit bid or purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by Agent (whether by judicial action or otherwise) in accordance with applicable law. In connection with any such credit bid or purchase, (a) the Liabilities owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Liabilities with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Secured Parties whose Liabilities are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Liabilities credit bid in relation to the aggregate amount of Liabilities so credit bid) in the asset or assets so purchased (or in the Equity Interests of the acquisition vehicle or vehicles that are used to consummate such purchase), and (b) Agent, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by such acquisition vehicle or vehicles and in connection therewith Agent may reduce the Liabilities owed to the Secured Parties (ratably based upon the proportion of their Liabilities credit bid in relation to the aggregate amount of Liabilities so credit bid) based upon the value of such non-cash consideration.

# 9    **AGENT AND AGENCY**.

**9.1**    **Authorization and Action**.  Each Lender appoints Agent as its agent under, and irrevocably authorizes Agent (subject to Section 9.6) to take such action on its behalf and to exercise such powers under any Financing Agreement as are delegated to Agent by the terms thereof, together with such powers as are reasonably incidental thereto.  Without limitation of the foregoing, each Lender expressly authorizes Agent to execute, deliver, and perform its obligations under each of the Financing Agreements to which Agent is a party, and to exercise all rights, powers, and remedies that Agent may have thereunder. As to any matters not expressly provided for by this Agreement, Agent shall not be required to exercise any discretion or take any action, but shall be required to act, or to refrain from acting (and shall be fully protected in so acting or refraining from acting), upon the instructions of the Required Lenders, and such instructions shall be binding upon all the Lenders and all holders of any Note; provided however, that Agent shall not be required to take any action which exposes Agent to personal liability or which is contrary to

this Agreement or applicable law.  Agent agrees to give to each Lender prompt notice of each notice given to it by Debtors pursuant to the terms of any Financing Agreement.

**9.2** **Agent's Reliance, Etc.**  Neither Agent nor any of its directors, officers, agents or employees shall be liable to any Lender for any action taken or omitted to be taken by it or them under or in connection with any Financing Agreement, except for its or their own gross negligence or willful misconduct.  Without limiting the generality of the foregoing, Agent:  (a) may treat the original or any successor holder of any Note as the holder thereof until it receives notice from the Lender which is the payee of such Note concerning the assignment of such Note; (b) may employ and consult with legal counsel (including counsel for Debtors), independent public accountants, and other experts selected by it and shall not be liable to any Lender for any action taken, or omitted to be taken, in good faith by it or them in accordance with the advice of such counsel, accountants, or experts received in such consultations and shall not be liable for any negligence or misconduct of any such counsel, accountants or other experts; (c) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any opinions, certifications, statements, warranties or representations made in or in connection with any Financing Agreement; (d) shall not have any duty to any Lender to ascertain or to inquire as to the performance or observance of any of the terms, covenants, or conditions of any Financing Agreement or any other instrument or document furnished pursuant thereto or to satisfy itself that all conditions to and requirements for any Loan have been met or that Debtors is entitled to any Loan or to inspect the property (including the books and records) of Debtors; (e) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Financing Agreement or any other instrument or document furnished pursuant thereto; and (f) shall incur no liability under or in respect of this Agreement by acting upon any notice, consent, certificate, or other instrument or writing (which may be by telegram, cable, telex, or otherwise) believed by it to be genuine and signed or sent by the proper party or parties.

**9.3** **Agent as a Lender, Affiliates**.  With respect to its Commitment, any Loan made by it, and the Note issued to it, Agent shall have the same rights and powers under this Agreement as any other Lender and may exercise the same as though it were not Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include Agent in its individual capacity.  Agent and its affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, Debtors, any Affiliates and any Person who may do business with or own securities of Debtors or any such Affiliate, all as if Agent were not Agent and without any duty to account to the Lenders.

**9.4** **Non-Reliance on Agent and Other Lenders**.  Each Lender agrees that it has, independently and without reliance on Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis of Debtors and its decision to enter into the transactions contemplated by the Financing Agreements and that it will, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own analysis and decisions in taking or not taking action under any Financing Agreement.  Agent shall not be required to keep itself informed as to the performance or observance by Debtors or any other Person of any Financing Agreement or to inspect the properties or books of Debtors.  Except for notices, reports, and other documents and information expressly required to be furnished to the Lenders by Agent hereunder, Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of Debtors (or any Affiliates) which may come into the possession of Agent or any of its affiliates.  Notwithstanding the foregoing, Agent will, upon the request of any Lender, provide to such Lender, at such Lender's expense, copies of any and all written information provided to Agent by Debtors.

**9.5** **Indemnification**.  Notwithstanding anything to the contrary herein contained, Agent shall be fully justified in failing or refusing to take any action unless it shall first be indemnified to its satisfaction

51

by the Lenders against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent in any way relating to or arising out of its taking or continuing to take any action.  Each Lender agrees to indemnify Agent (to the extent not reimbursed by Debtors), on a pro-rata basis according to such Lender's Commitments, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against Agent in any way relating to or arising out of any Financing Agreement or any action taken or omitted by Agent under any Financing Agreement; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements resulting from the gross negligence or willful misconduct of Agent; and provided further, that it is the intention of each Lender to indemnify Agent against the consequences of Agent's own negligence, whether such negligence be sole, joint, concurrent, active or passive.  Without limiting the foregoing, each Lender agrees to reimburse Agent promptly upon demand for its pro-rata share, according to such Lender's Commitments of any out-of-pocket expenses (including attorneys' fees) incurred by Agent in connection with the preparation, administration, or enforcement of, or legal advice in respect of rights or responsibilities under, any Financing Agreement, to the extent that Agent is not reimbursed for such expenses by Debtors.

**9.6**    **Successor Agent**.  Agent may resign at any time as Agent under the Financing Agreements by giving written notice thereof to the Lenders and Debtors and may be removed by the Required Lenders if it has breached its obligations under the Financing Agreements.  Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Agent with, provided that no Default or Matured Default has occurred and is continuing hereunder, the prior written consent of Debtors, such consent not to be unreasonably withheld.  If no successor Agent shall have been so appointed by the Required Lenders or shall have accepted such appointment within sixty (60) days after the retiring Agent's giving of notice of resignation or the Required Lenders' removal of Agent, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent with, provided that no Default or Matured Default has occurred and is continuing hereunder, the prior written consent of Debtors, such consent not to be unreasonably withheld, which shall be a commercial bank or other financial institution organized under the laws of the United States of America or of any State thereof and having a combined capital and surplus of at least $500,000,000.00.  Upon the acceptance of any appointment as Agent hereunder by a successor of Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement.   After the retiring Agent's resignation or removal as Agent, the provisions of Section 9.5 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

**9.7**    **Verification of Borrowing Notices**.  The natural Person signing this Agreement on behalf of Debtors (or any one of them, if more than one), or any natural Person designated by them (or any one of them) shall be presumed to have the authority to request Loans under this Agreement.  Agent shall have no duty to verify the authenticity of the signature appearing on any Funds Request, and with respect to any oral request for a Loan, Agent shall have no duty to verify the identity of any Person representing himself as one of the natural Persons authorized to make such request on behalf of Debtors.  Neither Agent nor any Lender shall incur any liability to Debtors in acting upon any telephonic notice referred to above which Agent or such Lender believes in good faith to have been given by a duly authorized Person authorized to borrow on behalf of Debtors or for otherwise acting in good faith.

**9.8**    **Titles**.  Anything herein to the contrary notwithstanding, the use of the title of "Sole Lead Arranger" shall not create or imply any powers, duties or responsibilities under this Agreement or any of the other Financing Agreements other than as the holder of such title may have independently as Agent or a Lender hereunder.

139697745.3

**9.9**     **Erroneous Payments**

(a)     If Agent (x) notifies a Lender or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient, a "**Payment Recipient**") that Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice from Agent) received by such Payment Recipient from Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf)  (any such funds, whether  transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of Agent pending its return or repayment as contemplated below in this <u>Section 9.9</u> and held in trust for the benefit of Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter (or such later date as Agent may, in its sole discretion, specify in writing), return to Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)     Without limiting immediately preceding clause (a), each Lender, Secured Party or any Person who has received funds on behalf of a Lender or Secured Party, agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)     it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)     such Lender or Secured Party shall (and shall use commercially reasonable efforts to cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one (1) Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying Agent pursuant to this <u>Section 9.9(b)</u>.

For the avoidance of doubt, the failure to deliver a notice to Agent pursuant to this Section 9.9(b) shall not have any effect on a Payment Recipient's obligations pursuant to Section 9.9(a) or on whether or not an Erroneous Payment has been made.

(c)        Each Lender or Secured Party hereby authorizes Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by Agent to such Lender or Secured Party under any Loan Document with respect to any payment of principal, interest, fees or other amounts, against any amount that Agent has demanded to be returned under immediately preceding clause (a).

(d)        The parties hereto agree that (x) irrespective of whether Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender or Secured Party, to the rights and interests of such Lender or Secured Party, as the case may be) under the Financing Agreements with respect to such amount (the "**Erroneous Payment Subrogation Rights**") and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Liabilities owed by Debtors; provided that this Section 9.9 shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Liabilities of Debtors relative to the amount (or timing for payment) of the Liabilities that would have been payable had such Erroneous Payment not been made by Agent; provided, further, that for the avoidance of doubt, immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by Agent from Debtors for the purpose of making such Erroneous Payment.

(e)        To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

Each party's obligations, agreements and waivers under this Section 9.9 shall survive the resignation or replacement of Agent, the termination of the Commitments and the Full Satisfaction of the Liabilities (or any portion thereof).

## 10    **MISCELLANEOUS**.

**10.1    Timing of Payments**.  For purposes of determining the outstanding balance of the Liabilities, including without limitation, the computations of interest which may from time to time be owing to Agent or the Lenders, the receipt by Agent of any check or any other item of payment whether through a blocked account or lockbox or otherwise, shall not be treated as a payment on account of the Liabilities until such check or other item of payment is actually received by the Agent and is paid to Agent in cash or a cash equivalent.  Notwithstanding the terms of this Agreement or any other Financing Agreement, if the due date of any payment falls on a day that is not a Business Day, such payment may be made and shall not be considered late if made on the next succeeding Business Day.

**10.2    Attorneys' Fees and Costs**.  If at any time Agent employs counsel in connection with protecting or perfecting Agent's security interest in the Collateral or in connection with any matters contemplated by or arising out of this Agreement, whether: (a) to commence, defend, or intervene in any

litigation or to file a petition, complaint, answer, motion or other pleading; (b) to take any other action in or with respect to any suit or proceeding (bankruptcy or otherwise); (c) to consult with officers of Agent to advise Agent or to draft documents for Agent in connection with any of the foregoing or in connection with any release of Agent's claims or security interests or any proposed extension, amendment or refinancing of the Liabilities; (d) to protect, collect, lease, sell, take possession of, or liquidate any of the Collateral; or (e) to enforce or to attempt to enforce any security interest in any of the Collateral, or to enforce or to attempt to enforce any rights of Agent to collect any of the Liabilities; then in any of such events, all of the reasonable attorneys' fees arising from such services, and any related expenses, costs and charges, including without limitation, all fees of all paralegals, legal assistants and other staff employed by such attorneys whether outside Agent or in Agent's legal department all at commercially reasonable rates, together with interest at the highest interest rate then payable by Debtors under this Agreement or any other Financing Agreement, shall constitute additional Liabilities, payable first on the Closing Date and thereafter on demand, and secured by the Collateral.

In addition, if a Matured Default has occurred and is continuing, and thereafter any Lender employs counsel:  (a) in connection with, arising out of, or any way related to, protecting, exercising or enforcing such Lender's interest in the Collateral or this Agreement or the other Financing Agreements; (b) to commence, defend or intervene in any litigation or to file a petition, complaint, answer, motion or other pleading; (c) to take any other action in or with respect to any suit or proceeding (bankruptcy or otherwise); (d) to protect, collect, lease, sell, take possession of, or liquidate any of the Collateral; or (e) to attempt to enforce or to enforce any security interest in any of the Collateral, or to attempt to enforce or to enforce any rights of such Lender to collect any of the Liabilities; then in any of such events, all of the reasonable attorneys' fees arising from such services, and any expenses, costs and charges relating thereto, including without limitation, all fees of all paralegals, legal assistants and other staff employed by such attorneys whether outside the Lender or in the Lender's legal department, together with interest at the highest interest rate then payable by Debtors under this Agreement or any other Financing Agreement, shall constitute additional Liabilities, payable on demand and secured by the Collateral.

This Section 10.2 shall survive the termination of this Agreement and the Full Satisfaction of the Liabilities.

**10.3**    **Expenditures by Agent**. In the event that Debtors (a) shall fail to pay taxes, insurance, assessments, costs or expenses which Debtors are, under any of the terms hereof or of any of the other Financing Agreements, required to pay, (b) fail to keep the Collateral free from Liens, except as permitted herein, (c) fail to maintain any Collateral in accordance with this Agreement including, without limitation, Section 6.3, or as otherwise required under any other of the Financing Agreements, or (d) or fail to perform or satisfy any of Debtors' other obligations under this Agreement or any other of the Financing Agreements, Agent may, in Agent's discretion and without obligation to do so, make expenditures for any or all of such purposes, and the amount so expended, together with interest at the highest interest rate then payable by Debtors under this Agreement or any other Financing Agreement, shall constitute additional Liabilities, payable on the Closing Date and thereafter on demand, and secured by the Collateral.

**10.4**    **Agent's Costs and Expenses as Additional Liabilities**.  Debtors shall reimburse Agent for all expenses and fees paid or incurred in connection with the documentation, negotiation and closing of the Loans and other financial accommodations described in this Agreement (including without limitation, filing fees, recording fees, document or recording taxes, search fees, appraisal fees and expenses, and the reasonable fees and expenses of Agent's attorneys, paralegals, and legal assistants, whether outside Agent or in Agent's legal department, and whether such expenses and fees are incurred prior to or after the Closing Date) and the preparation and review of pleadings, documents and reports related to the Bankruptcy Cases (and any successor cases relating thereto), attendance at meetings, court hearings or conferences related to the Bankruptcy Cases (and any successor cases relating thereto) and general monitoring of the Bankruptcy

55

Cases (and any successor cases relating thereto). Debtors further agrees to reimburse Agent for all reasonable expenses and fees paid or incurred in connection with the documentation of any renewal or extension of the Loans, any additional financial accommodations, or any other amendments to this Agreement. All reasonable costs and expenses incurred by Agent with respect to such negotiation and documentation, together with interest at the highest interest rate then payable by Debtors under this Agreement or any other Financing Agreement, shall constitute additional Liabilities, payable on the Closing Date and thereafter on demand, and secured by the Collateral.

**10.5    Claims and Taxes; Release**.

(a)    Debtors agrees to indemnify and hold Agent and the Lenders and any of the officers, directors employees, agents, attorneys or affiliates of any of them, harmless from and against any and all claims, demands, liabilities, losses, damages, penalties, costs, obligations, actions, judgments, suits, disbursements and expenses (including without limitation, reasonable attorneys' fees) relating to or in any way arising out of the possession, use, operation or control of any of Debtors' assets, or in any way arising out of or related to this Agreement or the other Financing Agreements, which agreement to indemnify and hold Agent and the Lenders harmless shall survive the termination of this Agreement and the Full Satisfaction of the Liabilities. Debtors shall pay or cause to be paid all license fees, bonding premiums and related taxes and charges, and shall pay or cause to be paid all of Debtors' real and personal property taxes, assessments and charges and all of Debtors' franchise, income, unemployment, use, excise, old age benefit, withholding, sales and other taxes and other governmental charges assessed against Debtors, or payable by Debtors, at such times and in such manner as to prevent any penalty from accruing or any Lien or charge from attaching to Debtors' property, provided, however, that Debtors shall have the right to contest in good faith, by an appropriate proceeding promptly initiated and diligently conducted, the validity, amount or imposition of any such tax, and upon such good faith contest to delay or refuse payment thereof, if: (a) Debtors establishes adequate reserves to cover such contested taxes; and (b) such contest does not have a material adverse effect on the financial condition of Debtors, the ability of Debtors to pay any of the Liabilities, or the priority or value of the Lender's security interests in the Collateral. To the extent permitted by applicable law, no Debtors shall assert, and each hereby waives, any claim against Agent or any Lender and any of the officers, directors employees, agents, attorneys or affiliates of any of them, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement, instrument or transactions contemplated hereby, or any Loan or the use of the proceeds thereof.

(b)    In consideration of the financial accommodations afforded Debtors pursuant to this Agreement, and effective upon entry of the Final Order, each Debtor, on behalf of itself, and all persons and entities claiming by, through, or under it, hereby unconditionally releases, remises, acquits, waives and forever discharges Agent, Lenders, the other Secured Parties and all of Agent's, Lenders' and the other Secured Parties' past and present officers, employees, directors, shareholders, attorneys, agents, accountants, auditors, representatives, parent corporation, subsidiaries, Affiliates, trustees, administrators, predecessors, successors and assigns (collectively, the "**Lender Group**"), of, from, and with respect to any and all manner of action and actions, cause and causes of actions, suits, disputes, debts, dues, damages, penalties, fees, losses, costs, expenses, attorneys' fees, accounts, bonds, covenants, contracts, agreements, promises, warranties, guarantees, representations, liens, mechanic's liens, judgments, awards, claims, cross claims, counterclaims, obligations, defenses, demands and any claims for avoidance or other remedies whatsoever available to Debtors, or their respective successors or assigns, whether now known or unknown, suspected or unsuspected, past or present, asserted or unasserted, contingent or liquidated, whether or not well founded in fact or law, whether in contract, in tort or otherwise or

resulting from any assignment, if any, at law or in equity (collectively referred to as "**Claims**"), which such Debtor ever had or now has, claims to have had, now claims to have or hereafter can, shall or may claim to have against the Lender Group (or any part thereof), for or by reason of any cause, matter, or thing whatsoever arising from the beginning of time through the date hereof, including, without limitation, any and all claims based upon, relating to or arising out of any and all transactions, agreements, relationships or dealings with or loans made to Debtors prior to the date hereof.

**10.6**    **Custody and Preservation of Collateral**.  Agent shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in Agent's possession if Agent takes such action for that purpose as Debtors shall request in writing, but failure by Agent to comply with any such request shall not of itself be deemed a failure to exercise reasonable care, and no failure by Agent or any Lender to preserve or protect any right with respect to such Collateral against prior parties, or to do any act with respect to the preservation of such Collateral not so requested by Debtors, shall of itself be deemed a failure to exercise reasonable care in the custody or preservation of such Collateral.

**10.7**    **Inspection**.  Agent (by and through its officers and employees), or any Person designated by Agent in writing (including officers and employees of the other Lenders), shall have the right from time to time, to call at Debtors' place or places of business (or any other place where Collateral or any information as to Collateral is kept or located) during reasonable business hours, and, without hindrance or delay, to: (a) inspect, audit, check and make copies of and extracts from Debtors' books, records, journals, orders, receipts and any correspondence and other data relating to Debtors' business or to any transactions between the parties to this Agreement or arising out of this Agreement; (b) make such verification concerning the Collateral as Agent may consider reasonable under the circumstances; and (c) review operating procedures, review maintenance of property and discuss the affairs, finances and business of Debtors with Debtors' officers, employees, directors, members, or managers.  Debtors agrees to reimburse Agent for a reasonable per day audit fee, plus all out of pocket expenses reasonably incurred by or on behalf of Agent related thereto, with respect to the matters set forth in this Section 10.7 which reimbursements may, at the discretion of Agent, be paid by an Agent initiated Loan or by a debit to a Deposit Account initiated by Agent per any preauthorization provided by Debtors to Agent, without prior demand by Agent, provided, however that Debtors shall not be required to reimburse Agent with respect to the matters set forth in this Section 10.7 conducted more than two times in each calendar year unless a Default or Matured Default shall have occurred and be continuing.

**10.8**    **Examination of Banking Records**.  Debtors consent to the examination by Agent (by and through its officers and employees), or any Person designated by Agent in writing (including officers and employees of the other Lenders), whether or not there shall have occurred a Default or a Matured Default, of any and all of Debtors' banking records, wherever they may be found, and directs any Person which may be in control or possession of such records (including without limitation, any bank, other financial institution, accountant or lawyer) to provide such records to Agent and Agent's officers, employees and agents, upon their request.  Such examination may be conducted by Agent with or without notice to Debtors at the option of Agent, any such notice being waived by Debtors.

**10.9**    **Governmental Reports**.  Debtors will furnish to Agent, upon the reasonable request of Agent, copies of the reports of examinations or inspections of Debtors by all Governmental Authorities, and if Debtors fails to furnish such copies to Agent, Debtors authorizes all such Government Authorities to furnish to Agent copies of their reports of examinations or inspections of Debtors.

**10.10**    **Reliance by Agent and the Lenders**.  All covenants, agreements, representations and warranties made herein by Debtors shall, notwithstanding any investigation by Agent or any of the Lenders, be deemed to be material to and to have been relied upon by Agent and the Lenders.

**10.11**    **Parties**.  Whenever in this Agreement there is reference made to any of the parties, such reference shall be deemed to include, wherever applicable, a reference to the respective successors and assigns of Debtors, Agent and the Lenders.  Debtors shall not assign any of it rights or delegate any of its duties under this Agreement or any of the other Financing Agreements without the prior written consent of Agent and the Lenders.

**10.12**    **Applicable Law; Severability**.  THIS AGREEMENT SHALL BE CONSTRUED IN ALL RESPECTS IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS AND DECISIONS OF THE STATE OF IDAHO AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

**10.13**    **SUBMISSION TO JURISDICTION; WAIVER OF BOND AND TRIAL BY JURY**. WITH RESPECT TO ANY AND ALL ACTIONS, CAUSES OF ACTION, SUITS, CLAIMS, DEMANDS, DEBTS, DAMAGES, COSTS AND EXPENSES, WHATSOEVER, WHETHER BASED ON STATUTE, COMMON LAW, PRINCIPLES OF EQUITY OR OTHERWISE, ARISING OUT OF ANY MATTER, THING OR EVENT WHICH IS DIRECTLY OR INDIRECTLY RELATED TO THIS AGREEMENT, DEBTORS CONSENT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM, JURISDICTION, THE JURISDICTION OF ANY LOCAL, STATE, OR FEDERAL COURT LOCATED WITHIN THE STATE OF IDAHO AND WAIVES ANY OBJECTION WHICH DEBTORS MAY HAVE BASED ON IMPROPER VENUE OR FORUM NON CONVENIENS TO THE CONDUCT OF ANY PROCEEDING IN ANY SUCH COURT AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON DEBTORS, AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, OR MESSENGER DIRECTED TO DEBTORS AT THE ADDRESS SET FORTH IN SECTION 10.19. SERVICE, SO MADE, SHALL BE DEEMED TO BE COMPLETE UPON THE EARLIER OF ACTUAL RECEIPT OR THREE (3) DAYS AFTER THE SAME SHALL HAVE BEEN POSTED. DEBTORS, AGENT AND EACH LENDER HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH ANY FINANCING AGREEMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.  DEBTORS WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF AGENT.

**10.14**    **Application of Payments: Waiver**.  Except as set forth below, payments made by Debtors or from the proceeds of Collateral under this Agreement shall generally be applied first to any costs or fees owing by Debtors to Agent or any Lender including, without limitation, expenditures under Section 10.3, shall be applied second to any interest payments owing hereunder which are due and unpaid, shall be applied third, on a pro-rata basis, to any outstanding principal owing hereunder and Bank Products Obligations owing hereunder, shall be applied fourth to interest accrued but not yet due, and shall be applied fifth to all other Liabilities.  Unless otherwise specified in this Agreement, prepayments of principal made by Debtors on any Loans repayable in installments shall be applied to the most remote installment then due (which shall be deemed to include, as applicable, any balloon payment due at maturity).  Notwithstanding the terms of this Section 10.14, any other terms of this Agreement or any terms of any other Financing Agreement, Agent shall first apply payments and proceeds of Collateral to any charge-backs, payments pursuant to any avoidance claims or any other loss, overdraft, or shortfall with respect to deposit accounts maintained with Agent or any other Lender, to the extent that the funds that are the subject of such charge-backs, payments pursuant to any avoidance claims or any other loss, overdraft, or shortfall have been previously paid or

applied by Agent to the Liabilities other than Bank Products Obligations. In the event that such payments and proceeds of Collateral are insufficient to cover such charge-backs, payments pursuant to any avoidance claims or any other loss, overdraft, or shortfall, then Agent or any other Lender shall be indemnified for the resulting loss in the manner provided for in <u>Section 9.5</u>.  Immediately Available Funds held by Agent that are payable to the Lenders in accordance with the terms of this Agreement (including, but not limited to, this <u>Section 10.14</u> and <u>Section 10.1</u>), shall be promptly remitted to the Lenders by Agent in accordance with the written instructions given to Agent by the Lenders, respectively.

**10.15**  **<u>Marshaling</u>**.  Agent and the Lenders shall be under no obligation to marshal any assets in favor of Debtors or against or in payment of any or all of the Liabilities.

**10.16**  **<u>Section Titles</u>**.  The Section titles contained in this Agreement shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties.

**10.17**  **<u>Continuing Effect</u>**.  This Agreement, Agent's security interests in the Collateral, and all of the other Financing Agreements shall continue in full force and effect so long as (a) any Liabilities shall be owed to Agent or any of the Lenders or (b) as long as Agent or any of the Lenders remains committed to make Loans under this Agreement (even if there shall be no Liabilities outstanding).

**10.18**  **<u>No Waiver</u>**.  Agent's or the Required Lenders' failure, at any time or times hereafter, to require strict performance by Debtors of any provision of this Agreement or the other Financing Agreements shall not waive, affect or diminish any right of Agent or the Required Lenders thereafter to demand strict compliance and performance therewith. Any suspension or waiver by Agent or the Required Lenders of any Default or Matured Default under this Agreement or any of the other Financing Agreements, shall not suspend, waive or affect any other Default or Matured Default under this Agreement or any of the other Financing Agreements, whether the same is prior or subsequent thereto and whether of the same or of a different kind or character.   None of the undertakings, agreements, warranties, covenants and representations of Debtors contained in this Agreement or any of the other Financing Agreements and no Default or Matured Default under this Agreement or any of the other Financing Agreements, shall be deemed to have been suspended or waived by Agent or the Required Lenders unless such suspension or waiver is in writing signed by an officer of Agent or each of the Required Lenders (as applicable) and is directed to Debtors specifying such suspension or waiver.

**10.19**  **<u>Notices</u>**.  Except as otherwise expressly provided herein, any notice required or desired to be served, given or delivered pursuant to this Agreement shall be in writing, and shall be sent by manual delivery, overnight courier or United States mail (postage prepaid) addressed to the party to be notified as follows:

(a)      If to Agent at:

Coöperatieve Rabobank U.A., New York Branch
c/o Rabobank Corporate Banking Services
245 Park Avenue, 38th Floor
New York, NY  10167
Attn:  Jasvir Sihra
Email:  <u>Jasvir.Sihra@rabobank.com</u> and <u>fm.am.syndicatedloans@rabobank.com</u>

with copies of notices to Agent to:

Norton Rose Fulbright US LLP

1301 Avenue of the Americas
New York, NY  10019-6022
Attn: Andrew J. Schoulder
Email:  andrew.schoulder@nortonrosefulbright.com

(b)    If to Debtors at:

Millenkamp Cattle, Inc.
471 North 300 West
Jerome, Idaho 83338
Attn: William Millenkamp
Email:  bill@millenkamp.com

with a copy to:

Johnson May Law
199 N. Capitol Blvd.
Suite 200
Boise, ID 83702
Attn: Matthew T. Christensen
Email:  mtc@johnsonmaylaw.com

or, as to each party, addressed to such other address as shall be designated by such party in a written notice to the other parties. All such notices shall be deemed given on the date of delivery if manually delivered, on the first Business Day after the date of sending if sent by overnight courier, or three (3) days after the date of mailing if mailed.

**10.20    Regulatory Changes.**  In the event any Governmental Authority (i) subjects the Lenders or any of them or any of their respective lending offices to any new or additional charge, fee, withholding, duty or tax of any kind with respect to any Loans or other Liabilities hereunder, (ii) changes the method or basis of taxation of such Loans or other Liabilities, except for changes in the rate of tax on the overall net income of such Lender or its lending office imposed by the jurisdiction in which such Lender's principal executive office or lending office is located, or (iii) makes a Change in the reserve or deposit requirements applicable to such Loans or other Liabilities (including, without limitation, the imposition, modification or deemed application of any reserve, special deposit or similar requirement (including, without limitation, any such requirement imposed by the Board of Governors) against assets of, deposits with or for the account of any Lender, or its lending office, and including without limitation, the issuance of a request or directive regarding capital adequacy (whether or not having the force of law) that has the effect of reducing the rate of return on such Lender's capital as a consequence of its obligations under this Agreement to a level below that which such Lender could have achieved but for such adoption, Change or compliance (taking into consideration such Lender's policies with respect to capital adequacy)), then in any such event, Debtors shall pay to such Lender such additional amounts as will compensate such Lender for such costs or lost income resulting thereby as reasonably determined by such Lender.  Without limiting the generality of the foregoing, the term "**Change**" shall include (i) any change after the date of this Agreement in the Risk-Based Capital Guidelines or (ii) any adoption of or change in any other law, governmental or quasi-governmental rule, regulation, policy, guideline, interpretation, or directive (whether or not having the force of law) or in the interpretation, promulgation, implementation or administration thereof after the date of this Agreement which affects the amount of capital required or expected to be maintained by any Lender or any corporation controlling any Lender.  Notwithstanding the foregoing, for purposes of this Agreement, all requests, rules, guidelines or directives in connection with the Dodd-Frank Wall Street Reform and Consumer Protection Act shall be deemed to be a Change regardless of the date enacted, adopted or issued

60

and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) or the United States financial regulatory authorities shall be deemed to be a Change regardless of the date adopted, issued, promulgated or implemented. "**Risk-Based Capital Guidelines**" means (i) the risk-based capital guidelines in effect in the United States on the date of this Agreement, including transition rules, and (ii) the corresponding capital regulations promulgated by regulatory authorities outside the United States including transition rules, and any amendments to such regulations adopted prior to the date of this Agreement.

**10.21    Payments Set Aside**. To the extent that any payment by or on behalf of Debtors is made to Agent or any Lender, or Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the greater of the Federal Funds Rate from time to time in effect and a rate determined by Agent in accordance with banking industry rules on interbank compensation.

**10.22    Taxes**. Without limiting the generality of <u>Section 10.20</u>:

(a)    Any and all payments by or on account of any obligation of Debtors under any Financing Agreement shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law requires the deduction or withholding of any Tax from any such payment, then Debtors shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax or Other Tax, then the sum payable by Debtors shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 10.22</u>) the applicable Lender or Agent receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Debtors shall timely pay to the relevant Governmental Authority in accordance with applicable law or at the option of Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Debtors shall indemnify the Lender or Agent, within fifteen (15) days after demand therefor, for the full amount of any Indemnified Taxes and Other Taxes (including Indemnified Taxes and Other Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 10.22</u> payable or paid by such Lender or Agent or required to be withheld or deducted from a payment to such Lender or Agent and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes and Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Debtors by a Lender (with a copy to Agent), or by Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Each Lender shall severally indemnify Agent, within fifteen (15) days after demand therefor, for (i) any Indemnified Taxes and Other Taxes attributable to such Lender (but

61

only to the extent that Debtors have not already indemnified Agent for such Indemnified Taxes and Other Taxes and without limiting the obligation of Debtors to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 5f.103-1(c) of the United States Treasury Regulations relating to the maintenance of a participant register, and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Financing Agreement, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error. Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Financing Agreement or otherwise payable by Agent to the Lender from any other source against any amount due to Agent under this paragraph (d).

(e)    As soon as practicable after any payment of Taxes by Debtors to a Governmental Authority pursuant to this Section 10.22, Debtors shall deliver to Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Agent.

(f)    (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Financing Agreement shall deliver to the Administrative Debtor and Agent, at the time or times reasonably requested by the Administrative Debtor or Agent, such properly completed and executed documentation reasonably requested by the Administrative Debtor or Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Administrative Debtor or Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Administrative Debtor or Agent as will enable the Administrative Debtor or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (A), (B) and (D) of Section 10.22(f)(ii)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender..

(ii)    Without limiting the generality of the foregoing, in the event that the Debtor is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Administrative Debtor or Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Debtors or Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax;

(B)    any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Debtor or Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Debtor or Agent), whichever of the following is applicable:

62

(1)    in the case of a Non-U.S. Lender claiming the benefits of an income Tax treaty to which the United States is a party (x) with respect to payments of interest under any Financing Agreement, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" Article of such Tax treaty and (y) with respect to any other applicable payments under any Financing Agreement, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" Article of such Tax treaty;

(2)    executed originals of IRS Form W-8ECI;

(3)    in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(a) of the Code, a "10 percent shareholder" of the Debtors within the meaning of Section 881(c)(3)(b) of the Code, or a "controlled foreign corporation" related to Debtors as described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)    to the extent a Non-U.S. Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W 8BEN-E, a U.S. Tax Compliance Certificate, IRS Form W-9, or other certification documents from each beneficial owner, as applicable; provided that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate on behalf of each such direct and indirect partner.

(C)    any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Debtor and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Debtor or Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Debtors or Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Financing Agreement would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Administrative Debtor and Agent at the time or times prescribed by law and at such time or times reasonably requested by the Administrative Debtor or Agent such documentation prescribed by

applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Debtors or Agent as may be necessary for the Debtors and Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (B), "**FATCA**" shall include any amendments made to FATCA after the date of this Agreement.

(iii)     Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall promptly upon obtaining knowledge of such occurrence, update such form or certification or notify the Debtors and Agent in writing of its legal inability to do so.

(g)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 10.22 (including by the payment of additional amounts pursuant to this Section 10.22), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).   Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.   Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)     Each party's obligations under this Section 10.22 shall survive the resignation or replacement of Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the Full Satisfaction of the Liabilities.

**10.23   Assignments and Participation**.

(a)     After the Closing Date, each Lender may assign to any Person (the "**Assignee**") all or a portion of its rights and obligations under this Agreement (including without limitation, all or a portion of its Commitments and the Notes held by it); provided however, that (i) each such assignment shall be of a constant, and not a varying, percentage of all of the assigning Lender's rights and obligations under this Agreement, (ii) the total amount of the Commitment or Commitments (based on the original Commitment or Commitments without giving effect to any repayments or prepayments) so assigned to an Assignee or to an Assignee and its affiliates taken as a whole shall equal or exceed the lesser of the total amount of the Commitment or Commitments held by the assigning Lender or $5,000,000.00 (iii) the remaining Commitment or Commitments (based on the original Commitment or Commitments without giving effect to any repayments or prepayments) held by the assigning Lender and its affiliates after giving effect to any such assignment shall equal or exceed $5,000,000.00, (iv) the assignment shall not be made to Debtors or any of Debtors' Affiliates, and shall not cause Debtors to incur any additional liability or expense

64

and (v) the parties to each such assignment shall execute and deliver to Agent for its acceptance (which acceptance may be withheld in the discretion of Agent) an Assignment and Acceptance in substantially the form attached as Schedule B ("**Assignment and Acceptance**"), together with any Note or Notes subject to such assignment and a processing and recordation fee, charged at Agent's discretion, in the amount of $3,500.00.  Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, which effective date shall be the date on which such Assignment and Acceptance is accepted by Agent, (vi) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender under the Financing Agreements and (vii) the Lender assignor thereunder shall be deemed to have relinquished its rights and to be released from its obligations under the Financing Agreements, to the extent (and only to the extent) that its rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under the Financing Agreements, such Lender shall cease to be a party thereto).  Notwithstanding the foregoing, no such assignment shall be made to:  (A) any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute a Defaulting Lender or a Subsidiary thereof; or (B) a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person).

(b)      By executing and delivering an Assignment and Acceptance, the Lender assignor thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Financing Agreements or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Financing Agreements or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Debtors or the performance or observance by Debtors of any of its obligations under the Financing Agreements or any other instrument or document furnished pursuant hereto; (iii) such Assignee confirms that it has received a copy of the Financing Agreements, together with copies of the financial statements referred to in Section 6.1 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such Assignee appoints and authorizes Agent to take such action as Agent on its behalf and to exercise such powers under the Financing Agreements as are delegated to Agent by the terms thereof, together with such powers as are reasonably incidental thereto; and (vi) such Assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Financing Agreements are required to be performed by it as a Lender.

(c)      Agent shall maintain at its address referred to in Section 10.19 a copy of each Assignment and Acceptance delivered to and accepted by it.

(d)      Upon its receipt of an Assignment and Acceptance executed by an assigning Lender, together with any Note or Notes subject to such assignment, Agent shall, if such Assignment and Acceptance has been properly completed and accepted by Agent (and, if required consented to by the Debtors), (i) accept such Assignment and Acceptance and (ii) give prompt

65

notice thereof to Debtors. Within five (5) Business Days after its receipt of such notice, Debtors, at its own expense, shall execute and deliver to Agent in exchange for the surrendered Note or Notes, a new Note or new Notes to the order of such Assignee in an amount equal to the Commitment or Commitments assumed by it pursuant to such Assignment and Acceptance and, if the assigning Lender has retained a Commitment or Commitments, a portion of which has been assigned, a new Note or New Notes to the order of the assigning Lender in an amount equal to the Commitment or Commitments retained by it hereunder. Such new Note or Notes shall be in an aggregate principal amount equal to the aggregate principal amount of such surrendered Note or Notes, shall be dated the effective date of such Assignment and Acceptance and shall otherwise be in substantially the form required under this Agreement. Upon receipt by Agent of such new Note or Notes conforming to the requirements set forth in the preceding sentences, Agent shall return to Debtors such surrendered Note or Notes, marked to show that such surrendered Note or Notes has (have) been replaced, renewed and extended by such new Note or Notes.

(e)     Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement (including without limitation, all or a portion of its Commitments and any Note held by it); provided however, that (i) such Lender's obligations under this Agreement (including without limitation, its Commitments to Debtors hereunder) shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) the sale of the participation will not cause Debtors to incur any additional liability, and (v) Debtors, Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, provided that no participant shall be entitled to recover under the above-described provisions an amount in excess of the proportionate share which such participant holds of the original aggregate principal amount hereunder to which the assigning Lender would otherwise be entitled.

(f)     Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 10.23, disclose to the assignee or participant or proposed assignee or participant, any information relating to Debtors furnished to such Lender by or on behalf of Debtors; provided that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree in writing to preserve the confidentiality of any confidential information relating to Debtors received by it from such Lender.

(g)     Any Lender may assign and pledge all or any of the instruments held by it as collateral security; provided that any payment made by Debtors for the benefit of such assigning and/or pledging Lender in accordance with the terms of the Financing Agreements shall satisfy Debtors' obligations under the Financing Agreements in respect thereof to the extent of such payment. No such assignment and/or pledge shall release the assigning and/or pledging Lender from its obligations hereunder.

**10.24    Maximum Interest**. No agreements, conditions, provisions or stipulations contained in this Agreement or in any of the other Financing Agreements, or any Default or Matured Default, or any exercise by Agent of the right to accelerate the payment of the maturity of principal and interest, or to exercise any option whatsoever, contained in this Agreement or any of the other Financing Agreements, or the arising of any contingency whatsoever, shall entitle Agent to collect, in any event, interest exceeding the maximum authorized by law, and in no event shall Debtors be obligated to pay interest exceeding such rate, and all agreements, conditions or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel Debtors to pay a rate of interest exceeding the maximum allowed by law, shall be without binding force or effect, at law or in equity, to the extent only of the excess

66

of interest over such maximum interest allowed by law. In the event any interest is charged in excess of the maximum allowed by law ("**Excess**"), Debtors acknowledges and stipulates that any such charge shall be the result of an accidental and bona fide error, and such Excess shall be, first, applied to reduce the principal of any Liabilities due, and, second, returned to Debtors, it being the intention of the parties not to enter at any time into a usurious or otherwise illegal relationship. Debtors and Agent both recognize that, with fluctuations of index rates and applicable margins, such an unintentional result could inadvertently occur. By the execution of this Agreement, Debtors covenants that: (a) the credit or return of any Excess shall constitute the acceptance by Debtors of such Excess; and (b) Debtors shall not seek or pursue any other remedy, legal or equitable, against Agent based, in whole or in part, upon the charging or receiving of any interest in excess of the maximum authorized by law. For the purpose of determining whether or not any Excess has been contracted for, charged or received by Agent, all interest at any time contracted for, charged or received by Agent in connection with the Liabilities shall be amortized, prorated, allocated and spread in equal parts during the entire term of this Agreement. Notwithstanding the foregoing, if for any period of time interest on any of Debtors' obligations is calculated at the Highest Lawful Rate rather than the rate otherwise applicable under this Agreement, and thereafter such applicable rate becomes less than the Highest Lawful Rate, the rate of interest payable on the Debtors' obligations shall remain at the Highest Lawful Rate until the Lenders have received the amount of interest which such Lenders would have received during such period on the Debtors' obligations had the rate of interest not been limited to the Highest Lawful Rate during such period.

**10.25**   **Additional Advances**. All fees, charges, expenses, costs, expenditures, obligations, liabilities, losses, penalties and damages incurred or suffered by Agent or any Lender and for which Debtors is bound to indemnify or reimburse Agent or any Lender under this Agreement (other than those which may be paid without demand, by Agent initiated Loans or by a debit to a Deposit Account initiated by Agent per any preauthorization provided by Debtors to Agent) may, at the option of Agent or any Lender, be paid by Agent initiated Loans or by a debit to a Deposit Account initiated by Agent per any preauthorization provided by Debtors to Agent if such amounts remain unpaid for a period of fifteen (15) days after Agent or any Lender has made demand.

**10.26**   **Loan Agreement Controls**. If there are any conflicts or inconsistencies among this Agreement and any of the other Financing Agreements, the provisions of this Agreement shall prevail and control.

**10.27**   **Obligations Several**. The obligations of each Lender under each Financing Agreement to which it is a party are several, and no Lender shall be responsible for any obligation or Commitment of any other Lender under any Financing Agreement to which it is a party. Nothing contained in any Financing Agreement to which it is a party, and no action taken by any Lender pursuant thereto, shall be deemed to constitute the Lenders to be a partnership, an association, a joint venture, or any other kind of entity.

**10.28**   **Pro Rata Treatment**. All Loans under this Agreement, and except as set forth below, all payments and other amounts received with respect to any amount due under this Agreement or any of the other Financing Agreements (including, without limitation, amounts received as a result of the exercise by any Lender of any right of set-off), shall be effectively shared by the Lenders ratably in accordance with the respective Pro Rata Percentages of the Lenders. If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) of any amount due under this Agreement or any of the other Financing Agreements (other than pursuant to 2.5(a), 10.20, 10.21, or 10.22, or pursuant to Section 10.14 with respect to Bank Products Obligations) in excess of its Pro Rata Percentage of such payments, such Lender shall purchase from the other Lenders such participation in the Notes or Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and

such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (a) the amount of such Lender's required repayment to (b) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered. Disproportionate payments of interest shall be shared by the purchase of separate participation in unpaid interest obligations, disproportionate payments of fees shall be shared by the purchase of separate participation in unpaid fee obligations, and disproportionate payments of principal shall be shared by the purchase of separate participation in unpaid principal obligations. Debtors agrees that any Lender so purchasing a participation from another Lender pursuant to this Section 10.28 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of Debtors in the amount of such participation. Notwithstanding the foregoing, a Lender may receive and retain an amount in excess of its Pro Rata Percentage to the extent, but only to the extent, that such excess results from such Lender's Highest Lawful Rate exceeding another Lender's Highest Lawful Rate.

**10.29    Confidentiality and Information**. Each of Agent and the Lenders agrees that it will use its best efforts to keep confidential, in accordance with its customary procedures for handling confidential information and in accordance with safe and sound banking practices any proprietary information of Debtors, designated in writing by Debtors, as being proprietary and confidential; provided that Agent or any Lender may disclose any such information (a) to enable it to comply with any Governmental Requirement applicable to it, (b) in connection with the defense of any litigation or other proceeding brought against it arising out of the transactions contemplated by this Agreement and the other Financing Agreements, (c) in connection with the supervision and enforcement of the rights and remedies of Agent and Lenders under any Financing Agreement, (d) as set forth in Section 10.23; and (e) if not otherwise covered by the foregoing, to its legal counsel. Notwithstanding anything to the contrary in this Agreement, each Lender (or its representatives, agents or employees) may (i) consult any tax advisor regarding the tax treatment and tax structure of the transaction contemplated by this Agreement and (ii) may at any time disclose to any Person, without limitation of any kind, the tax treatment and tax structure of such transaction and all materials of any kind (including opinions or other tax analyses) that are provided relating to such tax treatment or tax structure. The preceding sentence is intended to satisfy the requirements for the transaction contemplated herein to avoid classification as a "confidential transaction" for purposes of Treasury Regulations Section 1.6011-4(b)(3) and shall be interpreted consistent with such intent. This authorization is not intended to permit disclosure of any information that is unrelated to the tax treatment or tax structure of any transaction contemplated hereby, including, without limitation, any pricing or financial information, except in each case to the extent such information is related to the tax treatment or tax structure of any such transaction. Debtors grant to Agent and the Lenders and each of their affiliates, the right to use Debtors' trademarks, service marks, logos, names, and other intellectual property, limited, however, to the publication and memorialization of transactions with Debtors and other disclosures incidental thereto.

**10.30    Independence of Covenants**. All covenants under this Agreement and the other Financing Agreements shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant shall not avoid the occurrence of a Default or a Matured Default if such action is taken or condition exists.

**10.31    Amendments and Waivers.**

(a)    Except as provided in 10.31(a) and 10.31(c), any term, covenant, agreement or condition of this Agreement or the other Financing Agreements may be amended only by a written amendment executed by Debtors, the Required Lenders and, if the rights or duties of Agent are

affected thereby, Agent, or compliance therewith only may be waived (either generally or in a particular instance and either retroactively or prospectively), if Debtors shall have obtained the consent in writing of the Required Lenders and, if the rights or duties of Agent are affected thereby, Agent, provided however, that without the consent in writing of the holders of all outstanding Notes, or of all Lenders if no Notes are outstanding, no such amendment or waiver shall (i) change the amount or postpone the date of payment of any scheduled payment or required payment of principal of the Notes or reduce the rate or extend the time of payment of interest on the Notes, or reduce the amount of principal thereof, or modify any of the provisions with respect to the payment or prepayment thereof, (ii) give to any Note any preference over any other Notes, (iii) amend the definition of Required Lenders, (iv) alter, modify or amend the provisions of Section 10.28 or of this Section 10.31, (v) increase the total amount or extend the term of any of the Commitments (vi) reduce the fees required under Section 2.5 (excluding any Agent's fees under the Agent's letter that are payable exclusively to Agent), (vii) alter, modify or amend the provisions of Section 8.1 or Section 8.2, (viii) alter, modify or amend any Lender's right hereunder to consent to any action, make any request or give any notice, and (ix) release any Collateral unless such release is permitted by the Financing Agreements (specifically including Section 7.6 of this Agreement). Notwithstanding the foregoing, technical and conforming modifications to this Agreement, or any other Financing, may be made with the consent of Debtors and Agent to the extent necessary to cure any ambiguity, omission, defect or inconsistency.

(b)     Without the consent in writing of the affected Lender, no amendment or waiver shall increase the amount of or the Pro Rata Percentage of any Commitment of such Lender (but the amount of or the Pro Rata Percentage or any Commitment of such Lender may be decreased without the consent of such Lender).

(c)     Agent may, without the consent of the Required Lenders, amend or waive any provision of this Agreement or any other Financing Agreement or consent to any departure by any party to this Agreement or any other Financing Agreements therefrom, which amendment, waiver or consent is intended to be within Agent's discretion or otherwise which shall not, in Agent's reasonable discretion, have a material adverse effect on (a) the ability of the Debtors to pay the Liabilities and to perform any of its material obligations under this Agreement or any other Financing Agreements, (b) the legality, validity, binding effect, or enforceability of this Agreement or any other Financing Agreements, (c) the rights and remedies of or benefits available to Agent or the Lenders under this Agreement or any other Financing Agreements, or (d) the value of the Collateral, taken as a whole.

(d)     Any amendment or waiver made in accordance with this Section 10.31 shall apply equally to all Lenders and all the holders of the Notes and shall be binding upon them, upon each future holder of any Note and upon Debtors, whether or not such Note shall have been marked to indicate such amendment or waiver.  No such amendment or waiver shall extend to or affect any obligation not expressly amended or waived.

**10.32   Replacement of a Lender**. If a Lender (other than Agent as a Lender) becomes a Replacement Candidate (as defined below), Debtors (provided that no Matured Default shall have occurred and be continuing), or Agent, shall have the right to require such Lender to assign to another lender or other institution selected by Debtors (provided that no Matured Default shall have occurred and be continuing) and reasonably satisfactory to Agent, or Agent and reasonably satisfactory to Debtors (provided that no Matured Default shall have occurred and be continuing), which may be one or more of the Lenders, the Commitments and the Notes held by such Lender pursuant to the terms of an appropriately completed Assignment and Acceptance in accordance with Section 10.23; provided, that neither Agent nor any Lender shall have any obligation to Debtors to find any such lender or other institution and in order for Debtors to

replace a Lender, Debtors (provided that no Matured Default shall have occurred and be continuing) must require such replacement within three (3) months of the date the Lender became a Replacement Candidate. Each Lender (other than Agent as a Lender) agrees to its replacement at the option of Debtors or Agent pursuant to this Section 10.32; provided, that the assignee selected by Debtors or Agent shall purchase such Lender's interest in the Loans and Liabilities owed to such Lender for cash in an aggregate amount equal to the aggregate unpaid principal thereof, all unpaid interest accrued thereon, all unpaid fees accrued for the account of such Lender and all other amounts then owing to such Lender hereunder or under any other Financing Agreement. A Lender will become a "**Replacement Candidate**" if (i) it has made a demand under 10.20, 10.21, or 10.22, or (ii) is a Defaulting Lender. The rights of Debtors, Agent and the other Lenders under this Section 10.32 shall be in addition to any other rights or remedies Debtors, Agent and the other Lenders may have under this Agreement, at law or in equity (including but not limited to the right of setoff with respect to the Liabilities owed to a Defaulting Lender).

       **10.33**   **Representations by the Lenders**. Each Lender represents that it is the present intention of such Lender, as of the date of its acquisition of the Notes, to acquire the Notes for its account or for the account of its affiliates, and not with a view to the distribution or sale thereof that would be in violation of any applicable laws, and, subject to any applicable laws, the disposition of such Lender's property shall at all times be within its control. The Notes have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), and may not be transferred, sold or otherwise disposed of except (a) in a registered offering under the Securities Act; (b) pursuant to an exemption from the registration provisions of the Securities Act; or (c) if the Securities Act shall not apply to the Notes or the transactions contemplated by the Financing Agreements. Nothing in this Section 10.33 shall affect the characterization of the Loans and the transactions contemplated hereunder as commercial lending transactions.

       **10.34**   **Counterparts and Electronic and Facsimile Signatures**. This Agreement, any other Financing Agreement and any subsequent amendment to any of them may be executed in several counterparts, each of which shall be construed together as one original. Facsimile or electronically transmitted signatures on this Agreement, any other Financing Agreement and any subsequent amendment to any of them shall be considered as original signatures. As related to this Agreement, (i) Agent shall be permitted (i) to create electronic images and to destroy paper originals of any imaged documents; (ii) any such images maintained by Agent as a part of its normal business processes shall be given the same legal effect as the paper originals; and (iii) when appropriate, Agent shall be permitted to convert any instrument into a "transferable record" under the Uniform Electronic Transactions Act ("**UETA**"), with the image of such instrument in Agent's possession constituting an "authoritative copy" under UETA. Debtors shall deliver or caused to be delivered to Agent original executed counterparts of this Agreement, any other Financing Agreement and any subsequent amendment to any of them, not later than 20 days following the later of each of their full execution or effective date.

       **10.35**   **Set-off**. Debtors give and confirm to each Lender a right of set-off of all moneys, securities and other property of Debtors (whether special, general or limited) and the proceeds thereof, at any time delivered to remain with or in transit in any manner to such Lender, its correspondent or its agents from or for Debtors, whether for safekeeping, custody, pledge, transmission, collection or otherwise or coming into possession of such Lender in any way, and also, any balance of any deposit accounts and credits of Debtors with, and any and all claims of security for the payment of the Liabilities owed by Debtors to such Lender, contracted with or acquired by the Lender, whether such liabilities and obligations be joint, several, absolute, contingent, secured, unsecured, matured or unmatured, and Debtors authorizes such Lender, without prior notice, to apply such money, securities, other property, proceeds, balances, credits of claims, or any part of the foregoing, to such liabilities in such amounts as it may select, whether such Liabilities be contingent, unmatured or otherwise, and whether any collateral security in support thereof is deemed adequate or not. The rights described herein shall be in addition to any collateral security described in any separate agreement executed by Debtors.

**10.36    PATRIOT Act Information**. Each Lender that is subject to the PATRIOT ACT hereby notifies Debtors that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies Debtors, which information includes the name and address of Debtors and other information that will allow each Lender to identify Debtors in accordance with the PATRIOT Act. Debtors shall provide such information and take such actions as are reasonably requested by any Lender in order to assist such Lender in maintaining compliance with the PATRIOT Act.

**10.37    Binding Effect**. This Agreement and all of the other Financing Agreements set forth the legal, valid and binding obligations of Debtors, Agent and the Lenders and are enforceable against Debtors in accordance with their respective terms. Should more than one Person be a Debtor under this Agreement or any Note, the obligations of each such Person shall be joint and several. The Lenders may settle, release, compromise, collect or otherwise liquidate the obligations of any Debtor and any security or collateral for such obligations or for any such guaranty, in any manner, without affecting or impairing the obligations of any Debtor.

**10.38    Administrative Debtor**. Each Debtor hereby irrevocably appoints Millenkamp Cattle, Inc. as the borrowing agent and attorney-in-fact for all Debtors ("**Administrative Debtor**") and Millenkamp Cattle, Inc. hereby accepts such appointment, which appointment shall remain in full force and effect unless and until Agent shall have received prior written notice signed by each Debtor that such appointment has been revoked and that another Debtor has been appointed Administrative Debtor. Each Debtor hereby irrevocably appoints and authorizes Administrative Debtor to take on its behalf all actions required of such Debtor under the Financing Agreements, and to exercise all powers and to perform all duties of such Debtor thereunder, including to submit and receive all certificates, notices, elections, and communications. For the avoidance of doubt and notwithstanding anything in this Agreement or any other Financing Agreement to the contrary, each Debtor agrees that any notice, demand, certificate, delivery or other communication delivered by Agent or any Lender to Millenkamp Cattle, Inc. shall be deemed delivered to Debtors at the time of such delivery.

**10.39    No Advisory or Fiduciary Responsibility**. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Financing Agreement), each Debtor acknowledges and agrees that: (i) (A) the arranging and other services regarding this Agreement provided by the Lenders are arm's-length commercial transactions between Debtors and its Affiliates, on the one hand, and Agent, the Lenders and their Affiliates, on the other hand, (B) such Debtor has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) such Debtor is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Financing Agreements; (ii) (A) each of the Lenders and their Affiliates is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for such Debtor or any of its Affiliates, or any other Person and (B) no Lender or any of its Affiliates has any obligation to such Debtor or any of its Affiliates with respect to the transactions contemplated hereby except, in the case of a Lender, those obligations expressly set forth herein and in the other Financing Agreements; and (iii) each of the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of such Debtor and its Affiliates, and no Lender or any of its Affiliates has any obligation to disclose any of such interests to such Debtor or its Affiliates. To the fullest extent permitted by law, each Debtor hereby waives and releases any claims that it may have against Agent, each of the Lenders and their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transactions contemplated hereby.

**10.40    FINAL AGREEMENT**. THIS WRITTEN AGREEMENT AND THE OTHER FINANCING AGREEMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES

139697745.3

AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**10.41  ACKNOWLEDGEMENT AND CONSENT TO BAIL-IN OF EEA FINANCIAL INSTITUTIONS**.  Notwithstanding anything to the contrary in any Financing Agreement or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Financing Agreement, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Financing Agreement; or (iii)the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER IDAHO LAW.**

*[Signature Pages Follow]*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

**DEBTORS**

**MILLENKAMP CATTLE, INC.**

By:‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
 William J. Millenkamp, President

**MILLENKAMP FAMILY LLC**

By:‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
 William J. Millenkamp, Member

**IDAHO JERSEY GIRLS LLC**

By:‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
 William J. Millenkamp, as President of
 Millenkamp Cattle, Inc., its sole member

**GOOSE RANCH LLC**

By:‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
 William J. Millenkamp, as Manager
 of Millenkamp Family LLC, its Manager

**EAST VALLEY CATTLE, LLC**

By:‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
 William J. Millenkamp, Member

**IDAHO JERSEY GIRLS JEROME DAIRY LLC**

By:‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
 William J. Millenkamp, Manager
 Susan J. Millenkamp, Manager

**MILLENKAMP PROPERTIES, L.L.C..**

By:‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
 William J. Millenkamp, as Manager of
 Millenkamp Family LLC, its Member

**BLACK PINE CATTLE LLC**

By:‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
 William J. Millenkamp, Manager

**MILLENKAMP PROPERTIES II LLC**

By:‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
 William J. Millenkamp, as Manager of
 Millenkamp Family LLC, its Member

**MILLENKAMP ENTERPRISES LLC**

By:‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
 William J. Millenkamp, Manager

**SOLE LEAD ARRANGER,**
**AGENT AND LENDER**

**COÖPERATIEVE RABOBANK U.A.,**
   **NEW YORK BRANCH**

By _____

Name _____

Its _____

**LENDER**

_____

By _____

Name _____

Its _____

**SCHEDULE A**
**to Senior Secured Super-Priority Debtor-in-Possession Credit Agreement**

**Lenders' Commitments**

| Coöperatieve Rabobank U.A., New York Branch | | [other lender(s)] | | Total |
|---|---|---|---|---|
| Commitment | Pro Rata % | Commitment | Pro Rata % | |
| $35,000,000 | 100.00% | | | $35,000,000 |

**SCHEDULE B**
**to Senior Secured Super-Priority Debtor-in-Possession Credit Agreement**

**<u>Agreed Budget</u>**

[Attached]

**EXHIBIT 2A**
**to Senior Secured Super-Priority Debtor-in-Possession Credit Agreement**

**Form of Note**

[Attached]

139697745.3

## <u>NOTE</u>

$_____

Jerome, Idaho

_____, 2024

      FOR VALUE RECEIVED, the undersigned MILLENKAMP CATTLE, INC., an Idaho corporation, doing business as BLACK PINE CATTLE, IDAHO JERSEY GIRLS LLC, an Idaho limited liability company, EAST VALLEY CATTLE, LLC, an Idaho limited liability company, MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company, MILLENKAMP PROPERTIES II LLC, an Idaho limited liability company, MILLENKAMP FAMILY LLC, an Idaho limited liability company, GOOSE RANCH LLC, an Idaho limited liability company, IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company, BLACK PINE CATTLE LLC, an Idaho limited liability company, and MILLENKAMP ENTERPRISES LLC, an Idaho limited liability company, (each, as debtors and debtors-in-possession under chapter 11 of the Bankruptcy Code, collectively, the "**Debtors**"), promise to pay to the order of (hereinafter referred to as "**Lender**"), at such place as Lender may designate, in lawful money of the United States of America and in Immediately Available Funds, the principal sum of _____ Dollars ($_____.00) or so much thereof as may be advanced and be outstanding, together with interest on any and all principal amounts outstanding calculated in accordance with the provisions set forth below. This Note is issued under that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement dated as of April ___, 2024 (as the same may be amended, replaced, restated and/or supplemented from time to time, the "**Loan Agreement**") between Debtors, Lender, Coöperatieve Rabobank U.A., New York Branch, as agent (the "**Agent**"), and the other lenders identified therein and is one of the Notes defined in the Loan Agreement.

      Capitalized terms used and not defined herein shall have the meanings given to such terms in the Loan Agreement.

      The Debtors shall have the right to make prepayments of principal only in accordance with the Loan Agreement.

      Debtors shall pay interest on the unpaid principal amount of each Loan made by the Lender from the date of such Loan until such principal amount shall be paid in full, at the times and at the rates per annum set forth in the Loan Agreement.

      The unpaid balance of this obligation at any time shall be the total amounts advanced hereunder by the Lender, together with accrued and unpaid interest, less the amount of payments made hereon by or for the Debtors, which balance may be endorsed hereon from time to time by the Lender.

      In addition to the repayment requirements imposed upon the Debtors under the Loan Agreement, together with the agreements referred to therein, the principal and interest owing under this Note shall be due and payable in full on the Maturity Date, without presentment, demand, protest or further notice (including without limitation, notice of intent to accelerate and notice of acceleration) of any kind, all of which are expressly waived by the Debtors.  Time is of the essence hereof.

      Interim payments made by Debtors pursuant to and in accordance with the Loan Agreement shall be applied as provided therein.

1

139697745.3

Should any Matured Default occur and be continuing, then all sums of principal and interest outstanding hereunder may be declared immediately due and payable in accordance with the Loan Agreement, without presentment, demand or notice of dishonor, all of which are expressly waived, and the Lender may have no further obligation to make Loans pursuant to the terms of the Loan Agreement.

The obligations of the Debtors to the Lender hereunder and under the Loan Agreement are secured by the Collateral granted to the Agent, for the ratable benefit of the Lenders pursuant to and as set forth in the Loan Agreement.

This note shall be construed in accordance with the laws of the State of Idaho.

*[Signature Pages Follow]*

2

**DEBTORS**

**MILLENKAMP CATTLE, INC.**

By:_____
    William J. Millenkamp, President

**IDAHO JERSEY GIRLS LLC**

By:_____
    William J. Millenkamp, as President of
    Millenkamp Cattle, Inc., its sole member

**EAST VALLEY CATTLE, LLC**

By:_____
    William J. Millenkamp, Member

**MILLENKAMP PROPERTIES, L.L.C..**

By:_____
    William J. Millenkamp, as Manager of
    Millenkamp Family LLC, its Member

**MILLENKAMP PROPERTIES II LLC**

By:_____
    William J. Millenkamp, as Manager of
    Millenkamp Family LLC, its Member

**MILLENKAMP FAMILY LLC**

By:_____
    William J. Millenkamp, Member

**GOOSE RANCH LLC**

By:_____
    William J. Millenkamp, as Manager
    of Millenkamp Family LLC, its Manager

**IDAHO JERSEY GIRLS JEROME DAIRY LLC**

By:_____
    William J. Millenkamp, Manager
    Susan J. Millenkamp, Manager

**BLACK PINE CATTLE LLC**

By:_____
    William J. Millenkamp, Manager

**MILLENKAMP ENTERPRISES LLC**

By:_____
    William J. Millenkamp, Manager

139697745.3

**EXHIBIT 2B**
**to Senior Secured Super-Priority Debtor-in-Possession Credit Agreement**

**<u>Form of Assignment and Acceptance</u>**

<u>Assignment and Acceptance</u>

Dated:_____, 202__

Reference is made to that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement dated as of April ___, 2024 (as modified, amended, extended or renewed from time to time, the "**Loan Agreement**") by and among MILLENKAMP CATTLE, INC., an Idaho corporation, doing business as BLACK PINE CATTLE, IDAHO JERSEY GIRLS LLC, an Idaho limited liability company, EAST VALLEY CATTLE, LLC, an Idaho limited liability company, MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company, MILLENKAMP PROPERTIES II LLC, an Idaho limited liability company, MILLENKAMP FAMILY LLC, an Idaho limited liability company, GOOSE RANCH LLC, an Idaho limited liability company, IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company, BLACK PINE CATTLE LLC, an Idaho limited liability company, and MILLENKAMP ENTERPRISES LLC, an Idaho limited liability company (collectively, the "**Debtors**"), the financial institutions party thereto in accordance with the provisions thereof (collectively the "**Lenders**" and individually a "**Lender**"), and COÖPERATIEVE RABOBANK U.A., NEW YORK BRANCH, in its capacity as the agent for the Lenders and other Secured Parties (in such capacity, the "**Agent**"). Capitalized terms not defined herein shall have the meanings set forth in the Loan Agreement.

NOW, THEREFORE, [Insert Name of Lender Making Assignment] (the "**Assignor**") and [Insert Name of Lender Receiving Assignment] (the "**Assignee**") agree as follows:

The Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor [Insert % Amount]% of the [applicable Commitments] (out of the [Insert % Amount]% which Assignor holds) together with all of the Assignor's related rights and obligations under the Loan Agreement as of the Effective Date (as defined below).

The Assignor: (a) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (b) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Financing Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of any Financing Agreement or any other instrument or document furnished pursuant thereto; (c) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Debtors or the performance or observance by the Debtors of any of its obligations under any Financing Agreement or any other instrument or document furnished pursuant thereto; and [(d) attaches the [insert applicable existing Note] payable to the Assignor and requests that the Agent exchange such [insert applicable existing Note] for new [insert applicable new Note] as follows: a [insert applicable new Note] dated [insert applicable date] in the principal amount of $[Insert Amount], payable to the order of the Assignee and a [insert applicable new Note] dated [insert applicable date] in the principal amount of $[Insert Amount], payable to the order of the Assignor; / (d) and has delivered and endorsed the Notes held by the Assignor to the Assignee, payable to the order of the Assignee].

The Assignee: (a) confirms that it has received copies of the Financing Agreements, together with copies of the most recent financial statements referred to in <u>Section 6.1</u> of the Loan Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (b) agrees that it will, independently and without reliance upon the Agent, the Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Agreement; (c) appoints and authorizes the Agent to take such action on the Assignee's behalf and to exercise such powers under the Financing Agreements as are delegated to the Agent by the terms

2

thereof, together with such powers as are reasonably incidental thereto; (d) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Agreement and the other Financing Agreements are required to be performed by the Assignee as a Lender; (e) (if such Assignee is a bank or financial institution organized outside the United States) agrees that it will deliver to the Agent and the Debtors the forms prescribed by the Internal Revenue Service of the United States (including without limitation, Form W-8 BEN, Form W-8 ECI, or Form W-8 IMY) certifying such Assignee's exemption from United States withholding taxes with respect to all payments to be made to such Assignee under its Notes and under any other Financing Agreement; and (f) specifies as its address for notices the office set forth beneath its name on the signature pages hereof.

The effective date for this Assignment and Acceptance shall be [Agent to insert date of its acceptance] (the "**Effective Date**").  Following the execution of this Assignment and Acceptance, it will be delivered to the Agent for acceptance and recording by the Agent.

Upon such acceptance and recording, as of the Effective Date: (a) the Assignee shall be a party to the Loan Agreement and, to the extent provided in this Assignment and Acceptance, shall have the rights and obligations of a Lender thereunder and under the other Financing Agreements; and (b) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Loan Agreement and the other Financing Agreements and in the event that the Assignor has assigned to the Assignee hereunder all of its rights and obligations under the Loan Agreement and the other Financing Agreements, the Assignor shall cease to be a party to the Loan Agreement and such other Financing Agreements.

Upon such acceptance and recording, from and after the Effective Date, the Agent shall make all payments under the Loan Agreement in respect of the interest assigned hereby (including without limitation, all payments of principal, interest and any fees with respect thereto) to the Assignee.  The Assignor and Assignee shall make all appropriate adjustments in payments under the Loan Agreement for periods prior to the Effective Date directly between themselves.

This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of Missouri.

*[Signature Pages Follow]*

3

139697745.3

IN WITNESS WHEREOF, the parties hereto, by their respective officers thereunto duly authorized, have executed this Assignment and Acceptance effective as of the day first written above.

ASSIGNOR

[Insert Name of Assignor]

By: _____
Name: _____
Title: _____

ASSIGNEE

[Insert Name of Assignor]

By: _____
Name: _____
Title: _____

Address for Notices:
[Insert]

*[Signature Page to Assignment and Acceptance]*

Accepted on ___, 2024

COÖPERATIEVE RABOBANK U.A., NEW
YORK BRANCH
245 Park Avenue
New York, NY  10167
Attn: _____

By: _____
Name: _____
Title: _____

[*Signature Page to Assignment and Acceptance*]

[*Signature Page to Assignment and Acceptance*]

**EXHIBIT 3A**
**to Senior Secured Super-Priority Debtor-in-Possession Credit Agreement**

List of Closing Documents

1) Senior Secured Super-Priority Debtor-in-Possession Financing Agreement, together with all Schedules and Exhibits thereto;

2) Note payable to each Lender having a Commitment;

3) Agreed Budget, certified by a Responsible Officer of the Debtors, and in form and substance satisfactory to the Agent and the Lenders;

4) Funds Request;

5) Designation of Account Form;

6) Authorized User Agreement;

7) IRS Form W-9 for each Debtor;

8) Organizational Documents from each Debtor;

9) Authorizing Resolutions from each Debtor;

10) Evidence of Good Standing for each Debtor;

11) Certification Regarding Beneficial Owners;

12) Satisfaction of All Applicable Regulatory and Compliance Requirements;

13) Evidence of all insurance required to be maintained under this Agreement & loss payee endorsements;

14) Current financial statements for Debtors;

15) Certified copy of the Interim Order;

16) Payment of fees and expenses; and

17) Other Items Indicted on Agent's Closing Checklist.

**EXHIBIT 3B**
**to Senior Secured Super-Priority Debtor-in-Possession Credit Agreement**

**EXHIBIT 5A**
**to Senior Secured Super-Priority Debtor-in-Possession Credit Agreement**

**Disclosure Schedule**

**Part 3:**     **Licenses, Patents, Copyrights, Trademarks, Trade Names and Applications**
[None]

**Part 5:**     **Locations of Debtors' Assets**
The Collateral is located on the Land, as defined in the Mortgage.  All other assets of
Debtors are generally located at the following locations:

1.     Calf Ranch:  471 N. 300 W., Jerome, Idaho  83338
2.     Goose Ranch:  870 N. 1370 Lane E., Jackson, Idaho  83350
3.     East Valley Cattle:  700 S. 2725 E., Declo, Idaho  83323
4.     Jersey Girls Jerome:  211 W. 400 N., Jerome, Idaho  83338

**Part 8:**     **Other Names and Aliases**
[None]

**Part 9:**     **Structure and Affiliates**
See Exhibit 5A, Part 9 attached hereto

**Part 11:**    **Deposits, Investments, Advances or Loans**
[To be supplied]

**EXHIBIT 5A – Part 9**

**<u>Affiliates</u>**

**EXHIBIT 5B**
**to Senior Secured Super-Priority Debtor-in-Possession Credit Agreement**

**<u>Organizational Chart</u>**

[Attached]

**EXHIBIT 6A**
**to Senior Secured Super-Priority Debtor-in-Possession Credit Agreement**

**<u>Compliance Certificate</u>**

[Attached]

## <u>Compliance Certificate</u>

Pursuant to Section 6.1 of the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement dated as of April ___, 2024 (as amended, replaced, restated or supplemented from time to time, the "**Loan Agreement**") by and among MILLENKAMP CATTLE, INC., an Idaho corporation, doing business as BLACK PINE CATTLE, IDAHO JERSEY GIRLS LLC, an Idaho limited liability company, EAST VALLEY CATTLE, LLC, an Idaho limited liability company, MILLENKAMP PROPERTIES, L.L.C., an Idaho limited liability company, MILLENKAMP PROPERTIES II LLC, an Idaho limited liability company, MILLENKAMP FAMILY LLC, an Idaho limited liability company, GOOSE RANCH LLC, an Idaho limited liability company, IDAHO JERSEY GIRLS JEROME DAIRY LLC, an Idaho limited liability company, BLACK PINE CATTLE LLC, an Idaho limited liability company, and MILLENKAMP ENTERPRISES LLC, an Idaho limited liability company (collectively, the "**Debtors**"), the financial institutions party thereto in accordance with the provisions thereof (collectively the "**Lenders**"), and COÖPERATIEVE RABOBANK U.A., NEW YORK BRANCH, in its capacity as the agent for the Lenders and other Secured Parties, (in such capacity, the "**Agent**") and as a Lender, Debtors hereby certifies as follows (with capitalized terms not defined herein having the meaning set forth in the Loan Agreement:

1.    The financial statements attached hereto for the period ending _____, 2024 (the "**Financial Statements**"), have been prepared in accordance with the requirements of <u>Section 6.1</u> of the Loan Agreement and have been delivered on or before the date they are due.

2.    The representations and warranties contained in <u>Section 5</u> of the Loan Agreement are true and correct as of the date hereof (subject to the qualifications set forth therein).

3.    Each Debtor is in compliance with all of the affirmative and negative covenants set forth in <u>Sections 6</u> and <u>7</u> of the Loan Agreement as of the date hereof, except: .

[Signature Page Follows]

Dated:_____, 2024

By and on behalf of each Debtors as a Responsible Officer of the Administrative Debtor:

**MILLENKAMP CATTLE, INC.**


By:_____
      William J. Millenkamp, President

# EXHIBIT

# B

Covenants Pertaining to Cash Collateral Use:

1. **Covenant regarding Borrowing Base Contraction**.

   During the pendency of the Chapter 11 Cases, the Debtors shall submit borrowing base certificates to RAF on Friday of each week, beginning on April ___, 2024 and computed as of the preceding [*day of week*] of each such week.  Each borrowing base certificate shall be in form and substance satisfactory to RAF and shall quantify the Debtors' then current herd value, accounts receivable and milk accounts, utilizing the valuation principles and advance rates applicable to such assets in a manner consistent with the preparation of borrowing base certificates pursuant to the Pre-Petition RLOC Credit Agreement and as otherwise agreed by RAF.  All calculations of the borrowing base pursuant to this provision shall add as a component of the borrowing base the amount of funds then on deposit in the Cattle Sales Reserve Account (defined below) and the borrowing base shall be reduced by an amount equal to the then current amount of the Debtors' accounts payable arising on or after the Petition Date which remain unpaid more than thirty (30) days after the applicable invoice date.  The initial borrowing base calculated pursuant to this provision, as approved by RAF, shall be referred to as the "**Initial Borrowing Base**."  In the event (a) both of the borrowing base certificates to be delivered by Debtors to RAF during any period of two (2) consecutive calendar weeks show a reduction in the borrowing base in excess of 5% of the amount of the Initial Borrowing Base, (b) a total of three or more borrowing base certificates to be delivered by Debtors to RAF pursuant to this provision show a reduction in the borrowing base in excess of 5% of the amount of the Initial Borrowing Base, or (c) any borrowing base certificate to be delivered by Debtors to RAF pursuant to this provision shows a reduction in the borrowing base in excess of 8% of the amount of the Initial Borrowing Base, then in any such event, Debtors shall, on or before the Friday of the succeeding calendar week, deposit or cause to be deposited cash in an amount not less than the aggregate decrease in the borrowing base as may be reflected in the applicable borrowing base certificate(s) in a deposit account in the name of Debtors maintained at RAF or another financial institution acceptable to RAF and which shall be subject to a control agreement satisfactory in form and substance to Agent (the "**Borrowing Base Reserve Account**").  Funds deposited in the Borrowing Base Reserve Account shall be held for the benefit of the Pre-Petition RLOC Secured Parties for distribution to such parties on the effective date of the Debtors' plan of reorganization or in connection with the Debtors' plan of liquidation or as may be otherwise ordered by this Court.  Calculations of the herd value shall utilize current information from Dairy Comp 305 or such other software program as may be approved by Agent.

2. **Production and Sale Reports**.  During the pendency of the Chapter 11 Cases, Debtors shall deliver to RAF on a daily basis any and all production or sales reports prepared by or on behalf of all Debtors' product off-takers.

3. **Covenant regarding Cattle Sale Proceeds**.

   Debtors shall deposit the net proceeds of any steer sales and culled cattle sales that would, absent the establishment of the Cattle Sales Reserve Account (as defined below), have the effect of reducing the borrowing base (as calculated pursuant to

foregoing) in a deposit account in the name of Debtors maintained at RAF or another financial institution acceptable to RAF and which shall be subject to a control agreement satisfactory in form and substance to Agent (the "**Cattle Sales Reserve Account**").  Funds deposited in the Cattle Sales Reserve Account shall be held for the benefit of the Pre-Petition RLOC Secured Parties for distribution to such parties on the effective date of the Debtors' plan of reorganization or in connection with the Debtors' plan of liquidation or as may be otherwise ordered by this Court.  Debtors may add new Cattle (whether raised or purchased by Debtors in accordance with past practices approved by RAF) to the borrowing base as calculated above.

4. **Covenant regarding Administrative Expense Claims**.

[Upon notice to this Court and this Court's entry of a suitable order,] RAF may withdraw its consent to the Debtors' use of the Pre-Petition RLOC Secured Parties' Cash Collateral in the event Debtors fail to pay, within forty-five (45) days after the applicable invoice date, one or more accounts payable in an amount not less than $100,000 in each instance or $500,000 in the aggregate during the Chapter 11 Cases, to any one or more trade creditors in respect of any Debtor's obligations arising on or after the Petition Date.

5. **Covenant regarding Critical Vendors**.

Debtors shall remit payments to their critical vendors in the amounts set forth in the Debtors' budget attached to the *Emergency Motion of Debtors for Interim and Final Orders (A) authorizing the Debtors to obtain Post-Petition Financing; (B) granting Adequate Protection to Pre-Petition Secured Creditors; and (C) setting a Final Hearing* and shall cause each such critical vendor to release any and all liens, security interests or other encumbrances affecting any of Debtors' assets.