Matthew T. Christensen, ISB: 7213
J. Justin May, ISB: 5818
JOHNSON MAY
199 N. Capitol Blvd, Ste 200
Boise, Idaho 83702
Phone: (208) 384-8588
Fax: (208) 629-2157
Email: mtc@johnsonmaylaw.com
        jjm@johnsonmaylaw.com


Krystal Mikkilineni, *PHV*
Robert E. Richards, *PHV*
Tirzah Roussell, *PHV*
DENTONS
215 10th Street, Ste 1300
Des Moines, IA 50309
Phone: (515) 288-2500
Fax: (515) 243-0654
Email: krystal.mikkilineni@dentons.com
        robert.richards@dentons.com
        tirzah.roussell@dentons.com

Attorneys for the Debtor

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re<br><br>MILLENKAMP CATTLE, INC., *et. al.*,<br><br>Debtors.[1] | Case No. 24-40158-NGH<br><br>Chapter 11 |

**SUPPLEMENT TO DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING; (B) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED CREDITORS; AND (C) SETTING A FINAL HEARING**

---

[1] The Debtors in the Chapter 11 Cases are: Millenkamp Cattle, Inc.; Idaho Jersey Girls LLC; East Valley Cattle, LLC; Millenkamp Properties, L.L.C.; Millenkamp Properties II LLC; Millenkamp Family LLC; Goose Ranch, LLC; Idaho Jersey Girls Jerome Dairy LLC; Black Pine Cattle LLC; and Millenkamp Enterprises LLC.

Millenkamp Cattle, Inc. ("Millenkamp Cattle") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 case (the "Chapter 11 Case"), by and through its undersigned counsel, hereby respectfully submit this *Supplement to Debtors' Motion for Interim and Final Orders (A) Authorizing the Debtors to Obtain Post-Petition Financing; (B) Granting Adequate Protection to Pre-Petition Secured Creditors; and (C) Setting a Final Hearing* (the "Supplement") and in support of this Supplement, the Debtors represent as follows:

1.      On April 2, 2024, the Debtors filed a *Motion for Interim and Final Orders (A) Authorizing the Debtors to Obtain Post-Petition Financing; (B) Granting Adequate Protection to Pre-Petition Secured Creditors; and (C) Setting a Final Hearing* (Docket No. 24) (the "DIP Motion").

2.      Attached hereto as "Exhibit A" is the negotiated DIP Credit Agreement between the Debtors and Sandton Capital Solutions Master Fund VI, LP (the "Credit Agreement").

3.      Attached hereto as "Exhibit B" is a revised proposed interim DIP Order.

4.      The Debtors file this supplement to comply with the Local Bankruptcy Rules.

5.      Local Bankruptcy Rule 4001-1(a)(9) requires a "statement of whether or not the debtor proposes any provision contained in the Guidelines Regarding Motions to Use Cash Collateral or Obtain Credit….other than the provisions which are normally approved by the court (under subsection (a) of the Guidelines, and if so, the provisions shall be clearly identified."

6.      The relief requested in the DIP Motion includes some provisions that appear in subsection (b) of the Guidelines. Those provisions include:

7.      The relief requested under the DIP Motion seeks to prime the liens/and or security interests of secured creditors, such as Metlife, Rabo, and Conterra, who are not parties to the

agreement and have not consented under LBR, Appendix I (b)(5). *See* DIP Motion at 19 and DIP

Interim Order at 2(c) and (d).

      8.      The DIP Motion contains provisions that carve out administrative expenses that do

not treat all such expenses equally or on a pro rata basis under LBR, Appendix I (b)(15). The DIP

Motion and Credit Agreement grant superpriority administrative expense claims to the DIP Lender

having priority over all administrative expense claims and unsecured claims against such

Borrowers now existing or hereafter arising, of any kind whatsoever. *See* Credit Agreement at

5.23(e).

DATED this 11th day of April 2024

                    JOHNSON MAY

                    */s/  Matt Christensen*
                    Matthew T. Christensen
                    Attorney for the Debtors

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of April 2024, I caused to be served a true and correct copy of the foregoing SUPPLEMENT electronically through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Matthew T. Christensen mtc@johnsonmaylaw.com
Krystal R. Mikkilineni krystal.mikkilineni@dentons.com
US Trustee ustp.region18.bs.ecf@usdoj.gov
Heidi Buck Morrison heidi@racineolson.com
David A. Coleman david@colemanjacobsonlaw.com
Gery W. Edson gedson@gedson.com
J.B. Evans evans.jb@dorsey.com
Zachary Fairlie zfairlie@spencerfane.com
Kimbell D. Gourley kgourley@idalaw.com
Daniel C. Green dan@racineolson.com
John O'Brien jobrien@spencerfane.com
Scott C. Powers spowers@spencerfane.com
Janine P. Reynard janine@averylaw.net
Sheila R. Schwager sschwager@hawleytroxell.com
Brent R. Wilson bwilson@hawleytroxell.com
Zachary Fairlie zfairlie@spencerfance.com
John O'Brien jobrien@spencerfane.com
Gery W. Edson gedson@gedson.com
Aaron Bell abell@evanskeane.com
Brian Faria brian@sawtoothlaw.com
Robert A. Faucher rfaucher@hollandhart.com
Matthew W. Grimshaw matt@grimshawlawgroup.com
Karen Lloyd klloyd@grsm.com
James Justin May jjm@johnsonmaylaw.com
Rhett Michael Miller rmiller@magicvalley.law
Robert E. Richards robert.richards@dentons.com
Holly Roark holly@roarklawboise.com
Evan Thomas Roth evan@sawtoothlaw.com

Any others as listed on the Court's ECF Notice.


/s/  Matt Christensen
MATTHEW T. CHRISTENSEN


SUPPLEMENT TO DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING; (B) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED CREDITORS; AND (C) SETTING A FINAL HEARING- 4

EXHIBIT A

**SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT**

Dated as of *[April ___]*, 2024

between

**MILLENKAMP CATTLE, INC., BLACK PINE CATTLE LLC,
EAST VALLEY CATTLE, LLC, GOOSE RANCH LLC, IDAHO JERSEY GIRLS, LLC,
IDAHO JERSEY GIRLS JEROME DAIRY LLC, MILLENKAMP ENTERPRISES LLC,
MILLENKAMP FAMILY LLC, MILLENKAMP PROPERTIES LLC,** and
**MILLENKAMP PROPERTIES II LLC,**
as the Borrowers

and

**SANDTON CAPITAL SOLUTIONS MASTER FUND VI, LP,**
as the Lender

US.363276657.05

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS AND ACCOUNTING TERMS ................................................. 2
    **1.01**   Defined Terms ........................................................................................... 2
    **1.02**   Other Interpretive Provisions ................................................................. 24
    **1.03**   Accounting Terms .................................................................................. 25
    **1.04**   Rounding ................................................................................................ 25
    **1.05**   Times of Day ......................................................................................... 25
    **1.06**   Divisions ............................................................................................... 25

Article II THE LOANS ............................................................................................... 26
    **2.01**   Initial Term Loan and Delayed Draw Term Loans ................................ 26
    **2.02**   Borrowings of Loans .............................................................................. 26
    **2.03**   Repayment of Loans .............................................................................. 27
    **2.04**   Extension of Maturity Date .................................................................... 27
    **2.05**   Optional Prepayments ............................................................................ 27
    **2.06**   Mandatory Prepayments ........................................................................ 27
    **2.07**   Interest ................................................................................................... 28
    **2.08**   Fees ........................................................................................................ 29
    **2.09**   Computation of Interest and Fees .......................................................... 30
    **2.10**   Evidence of Debt ................................................................................... 30
    **2.11**   Payments Generally; Clawback ............................................................. 30
    **2.12**   Priority and Liens .................................................................................. 31
    **2.13**   No Discharge; Survival of Claims ......................................................... 32

Article III TAXES, YIELD PROTECTION AND ILLEGALITY ............................... 32
    **3.01**   Taxes ...................................................................................................... 32
    **3.02**   Increased Costs ...................................................................................... 33
    **3.03**   Survival .................................................................................................. 34

Article IV CONDITIONS PRECEDENT TO THE CLOSING DATE ......................... 34
    **4.01**   Conditions Precedent to the Occurrence of the Closing Date and to the Making of the Initial Term Loan ........................................................... 34
    **4.02**   Conditions Precedent to All Loans ........................................................ 36

Article V REPRESENTATIONS AND WARRANTIES .............................................. 37

i

## TABLE OF CONTENTS
### (continued)

| | | |
|---|---|---|
| **5.01** | Existence, Qualification and Power | 37 |
| **5.02** | Authorization; No Contravention | 37 |
| **5.03** | Governmental Authorization; Other Consents | 38 |
| **5.04** | Binding Effect | 38 |
| **5.05** | Financial Statements; No Material Adverse Effect | 38 |
| **5.06** | Litigation | 39 |
| **5.07** | No Default | 39 |
| **5.08** | Ownership of Property; Liens | 39 |
| **5.09** | Environmental Compliance | 39 |
| **5.10** | Insurance | 40 |
| **5.11** | Taxes | 40 |
| **5.12** | Employee Benefit Plans and Labor Matters | 41 |
| **5.13** | Subsidiaries; Equity Interests | 41 |
| **5.14** | Margin Regulations; Investment Company Act | 41 |
| **5.15** | Disclosure | 41 |
| **5.16** | Compliance with Laws | 42 |
| **5.17** | Intellectual Property | 42 |
| **5.18** | Anti-Corruption Laws and Sanctions | 42 |
| **5.19** | Security Documents | 43 |
| **5.20** | Data Security | 43 |
| **5.21** | Accounts | **Error! Bookmark not defined.** |
| **5.22** | Brokers | 44 |
| **5.23** | Bankruptcy Matters | 44 |
| **5.24** | Material Contracts | 44 |
| Article VI | AFFIRMATIVE COVENANTS | 45 |
| **6.01** | Financial Statements | 45 |
| **6.02** | Certificates; Other Information | 46 |
| **6.03** | Notices | 46 |
| **6.04** | Payment of Obligations | 47 |
| **6.05** | Preservation of Existence, Etc | 48 |
| **6.06** | Maintenance of Properties | 48 |
| **6.07** | Maintenance of Insurance | 48 |
| **6.08** | Compliance with Laws; Policies and Procedures | 49 |

## TABLE OF CONTENTS
### (continued)

| | | |
|---|---|---|
| **6.09** | Books and Records; Accountants | 49 |
| **6.10** | Inspection Rights | 49 |
| **6.11** | Use of Proceeds | 50 |
| **6.12** | Information Regarding the Collateral | 50 |
| **6.13** | Lender Meetings and Conference Calls | 51 |
| **6.14** | Environmental Laws | 51 |
| **6.15** | Further Assurances | 51 |
| **6.16** | Material Contracts | 52 |
| **6.17** | Compliance with Environmental Laws | 52 |
| **6.18** | Bankruptcy Matters | 52 |
| Article VII | NEGATIVE COVENANTS | 53 |
| **7.01** | Liens | 53 |
| **7.02** | Investments | 53 |
| **7.03** | Indebtedness; Disqualified Stock | 54 |
| **7.04** | Fundamental Changes | 54 |
| **7.05** | Dispositions | 54 |
| **7.06** | Restricted Payments | 54 |
| **7.07** | Prepayments of Indebtedness and Payments of Certain Indebtedness | 54 |
| **7.08** | Change in Nature of Business | 54 |
| **7.09** | Transactions with Affiliates | 54 |
| **7.10** | Additional Subsidiaries, Partnerships and Joint Ventures | 55 |
| **7.11** | Burdensome Agreements | 55 |
| **7.12** | Use of Proceeds | 55 |
| **7.13** | Amendment of Material Documents | 55 |
| **7.15** | Accounts | 56 |
| **7.16** | Disbursements; DIP Budget Variance | 56 |
| **7.17** | Case Matters | 56 |
| Article VIII | EVENTS OF DEFAULT AND REMEDIES | 58 |
| **8.01** | Events of Default | 58 |
| **8.02** | Remedies Upon Event of Default | 63 |
| **8.03** | Application of Funds | 63 |
| Article IX | MISCELLANEOUS | 64 |
| **9.01** | Amendments, Etc | 64 |

US.363276657.05

## TABLE OF CONTENTS
### (continued)

**9.02** Notices; Effectiveness; Electronic Communications ............................................... 64

**9.03** No Waiver; Cumulative Remedies ...................................................................... 65

**9.04** Expenses; Indemnity; Damage Waiver ............................................................... 65

**9.05** Payments Set Aside ......................................................................................... 66

**9.06** Successors and Assigns .................................................................................... 66

**9.07** Treatment of Certain Information; Confidentiality ............................................. 68

**9.08** Right of Setoff ............................................................................................... 68

**9.09** Interest Rate Limitation ................................................................................... 69

**9.10** Counterparts; Integration; Effectiveness; Electronic Signature ........................... 69

**9.11** Survival ......................................................................................................... 70

**9.12** Severability .................................................................................................... 71

**9.13** Governing Law; Jurisdiction; Etc ..................................................................... 71

**9.14** Waiver of Jury Trial ........................................................................................ 72

**9.15** No Advisory or Fiduciary Responsibility .......................................................... 72

**9.16** USA PATRIOT Act Notice ............................................................................. 73

**9.17** Time of the Essence ........................................................................................ 73

**9.18** Press Releases ................................................................................................ 73

**9.19** Additional Waivers .......................................................................................... 73

**9.20** No Strict Construction ..................................................................................... 75

**9.21** Attachments ................................................................................................... 75

**9.22** No Marshalling ............................................................................................... 75

**9.23** DIP Orders Govern ......................................................................................... 75

US.363276657.05

# TABLE OF CONTENTS
## (continued)

**SCHEDULES**

Schedule 9.02          Certain Addresses for Notices

**EXHIBITS**

Exhibit A          Form of Committed Loan Notice
Exhibit B          Form of Interim DIP Order
Exhibit C          Form of Note
Exhibit D          Form of Variance Report

US.363276657.05

## SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AGREEMENT

This **SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AGREEMENT** (this "**Agreement**") is entered into as of April [●], 2024, between **MILLENKAMP CATTLE, INC.,** an Idaho corporation ("**Millenkamp Cattle**"), **BLACK PINE CATTLE LLC, EAST VALLEY CATTLE, LLC, GOOSE RANCH LLC, IDAHO JERSEY GIRLS, LLC, IDAHO JERSEY GIRLS JEROME DAIRY LLC, MILLENKAMP ENTERPRISES LLC, MILLENKAMP FAMILY LLC, MILLENKAMP PROPERTIES LLC,** and **MILLENKAMP PROPERTIES II LLC**, each an Idaho limited liability company, and together with Millenkamp Cattle, the Debtors and Debtors-in-Possession in the Cases (as defined below) being jointly administered under chapter 11 of the Bankruptcy Code (collectively, the "**Borrowers**"), and **SANDTON CAPITAL SOLUTIONS MASTER FUND VI, LP** (the "**Lender**").

WHEREAS, capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.01 hereof;

WHEREAS, on April 2, 2024 (the "**Petition Date**"), each of the Borrowers commenced a chapter 11 case (each a "**Case**" and collectively, the "**Cases**"), by filing with the United States Bankruptcy Court for the District of Idaho (the "**Bankruptcy Court**") voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which Cases are jointly administered for procedural purposes at case number 24-40158-NGH; the Borrowers have continued to operate their businesses as debtors-in- possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, the Pre-Petition RLOC Lenders (as hereinafter defined), provided financing to the Borrowers pursuant to that certain Third Amended and Restated Loan and Security Agreement, dated as of April 21, 2021 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "**Pre-Petition RLOC Loan Agreement**"), by and among the Borrowers, certain other borrowers party thereto, Rabo AgriFinance LLC, as agent for the Pre-Petition RLOC Lenders (in such capacity, the "**Pre-Petition RLOC Agent**"), and the lenders from time to time party thereto (the "**Pre-Petition RLOC Lenders**" and, together with the Pre-Petition RLOC Agent, the "**Pre-Petition RLOC Secured Parties**");

WHEREAS, prior to the Petition Date, MetLife (as hereinafter defined), provided commercial real estate loans to certain Borrowers pursuant to certain loan documents, mortgages and other documents evidencing such loans (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "**Pre-Petition MetLife Loan Documents**"), by and among certain Borrowers, certain other borrowers party thereto, Metropolitan Life Insurance Company ("**MLIC**") and MetLife Real Estate Lending LLC ("**MLREL**"; together with MLIC, collectively, "**MetLife**"));

WHEREAS, prior to the Petition Date, Conterra (as hereinafter defined), provided financing to certain Borrowers pursuant to certain loan and security agreements (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "**Pre-Petition Conterra Loan Documents**"; together with the Pre-Petition RLOC Loan Documents and the

1

Pre-Petition MetLife Loan Documents, collectively, the "**Pre-Petition Loan Documents**"), by and between certain Borrowers and Conterra Agricultural Capital, LLC ("**Conterra**"; together with the Pre-Petition RLOC Secured Parties and MetLife, collectively, the "**Pre-Petition Secured Parties**");

WHEREAS, the Borrowers have requested and the Lender has agreed to provide the Borrowers with a secured superpriority debtor-in-possession credit facility in an aggregate principal amount not to exceed $45,000,000 subject to the terms and conditions set forth in this Agreement and the DIP Orders, as applicable.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01** *Defined Terms*. As used in this Agreement, the following terms shall have the meanings set forth below:

"**Account**" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not constituting an "account" as defined in the UCC, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state.

"**Account Control Agreement**" means any account control agreement (or equivalent agreements in foreign jurisdictions) by and among a Borrower, the depository bank or securities intermediary, as applicable, and the Lender, in each case in form and substance reasonably satisfactory to the Lender.

"**Acquisition**" means, with respect to any Person (a) an investment in, or a purchase of, a Controlling interest in the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit, division or line of business of another Person, or (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or of any business unit, division or line of business of another Person, or a Controlling interest in the Equity Interests, of any Person, in each case in any transaction or group of transactions which are part of a common plan.

"**Adequate Protection Obligations**" means the Borrowers' obligations to provide adequate protection to the Pre-Petition Secured Parties.

2

"**Affiliate**" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any director, officer, managing member, partner, trustee, or beneficiary of that Person, and (iii) any other Person directly or indirectly holding 10% or more of any voting class of the Equity Interests of that Person.

"**Agreement**" means this Senior Secured Debtor-in-Possession Loan Agreement.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to any Borrower or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"**Applicable Rate**" means 12.50% per annum.

"**Approved Budget**" has the meaning specified in Section 4.01(j).

"**Approved Plan**" has the meaning specified in Section 8.01(j)(ii).

"**Audited Financial Statements**" means the audited consolidated balance sheet of the Borrowers and their Subsidiaries for the Fiscal Year ended December 31, 2023, and the related consolidated statements of income or operations, members' equity and cash flows for such Fiscal Year of the Borrowers and their Subsidiaries, including the notes thereto.

"**Automatic Stay**" means the automatic stay imposed under Section 362 of the Bankruptcy Code.

"**Avoidance Action**" means any action under chapter 5 of the Bankruptcy Code.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" has the meaning specified in the Recitals hereto.

"**Board of Directors**" means the board of directors or managers or equivalent governing body of a Borrower, as applicable.

"**Borrowers**" has the meaning specified in the Recitals hereto.

"**Borrowing**" means a borrowing of Loans made by the Lender pursuant to Section 2.01.

"**Business**" means the business of the Borrowers as conducted on the date hereof.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Lender's Office or Twin Falls, Idaho are located.

"**Capital Expenditures**" means, with respect to any Person, the aggregate costs incurred by such Person during any measuring period for the acquisition of any fixed assets or improvements or replacements of, substitutions for or additions to any existing fixed asset

3

resulting in a future economic benefit to such Person, and that are required to be capitalized in accordance with GAAP.

"**Capital Lease Obligations**" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Carve Out**" has the meaning specified in the DIP Orders.

"**Case**" or "**Cases**" has the meaning specified in the recitals to this Agreement.

"**Cash and Cash Equivalents**" means the Permitted Investments described in clauses (a) through (h) of the definition of Permitted Investments.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980.

"**CERCLIS**" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall for the purpose of this Agreement, be deemed to be adopted after the Closing Date, regardless of the date enacted, adopted or issued.

"**Change of Control**" means, (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), of Equity Interests representing more than ten percent (10%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of any Borrower; (b) a change of any member, manager, officer, or director of any Borrower, unless, in the case of changes of officers or directors, a majority of the officers or directors existing on the Closing Date shall remain; (c) the acquisition of direct or indirect Control of any Borrower by any Person or group; or (d) a "Change of Control" or similar or analogous event, however defined, shall occur under any Pre-Petition Loan Document.

4

"**Closing Date**" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 9.01.

"**Collateral**" means any and all "Collateral" or "Mortgaged Property" as defined in any applicable Security Document and all other property that is or is intended under the terms of the Security Documents and the DIP Orders to be subject to Liens in favor of the Lender.

"**Commitments**" means the Initial Term Loan Commitment and the Delayed Draw Term Loan Commitment. The aggregate amount of the Commitments as of the Closing Date is $45,000,000.

"**Committed Loan Notice**" means a notice of a Borrowing which, if in writing, shall be substantially in the form of Exhibit A.

"**Committee**" means an official committee of unsecured creditors holding unsecured claims, if any, appointed in the Cases pursuant to Section 1102(a) of the Bankruptcy Code.

"**Commodity Account**" has the meaning specified in the UCC.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated**" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"**Conterra**" has the meaning specified in the Recitals hereto.

"**Contractual Obligation**" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"**Debt Issuance**" means the issuance by any Borrower or any Subsidiary of any Indebtedness other than Indebtedness permitted under Section 7.03.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

5

"**Debtors**" means each Borrower in their capacities as debtors-in-possession in the Cases.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would constitute an Event of Default.

"**Default Rate**" means when used with respect to the Loans and the other Obligations, an interest rate equal to 14.5% per annum.

"**Delayed Draw Term Loan**" has the meaning specified in Section 2.01(b).

"**Delayed Draw Term Loan Commitment**" means the commitment of the Lender to make or otherwise fund any Delayed Draw Term Loan pursuant to Section 2.01(b). The aggregate amount of the Delayed Draw Term Commitment as of the Closing Date is (a) $45,000,000 less (b) the aggregate principal amount of the Initial Term Loan drawn by the Borrowers.

"**Deposit Account**" has the meaning specified in the UCC.

"**DIP Facility**" means the credit facility contemplated by this Agreement.

"**DIP Issuance Fee**" has the meaning specified in Section 2.08(a).

"**DIP Lien**" has the meaning specified in the DIP Orders.

"**DIP Orders**" means the Interim DIP Order and/or the Final DIP Order, as applicable, as each may be amended, restated, amended and restated, supplemented or otherwise modified with the prior written consent of the Lender.

"**Disbursements Variance**" has the meaning specified in Section 6.01(a).

"**Disposition**" or "**Dispose**" means the sale, transfer, exclusive license, lease or other disposition (including any sale and leaseback transaction and any sale, transfer, license or other disposition (including by way of Division) of (whether in one transaction or in a series of transactions) of any property (including, without limitation, any Equity Interests by any Person or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Stock**" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Equity Interests that do not constitute Disqualified Stock), pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the date on which the Loans mature; provided, however, that (a) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (b) with respect to any Equity Interests issued to any employee or to any plan for the benefit of

6

employees of any Borrower or its Subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by such Borrower or one of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Borrower to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Borrowers and their Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"**Division**" means the division of the assets, liabilities and/or obligations of a Person (the "**Dividing Person**") among two or more Persons, whether pursuant to a "plan of division" or similar arrangement pursuant to Section 18-217 of the Delaware Limited Liability Company Act or any similar provision under the laws of any other applicable jurisdiction and pursuant to which the Dividing Person may or may not survive.

"**Dollars**" and "**$**" mean lawful money of the United States.

"**Environmental Laws**" means any and all federal, state, local and foreign statutes, laws, including applicable common law, regulations, ordinances, rules, judgments, orders, decrees or governmental restrictions relating to pollution, the protection of the environment, the release of Hazardous Materials into the environment and human exposure to Hazardous Materials, including those related to the treatment, transport, storage and disposal of Hazardous Materials, air emissions and discharges to public pollution control systems.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, monitoring or oversight by a Governmental Authority, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) human exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other binding consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equipment**" has the meaning set forth in the UCC and to the extent not included therein, all motor vehicles and other rolling stock.

7

"**Equity Interests**" means, with respect to any Person, all of the shares of capital stock of (or other ownership interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting.

"**ERISA Affiliate**" means (a) any corporation which is a member of the same controlled group of corporations (within the meaning of Section 414(b) of the Tax Code) as a Borrower, (b) a trade or business (whether or not incorporated) under common control (within the meaning of Section 414(c) of the Tax Code) with a Borrower or (c) a member of the same affiliated service group (within the meaning of Section 414(m) of the Tax Code) as a Borrower, any corporation described in clause (a) above or any trade or business described in clause (b) above.

"**ERISA Event**" means (a) a Reportable Event with respect to a Plan; (b) the withdrawal of a Borrower or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization (within the meaning of Section 4241 of ERISA) or insolvent (within the meaning of Section 4245 of ERISA); (d) the filing of a notice of intent to terminate or the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, respectively, (e) the institution by the PBGC of proceedings to terminate a Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan; (g) the determination that any Plan is considered an at-risk plan within the meaning of Section 430 of the Tax Code or Section 303 of ERISA; (h) the determination that any Multiemployer Plan is considered a plan in endangered or critical status within the meaning of Sections 431 and 432 of the Tax Code or Sections 304 and 305 of ERISA; (i) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; (j) the conditions for the imposition of a lien under Section 430(k) of the Tax Code or Section 303(k) of ERISA shall have been met with respect to any Plan; or (k) any other event or condition with respect to a Plan or Multiemployer Plan that could result in liability of a Borrower, other than in the usual course.

"**Event of Default**" has the meaning specified in <u>Section 8.01</u>. An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in <u>Section 9.01</u> hereof.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to the Lender or required to be withheld or deducted from a payment to the Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the Lender being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in,

the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of the Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of the Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) the Lender acquires such interest in the Loan or Commitment or (ii) the Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to the Lender's assignor immediately before the Lender became a party hereto or to the Lender immediately before it changed its lending office, (c) Taxes attributable to a failure (other than as a result of a Change in Law) to comply with Section 3.02, and (d) any U.S. federal withholding tax imposed under FATCA.

"**Exit Fee**" has the meaning specified in Section 2.08(b).

"**Extension Fee**" has the meaning specified in Section 2.08(c).

"**Extraordinary Receipt**" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), indemnity payments (other than to the extent such payments are payable to a Person that is not an Affiliate of any Borrower or any of its respective Subsidiaries) and any purchase price adjustments.

"**FATCA**" means Sections 1471 through 1474 of the Tax Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Tax Code and any fiscal or regulatory legislation, rules or official practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Tax Code.

"**Final DIP Order**" means an order of the Bankruptcy Court approving the Loans, this Agreement and the other Loan Documents on a final basis, which order shall be (a) in form and substance acceptable to each Lender in its sole discretion, and (b) in full force and effect and shall not have been reversed, vacated or stayed.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive,

legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantee**" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other Obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness or other obligation to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning. The endorsement of negotiable instruments for collection in the ordinary course of business shall not constitute a "Guarantee."

"**Hazardous Materials**" means all radioactive and all hazardous or toxic substances, materials or wastes, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated as "hazardous" or "toxic," or as a "pollutant" or a "contaminant," pursuant to any Environmental Law.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in

US.363276657.05

each case, not past due for more than ninety (90) days after the date on which such trade account payable was due and payable);

(d)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(e)    All Indebtedness of such Person in respect of any Capital Lease Obligations of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP;

(f)    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock), or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(g)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non- recourse to such Person or such Person has no liability therefor as a matter of law.

"**Indemnified Taxes**" means (a) Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any Obligation of any Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitees**" has the meaning specified in Section 9.04(b).

"**Information**" has the meaning specified in Section 9.07.

"**Initial Term Loan Commitment**" means, as to the Lender, its commitment to make an Initial Term Loan to the Borrowers on the Closing Date (before giving effect to the Initial Term Loans made on the Closing Date) pursuant to Section 2.01(a). The Initial Term Loan Commitment to make Initial Term Loans on the Closing Date shall not exceed $25,000,000 (in each case, before giving effect to the Initial Term Loan made on the Closing Date).

"**Initial Term Loan**" has the meaning specified in Section 2.01(a).

"**Intellectual Property**" means all of each Borrower's right, title and interest in and to all present and future: trade secrets, confidential know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be

US.363276657.05

issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights; patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, customer lists, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source code, object code, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"**Intellectual Property Security Agreements**" means each short-form Trademark Security Agreement or Copyright Security Agreement among the applicable Borrowers and the Lender and in a form reasonably satisfactory to the Lender, in each case granting a Lien in the applicable Intellectual Property and certain other assets of the Borrowers, and in each case as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"**Interim DIP Order**" means an interim order of the Bankruptcy Court approving the Loans, this Agreement and the other Loan Documents on an interim basis, which order shall be substantially in the form attached hereto as Exhibit B (or in form and substance acceptable to the Lender in its sole discretion).

"**Interim Order Entry Date**" means the date on which the Interim DIP Order is entered by the Bankruptcy Court.

"**Inventory**" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"**Investment**" means, as to any Person, any direct or indirect acquisition (including pursuant to any merger or Division) or investment by such Person in any other Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition, or (d) any other investment of money or capital in any other Person. The amount of any outstanding Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment net of any repayments thereof.

"**IRS**" means the United States Internal Revenue Service.

"**Laws**" means each international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged

12

with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"**Lender**" has the meaning specified in the introductory paragraph hereto.

"**Lender Expenses**" means, without limitation, all reasonable and documented out-of-pocket expenses and customary administrative charges incurred by the Lender in connection with this Agreement and the other Loan Documents, including without limitation (a) the reasonable and documented fees and disbursements of (i) counsel for the Lender, (ii) outside consultants for the Lender (which Lender shall advise the Borrower as any such consultants are being engaged including the terms of their engagement and fee structure), (iii) appraisers, and (iv) commercial finance examinations, (b) in connection with (i) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce Lender's rights in the Collateral, or (iii) any workout, restructuring or negotiations in respect of any Obligations, and (c) all customary fees and charges (as adjusted from time to time) of the Lender with respect to the disbursement of funds (or the receipt of funds) to or for the account of the Borrowers (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith.

"**Lien**" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan Account**" has the meaning assigned to such term in Section 2.10(a).

"**Loan Documents**" means this Agreement, each Note, the Security Documents, the DIP Orders, the Perfection Certificate and any other instrument or agreement now or hereafter executed and delivered in connection herewith or therewith.

"**Loans**" means the Initial Term Loan and the Delayed Draw Term Loans.

"**Material Adverse Effect**" means any (a) event or circumstance that has had or is reasonably likely to have a material adverse effect on the business, financial condition or results of operations of the Borrowers and their respective Subsidiaries (taken as a whole) since the Closing Date, but excluding any matters publicly disclosed prior to the filing of the Bankruptcy Cases and excluding the effect of the filing of the Bankruptcy Cases or the circumstances and events leading up thereto; (b) a material impairment of the ability of the Borrowers (taken as a whole) to perform their obligations under the Loan Documents; (c) a material impairment of the

rights and remedies of the Lender under any Loan Document or with respect to any of the Collateral (other than Collateral having a de minimis value), or (d) a material adverse effect on the Lender's Liens on the Collateral or the priority of such Liens.

"**Material Contract**" means, with respect to any Person, each contract to which such Person is a party the termination of which would have a Material Adverse Effect.

"**Material Indebtedness**" means Indebtedness (other than the Obligations) of the Borrowers in an aggregate principal amount exceeding the Threshold Amount, and at all times shall include the Indebtedness outstanding under the Pre-Petition Facilities. For purposes of determining the amount of Material Indebtedness at any time, (a) undrawn committed or available amounts shall be included, and (b) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"**Maturity Date**" means the earliest of (a) *[January __]*, 2025 (as such date may be extended by the Lender in its sole discretion pursuant to Section 2.04) (b) the date on which Borrowers file a motion seeking dismissal of any of the Cases, the date of dismissal of any of the Cases, or the date on which Borrowers file a motion seeking to convert any of the Cases to a case under Chapter 7 of the Bankruptcy Code, (c) the "effective date" of a Reorganization Plan or similar dispositive restructuring plan of any Borrower which has been confirmed by an order entered by the Bankruptcy Court in any of the Cases, (d) the date on which the Borrowers consummate a sale of all or substantially all of the assets of the Borrowers or their Subsidiaries pursuant to Section 363 of the Bankruptcy Code or otherwise and (e) the date of acceleration of the Obligations and the termination of all Commitments hereunder upon the occurrence of an Event of Default in accordance with the Loan Documents and the DIP Orders. *[NTD: Date nine months after the Closing Date to be inserted.]*

"**Maximum Rate**" has the meaning specified in Section 9.09.

"**MetLife**" has the meaning specified in the Recitals hereto.

"**Millenkamp Cattle**" has the meaning specified in the Recitals hereto.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Proceeds**" means:

(a)     with respect to any Disposition by any Borrower or any of its Subsidiaries, or any Extraordinary Receipt, insurance proceeds or condemnation awards received or paid to the account of any Borrower or any of its Subsidiaries, the excess, if any, of (i) the sum of Cash and Cash Equivalents received in connection with such transaction (including any Cash and Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by a Lien permitted hereunder, on the applicable asset which is senior to the Lender's Lien on such asset and that is required to be repaid (or to

14

establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by such Borrower or such Subsidiary in connection with such transaction (including, without limitation, appraisals, brokerage, legal, investment banking, title and recording or transfer tax expenses and commissions, success or transaction fees) paid by any Borrower to third parties, including, without limitation, professional liquidators (other than Affiliates)), (C) taxes (including transfer tax and recording tax) paid or reasonably estimated to be payable by the applicable Borrower or applicable Subsidiary and that are directly attributable to such Disposition (as determined reasonably and in good faith by a Responsible Officer of such Borrower), (D) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (C) above) (1) related to any of the applicable business or assets and (2) retained by such Borrower or any of its Subsidiaries, including, without limitation, liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability), shall be deemed to be Net Proceeds of such transaction occurring on the date of such reduction) and (E) all amounts deposited in trust or escrow in respect of any purchase price adjustment or escrow obligations of such Borrower for the benefit of any third party or to which any third party may be entitled in connection with such transaction; and

(b)    with respect to the sale or issuance of any Equity Interest by any Borrower or any of its Subsidiaries, or any Debt Issuance by any Borrower or any of its Subsidiaries, the excess of (i) the sum of the Cash and Cash Equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Borrower or such Subsidiary in connection therewith.

"**Note**" means a promissory note made by the Borrowers in favor of the Lender (or its permitted assigns) evidencing the Loans made by the Lender, substantially in the form of Exhibit C, as each may be amended, supplemented or modified from time to time.

"**NPL**" means the National Priorities List under CERCLA.

"**Obligations**" means all Loans, advances to, and debts (including principal, interest, fees, costs, and expenses, liabilities, obligations, covenants, indemnities, and duties of, any Borrower arising under any Loan Document with respect to any Loan (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor)), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Borrower or any of its Subsidiaries thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest ,fees, costs, expenses and indemnities are allowed claims in such proceeding.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non- U.S. jurisdiction); (b) with respect to any limited liability company, the

certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"**Other Connection Taxes**" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Tax (other than connections arising solely from the Lender having executed, delivered, become a party to, performed its obligations under, received payments under, or received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Participant**" has the meaning specified in Section 9.06(b).

"**Participant Register**" has the meaning specified in Section 9.06(b).

"**PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Perfection Certificate**" shall mean that certain perfection certificate, executed and delivered by each Borrower in favor of the Lender in accordance with Section 6.20 hereof, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Permitted Disposition**" means any of the following:

(a)    Dispositions of Inventory in the ordinary course of business;

(b)    non-exclusive licenses and sub-licenses of Intellectual Property of a Borrower or any of its Subsidiaries in the ordinary course of business;

(c)    Dispositions of Equipment in the ordinary course of business that is substantially worn-out, damaged, obsolete or, in the judgment of a Borrower, is no longer useful

16

or necessary in its business or that of any Subsidiary and is replaced with similar property having at least equivalent value;

(d)    Dispositions among the Borrowers or by any Subsidiary to a Borrower;

(e)    Dispositions by any Subsidiary which is not a Borrower to another Subsidiary that is not a Borrower;

(f)    Dispositions of Accounts in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy, workout or similar proceedings, to the extent approved by the Bankruptcy Court;

(g)    Dispositions consisting of short-term rentals of Equipment to its customers in the ordinary course of business;

(h)    the granting of Permitted Encumbrances;

(i)    any involuntary loss, damage or destruction of property;

(j)    any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(k)    (i) the lapse of registered patents, trademarks, copyrights and other intellectual property of any Borrower or any of its Subsidiaries that are, in the reasonable business judgment of such Borrower or such Subsidiary, no longer material to, or no longer used or useful in or not economically desirable for, the business of such Borrower or such Subsidiary or (ii) the abandonment of patents, trademarks, copyrights, or other intellectual property rights in the ordinary course of business, so long as (in each case under clauses (i) and (ii)), (A) with respect to copyrights, such copyrights are not material revenue generating copyrights and (B) such lapse is not materially adverse to the interests of the Borrowers and their Subsidiaries;

(l)    the making of Permitted Investments;

(m)    Dispositions of cash and Cash Equivalents in the ordinary course of business and in accordance with the Approved Budget; and

(n)    the making of Restricted Payments that are expressly permitted to be made pursuant to Section 7.06 of this Agreement.

"**Permitted Encumbrances**" means:

(a)    Liens imposed by law for (i) pre-petition Taxes that were not yet due on the Petition Date and (ii) post-petition Taxes that are not yet due and payable;

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Law, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested in

17

good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP;

(c)     pledges and deposits of cash made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d)     deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)     judgment Liens in respect of judgments that do not constitute an Event of Default;

(f)     easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of any Borrower or its Subsidiaries;

(g)     other imperfections of title, easements, covenants, conditions or restrictions or encumbrances, which are not reasonably likely, individually or in the aggregate, to result in a Material Adverse Effect;

(h)     leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of any Borrower or its Subsidiaries, or (ii) secure any Indebtedness;

(i)     Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and (iii) in favor of a banking or other financial institution arising as a matter of law or under customary contractual provisions encumbering deposits or other funds maintained with such banking or other financial institution (including the right of set off and grants of security interests in deposits and/or securities held by such banking or other financial institution) and that are within the general parameters customary in the banking industry;

(j)     reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts maintained in the ordinary course of business and not for speculative purposes;

(k)     Liens in favor of the Lender to secure the Obligations and Liens pursuant to the DIP Orders;

(l)     Liens securing the Pre-Petition Obligations and Pre-Petition Loan Documents, which Liens are subject to the DIP Orders; and

US.363276657.05

(m)    Liens consisting of an agreement to Dispose of any property in a Disposition permitted hereunder, in each case, solely to the extent such Disposition would have been a Permitted Disposition on the date of the creation of such Lien.

"**Permitted Indebtedness**" means each of the following:

(a)    Indebtedness outstanding on the Closing Date and set forth in the financial statements delivered to the Lender;

(b)    Indebtedness of the Borrowers under the Loan Documents;

(c)    Indebtedness evidenced by the Pre-Petition Loan Documents in an amount not to exceed the aggregate principal amount outstanding on the Closing Date plus accrued but unpaid interest and fees thereon and in respect thereof, as incurred under the terms of the Pre-Petition Loan Documents as in effect on the date hereof, including any capitalized interest;

(d)    Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business; and

(e)    obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by any Borrower or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business.

Notwithstanding the foregoing, and except for the Carve Out to the extent provided in the DIP Orders, no Indebtedness shall be permitted to the extent it has an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the Superpriority Claims.

"**Permitted Intercompany Investments**" means Investments by a Borrower to or in another Borrower.

"**Permitted Investments**" means:

(a)    Investments in cash and Cash Equivalents;

(b)    equity Investments owned as of the Closing Date in any Subsidiary;

(c)    Permitted Intercompany Investments; and

(d)    any Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business or received in compromise or resolution of (A) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Borrower or any of its Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes.

19

"**Permitted Variances**" has the meaning specified in Section 7.16(b).

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"**Personal Information**" means any information or data (i) that identifies or can be used to identify, alone or in the aggregate, a natural person, or (ii) that is defined as "personal information" or "personal data" under any applicable federal or state data protection and privacy laws and regulations covering the processing of personal information.

"**Petition Date**" has the meaning specified in the Recitals hereto.

"**Petitions**" means the voluntary petitions for relief under Chapter 11 of the Bankruptcy Code filed by the Borrowers with the Bankruptcy Court.

"**Plan**" means any "employee benefit plan" (other than a Multiemployer Plan) within the meaning of Section 3(3) of ERISA that is maintained or is contributed to by any Borrower or any ERISA Affiliate and is subject to Title IV of ERISA or the minimum funding standards under Section 412 of the Tax Code or Section 302 of ERISA.

"**Prepayment Event**" has the meaning set forth in Section 2.06.

"**Pre-Petition Collateral**" means any and all collateral that any Borrower (as defined in the Pre-Petition Loan Documents) has pledged to secure the Pre-Petition Obligations as of the Petition Date.

"**Pre-Petition Facilities**" means the credit facilities made available pursuant to the Pre-Petition Loan Documents.

"**Pre-Petition Conterra Loan Documents**" has the meaning specified in the Recitals hereto.

"**Pre-Petition Lien**" has the meaning specified in the DIP Orders.

"**Pre-Petition Loan Documents**" has the meaning specified in the Recitals hereto.

"**Pre-Petition MetLife Loan Documents**" has the meaning specified in the Recitals hereto.

"**Pre-Petition Obligations**" means the any and all obligations of the Borrowers under the Pre-Petition Loan Documents.

"**Pre-Petition Priority Liens**" means the perfected and unavoidable Liens on the assets of any Borrower validly existing immediately prior to the Petition Date expressly described in the DIP Orders, which are not subject to the priming provisions of section 364(d) of the Bankruptcy Code, in the DIP Orders.

"**Pre-Petition RLOC Agent**" means Rabo AgriFinance LLC, in its capacity as agent for the Pre-Petition RLOC Secured Parties under the Pre-Petition RLOC Loan Agreement.

"**Pre-Petition RLOC Lenders**" has the meaning specified in the Recitals hereto.

"**Pre-Petition RLOC Loan Agreement**" has the meaning specified in the Recitals hereto.

"**Pre-Petition RLOC Loan Documents**" means the "Loan Documents" as defined in the Pre-Petition RLOC Loan Agreement.

"**Pre-Petition RLOC Secured Parties**" has the meaning specified in the Recitals hereto.

"**Pre-Petition Secured Parties**" has the meaning specified in the Recitals hereto.

"**Professional Fees**" means the reasonable and documented out-of-pocket fees and expense reimbursements of Professional Persons.

"**Professional Person**" means a Person who is an attorney, accountant, appraiser, auctioneer or financial advisor or other professional person who is retained with approval of the Bankruptcy Court by any Debtor or Committee pursuant to Section 327, 328 or 363 of the Bankruptcy Code.

"**Real Estate**" means all real property owned or leased by any Borrower or any of its Subsidiaries and other improvements thereon.

"**Receipts Variance**" has the meaning specified in Section 6.01(a).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"**Release Price**" means the amount of all outstanding Obligations.

"**Reorganization Plan**" means a liquidation plan or plan of reorganization in any or all of the Cases.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"**Responsible Officer**" means the chief executive officer, president, chief restructuring officer, vice- president, chief financial officer, treasurer or assistant treasurer of a Borrower or any of the other individuals designated in writing to the Lender by an existing Responsible Officer of a Borrower as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of a Borrower shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Borrower and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Borrower.

US.363276657.05

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment. Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"**Sanctioned Person**" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

"**Sanctions**" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or His Majesty's Treasury of the United Kingdom.

"**Securities Account**" has the meaning specified in the UCC.

"**Security Agreement**" means the Security Agreement, dated as of the Closing Date, between the Borrowers and the Lender, in form reasonably satisfactory to the Lender, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"**Security Documents**" means the Security Agreement, any Intellectual Property Security Agreements, each Account Control Agreement and each other security agreement or other instrument or document executed and delivered to the Lender pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Borrower.

"**Superpriority Claims**" means all of the allowed superpriority administrative expense claims of the Lender on account of the Obligations, which claims shall be entitled to the benefits of section 364(c)(1) and 364(e) of the Bankruptcy Code, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d),

726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. Superpriority Claims shall, at all times be (a) junior only to the Carve Out and (b) senior to any and all other administrative expense claims or other claims against the Borrowers or their estates, in the Cases and any successor cases.

"**Synthetic Lease Obligation**" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"**Tax Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Testing Period**" has the meaning specified in Section 6.01(a)(i).

"**Threshold Amount**" means $100,000.

"**Total Outstandings**" means the aggregate outstanding principal amount of all Loans.

"**UCC**" or "**Uniform Commercial Code**" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Trustee**" means the United States Trustee appointed under Title 28 Section 586(a)(3) of the Bankruptcy Code to supervise the administration of the Cases.

"**Unused Facility Amount**" means, as of any date, the aggregate amount of the Commitments minus the aggregate principal amount of the Loans outstanding on such date.

"**Unused Fee**" has the meaning specified in Section 2.08(d).

"**Variance Report**" has the meaning specified in Section 6.01(a).

23

"**Variance Report Date**" has the meaning specified in <u>Section 6.01(a)</u>.

"**Withholding Agent**" means the Borrowers and the Lender.

**1.02** *Other Interpretive Provisions*. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, unless otherwise expressly provided, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations (or any of them) shall mean the indefeasible payment and repayment in Dollars in full in cash or immediately available funds or other collateral as may be requested by the Lender of all of the Obligations (or the applicable Obligations) other than unasserted contingent indemnification Obligations.

(e)    References to an effect on any Pre-Petition Secured Party (or all Pre-Petition Secured Parties) shall be construed to include only those effects on such Person or

24

Person in its or their capacity as a party to the Pre-Petition Loan Documents, as applicable. If any matter is required hereunder to be acceptable or satisfactory to, or approved by, the Lender, and is also required under the applicable DIP Order to be satisfactory to the Pre-Petition Secured Parties (or any of them), at the option of the Lender, the Borrower shall not be deemed to have satisfied such requirement unless the requisite consent, acceptance or approval of the applicable Pre-Petition Secured Parties shall have been obtained.

**1.03**    *Accounting Terms*.

(a)    <u>Generally</u>. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)    <u>Changes in GAAP</u>. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Lender shall so request, the Lender and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Lender); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Lender financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP and without including the effect of any changes to lease accounting that requires the assets and liabilities arising under operating leases to be recognized in any statement of financial position. Notwithstanding the foregoing, financial calculations under this Agreement shall be computed to exclude any change to lease accounting rules from those in effect pursuant to Financial Account Standards Board Account Standards Codification 840 (Leases) and other related lease account guidance as in effect on the Closing Date.

**1.04**    *Rounding*. Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05**    *Times of Day*. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06**    *Divisions*. For all purposes under the Loan Documents, in connection with Division: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II
## THE LOANS

**2.01**   *Initial Term Loan and Delayed Draw Term Loans*.

(a)      <u>Initial Term Loan</u>. The Lender agrees, on the Interim Order Entry Date subject to the terms and conditions set forth herein and the DIP Orders, including the satisfaction (or waiver by the Lender) of the conditions precedent set forth in <u>Section 4.01</u>, to make a term loan to the Borrowers in a principal amount not to exceed the Initial Term Loan Commitment (such loan being referred to herein as the "**Initial Term Loan**"). Once repaid, whether such repayment is voluntary or required, no portion of the Initial Term Loan may be reborrowed.

(b)      <u>Delayed Draw Term Loans</u>. The Lender agrees to make, subject to satisfaction (or waiver by the Lender) of the conditions precedent set forth in <u>Section 4.02</u> and in accordance with the procedures in <u>Section 2.02</u>, upon written request by the Borrowers after the Closing Date to, but not including, the Maturity Date, term loans to the Borrowers in an aggregate principal amount not to exceed the Delayed Draw Term Loan Commitment (collectively, the "**Delayed Draw Term Loans**"); provided, however, the aggregate principal amount of Loans advanced hereunder shall not exceed the Commitment. Once repaid, whether such repayment is voluntary or required, no portion of the Delayed Draw Term Loans may be reborrowed.

(c)      <u>Funding of Loans</u>. Upon satisfaction of the applicable conditions set forth in <u>Section 4.01</u> or <u>4.02</u>, as applicable, the Lender will make each such Loan(s) available to the Borrowers by wire transfer of such funds in accordance with instructions provided to (and reasonably acceptable to) the Lender by the Borrower.

(d)      <u>Reduction of Commitments</u>.  The Initial Term Loan Commitment shall be automatically and permanently reduced to zero on the date of the Borrowing of the Initial Term Loan. The aggregate Delayed Draw Term Loan Commitment shall be automatically and permanently reduced to zero on the Maturity Date. The Commitments shall terminate on the date that is five (5) Business Days after the date hereof if the Closing Date has not occurred by such date.

**2.02**   *Borrowings of Loans*.

(a)      Each Borrowing of Loans shall be made upon the Borrowers' irrevocable notice to the Lender, which may be given by telephone. Each such notice must be received by the Lender not later than 11:00 a.m. (i) on the Business Day of the Borrowing of the Initial Term Loans, and (ii) seven Business Days prior to the requested date of the Borrowing of the Delayed Draw Term Loans (unless waived by the Lender). Each telephonic notice by the Borrowers pursuant to this <u>Section 2.02(a)</u> must be confirmed promptly by delivery to the Lender of a written Committed Loan Notice appropriately completed and signed by a Responsible Officer of the Borrowers. Each Borrowing of Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof. Each Committed Loan Notice (whether telephonic or written) shall specify (i) the requested date of the Borrowing (which shall be a Business Day) and (ii) the principal amount of Loans to be borrowed.

26

(b)    The Lender, without the request of the Borrowers, may advance any interest, fee, service charge (including direct wire fees), Lender Expenses, or other payment to which the Lender is entitled from the Borrowers pursuant hereto or any other Loan Document and may charge the same to the Loan Account. The Lender shall advise the Borrowers of any such advance or charge promptly after the making thereof. Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(b) shall bear interest at the interest rate then and thereafter applicable to the Loans.

2.03    *Repayment of Loans*. The Borrowers shall repay to the Lender the aggregate principal amount of all Loans outstanding on the Maturity Date.

2.04    *Extension of Maturity Date*. Upon written request of the Borrowers not later than 30 days prior to the Maturity Date, the Lender may approve one extension of the Maturity Date for a successive three-month period. Any such extension shall not be effective unless the Lender (a) provides written consent to such extension, which may be withheld in its sole and absolute discretion and (b) receives payment of the Extension Fee.  If the Lender does not extend the Maturity Date, then the Borrowers shall repay all Obligations on the original Maturity Date in accordance with this Agreement, except to the extent Lender consents in its sole discretion to convert some or all of the Obligations under an exit facility prior to the Maturity Date.

2.05    *Optional Prepayments*. The Borrowers may, upon irrevocable notice to the Lender, at any time or from time to time voluntarily prepay Loans in whole or in part, plus all amounts due under Section 2.07(c) and Section 2.08; provided, that, (i) such notice must be received by the Lender not later than 11:00 a.m. (A) three Business Days prior to any date of prepayment, and (ii) any prepayment shall be in a principal amount of at least $500,000 or a whole multiple of $100,000 in excess thereof; in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment. Any notice delivered pursuant to this Section 2.04 in connection with a refinancing of this Agreement may state that such notice is conditioned upon the effectiveness of the other credit facility or receipt of proceeds from the issuance of new Indebtedness comprising such replacement financing, in which case such notice may be revoked (by written notice to the Lender on or prior to the specified effective date of termination) if such effectiveness does not occur.

2.06    *Mandatory Prepayments*. Subject in all respects to the DIP Orders, the outstanding Loans shall be prepaid as follows upon any of the following events (each of the following being a "**Prepayment Event**"):

(a)    Dispositions.

(i)    On the date of receipt by any Borrower or any Subsidiary thereof of any Net Proceeds from one or more Dispositions (other than a sale to the Lender or its designee or a Permitted Disposition), the Borrowers shall prepay the Loans as set forth in subsection (e) below in an aggregate amount equal to such Net Proceeds.

27

(ii)      Nothing contained in this Section 2.06(a) shall permit the Borrowers or any of their Subsidiaries to sell or otherwise dispose of any assets other than in accordance with Section 7.05.

(b)      Insurance/Condemnation Proceeds. On the date of receipt by any Borrower or Subsidiary thereof, or the Lender as loss payee, of any Net Proceeds from insurance or any condemnation, taking or other casualty in excess of $50,000 in the aggregate over the term hereof, the Borrowers shall prepay the Loans as set forth in subsection (e) below in an aggregate amount equal to such Net Proceeds in excess of $50,000 in the aggregate.

(c)      Debt Issuance.  On the date of receipt by any Borrower or Subsidiary thereof, of any Net Proceeds from any Debt Issuance, the Borrowers shall prepay the Loans as set forth in subsection (e) below in an aggregate amount equal to such Net Proceeds.

(d)      Extraordinary Receipts. On the date of receipt by any Borrowers or any Subsidiary thereof of any Extraordinary Receipts, the Borrowers shall prepay the Loans as set forth in subsection (e) below in the amount of such Extraordinary Receipts.

(e)      Prepayment Certificate. Concurrently with any prepayment of the Loans pursuant to Section 2.06 through Section 2.06(d), the Borrowers shall deliver to the Lender a certificate of a Responsible Officer demonstrating the calculation of the amount of the applicable Net Proceeds. In the event that the Borrowers shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, the Borrowers shall promptly make an additional prepayment of the Loans, and the Borrowers shall concurrently therewith deliver to the Lender a certificate of a Responsible Officer demonstrating the derivation of such excess.

(f)      All mandatory prepayments in respect of the Loans shall be applied pro rata to the Loans.

2.07    *Interest.*

(a)      Subject to the provisions of Section 2.07(b) and Section 3.02 below, the Loans and the other Obligations shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Applicable Rate and accrue from the date any Loan is advanced or the Obligation is incurred or payable, until paid by the Borrowers.

(b)      (i)      If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)      If any Event of Default exists, then the Lender may notify the Borrowers that all outstanding Obligations shall thereafter bear interest at an interest rate per annum at all times equal to the Default Rate and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

US.363276657.05

(iii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest accrued on the Loans shall be due and payable in arrears, (i) on the first day of each month beginning with May 1, 2024; (ii) on any date of any voluntary or mandatory prepayment, with respect to the principal amount of the Loan being prepaid; and (iii) on the Maturity Date. Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable on demand. Notwithstanding the foregoing, interest accrued at the Default Rate shall be due and payable on demand, in accordance with the terms hereof upon the occurrence of an Event of Default hereunder which has not been waived or cured.

(d)    Interest payable hereunder shall automatically be paid in kind on each interest payment date specified in the foregoing subsections (a) through (c) by adding the accrued amount thereof to the outstanding principal amount of the Loans, and the amounts so added to principal shall thereafter bear interest in accordance with this Section 2.07.

**2.08**    *Fees*.

(a)    Issuance Fee. The Borrowers agree to pay to the Lender a non-refundable issuance fee equal to 1.50% of the aggregate amount of the Commitments (the "**DIP Issuance Fee**"), which is fully earned and due and payable upon the funding of the Initial Term Loan. Such DIP Issuance Fee shall automatically be paid in kind by being added to the principal balance of the Obligations on such date.

(b)    Exit Fee. The Borrowers agree to pay to the Lender a non-refundable exit fee  equal to 1.50% of the aggregate amount of the Commitments (the "**Exit Fee**"), payable at any time the Obligations are satisfied in full or in part (including, without limitation, as a result of an optional prepayment or mandatory prepayment pursuant to Sections 2.05 or 2.06, at maturity, upon or following acceleration or for any other reason), which Exit Fee shall be fully earned on the Closing Date and due and payable to the Lender in cash, and once paid not refundable for any reason, at the times set forth above.

(c)    Extension Fee. The Borrowers agree to pay to the Lender a non-refundable extension fee equal to 1.50% of the aggregate amount of the Commitments (the "**DIP Issuance Fee**"), payable at any time the Maturity Date is extended in accordance with Section 2.04, which DIP Issuance Fee shall be fully earned and payable on the date of such extension. Such DIP Issuance Fee shall be paid in kind by being added to the principal balance of the Obligations on such date.

(d)    Unused Fee. The Borrowers agree to pay to the Lender a non-refundable non-use fee (the "**Unused Fee**"), for the period from the Closing Date to the Maturity Date, at the rate of 1.00% per annum on the average daily amount of the Unused Facility Amount during each calendar month.  Such Unused Fee shall be payable in arrears on the first day of each calendar month and on the Maturity Date for any period then ending for which such Unused Fee shall not have previously been paid. Such Unused Fee shall automatically be paid in kind by being adding to principal balance of the Obligations on each payment date.

29

**2.09**    *Computation of Interest and Fees*. All computations of fees and interest shall be made on the basis of a 365-day year and actual days elapsed. Interest shall accrue on the day such Loan is made and until (but not including) the day on which such Loan (or such portion thereof) is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.11(a), bear interest for one day. Each determination by the Lender of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.10**    *Evidence of Debt*.

(a)    The Loans made by the Lender shall be evidenced by one or more accounts or records maintained by the Lender (the "**Loan Account**") in the ordinary course of business. The accounts or records maintained by the Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lender to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. Upon the request of the Lender, the Borrowers shall execute and deliver to the Lender a Note, which shall evidence the Loans in addition to such accounts or records. The Lender may attach schedules to the Note and endorse thereon the date, amount and maturity of the Loans and payments with respect thereto. Upon receipt of an affidavit of the Lender as to the loss, theft, destruction or mutilation of the Note and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of the Lender (or its permitted assigns), in the same principal amount thereof and otherwise of like tenor.

**2.11**    *Payments Generally; Clawback*.

(a)    All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein with respect to the payment of interest and fees in kind, rather than in cash, all payments by the Borrowers hereunder shall be made to the Lender in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. All payments received by the Lender after 2:00 p.m., at the option of the Lender, shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    Except for payments and other amounts received by the Lender and applied in accordance with the provisions of Section 8.03 (or required to be applied in accordance with Section 2.06), all payments and any other amounts received by the Lender from or for the benefit of the Borrowers shall be applied as follows: first, to pay principal of, and interest on, any portion of the Loan the Lender may have advanced pursuant to the express provisions of this Agreement for which the Lender has not then been reimbursed by the Borrowers, second, to pay all other Obligations then due and payable and third, as the Borrowers shall so designate.

30

(c)      The provisions of this Section 2.11 shall be subject in all respects to the DIP Orders.

**2.12** *Priority and Liens*.

(a)      Priority. The Obligations, and the Liens of the Security Documents, shall have the priority specified in the applicable DIP Order.

(b)      Collateral; Grant of Lien and Security Interest.

(i)      Each Borrower hereby grants the Lender a security interest in the Collateral to secure the payment and performance of the Obligations. Upon entry of the Interim DIP Order or Final DIP Order, as the case may be, the Liens and security interests in favor of the Lender under the Security Documents shall be valid, perfected, continuing, enforceable non-avoidable first priority Liens on, and security interests in, the Collateral, prior to all other Liens on, and security interests in, the Collateral, other than the Carve Out and any Pre-Petition Priority Liens. Such Liens and security interests and their priority shall remain in effect until the Commitments shall have been terminated and all Obligations shall have been repaid in cash.

(ii)      Notwithstanding anything herein to the contrary (i) all proceeds received by the Lender from the Collateral subject to the Liens granted under the Security Documents and by the DIP Orders shall be subject to the Carve Out and (ii) no Person entitled to the Carve Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

(c)      Grants; Rights and Remedies. The Liens and security interests granted under the Security Documents may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the DIP Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Lender hereunder and thereunder are cumulative.

(d)      No Filings Required. The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim DIP Order or the Final DIP Order, as the case may be. The Lender shall not be required to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim DIP Order or the Final DIP Order, as the case may be, or any other Loan Document; provided, that the Lender shall be permitted to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action with respect to the Lien and security interest granted by or pursuant to this Agreement.

(e)      Further Assurances. The Borrowers shall take any other actions reasonably requested by the Lender from time to time to cause the attachment, perfection and first priority of, and the ability of the Lender to enforce, the security interest of the Lender in any and all of the Collateral, including, without limitation, (a) executing and delivering any requested security agreement, pledge agreement or mortgage, (b) executing, delivering and, where appropriate,

31

filing financing statements and amendments relating thereto under the Uniform Commercial Code or other applicable law, to the extent, if any, that any Borrower's signature thereon is required therefor, (c) causing the Lender's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the security interest of the Lender in such Collateral, (d) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the security interest of the Lender in such Collateral, and (e) obtaining the consents and approvals of any Governmental Authority or third party and taking all actions required by the Uniform Commercial Code or by other law, as applicable in any relevant jurisdiction.

    **2.13** *No Discharge; Survival of Claims*. The Borrowers agree that to the extent that the Obligations have not been paid in full, (i) its obligations under the Loan Documents shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Borrowers, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (ii) the DIP Superpriority Claim granted to the Lender pursuant to the DIP Orders and the Liens granted to the Lender pursuant to the DIP Orders shall not be affected in any manner by the entry of an order confirming a Reorganization Plan. The Lender in its sole discretion may elect to convert some or all of the Obligations into exit financing in connection with a Reorganization Plan.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

    **3.01** *Taxes*.

        (a)    Payments Free of Taxes. Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable Law. If any applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after all such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 3.01(a)) the Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

        (b)    Payment of Other Taxes by the Borrowers. Without limiting the provisions of subsection (a) above, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Lender timely reimburse it for the payment of, any Other Taxes.

(c)    <u>Indemnification by the Borrowers</u>. The Borrowers shall indemnify the Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 3.01(c)</u>) payable or paid by the Lender or required to be deducted or withheld from a payment to the Lender, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by the Lender shall be conclusive absent manifest error.

(d)    <u>Evidence of Payments</u>. As soon as practicable after any payment of Indemnified Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(e)    <u>Treatment of Certain Refunds</u>. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to <u>Section 3.01</u> (including by the payment of additional amounts pursuant to <u>Section 3.01</u>), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under <u>Section 3.01</u> with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this <u>Section 3.01(e)</u> (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this <u>Section 3.01(e)</u>, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this <u>Section 3.01(e)</u> the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This <u>Section 3.01(e)</u> shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(f)    <u>Survival</u>. Each party's obligations under this <u>Section 3.01</u> shall survive any assignment of rights by the Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**3.02**    *Increased Costs*.

(a)    <u>Increased Costs Generally</u>. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, the Lender;

(ii)    subject the Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on the Lender any other condition, cost or expense affecting this Agreement or Loans made by the Lender;

and the result of any of the foregoing shall be to increase the cost to the Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or any other amount) then, upon request of the Lender, the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements. If the Lender determines that any Change in Law affecting the Lender regarding capital requirements has or would have the effect of reducing the rate of return on the Lender's capital as a consequence of this Agreement, the Commitment of the Lender or the Loans made by, to a level below that which the Lender could have achieved but for such Change in Law (taking into consideration the Lender's policies with respect to capital adequacy), then from time to time the Borrowers will pay to the Lender such additional amount or amounts as will compensate the Lender for any such reduction suffered.

(c)    Certificates for Reimbursement. A certificate of the Lender setting forth the amount or amounts necessary to compensate the Lender as specified in subsection (a) or (b) of this Section and delivered to the Borrowers shall be conclusive absent manifest error. The Borrowers shall pay the Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Delay in Requests. Failure or delay on the part of the Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of the Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate the Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than six months prior to the date that the Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of the Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

**3.03**    *Survival*. All of the Obligations under this Article III shall survive termination of the Commitments and repayment of all other Obligations hereunder.

**ARTICLE IV**
**CONDITIONS PRECEDENT TO THE CLOSING DATE**

**4.01**    *Conditions Precedent to the Occurrence of the Closing Date and to the Making of the Initial Term Loan*. The occurrence of the Closing Date, and the obligation of the Lender to

34

make the Initial Term Loan on the Closing Date is subject to the fulfillment (or waiver in accordance with <u>Section 9.01</u>), to the satisfaction of the Lender, of each of the following conditions precedent:

(a)    <u>Loan Documents</u>. Receipt by the Lender of executed counterparts of this Agreement and the other Loan Documents, each properly executed by a Responsible Officer of each Borrower.

(b)    <u>Organization Documents, Resolutions, Etc.</u> Receipt by the Lender of the following, in form and substance reasonably satisfactory to the Lender and its legal counsel:

(i)    copies of the Organization Documents of each Borrower, and certified by a secretary or assistant secretary of such Borrower to be true and correct as of the Closing Date;

(ii)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Borrower as the Lender may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Borrower is a party; and

(iii)    such documents and certifications as the Lender may require to evidence that each Borrower is duly organized or formed, and is validly existing, in good standing and qualified to engage in business in its state of organization or formation.

(c)    <u>Perfection and Priority of Liens</u>. Receipt by the Lender of the following:

(i)    searches of Uniform Commercial Code filings in the jurisdiction of formation of each Borrower or where a filing would need to be made in order to perfect the Lender's security interest in the Collateral, copies of the financing statements on file in such jurisdictions and evidence that no Liens exist other than Permitted Liens;

(ii)    UCC financing statements for each appropriate jurisdiction as is necessary, in the Lender's sole discretion, to perfect the Lender's security interest in the Collateral;

(iii)    duly executed notices of grant of security interest in the form required by the Security Agreement as are necessary, in the Lender's sole discretion, to perfect the Lender's security interest in the intellectual property of the Borrowers.

(d)    <u>Closing Certificate</u>. Receipt by the Lender of a certificate signed by a Responsible Officer of the Borrower certifying that the conditions specified in <u>Sections 4.02(a)</u> and <u>(b)</u> have been satisfied.

(e)    <u>Fees</u>. Receipt by the Lender of any fees required to be paid on or before the Closing Date, to the extent invoiced prior to the Closing Date.

US.363276657.05

(f)    <u>Request for Credit Extension</u>. Receipt by the Lender of a Committed Loan Notice in accordance with the requirements hereof with respect to the Initial Term Loan.

(g)    <u>Due Diligence; PATRIOT ACT</u>. The Lender shall have received all documentation and other information required under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

(h)    <u>Collateral Requirement</u>. On or prior to the Closing Date, the Security Agreement and the Interim DIP Order (upon its entry in the Cases), shall be effective to create in favor of the Lender, legal, valid and enforceable: (i) first priority (except for Pre-Petition Priority Liens) perfected security interests in and Liens on all of the Collateral that is not subject to a Pre-Petition Priority Lien; and (ii) junior perfected security interests in and Liens on the Collateral that is subject to Pre-Petition Priority Lien, in each case, subject to the Carve Out.

(i)    <u>Interim DIP Order</u>. Prior to the Closing Date, the Bankruptcy Court shall have entered the Interim DIP Order, which Interim DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior consent of the Lender in its sole discretion. If the Interim DIP Order is the subject of a pending appeal in any respect, neither the Interim DIP Order nor the making of the Loans or the performance by any Borrower of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(j)    <u>Budget</u>. The Lender shall have received and not have objected to a detailed weekly budget (the "**Approved Budget**") of projected receipts and expenditures of the Borrowers for the period commencing on the Petition Date and continuing through the period specified in the DIP Orders, delivered to the Lender on or prior to the Closing Date, which shall set forth forecasted (A) cash receipts, (B) cash operating disbursements, (C) cash bankruptcy disbursements and (D) net cash flow.

(k)    <u>Outside Date</u>. The Closing Date shall have occurred within 2 Business Days after the Interim Order Entry Date.

**4.02**    *Conditions Precedent to All Loans*. The Lender shall not be required to make any Loan unless and until the following conditions are satisfied:

(a)    <u>Representations and Warranties</u>. The representations and warranties of the Borrowers contained in <u>Article V</u> or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (or, if any such representation or warranty is qualified by materiality or Material Adverse Effect, it shall be true and correct in all respects) on and as of the date of such Loan, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or reference to Material Adverse Effect) as of such earlier date.

(b)    <u>Default</u>. No Default shall exist, or would result from such proposed Loan or from the application of the proceeds thereof.

(c)      Loan Notice. The Lender and shall have received a Committed Loan Notice in accordance with the requirements hereof.

(d)      Other Orders. (i) All orders (if any) providing for payment of pre-petition indebtedness of the Borrowers or affecting in any way the Obligations or Collateral submitted for entry in the Cases (in each case, other than the DIP Orders) shall be reasonably satisfactory in form and substance to the Lender, as entered, and shall not deviate from the form thereof approved by the Lender in any material respect which is adverse to the interests of the Lender and (ii) all motions and other documents to be filed by the Debtors with the Bankruptcy Court in connection with the DIP Facility or that could reasonably be expected to affect the DIP Facility, the Collateral or the rights or remedies of the Lender shall be in form and substance reasonably satisfactory to the Lender. For the avoidance of the doubt, the Lender has consented to the filed Critical Vendor Motion.

(e)      No Bar. Subject to the entry of the DIP Orders and subject to the terms thereof, the Borrowers and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement and the other Loan Documents, and the making of such loan shall not violate any requirement of Law and shall not have been enjoined, whether temporarily, preliminarily or permanently.

The Committed Loan Notice submitted by the Borrowers in respect of the Delayed Draw Term Loans shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(a), (b), and (d) have been satisfied.

# ARTICLE V
# REPRESENTATIONS AND WARRANTIES

To induce the Lender to enter into this Agreement and to make the Loans hereunder, each Borrower represents and warrants to the Lender that:

**5.01**    *Existence, Qualification and Power*. Each Borrower and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization, or formation, (b) subject to the entry of the DIP Orders and subject to the terms thereof, has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.02**    *Authorization; No Contravention*. Subject to the entry of the DIP Orders and subject to the terms thereof, the execution, delivery and performance by each Borrower of each Loan Document to which such Person is or is to be a party, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the

37

terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default (other than as a result of priming liens granted under the DIP Orders) under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Borrower (other than Liens in favor of the Lender under the Security Documents); or (d) violate any Law.

**5.03**    *Governmental Authorization; Other Consents*. Subject to the entry of the DIP Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Borrower of this Agreement or any other Loan Document to which such Person is a party, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the priority thereof as described in the DIP Orders) or (b) such as have been obtained or made and are in full force and effect.

**5.04**    *Binding Effect*. Subject to the entry of the DIP Orders, this Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Borrower that is party thereto. Subject to the entry of the DIP Orders, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Borrower, enforceable against each Borrower that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05**    *Financial Statements; No Material Adverse Effect*.

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of the Borrowers and their Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) to the extent required by GAAP, show all Material Indebtedness.

(b)    Any unaudited financial statements of the Borrowers and their Subsidiaries delivered to the Lender prior to the Closing Date, in each case as of the last day and for the applicable fiscal period then ended, (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Borrowers and their Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)      Since the date of the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

**5.06**    *Litigation*. There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrowers after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Borrower or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.07**    *No Default*. As of the Closing Date, no Borrower or any Subsidiary is in default in any material respect under or with respect to, any Material Contract or any Material Indebtedness except for any defaults triggered by the filing of the Bankruptcy Cases and existing defaults under the Pre-Petition Loan Documents disclosed to the Lender prior to the date hereof. Subject to the entry of the DIP Orders and subject to the terms thereof, no Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08**    *Ownership of Property; Liens*.

(a)      Each of the Borrowers and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests in all assets necessary or used in the ordinary conduct of its business, except in each case as does not have and would not reasonably be expected to result in a Material Adverse Effect.

(b)      The property of each Borrower and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

**5.09**    *Environmental Compliance*.

(a)      No Borrower is subject to any Environmental Liability that would reasonably be expected to have a Material Adverse Effect.

(b)      Except as would not reasonably be expected to have a Material Adverse Effect, (i) none of the properties currently, or to the knowledge of the Borrower, formerly owned or operated by, the Borrowers is listed or, to the knowledge of the Borrowers, proposed for listing on the NPL or on the SEMS, CERCLIS or any analogous foreign, state or local list, (ii) there are no and, to the knowledge of the Borrower, there never have been any underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by the Borrowers or, to the knowledge of Borrower, on any property formerly owned or operated by the Borrowers, (iii) there is no asbestos or asbestos-containing material on any property currently owned or operated by the Borrower requiring investigation, remediation, mitigation, removal, or assessment, or other response, remedial or corrective action, pursuant to any Environmental Law and (iv) Hazardous Materials have not been released, discharged or disposed of on any property currently or, to the knowledge of the Borrower,

39

formerly owned or operated by the Borrowers, except for such releases, discharges and disposals that were in compliance with Environmental Laws.

(c)    None of the real property owned by the Borrowers contain any Hazardous Materials in amounts or in concentrations which constitute a violation of, or require remedial action under, Environmental Laws or otherwise could reasonably be expected to give rise to an Environmental Liability, except for any such violations, remedial actions and liabilities that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)    No Borrower is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation, remediation, mitigation, removal, assessment or remedial, response or corrective action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law, except for any such investigations or assessments or remedial or responsive actions that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(e)    All Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or, to the knowledge of the Borrower, formerly owned or operated by the Borrowers have been disposed of in a manner not reasonably expected to result in liability to such Borrower that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**5.10**    *Insurance*. The properties of the Borrowers and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Borrowers, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrowers or the applicable Subsidiary operates. Each insurance policy maintained by the Borrowers or their Subsidiaries is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

**5.11**    *Taxes*. The Borrowers and their Subsidiaries have filed all federal, material state and other material tax returns and have paid all federal, material state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are prohibited or excused from being paid by the Bankruptcy Code or the Bankruptcy Court or are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, and as to which Taxes no Lien has been filed and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation. There is no proposed tax assessment against any Borrower or any Subsidiary that would, if made, have a Material Adverse Effect. No Borrower or any Subsidiary thereof is a party to any tax sharing agreement.

**5.12** *Employee Benefit Plans and Labor Matters*.

(a)    No Borrower or any of their respective ERISA Affiliates maintains, contributes to or has any obligation to contribute to any Plan. Further, the Borrowers are not, and are not acting on behalf of or with any assets of, any Plan, nor will they be during the term of any Loan Document.

(b)    Except as, in the aggregate, could not reasonably be expected to have a Material Adverse effect: (i) there are no strikes or other labor disputes against any Borrower pending or, to the knowledge of the Borrower, threatened; (ii) hours worked by and payment made to employees of each Borrower have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters; and (iii) all payments due from any Borrower on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Borrower.

**5.13** *Subsidiaries; Equity Interests*. All of the outstanding Equity Interests in any Subsidiary of any Borrower have been validly issued, are fully paid and non- assessable and are owned by a Borrower (or a Subsidiary of a Borrower) free and clear of all Liens except for those created under the Security Documents and Permitted Encumbrances. There are no outstanding rights to purchase any Equity Interests in any Subsidiary. All of the outstanding Equity Interests in the Borrowers have been validly issued, and are fully paid and non-assessable and are owned free and clear of all Liens except for those created under the Security Documents and the Permitted Encumbrances. The copies of the Organization Documents of each Borrower and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

**5.14** *Margin Regulations; Investment Company Act*.

(a)    No Borrower is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. None of the proceeds of the Loans shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b)    None of the Borrowers, any Person Controlling any Borrower, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15** *Disclosure*. Each of the Borrower and its Subsidiaries has disclosed to the Lender all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished by or on behalf of any Borrower to the Lender or any Lender in connection with the transactions contemplated hereby and the

41

negotiation of this Agreement or delivered hereunder or under any other Loan Document (excluding projected financial information, forward-looking statements and general industry or general economic data) (in each case, as modified or supplemented by other information so furnished) taken as whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected financial information, the Borrowers represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time (it being understood that projections by their nature are inherently uncertain and that, even though the projections are prepared in good faith on the basis of assumptions believed to be reasonable at the time such projections were prepared, the results reflected in the projections may not be achieved and actual results may differ and such differences may be material).

**5.16** *Compliance with Laws*. Each of the Borrowers and each Subsidiary is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its property including, but not limited to, the requirements of the telecommunications laws and regulations of it respective jurisdiction of incorporation and the telecommunications laws and regulations of other jurisdictions which are applicable to it, except where the failure to so comply would not reasonably be expected to have a Material Adverse Effect. Each of the Borrowers and each Subsidiary has filed all notices, reports, documents or other information required to be filed thereunder, except where the failure to file such notices, reports, documents or other information would not reasonably be expected to have a Material Adverse Effect. Neither the Borrower nor any of its Subsidiaries has received any notification from any telecommunications regulatory authority to the effect that any additional authorization, approval, order, consent, license, certificate, permit, registration or qualification from such telecommunications regulatory authority is needed to be obtained by the Borrower or any Subsidiary except where the failure to obtain such additional authorization, approval, order, consent, license, certificate, permit, registration or qualification would not reasonably be expected to have a Material Adverse Effect.

**5.17** *Intellectual Property*. Each Borrower and each Subsidiary owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted. No material claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property, nor does any Borrower know of any valid basis for any such claim. The use of Intellectual Property by each Borrower and each Subsidiary does not infringe on the rights of any Person in any material respect.

**5.18** *Anti-Corruption Laws and Sanctions*. Each Borrower and each Subsidiary has implemented and maintains in effect policies and procedures designed to ensure compliance by such Borrower, its Subsidiaries and its directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Borrower, its Subsidiaries, its officers and employees and to the knowledge of the Borrower, its directors and agents, are in compliance with Anti-Corruption Laws in all material respects and applicable Sanctions. Neither (a) any Borrower or Subsidiary or any of their respective directors, officers or employees, nor (b) to the knowledge of the Borrower, any agent of any Borrower or Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned

42

Person. No borrowing, use of proceeds or other transaction contemplated by the Transactions will violate Anti- Corruption Laws or applicable Sanctions.

**5.19** *Security Documents*.

(a)     Subject to the entry of the DIP Orders, the Security Agreement creates in favor of the Lender, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b)     None of the Borrowers is a "transmitting utility" as defined in Section 9-102(a)(80) of the Uniform Commercial Code.

(c)     The Lender has a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected under the UCC (in effect on the date this representation is made) by filing, recording or registering a financing statement or by obtaining control or possession, in each case prior and superior in right to any other Person subject to those Permitted Encumbrances which are expressly defined to have priority under the DIP Orders.

(d)     Subject to the entry of the DIP Orders, the Security Agreement is in appropriate form and create a perfected Lien on, and security interest in, all right, title and interest of the applicable Borrowers in the Intellectual Property (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person as described in the DIP Orders.

**5.20** *Data Security*. Except as individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect, (i) the Borrower and each of its Subsidiaries has complied with all federal, state or local laws applicable to it related to data security, and the protection, use, storage, handling and processing of any Personal Information, (ii) the Borrower and each of its Subsidiaries has implemented and is in compliance with technical and organizational measures to assure the integrity and security of (A) transactions executed through its computer systems, and of (B) all confidential or proprietary data, including Personal Information, possessed or retained by or on behalf of the Borrower or any Subsidiary, (iii) there has been no actual or alleged breach of security or unauthorized access to or acquisition, use, loss, destruction, compromise or disclosure of any Personal Information, confidential or proprietary data or any other such information maintained or stored by, or on behalf of, the Borrower or any Subsidiary involving data of suppliers, customers or other Persons and (iv) there have been no facts or circumstances that would require the Borrower or any Subsidiary to give notice to any suppliers, consumers or other Persons of any actual or perceived data security breaches pursuant to the requirements of all Applicable Laws requiring notice of such a breach.

**5.21** *Brokers*. No broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Borrower or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.22** *Bankruptcy Matters*.

(a) The Interim DIP Order and, at all times after its entry by the Bankruptcy Court, the Final DIP Order, is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Lender.

(b) Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lender shall, subject to the provisions of the Interim DIP Order or Final DIP Order, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder in accordance with the terms hereof, without further application to or order by the Bankruptcy Court.

(c) If either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, none of such DIP Order, the making of the Loans or the performance by the Borrowers of any of their obligations under any of the Loan Documents is or shall be the subject of a presently effective stay pending appeal. The Borrowers and the Lender shall be entitled to rely in good faith upon the DIP Orders, notwithstanding objection thereto or appeal therefrom by any interested party. The Borrowers and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

(d) The Borrowers are in compliance with all material agreements entered into and all orders entered by the Bankruptcy Court from and after the Petition Date.

(e) Pursuant to the terms of the DIP Orders, the joint and several Obligations of the Borrowers under this Agreement constitute Superpriority Claims and shall be allowed superpriority administrative expense claims in the Cases under section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Borrowers now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, subject only to the terms of the DIP Orders and the Carve Out.

**5.23** *Material Contracts*. The Borrowers have delivered to the Lender true, correct and complete copies of all Material Contracts to which a Borrower is a party on or before the Closing Date. Except for any pre-petition breaches or breaches caused by the filing of the Cases, the Borrowers are not in breach or in default in any material respect of or under any Material Contract.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted), the Borrowers shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each Subsidiary to:

**6.01** *Financial Statements*. Deliver to the Lender, in form and detail satisfactory to the Lender:

(a)   Weekly Cash Flow Statement. As soon as available and in any event within 3 calendar days after the end of each week, a statement of cash flows of the Borrowers for the week then ended, all in reasonable detail and certified by a Responsible Officer of the Borrowers as having been prepared and delivered in a format consistent with the Approved Budget.

(b)   Monthly Financial Statements. As soon as available and in any event within 45 calendar days after the end of each calendar month, financial statements of the Borrowers, consisting of a consolidated and consolidating balance sheet as of the end of such calendar month and related consolidated and consolidating statements of income, stockholders or members equity and cash flows for the calendar month then ended and the fiscal year through that date, all in reasonable detail and certified by a Responsible Officer of the Borrowers as having been prepared in accordance with GAAP (subject to normal year-end audit adjustments), consistently applied, and setting forth in comparative form the respective financial statements for the corresponding date and period in the previous fiscal year.

(c)   Budget and Variance Reports; Other Reports. Commencing the Wednesday following the Petition Date and for each calendar week thereafter, by no later than 5:00 p.m. on the Wednesday of such calendar week (each such Wednesday, a "**Variance Report Date**"), a variance report substantially in the form of Exhibit D (each, a "**Variance Report**") for the applicable Testing Period setting forth, in reasonable detail, any differences between (i) the aggregate cumulative actual cash receipts for such Testing Period compared to the projected aggregate cumulative cash receipts set forth in the Approved Budget for such Testing Period (any such difference, a "**Receipts Variance**") and (ii) the aggregate cumulative actual cash disbursements on a cumulative basis (excluding Professional Fees) for such Testing Period on a line by line basis compared to the projected aggregate cash disbursements on a line by line basis (excluding Professional Fees) set forth in the Approved Budget for such Testing Period (any such difference, a "**Disbursements Variance**"), together with a statement from a Responsible Officer certifying the information contained in such Variance Report and compliance with Section 7.16 hereof. The Variance Report shall also provide a reasonably detailed explanation for any variance that exceed the Permitted Variances. The term "**Testing Period**" means (x) with respect to the first two Variance Reports required to be delivered hereunder, the period from the Saturday following the Petition Date and ending on the Friday prior to such Variance Report Date and (y) with respect to each other Variance Report required to be delivered hereunder, the period beginning on the fifth Saturday prior to such Variance Report Date and ending on the Friday immediately prior to the applicable Variance Report Date; and

45

(d)      Cash Balance Report. On or before 5:00 p.m. on the Wednesday of each calendar week following the Closing Date, a report setting forth the Borrowers' cash balances as of the immediately preceding Sunday, together with a statement from a Responsible Officer certifying the information contained in such report and compliance with Section 6.19 hereof.

**6.02**    *Certificates; Other Information*. Deliver to the Lender, in form and detail satisfactory to the Lender:

(a)      promptly upon receipt, copies of any "final" detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Borrower by its certified public accounting firm in connection with the accounts or books of the Borrowers or any Subsidiary, or any audit of any of them;

(b)      promptly after the same are available, copies of all notices, requests and other documents sent or received under or pursuant to any Pre-Petition Loan Document;

(c)      promptly after the furnishing thereof, copies of any statement or report furnished to any holder of Material Indebtedness of any Borrower or any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lender pursuant to Section 6.01 or any other clause of this Section 6.02;

(d)      promptly after the Lender's reasonable request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness;

(e)      promptly, such additional information regarding the business affairs, financial condition or operations of any Borrower or any Subsidiary, or compliance with the terms of the Loan Documents, as the Lender may from time to time reasonably request;

(f)      promptly, and in any event within two (2) Business Days after receipt thereof by the Borrower or any Subsidiary, copies of all material written reports and presentations delivered by or on behalf of any Borrower to the Committee or any other party in interest in the Cases that have not been filed publicly on the Bankruptcy Court's docket within such period; and

(g)      promptly (after a director or officer of any Borrower obtains knowledge, or has notice, thereof), notice of any party seeking relief from the Automatic Stay other than as expressly authorized under the DIP Orders.

**6.03**    *Notices*. Promptly notify the Lender:

(a)      of the occurrence of any Default or Event of Default;

(b)      of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

US.363276657.05

(c)     of any breach or non-performance of, or any default under, a Material Contract or with respect to Material Indebtedness by any Borrower or any Subsidiary thereof (except for any pre-petition breaches or breaches caused by the filing of the Cases);

(d)     of any dispute, litigation, investigation, proceeding or suspension between any Borrower or any Subsidiary thereof and any Governmental Authority or the commencement of, or any material development in, any litigation or proceeding affecting any Borrower or any Subsidiary thereof, including pursuant to any applicable Environmental Laws, in each such case which could reasonably be expected to have a Material Adverse Effect;

(e)     of the occurrence of any ERISA Event, where there is any potential material liability to any Borrower or any Subsidiary thereof as a result thereof;

(f)     of any material change in accounting policies or financial reporting practices by any Borrower or any Subsidiary thereof;

(g)     of any change in any Borrower's or Subsidiary's senior executive officers;

(h)     of the discharge by any Borrower or Subsidiary of its present certified public accounting firm or any withdrawal or resignation by such certified public accounting firm;

(i)     of the filing of any Lien for unpaid Taxes against any Borrower or Subsidiary in excess of $50,000;

(j)     of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed; and

(k)     of any: (i) entry by a Borrower or Subsidiary into a Material Contract, (ii) voluntary or involuntary grant of any Lien other than a Permitted Encumbrance upon any property of a Borrower or Subsidiary; or (iii) making of any Permitted Investments by a Borrower or Subsidiary in excess of $25,000 (other than in another Borrower).

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the applicable Borrower setting forth details of the occurrence referred to therein and stating what action the Borrowers have taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached).

**6.04**     *Payment of Obligations*. In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay and discharge as the same shall become due and payable, all its post-petition obligations and liabilities, including (a) all Tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims which, if unpaid, would by law become a Lien upon its property; and, (c) to the extent not prohibited hereunder, all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (w) the validity or amount thereof is being contested in

US.363276657.05

good faith by appropriate proceedings diligently conducted, (v) such Borrower has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (x) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (y) no Lien has been filed with respect thereto and (z) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

6.05    *Preservation of Existence, Etc*.

(a)    Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property (i) is no longer used or useful in the conduct of the business of the Borrowers or (ii) is not otherwise material to the business of any Borrower or any of its Subsidiaries in any respect.

6.06    *Maintenance of Properties*. (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.07    *Maintenance of Insurance*.

(a)    Maintain or cause to be maintained, with financially sound and reputable insurers, (i) business interruption insurance reasonably satisfactory to the Lender, and (ii) casualty insurance, such commercial general liability insurance, third party property damage insurance or such other insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Borrowers and their Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self- insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons. Each such commercial general policy of insurance maintained by the Borrowers shall (1) name the Lender as an additional insured thereunder as its interests may appear, and (2) in the case of each property insurance policy, contain a lenders loss payable clause or endorsement, satisfactory in form and substance to the Lender, that names the Lender as the loss payee thereunder. If any Borrower or any of their respective Subsidiaries fails to maintain such insurance, the Lender may, upon prior written notice to the Borrowers, arrange for such insurance, but at the Borrowers' expense and without any responsibility on the Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Upon the occurrence and during the continuance of an Event of Default, the Lender shall have the sole right, in the name of the Borrowers and their Subsidiaries, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements,

48

receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(b)    Each of the insurance policies required to be maintained under this Section 6.07 shall provide for at least thirty (30) days' prior written notice to the Lender of the cancellation or substantial modification thereof. Receipt of such notice shall entitle the Lender (but the Lender shall not be obligated), upon prior written notice to the Borrower, to renew any such policies, cause the coverages and amounts thereof to be maintained at levels required pursuant to this Section 6.07 or otherwise to obtain similar insurance in place of such policies, in each case at the expense of the Borrowers and to the extent the Borrowers have not so renewed such policies or obtained similar insurance in place therefor.

6.08    *Compliance with Laws; Policies and Procedures*. Without limiting any of the other covenants in this Article VI, (i) conduct its business, and otherwise be, in compliance with all applicable laws, regulations, ordinances and orders of any governmental or judicial authorities if the failure to comply thereunder would reasonably be expected to have a Material Adverse Effect; provided, however, that this Section 6.08 shall not require the Borrowers to comply with any such law, regulation, ordinance or order if it shall be contesting such law, regulation, ordinance or order in good faith by appropriate proceedings and reserves in conformity with GAAP, (ii) comply with all obligations it might have under Anti-Corruption Laws and (iii) comply with all applicable Sanctions imposed on it. Maintain in effect and enforce policies and procedures intended to ensure compliance by each Borrower and its Subsidiaries and their respective officers, directors, employees and agents with Anti-Corruption Laws and Sanctions.

6.09    *Books and Records; Accountants*.

(a)    Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Borrowers or any of their respective Subsidiaries, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrowers or any of their respective Subsidiaries, as the case may be.

(b)    At all times retain a firm of certified public accountants which is reasonably satisfactory to the Lender and shall instruct such firm to cooperate with, and be available to, the Lender or its representatives to discuss the Borrowers' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such firm, as may be reasonably raised by the Lender.

6.10    *Inspection Rights*. Permit representatives and independent contractors of the Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and certified public accountants, and permit the Lender or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Lender to conduct evaluations of the Borrowers' business plan, forecasts and cash flows, all at the expense of the Borrowers and at such reasonable times during normal business hours and

49

as often as may be reasonably desired, upon reasonable advance notice to the Borrowers; provided, however, that when a Default or Event of Default exists the Lender (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrowers at any time during normal business hours and without advance notice.

**6.11** *Use of Proceeds.*

(a)    Use the proceeds of the Loans (i) to pay certain costs, fees and expenses related to this Agreement and the Cases, (ii) to fund the Carve Out as more fully described in the DIP Orders and (iii) for working capital and general corporate purposes of the Borrowers and their Subsidiaries, in each case in accordance with the Approved Budget, or in a manner constituting a Permitted Variance.

(b)    Notwithstanding anything to the contrary contained in any Loan Document, none of the proceeds of the Loans and none of the Obligations, the cash collateral, the Collateral or the Carve Out may be used in connection with: (i) preventing, hindering, or delaying the Secured Parties' enforcement or realization upon any of the Collateral; (ii) using or seeking to use cash collateral or selling or otherwise disposing of Collateral outside the ordinary course of business; (iii) outside the ordinary course of business, using or seeking to use any insurance proceeds constituting Collateral; (iv) incurring any indebtedness; (v) seeking to amend or modify any of the rights granted to the Secured Parties under the Interim DIP Order or the Loan Documents; (vi) objecting to or challenging in any way the Liens, the Obligations, the Collateral (including cash collateral) or any other claims or liens, held by or on behalf of any of the Secured Parties; (vii) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the Secured Parties, or any of their affiliates, successors and assigns and the partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals); (viii) litigating, objecting to, challenging, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Obligations, the Liens, or any other rights or interests of the Secured Parties; or (ix) seeking to subordinate, recharacterize, disallow, or avoid the Obligations.

(c)    No portion of the proceeds of any Loan shall be used in any manner that causes or might cause such Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the FRB or any other regulation thereof.

**6.12** *Information Regarding the Collateral.* Furnish to the Lender at least fifteen (15) days (or such shorter period as the Lender may agree) prior written notice of any change in: (i) any Borrower's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Borrower's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility, but excluding in-transit Collateral); (iii) any Borrower's organizational structure or jurisdiction of incorporation or formation; or (iv) any Borrower's Federal Taxpayer Identification Number or organizational

identification number assigned to it by its state of organization. Except as otherwise agreed by the Lender, the Borrowers agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Lender to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral.

6.13    *Lender Meetings and Conference Calls*. Cause a Responsible Officer and any other Authorized Officers or other advisors of the Borrowers requested by the Lender, to participate in meetings with the Lender and its representatives as reasonably requested, and cause such officers to be available to meet with the Lender by phone every two weeks, if requested by the Lender.

6.14    *Environmental Laws*. Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all material environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws in all material respects pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, provided, however, that neither a Borrower nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Borrowers with respect to such circumstances in accordance with GAAP.

6.15    *Further Assurances*.

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Lender may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the DIP Orders or the validity or priority of any such Lien, all at the expense of the Borrowers. The Borrowers also agree to provide to the Lender, from time to time upon request, evidence reasonably satisfactory to the Lender as to the perfection and priority of the Liens created or intended to be created by the Security Documents and by the DIP Orders.

(b)    If any material assets of the type constituting Collateral are acquired by any Borrower after the Closing Date (other than assets constituting Collateral under the Security Documents or the DIP Orders that become subject to the perfected Lien under the Security Documents upon acquisition thereof), notify the Lender thereof, and the Borrowers will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by the Lender to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.15, all at the expense of the Borrowers. In no event shall compliance with this Section 6.15(b) waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this Section 6.15(b) if such transaction was not otherwise prohibited by this Agreement or the other Loan Documents.

**6.16**   *Material Contracts*. Except as otherwise excused by the Bankruptcy Court or the Bankruptcy Code, (a) perform and observe in all material respects all the terms and provisions of each Material Contract to be performed or observed by it, unless the failure to do perform such Material Contract could not reasonably be expected to have a Material Adverse Effect, (b) use commercially reasonable efforts to enforce each Material Contract in accordance with its terms, and (c) upon the occurrence and during the continuance of an Event of Default, at the request of the Lender, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Borrower or any of its Subsidiaries is entitled to make under such Material Contract.

**6.17**   *Compliance with Environmental Laws*. Except, in each case, to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect, (a) comply, and make all reasonable efforts to cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties and (b) to the extent required under Environmental Laws, conduct any investigation, mitigation, study, sampling and testing, and undertake any cleanup, removal or remedial, corrective or other action necessary to respond to and remove all Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws, unless liability for such actions is being contested in good faith.

**6.18**   *Bankruptcy Matters*.

(a)   Comply in all material respects with all of the requirements and obligations set forth in the DIP Orders and in all material respects with any other orders entered in the Cases to the extent relevant to the interests of the Lender, in each case after the entry thereof.

(b)   Deliver (or, if the same do not relate to the DIP Facility, the DIP Liens, or the Collateral, use reasonable efforts to deliver) to the Lender (and its respective advisors) as soon as reasonably practicable, but in no event less than three (3) days prior to any filing, copies of all material proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Borrowers with the Bankruptcy Court in the Cases that affect or may affect the Lender, or distributed by or on behalf of the Borrowers to any official or unofficial committee appointed or appearing in the Cases or any other party in interest, including, without limitation, the DIP Orders, any Reorganization Plan and any disclosure statements related to such plan, in the Cases (each of which must (i) in the case of any of the foregoing relating to the DIP facility, the DIP Liens or the Collateral, be in form and substance reasonably acceptable to the Lender in its sole discretion, or (ii) otherwise be in form and substance reasonably acceptable to the Lender).

(c)   If not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, promptly deliver to the Lender (and its counsel), copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Borrowers to any official or unofficial committee appointed or appearing in the Cases.

52

US.363276657.05

(d)    Except as otherwise is permitted by the DIP Orders, provide prior written notice as soon as reasonably practicable to the Lender (and its counsel) prior to any assumption or rejection of any Borrower's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected if such assumption or rejection adversely impacts the Collateral, any Liens thereon or any Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or Superpriority Claims), if the Lender informs the Borrower in writing within three (3) Business Days of receipt of the notice from the Borrower referenced above that it objects to such assumption or rejection, as applicable.

6.19    *Minimum Cash Balance*. The Borrowers will at all times maintain cash and Cash Equivalents in an account subject to an Account Control Agreement in favor of the Lender in an amount not less than $1,500,000 (which may be funded with proceeds of the Loans hereunder).

6.20    *Post-Closing Deliverables. T*he Borrowers will deliver to the Lender each of the following, each in form and substance satisfactory to the Lender:

(a)    Not later than 10 calendar days after the Closing Date, copies of the Organization Documents of each Borrower certified to be true and complete as of a recent date by the appropriate Governmental Authority of the state or other jurisdiction of its incorporation or organization, where applicable.

(b)    Not later than 10 calendar days after the Closing Date, searches of ownership of, and Liens on, intellectual property of each Borrower in the appropriate governmental offices.

(c)    Prior to the entry of the Final DIP Order, a completed Perfection Certificate duly executed by each Borrower.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted), no Borrower shall, nor shall it permit any Subsidiary to, directly or indirectly:

7.01    *Liens*. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Borrower or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income other than, as to all of the above, Permitted Encumbrances.

7.02    *Investments*. Make any Investments, except Permitted Investments.

US.363276657.05

**7.03** *Indebtedness; Disqualified Stock*. (a) Create, incur, assume, Guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; or (b) issue Disqualified Stock.

**7.04** *Fundamental Changes*. Merge, dissolve, liquidate, consolidate with or into another Person or consummate a Division, (or agree to do any of the foregoing).

**7.05** *Dispositions*. Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

**7.06** *Restricted Payments*. Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom:

      (a)     each Subsidiary of a Borrower may make Restricted Payments to the Borrower or any Subsidiary of the Borrower that is a Borrower; and

      (b)     the Borrowers and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other Equity Interests (other than Disqualified Stock) of such Person.

**7.07** *Prepayments of Indebtedness and Payments of Certain Indebtedness*. Except in respect of the Obligations as provided for herein and except as specifically authorized pursuant to the DIP Orders, prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in respect of any violation of any subordination terms of, any Indebtedness.

**7.08** *Change in Nature of Business*. Engage in any material line of business substantially different from the Business conducted by the Borrowers and their Subsidiaries on the Closing Date or any business reasonably related, complementary, ancillary or incidental thereto.

**7.09** *Transactions with Affiliates*. Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Borrower, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Borrowers as would be obtainable by the Borrowers at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) a transaction between or among the Borrowers, (b) advances for commissions, travel and other similar purposes in the ordinary course of business to directors, officers and employees to the extent permitted under this Agreement, (c) the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers, managers or employees of the Borrowers or any of their Subsidiaries in the ordinary course of business provided such fees, costs, compensation and arrangements are reasonable and comparable with compensation paid by companies of like nature and similarly situated, (f) Restricted Payments permitted under Sections 7.06 and payments permitted under Section 7.07, (h) employment and severance arrangements between the Borrowers and their respective Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee

benefit plans and arrangements in the ordinary course of business, and (i) payments to H&M Custom, LLC and certain other Affiliates in the ordinary course of business to the extent provided in the Approved Budget.

**7.10** *Additional Subsidiaries, Partnerships and Joint Ventures*. No Borrower shall, nor shall any Borrower permit any of its Subsidiaries to, own or create directly or indirectly any Subsidiaries other than any Subsidiary that exists on the Closing Date.  No Borrower shall become or agree to become a party to a joint venture.

**7.11** *Burdensome Agreements*. Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Borrower or to otherwise transfer property to or invest in a Borrower, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Borrower, or (iv) of the Borrowers or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Lender; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person; <u>provided</u> that the foregoing clauses (a) and (b) shall not apply to (i) restrictions and conditions imposed by law or by any Pre-Petition Loan Document (as in effect on the date hereof), (ii) customary provisions included in licenses, contracts, leases, agreements and other instruments restricting assignment and/or encumbrance, (iii) customary provisions restricting subletting, assignment or transfer of any lease governing a leasehold interest of any Borrower or any Subsidiary, (iv) restrictions arising in connection with cash or other deposits permitted hereunder and limited to such cash or deposit, (v) restrictions existing on the date hereof set forth in documents governing any Permitted Indebtedness, and (vi) any amendments, modifications, restatements or renewals of the agreements, contracts or instruments referred to in clauses (i) through (vi) above, <u>provided</u> that such amendments, modifications, restatements, or renewals, taken as a whole, are not materially more restrictive with respect to such encumbrances or restrictions than those contained in such predecessor agreements, contracts or instruments.

**7.12** *Use of Proceeds*. Use the proceeds of any Loans, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose; or (b) for purposes other than those permitted under this Agreement and the DIP Orders.

**7.13** *Amendment of Material Documents*. Amend, modify or waive any of a Borrower's or any Subsidiary's rights under (a) its Organization Documents or (b) any Material Contract or Material Indebtedness, in each case to the extent that such amendment, modification or waiver would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Lender or otherwise would be reasonably likely to have a Material Adverse Effect, <u>provided, that,</u> the restrictions set forth in this clause (b) shall not apply to the Pre-Petition Loan Documents, which may be amended, modified or waived with the consent of the Lender. The Borrowers may reject certain contracts or leases with the prior written consent of the Lender.

**7.14** *Fiscal Year.* Change the fiscal year of any Borrower, or the accounting policies or reporting practices of the Borrowers, except as required by GAAP.

**7.15** *Accounts.* Except as expressly contemplated by this Agreement and the Security Documents, open or maintain any Deposit Account, Securities Account or Commodity Account.

**7.16** *Disbursements; DIP Budget Variance.*

(a)    Make any disbursements other than those set forth in the Approved Budget (or as otherwise permitted in accordance with the terms of the DIP Orders).

(b)    Permit as of any Variance Report Date (i) a negative Receipts Variance for the most recent Testing Period in the Approved Budget in excess of 20% (with a negative variance meaning, for the avoidance of doubt, that actual receipts are less than projected receipts) or (ii) a positive Disbursements Variance for such Testing Period for any line item in the Approved Budget in excess of 20% (with positive variance meaning, for the avoidance of doubt, that actual disbursements are greater than the projected disbursements) (any negative or positive variances not exceeding the limitations set forth in this clause (b) are referred to in this Agreement as "**Permitted Variances**").

**7.17** *Case Matters.*

(a)    Assert, file or seek, or consent to the filing or the assertion of or joinder in, or use any portion of the proceeds of the Loans, Obligations, the Collateral, the Carve Out or cash collateral to compensate services rendered or expenses incurred in connection with, any claim, counterclaim, action, proceeding, order, application, pleading, motion, objection, any other papers or documents, defense (including offsets and counterclaims of any nature or kind), or other contested matter (including any of the foregoing the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration, or similar relief):

(i)    avoiding, re-characterizing, recovering, reducing, subordinating (except pursuant to the DIP Orders), disallowing, or otherwise challenging (under Sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or applicable non- bankruptcy law), in each case, in whole or in part, the Obligations or the DIP Liens; or reversing, modifying, amending, staying or vacating the DIP Orders, without the prior written consent of the Lender;

(ii)    granting priority for any administrative expense, secured claim or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final DIP Order), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Lender in respect of the Obligations, except as provided under the Carve Out or to the extent expressly permitted under the DIP Orders;

56

(iii)    granting or imposing, under Section 364(c) or 364(d) of the Bankruptcy Code or otherwise, any additional financing under such sections or any Lien equal or superior to the priority of the DIP Lien except to the extent expressly permitted under the DIP Orders;

(iv)    permitting the use of cash collateral as defined in Section 363 of the Bankruptcy Code, except as expressly permitted by the DIP Orders and this Agreement;

(v)    modifying, altering, or impairing in any manner the DIP Liens, or any of the Lender's rights or remedies under the DIP Orders, this Agreement, any of the other Loan Documents or any documents related thereto (including the right to demand payment of all Obligations and to enforce its Liens and security interests in the Collateral), whether by Reorganization Plan, order of confirmation, or any financings of, extensions of credit to, or incurring of debt by any Borrower or otherwise, whether pursuant to Section 364 of the Bankruptcy Code or otherwise;

(b)    Seek or consent to any order (i) dismissing any of the Cases under Sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; (ii) converting any of the Cases to cases under Chapter 7 of the Bankruptcy Code; (iii) appointing a Chapter 11 trustee in any of the Cases; (iv) appointing an examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases; or (v) granting a change of venue with respect to any Case or any related adversary proceeding.

(c)    Make any payments or transfer any property on account of claims asserted by any vendors of any Borrower for reclamation in accordance with Section 2-702 of any applicable UCC and Section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court upon prior notice to the Lender or unless otherwise consented to by the Lender.

(d)    Return any inventory or other property to any vendor pursuant to Section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court in accordance with Section 546(g) of the Bankruptcy Code upon prior notice to the Lender or unless otherwise consented to by the Lender.

(e)    Propose to the Bankruptcy Court, or otherwise, a sale of all or substantially all of the Collateral, without the prior written consent of the Lender.

(f)    (i) Make payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except, in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court after notice and hearing, (B) are expressly permitted by the terms of the Loan Documents and within the limits, including any allowed variance, of the Approved Budget, and (C) as approved by the Lender, or (ii)(A) enter into or make or implement any amendment, waiver, supplement, or other modification to any employment agreement or employee compensation plan or (B) pay or cause to be paid any amount contemplated by such agreements or plans before the date on

US.363276657.05

which such amount becomes due and payable pursuant to the terms of such agreements or plans, as applicable, in each case, unless in the ordinary course of business.

**7.18** *Maximum Capital Expenditures*. The Borrowers shall not make, or permit their Subsidiaries to make, Capital Expenditures except Capital Expenditures in the ordinary course of business and as set forth in the Approved Budget.

**ARTICLE VIII**
**EVENTS OF DEFAULT AND REMEDIES**

**8.01** *Events of Default*. Any of the following shall constitute an Event of Default:

(a)    Non-Payment. The Borrowers fail to pay when and as required to be paid herein, (i) any amount of principal of any Loan, or (ii) any interest on any Loan, or any fee due hereunder, or (iii) any other amount payable hereunder or under any other Loan Document.

(b)    Specific Covenants. (i) Any Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02, 6.03, 6.05, 6.07, 6.10, 6.11, 6.12, 6.13, 6.18, 6.19 or 6.20 or Article VII; or (ii) any of the Borrowers fails to perform or observe any term, covenant or agreement of the Security Agreement with respect to any portion of the Collateral; or

(c)    Other Defaults. Any Borrower fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after the earlier of (i) the date such Borrower obtains knowledge of a breach of any such covenant or agreement or (ii) the Borrower's receipt of notice from the Lender of any such breach; or

(d)    Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    Cross-Default. Other than with respect to the Pre-Petition Obligations and Pre-Petition Loan Documents or any defaults caused by the filing of the Cases or defaults barred by the automatic stay of the Bankruptcy Code, any Borrower or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness (after giving effect to the expiration of any applicable grace periods), or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs (after giving effect to the expiration of any applicable grace periods), the effect of which default or other event is to cause, or to permit the holder or holders of such Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such

58

Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or

(f)    <u>Invalidity of Loan Documents</u>. (i) Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or payment in full of all the Obligations, ceases to be in full force and effect (other than in accordance with its terms); or any Borrower or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Borrower denies that it has any or further liability or obligation under any provision of any Loan Document (other than as a result of the discharge of such Borrower in accordance with the terms of the applicable Loan Document), or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Borrower or any other Person not to be, a valid and perfected Lien on any Collateral (other than as a result of Lender's negligence with respect to failure to maintain the filing of a financing statement or loss of possessory Collateral), with the priority required by the applicable Security Document; or

(g)    <u>Change of Control</u>. There occurs any Change of Control; or

(h)    <u>Loss of Collateral</u>. There occurs any uninsured loss (in excess of any applicable insurance deductible) to Collateral with an aggregate value in excess of the Threshold Amount; or

(i)    <u>Subordination</u>. (i) The subordination provisions of the documents evidencing or governing any subordinated indebtedness shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Indebtedness; or (ii) any Borrower shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any such subordination provisions, (B) that such subordination provisions exist for the benefit of the Lender, or (C) that all payments of principal of or premium and interest on the applicable subordinated indebtedness, or realized from the liquidation of any property of any Borrower, shall be subject to any of such subordination provisions; or

(j)    <u>Chapter 11 Cases</u>. Any of the following shall have occurred in the Cases:

(i)    the bringing of a motion or application by any Debtor in the Cases, or the entry of any order by the Bankruptcy Court in the Cases: (A) to obtain additional post-petition financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the payment of all Obligations in full immediately upon the consummation of such financing; (B) to grant any Lien, other than Liens expressly permitted under this Agreement or the DIP Orders upon or affecting any Collateral; or (C) except as provided in this Agreement or the DIP Orders, to use cash collateral of the Lender under section 363(c) of the Bankruptcy Code; or

(ii)    the filing of any plan of reorganization or disclosure statement attendant thereto, or any amendment, modification or supplement to such plan or

59

disclosure statement, by any Debtor, unless such plan or disclosure statement contains provision for the payment in full of the Obligations on or prior to the Maturity Date (an "**Approved Plan**"); or

(iii)    the termination or modification of any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization; or

(iv)    the entry of an order in any of the Cases approving a disclosure statement in respect of a plan other than an Approved Plan, or the entry of an order confirming a Reorganization Plan other than an Approved Plan; or

(v)    entry of an order terminating exclusivity having been entered (or requested, unless actively contested by the Borrowers); or

(vi)    the entry of an order in the Cases amending, supplementing, staying, vacating or otherwise modifying any Loan Document in a manner adverse to the interests of the Lender; or

(vii)    the payment of, or application by any Debtor for authority to pay, any prepetition claim other than amounts set forth in the Approved Budget; or

(viii)    the entry of an order by the Bankruptcy Court appointing, or the filing of a motion or application by any Debtor for an order seeking the appointment of an interim or permanent trustee in the Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Cases, with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery); or

(ix)    the sale of any of the Debtors' assets either through a sale under section 363 of the Bankruptcy Code, through a Reorganization Plan confirmed by the Bankruptcy Court in the Cases, or otherwise, except to the extent that such sale results in the payment in full of the Obligations on or prior to the Maturity Date; or

(x)    the dismissal of any of the Cases, or if any Debtor files a motion or other pleading seeking the dismissal of the Cases; or

(xi)    the conversion of any of the Cases from one under Chapter 11 of the Bankruptcy Code to one under Chapter 7 of the Bankruptcy Code, or if any Debtor files a motion or other pleading seeking the conversion of any of the Cases under section 1112 of the Bankruptcy Code or otherwise; or

(xii)    any Debtor files a motion or application seeking, or the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral not in accordance with the terms hereof with respect to Collateral, or (y) with respect to any Lien of or the granting of any Lien on any

60

Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Lender; or

(xiii)    any Debtor files a motion or application seeking to challenge, subordinate, disgorge, avoid or require repayment of, or the entry of an order in the Cases challenging, subordinating, disgorging, avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents; or

(xiv)    the failure of any Debtor to perform any of its obligations under the DIP Orders or any violation of any of the terms of the DIP Orders, subject to any applicable grace or cure periods set forth therein; or

(xv)    the DIP Orders shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect; or

(xvi)    any Debtor shall be enjoined from conducting any material portion of its business, any disruption of the material business operations of the Debtors shall occur, or any material damage to or loss of material assets of any Debtor shall occur; or

(xvii)    the challenge by any Debtor to the validity, extent, perfection or priority of any liens granted under or obligations arising under the Loan Documents; or

(xviii)    the remittance, use or application of proceeds of the Loans, cash collateral or other cash or funds of any Debtor other than in accordance with this Agreement and the DIP Orders; or

(xix)    an order of the Court shall be entered denying or terminating use of cash collateral by the Borrowers; or

(xx)    any Debtor files a motion or application seeking, or the entry of an order in any of the Cases granting any other superpriority administrative claim or Lien equal or superior to that granted to the Lender, without the prior written consent of the Lender (other than any such superpriority administrative claim or lien that is expressly permitted to have such priority hereunder); or

(xxi)    the filing of a motion or application by any Debtor requesting, or the entry of any order granting, any superpriority claim which is senior or pari passu with or the Lender's claims under the Loan Documents not in accordance with the terms hereof; or

(xxii)    any (a) Debtor files a motion or application seeking, or the entry of an order precluding the Lender (or its designee) from having the right to or being permitted to "credit bid" any amount of the Obligations with respect to the assets of the Debtors or (b) the Bankruptcy Court enters an order prohibiting, restricting, precluding, or otherwise impairing the unqualified right of the Lender (or its designee) from having the right to or being permitted to "credit bit" any amount of the Obligations, with respect to the assets of the Debtors; or

61

(xxiii) any attempt by any Debtor to reduce (other than a reduction in accordance with the terms of this Agreement), avoid, set off or subordinate the Obligations or the Liens securing the Obligations to any other debt; or

(xxiv) the revocation, reversal, stay, vacation, supplementation or other modification of the DIP Orders or any provision thereof; or

(xxv) the payment of or granting adequate protection with respect to any Pre-Petition Obligations (other than with respect to payment permitted under the DIP Orders); or

(xxvi) the payment of any administrative expense claim of $50,000 or more, unless such claim is expressly set forth in the Approved Budget or otherwise approved by the Lender in writing; or

(xxvii) (A) any Debtor, holder of an Equity Interest in any Debtor or any Affiliate of any Debtor commences, or any Debtor supports any Person, in any proceeding challenging or seeking to challenge the validity and priority of the DIP Liens against the Lender or the Loan Documents, or the disallowance of the Obligations (or any of them), or (B) any material provision of the DIP Orders or any Order governing the use of Cash Collateral (as defined in the applicable DIP Order) shall, in each case, cease to be valid and binding unless, in any case under this clause (xxiii), the Lender shall have consented to the same; or

(xxviii) if the confirmation order with respect to any Reorganization Plan is entered in form and substance which is not acceptable to the Lender in respect of the treatment of the claims of the Lender; or

(xxix) any Debtor shall make any payment or grant any form of adequate protection with respect to Indebtedness existing prior to the Petition Date (other than, in each case, as permitted under this Agreement, the DIP Orders, any cash collateral order or an Approved Plan or relief sought in any "first day" motions filed on the Petition Date); or

(xxx) an application or motion for any of the orders described in this Section 8.01(j) shall be made by a Person other than the Lender and such application is not, to the extent requested by the Lender, contested by the Borrower in good faith and the relief requested is granted in an order that is not stayed pending appeal; or

(xxxi) the cessation of Liens or superpriority claims granted with respect to this Agreement to be valid, perfected and enforceable in all respects; or the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the DIP Orders, the Liens granted under the Collateral Documents and the Collateral; or

(xxxii) the entry by the Bankruptcy Court of an interim DIP order other than the Interim DIP Order, or a Final DIP Order that is not acceptable to the Lender in its sole discretion.

62

**8.02**    *Remedies Upon Event of Default*.  Upon the occurrence and during the continuance of any Event of Default, the Lender shall deliver a written notice to the Borrowers (a "**Termination Declaration**") and any notice required under the DIP Orders, that, pursuant to and subject to the DIP Orders, the automatic stay provision of Section 362 of the Bankruptcy Code shall be deemed vacated and modified to the extent necessary to permit the Lender to: (i) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers; and (ii) to the extent not prohibited by the DIP Orders, proceed to protect, enforce and exercise all rights and remedies of the Lender under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Lender.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

The Borrowers may seek an emergency hearing during the five (5) calendar days following the date a Termination Declaration is delivered (such five (5) calendar day period, the "**Remedies Notice Period**"), at which the sole issue that may be raised by the Borrowers shall be whether an Event of Default has in fact occurred or is continuing, and the Borrowers hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Secured Parties.

**8.03**    *Application of Funds*.  Subject to the DIP Orders, after the exercise of remedies provided for in <u>Section 8.02</u> (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Lender in the following order:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, Lender Expenses and other amounts (including fees, charges and disbursements of counsel to the Lender and amounts payable under <u>Article III</u>) payable to the Lender;

<u>Second</u>, to payment of that portion of the Obligations constituting indemnities, Lender Expenses, and other amounts (other than principal, interest and fees) payable to the Lender (including fees, charges and disbursements of counsel to the Lender and amounts payable under <u>Article III</u>);

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and fees payable in respect thereof;

63

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans;

Fifth, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations); and

Last, the balance, if any, after all of the Obligations have been paid in full, to the Borrowers or as otherwise required by Law.

## ARTICLE IX
## MISCELLANEOUS

**9.01** *Amendments, Etc.* No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Borrower therefrom, shall be effective unless in writing signed by the Lender, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**9.02** *Notices; Effectiveness; Electronic Communications*.

(a) Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number to the address, electronic mail address or telephone number specified for such Person on Schedule 9.02. Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received. Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b) Electronic Communications. Notices and other communications to the Borrowers and the Lender may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Lender. The Lender may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications. Unless the Lender otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

US.363276657.05

(c)    <u>Change of Address, Etc.</u> Each Borrower and the Lender may change its address, e-mail or telephone number for notices and other communications hereunder by notice to the other parties hereto.

(d)    <u>Reliance by the Lender</u>. The Lender shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrowers shall indemnify the Lender and the Related Parties of the Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrowers. All telephonic notices to and other telephonic communications with the Lender may be recorded by the Lender, and each of the parties hereto hereby consents to such recording.

**9.03**    *No Waiver; Cumulative Remedies*. No failure by the Lender to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Lender may have had notice or knowledge of such Default or Event of Default at the time.

**9.04**    *Expenses; Indemnity; Damage Waiver*.

(a)    <u>Costs and Expenses</u>. The Borrowers shall pay all Lender Expenses in accordance with the applicable DIP Order.

(b)    <u>Indemnification by the Borrowers</u>. The Borrowers shall indemnify the Lender and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to any Borrower or any of its Subsidiaries, (iv) any claims of, or amounts paid by the Lender to, a Person which has entered into a control agreement with the Lender hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any of

65

any Borrower's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, as determined by a final and nonappealable judgment by a court of competent jurisdiction.

(c)    <u>Waiver of Consequential Damages, Etc.</u> To the fullest extent permitted by applicable Law, the Borrowers shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof, in each case, whether or not arising in connection with any matter otherwise addressed in this <u>Section 9.04</u>. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(d)    <u>Payments</u>. All amounts due under this Section shall be payable on demand therefor.

(e)    <u>Survival</u>. The agreements in this Section shall survive the resignation of the Lender, the assignment of any portion of any Loan by the Lender, and the repayment, satisfaction or discharge of all the other Obligations.

**9.05**    *Payments Set Aside*. To the extent that any payment by or on behalf of the Borrowers is made to the Lender, or the Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

**9.06**    *Successors and Assigns*.

(a)    <u>Successors and Assigns Generally</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior consent of

US.363276657.05

the Lender. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Participations. The Lender may at any time, without the consent of, or notice to, the Borrowers, sell participations to any Person (other than a natural person or the Borrowers or any of the Borrowers' Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of the Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) the Lender's obligations under this Agreement shall remain unchanged, (ii) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Agreement. Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 9.07 as if such Participant were a Lender hereunder.

Any agreement or instrument pursuant to which the Lender sells such a participation shall provide that the Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that the Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 9.01 that affects such Participant. Subject to subsection (e) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.01 and 3.02 (subject to the requirements and limitations of such Sections) to the same extent as if it were a Lender. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender. The Lender shall, as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents ("**Participant Register**"); provided that, the Lender shall have no obligation to disclose all or any portion of any Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Loans or other rights or obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Loan or other right or obligation is in registered form under Treasury Regulation Sections 5f.103-1(c) and 1.871-14(c). The entries in the Participant Register shall be conclusive, absent manifest error, and the Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(c)    Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.02 than the Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the right to receive a greater payment results from a Change in Law after the participant becomes a Participant.

(d)    Certain Pledges. The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of the Lender, including any pledge or assignment to secure obligations to a

Federal Reserve Bank; provided that no such pledge or assignment shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.

**9.07**    *Treatment of Certain Information; Confidentiality*. The Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Borrower and its obligations, (g) with the consent of the Borrowers or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Lender or any of its Affiliates on a non-confidential basis from a source other than the Borrowers (but only if the Lender has no actual knowledge that such source has breached a confidentiality obligation).

For purposes of this Section, "Information" means all information received from the Borrowers or any Subsidiary thereof relating to the Borrowers or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Lender on a non-confidential basis prior to disclosure by the Borrowers or any Subsidiary thereof (provided that, if such information is furnished by a source actually known to the Lender to be subject to a confidentiality obligation, such source, to the knowledge of the Lender, is not in violation of such confidentiality obligation by such disclosure), provided that, in the case of information received from any Borrower or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

The Lender acknowledges that (a) the Information may include material non-public information concerning the Borrowers or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

**9.08**    *Right of Setoff*. Subject to the DIP Orders, if an Event of Default shall have occurred and be continuing or if the Lender shall have been served with a trustee process or

similar attachment relating to property of a Borrower, the Lender, and each of its Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Lender, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by the Lender, or any such Affiliate to or for the credit or the account of any Borrower against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to the Lender, regardless of the adequacy of the Collateral, and irrespective of whether or not the Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of such Borrower may be contingent or unmatured or are owed to a branch or office of the Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of the Lender, and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that the Lender, or its respective Affiliates may have. The Lender agrees to notify the Borrowers promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**9.09**    *Interest Rate Limitation*. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**"). If the Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**9.10**    *Counterparts; Integration; Effectiveness; Electronic Signature*.

(a)    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

(i)    The words "delivery," "execute," "execution," "signed," "signature," and words of like import in any Loan Document or any other document executed in connection herewith and the transactions contemplated hereby shall be deemed to include electronic signatures, the electronic matching of assignment terms and

69

contract formations on electronic platforms approved by the Lender, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state Laws based on the Uniform Electronic Transactions Act;·provided that notwithstanding anything contained herein to the contrary the Lender is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Lender pursuant to procedures approved by it and provided further without limiting the foregoing, upon the request of any party, any electronic signature shall be promptly followed by such manually executed counterpart. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Lender of a manually signed paper document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement (each a "Communication") which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention.

(ii)    Each Borrower hereby acknowledges the receipt of a copy of this Agreement and all other Loan Documents. The Lender may, on behalf of the Borrowers, create a microfilm or optical disk or other electronic image of this Agreement and any or all of the other Loan Documents. The Lender may store the electronic image of this Agreement and the other Loan Documents in its electronic form and then destroy the paper original as part of the Lender's normal business practices, with the electronic image deemed to be an original and of the same legal effect, validity and enforceability as the paper originals.

**9.11**    *Survival*. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Lender, regardless of any investigation made by the Lender or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or Event of Default at the time of any Loans, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder (other than contingent indemnity obligations for which claims have not been made) shall remain unpaid or unsatisfied. Further, the provisions of Sections 3.01 and 3.02, and 9.04 shall survive and remain in full force and effect regardless of the repayment of the Obligations, and the Commitments or the termination of this Agreement or any provision hereof. In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Lender may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Lender against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked and (y) any Obligations that may thereafter arise under Section 9.04.

**9.12**    *Severability*. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**9.13**    *Governing Law; Jurisdiction; Etc*.

(a)    GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)    SUBMISSION TO JURISDICTION. EACH BORROWER IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE BORROWERS HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE BORROWERS HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE. EACH BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE BORROWERS HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT

PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 9.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    ACTIONS COMMENCED BY BORROWERS. EACH BORROWER AGREES THAT ANY ACTION COMMENCED BY ANY BORROWER ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM )JURISDICTION, SOLELY IN A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AS THE LENDER MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**9.14**    *Waiver of Jury Trial*. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**9.15**    *No Advisory or Fiduciary Responsibility*. In connection with all aspects of each transaction contemplated hereby, the Borrowers each acknowledge and agree that: (a) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrowers, on the one hand, and the Lender, on the other hand, and each of the Borrowers is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (b) in connection with the process leading to such transaction, the Lender is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Borrowers or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (c) the Lender has not

US.363276657.05

assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrowers with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether the Lender has advised or is currently advising any Borrower or any of its Affiliates on other matters) and the Lender has no any obligation to any Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (d) the Lender and its respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrowers and their respective Affiliates, and the Lender has no obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (e) the Lender has not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Borrowers has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each Borrower hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Lender with respect to any breach or alleged breach of agency or fiduciary duty.

      **9.16**    *USA PATRIOT Act Notice*. The Lender hereby notifies the Borrowers that pursuant to the requirements of the PATRIOT Act it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of each Borrower and other information that will allow the Lender to identify each Borrower in accordance with the PATRIOT Act. Each Borrower is in compliance, in all material respects, with the PATRIOT Act.

      **9.17**    *Time of the Essence*. Time is of the essence with respect to all provisions of the Loan Documents.

      **9.18**    *Press Releases*.  Each Borrower consents to the publication by the Lender or its respective representatives of advertising material, including any "tombstone," press release or comparable advertising, on its website or in other marketing materials of the Lender, relating to the financing transactions contemplated by this Agreement using any Borrower's name, product photographs, logo, trademark or other insignia. The Lender shall provide a draft reasonably in advance of any advertising material, "tombstone" or press release to the Borrowers for review and comment prior to the publication thereof. The Lender reserves the right to provide to industry trade organizations and loan syndication and pricing reporting services information necessary and customary for inclusion in league table measurements.

      **9.19**    *Additional Waivers*.

          (a)    The Obligations are the joint and several obligation of each Borrower. To the fullest extent permitted by Applicable Law, the obligations of each Borrower shall not be affected by (i) the failure of the Lender to assert any claim or demand or to enforce or exercise any right or remedy against any other Borrower under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document,

US.363276657.05

or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Lender.

(b)    The obligations of each Borrower shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the payment in full of the Obligations), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Borrower hereunder shall not be discharged or impaired or otherwise affected by the failure of the Lender to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Borrower or that would otherwise operate as a discharge of any Borrower as a matter of law or equity (other than the payment in full of all the Obligations).

(c)    To the fullest extent permitted by applicable Law, each Borrower waives any defense based on or arising out of any defense of any other Borrower or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Borrower, other than the payment in full of all the Obligations. The Lender may, at their election, and subject to the DIP Orders and applicable Law, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Borrower, or exercise any other right or remedy available to them against any other Borrower, without affecting or impairing in any way the liability of any Borrower hereunder except to the extent that all the Obligations have been paid in full. Each Borrower waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Borrower against any other Borrower, as the case may be, or any security.

(d)    Each Borrower is obligated to repay the Obligations as joint and several obligors under this Agreement. Upon payment by any Borrower of any Obligations, all rights of such Borrower against any other Borrower arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior payment in full of all the Obligations. In addition, any indebtedness of any Borrower now or hereafter held by any other Borrower is hereby subordinated in right of payment to the prior payment in full of the Obligations and no Borrower will demand, sue for or otherwise attempt to collect any such indebtedness. If any amount shall erroneously be paid to any Borrower on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Borrower, such amount shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Lender to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.

74

**9.20**   *No Strict Construction*. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**9.21**   *Attachments*. The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

**9.22**   *No Marshalling*. In no event shall the Lender be subject to the equitable doctrine of marshaling or any similar doctrine.

**9.23**   *DIP Orders Govern*. Each Borrower and the Lender agree that any reference contained herein to (a) the Interim DIP Order shall include all terms, conditions, and provisions of such Interim DIP Order and that the Interim DIP Order is incorporated herein for all purposes, and (b) the Final DIP Order shall include all terms, conditions, and provisions of the Final DIP Order and that the Final DIP Order is incorporated herein for all purposes. To the extent there is any inconsistency between the terms of this Agreement or any other Loan Document and the terms of the DIP Orders, the terms of the DIP Orders shall govern.

[Signature Pages Follow]

US.363276657.05

*IN WITNESS WHEREOF*, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**MILLENKAMP CATTLE, INC.**

By: _____
Name: _____
Title: _____


**BLACK PINE CATTLE LLC**

By: _____
Name: _____
Title: _____


**EAST VALLEY CATTLE, LLC**

By: _____
Name: _____
Title: _____


**GOOSE RANCH LLC**

By: _____
Name: _____
Title: _____


**IDAHO JERSEY GIRLS, LLC**

By: _____
Name: _____
Title: _____

*Signature Page to Senior Secured Debtor-in-Possession Loan Agreement*

**IDAHO JERSEY GIRLS JEROME DAIRY
LLC**

By: _____

Name: _____

Title: _____

**MILLENKAMP ENTERPRISES LLC**

By: _____

Name: _____

Title: _____

**MILLENKAMP FAMILY LLC**

By: _____

Name: _____

Title: _____

**MILLENKAMP PROPERTIES LLC**

By: _____

Name: _____

Title: _____

**MILLENKAMP PROPERTIES II LLC**

By: _____

Name: _____

Title: _____

*Signature Page to Senior Secured Debtor-in-Possession Loan Agreement*

**SANDTON CAPITAL SOLUTIONS MASTER FUND VI, LP**

By: _____

Name: _____

Title: _____

*Signature Page to Senior Secured Debtor-in-Possession Loan Agreement*

**Exhibit A**

### <u>Form of Committed Loan Notice</u>

**[_____, _____]**

To:     Sandton Capital Solutions Master Fund VI, LP
16 West 46th Street 11th Floor
New York, NY 10036
Attn: Robert Rice

We refer to that certain Senior Secured Debtor-in-Possession Loan Agreement dated as of **\*[April ___]\***, 2024 (as amended, supplemented or otherwise modified to date, the "**Loan Agreement**") between MILLENKAMP CATTLE, INC., an Idaho corporation ("**Millenkamp Cattle**"), BLACK PINE CATTLE LLC, EAST VALLEY CATTLE, LLC, GOOSE RANCH LLC, IDAHO JERSEY GIRLS, LLC, IDAHO JERSEY GIRLS JEROME DAIRY LLC, MILLENKAMP ENTERPRISES LLC, MILLENKAMP FAMILY LLC, MILLENKAMP PROPERTIES LLC, and MILLENKAMP PROPERTIES II LLC, each an Idaho limited liability company (together with Millenkamp Cattle, collectively, the "**Borrowers**"), and SANDTON CAPITAL SOLUTIONS MASTER FUND VI, LP (the "**Lender**").  Capitalized terms used herein but not otherwise defined shall have the same meanings assigned to them in the Loan Agreement.

1.     Pursuant to Section 2.02(a) of the Loan Agreement, we hereby request or confirm our request for an [Initial Term Loan / Delayed Draw Term Loan] on the date and in the amount specified below and request or confirm our request that the Lender make such Loan under the DIP Facility (the "**Requested Loan**").

(a)     Principal Amount of Requested Loan: $ _____.

(b)     Date of Requested Loan: _____, ____.

2.     To induce the Lender to make the Requested Loan, we hereby represent and warrant to the Lender that:

(a)     As of the date hereof and before giving effect to the Requested Loan, Total Outstandings were $[_____]. After giving effect to the Requested Loan, Total Outstandings will be $[_____], which does not exceed the aggregate Commitment of $45,000,000.

(b)     The representations and warranties of the Borrowers contained in <u>Article V</u> of the Loan Agreement or any other Loan Document, or which are contained in any document furnished at any time under or in connection with the Loan Agreement or any other Loan Document, are true and correct in all material respects (or, if any such representation or warranty is qualified by materiality or Material Adverse Effect, true and correct in all respects) on and as of the date of the Requested Loan, except to the extent that such representations and warranties specifically refer to an earlier date, in which case

they are true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or reference to Material Adverse Effect) as of such earlier date.

(c)     No Default or Event of Default exists, or would result from the Requested Loan or from the application of the proceeds thereof.

(d)     Subject to the entry of the DIP Orders and subject to the terms thereof, the Borrowers and the Lender are permitted and required to perform their respective obligations in compliance with the Loan Agreement and the other Loan Documents, and the making of the Requested Loan does not violate any requirement of Law and has not been enjoined, whether temporarily, preliminarily or permanently.

**[BORROWER]**

By: _____
Name: _____
Title: _____

A-2

**Exhibit B**

## Form of Interim DIP Order

*See attached.*

**Exhibit C**

## Form of Promissory Note

$45,000,000                                                           *[April __]*, 2024

      For value received, each of MILLENKAMP CATTLE, INC., an Idaho corporation ("**Millenkamp Cattle**"), BLACK PINE CATTLE LLC, EAST VALLEY CATTLE, LLC, GOOSE RANCH LLC, IDAHO JERSEY GIRLS, LLC, IDAHO JERSEY GIRLS JEROME DAIRY LLC, MILLENKAMP ENTERPRISES LLC, MILLENKAMP FAMILY LLC, MILLENKAMP PROPERTIES LLC, and MILLENKAMP PROPERTIES II LLC, each an Idaho limited liability company (together with Millenkamp Cattle, collectively, the "**Borrowers**"), promises to pay to the order of SANDTON CAPITAL SOLUTIONS MASTER FUND VI, LP (the "**Lender**"), at such place as the Lender may from time to time designate in writing, in lawful money of the United States of America and in immediately available funds, the principal sum of $45,000,000 or, if less, the aggregate unpaid principal amount of all Loans (as defined in the Loan Agreement described below) made by the Lender to the Borrowers under that certain Senior Secured Debtor-in-Possession Loan Agreement dated as of *[April ___]*, 2024, between the Borrowers and the Lender (as the same may be amended, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), together with interest on the unpaid principal balance hereof at such interest rates and payable at such times as are specified in the Loan Agreement.

      This Note is the Note as defined in the Loan Agreement, and is issued subject, and pursuant, to the Loan Agreement, which among other things, provides for the amount and date of payments of principal and interest required hereunder, acceleration of the maturity hereof upon the occurrence of an Event of Default (as defined in the Loan Agreement), and prepayment hereof upon the occurrence of certain events.

      The Borrower shall pay all costs of collection, including reasonable attorneys' fees and legal expenses, if this Note is not paid when due, whether or not legal proceedings are commenced.

      Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

*Signature pages follow*

C-1

IN WITNESS WHEREOF, the parties hereto have caused this Note to be duly executed by their respective authorized officers as of the date first above written.

**MILLENKAMP CATTLE, INC.**

By: _____
Name: _____
Title: _____

**BLACK PINE CATTLE LLC**

By: _____
Name: _____
Title: _____

**EAST VALLEY CATTLE, LLC**

By: _____
Name: _____
Title: _____

**GOOSE RANCH LLC**

By: _____
Name: _____
Title: _____

**IDAHO JERSEY GIRLS, LLC**

By: _____
Name: _____
Title: _____

**IDAHO JERSEY GIRLS JEROME DAIRY LLC**

By: _____
Name: _____
Title: _____

**MILLENKAMP ENTERPRISES LLC**

By: _____
Name: _____
Title: _____

**MILLENKAMP FAMILY LLC**

By: _____
Name: _____
Title: _____

**MILLENKAMP PROPERTIES LLC**

By: _____
Name: _____
Title: _____

**MILLENKAMP PROPERTIES II LLC**

By: _____
Name: _____
Title: _____

**Exhibit D**

**Form of Variance Report**

[_____, _____]

To:    Sandton Capital Solutions Master Fund VI, LP
       16 West 46th Street 11th Floor
       New York, NY 10036
       Attn: Robert Rice

We refer to that certain Senior Secured Debtor-in-Possession Loan Agreement dated as of **\*[April ___]\***, 2024 (as amended, supplemented or otherwise modified to date, the "**Loan Agreement**") between MILLENKAMP CATTLE, INC., an Idaho corporation ("**Millenkamp Cattle**"), BLACK PINE CATTLE LLC, EAST VALLEY CATTLE, LLC, GOOSE RANCH LLC, IDAHO JERSEY GIRLS, LLC, IDAHO JERSEY GIRLS JEROME DAIRY LLC, MILLENKAMP ENTERPRISES LLC, MILLENKAMP FAMILY LLC, MILLENKAMP PROPERTIES LLC, and MILLENKAMP PROPERTIES II LLC, each an Idaho limited liability company (together with Millenkamp Cattle, collectively, the "**Borrowers**"), and SANDTON CAPITAL SOLUTIONS MASTER FUND VI, LP (the "**Lender**").  Capitalized terms used herein but not otherwise defined shall have the same meanings assigned to them in the Loan Agreement.

The undersigned hereby certifies as follows:

1.  I am a duly qualified and acting Responsible Officer of the Borrowers and I am familiar with the financial statements and financial affairs of the Borrowers and am authorized to execute this Certificate on behalf of the Borrowers.

2.  Pursuant to Sections 6.01(c) and (d) of the Loan Agreement, attached is the required (i) Variance Report and (ii) cash balance report for the calendar week ended [_____ __, 20__], each prepared in accordance with the Loan Agreement, together with all accompanying notes and explanations delivered therewith.

3.  I have no knowledge of any Default or Event of Default, except as specifically stated on an attachment hereto (if any).

4.  The computations in the Variance Report attached hereto as Annex I set forth the Borrowers' [compliance / non-compliance] with the Permitted Variances set forth in Section 7.16(b) of the Loan Agreement as of the dates set forth herein. The cash balance included in Annex I hereto sets forth the Borrowers' [compliance / non-compliance] with the minimum cash balance requirement set forth in Section 6.19 of the Loan Agreement as of the dates set forth herein. All relevant facts are set forth in reasonable detail in Annex I to evidence such [compliance / non-compliance] with Sections 7.16 and 6.19 of the Loan Agreement.  Such computations have been prepared from, and on a basis consistent with, the Approved Budget.

Name: _____

Title: _____

**Annex I**
**to Exhibit D**

### <u>Variance Report and Cash Balance Report</u>

[Borrowers to attach].

**Schedule 9.02**

### Addresses for Notices

If to the Borrowers:

_____

_____

_____

Attention:
Telephone:
E-mail:


If to the Lender:

Sandton Capital Solutions Master Fund VI, LP
16 West 46th Street 11th Floor
New York, NY 10036
Attention: Robert Rice
Telephone: (310) 600-3980
E-mail: rrice@sandtoncapital.com

# SECURITY AGREEMENT

This Agreement is made as of **[April __]**, 2024 between **MILLENKAMP CATTLE, INC.**, an Idaho corporation ("**Millenkamp Cattle**"), **BLACK PINE CATTLE LLC**, **EAST VALLEY CATTLE, LLC**, **GOOSE RANCH LLC**, **IDAHO JERSEY GIRLS, LLC**, **IDAHO JERSEY GIRLS JEROME DAIRY LLC**, **MILLENKAMP ENTERPRISES LLC**, **MILLENKAMP FAMILY LLC**, **MILLENKAMP PROPERTIES LLC**, and **MILLENKAMP PROPERTIES II LLC**, each an Idaho limited liability company (together with Millenkamp Cattle, collectively, the "**Grantors**"), and **SANDTON CAPITAL SOLUTIONS MASTER FUND VI, LP** (the "**Lender**").

Pursuant to a Senior Secured Debtor-in-Possession Loan Agreement of even date herewith (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**") between the Grantors and the Lender, the Lender has agreed to make advances and grant certain other financial accommodations to the Borrower.

As a condition to extending credit under the Loan Agreement, the Lender has required the execution and delivery of this Agreement by the Grantors.

ACCORDINGLY, in consideration of the mutual covenants contained in the Loan Agreement and herein, the parties hereby agree as follows:

1.      **Definitions.**

(a)     *Terms defined in Loan Agreement.* All terms defined in the Loan Agreement that are not otherwise defined herein shall have the meanings given them in the Loan Agreement.

(b)     *Terms defined in UCC.* The following terms, when used herein (whether or not capitalized), shall have the meanings given them in the UCC (and, in the case of any term defined in Article 9 of the UCC and in another Article of the UCC, the definition thereof in Article 9 of the UCC shall control), except that (i) for purposes of this Agreement, the meaning of such terms will not be limited by reason of any limitation on the scope of the UCC, whether under Section 9-109 of the UCC, by reason of federal preemption or otherwise, and (ii) to the extent the definition of any category or type of Collateral is expanded by any amendment, modification or revision to the UCC, such expanded definition will apply automatically as of the date of such amendment, modification or revision:

> "**Account**"
> "**Chattel paper**"
> "**Commercial tort claim**"
> "**Consumer goods**"
> "**Deposit account**"
> "**Document**"
> "**Electronic chattel paper**"
> "**Equipment**"
> "**Farm products**"
> "**Fixtures**"
> "**General intangible**"
> "**Instrument**"

> "**Inventory**"
> "**Investment property**"
> "**Letter-of-credit right**"
> "**Letter of credit**"
> "**Money**"
> "**Payment intangible**"

(c)     *Other Definitions.*  The following terms have the meanings set forth below:

> "**Collateral**" means all right, title and interest of any Grantor in and to accounts, chattel paper, commercial tort claims, consumer goods, deposit accounts, documents, equipment, farm products, general intangibles, instruments, inventory, investment property, letter-of-credit rights, letters of credit, money, Real Estate, and fixtures, in each case whether a Grantor now has or hereafter acquires ownership or other rights therein.

> "**Receivable**" means any account, chattel paper, instrument, payment intangible or other right to payment arising out of the provision of goods or services by any Grantor.

> "**Security Interest**" means the security interest granted hereunder.

**2.**     *Security Interest.* Each Grantor hereby grants the Lender a security interest in the Collateral to secure the payment and performance of the Obligations.

**3.**     *Representations, Warranties and Agreements.* Each Grantor hereby represents, warrants and agrees as follows:

(a)     Title.  One of the Grantors (i) has absolute title (or leasehold) to each item of Collateral in existence on the date hereof, free and clear of all Liens other than Permitted Encumbrances, (ii) will have, at the time any Grantor acquires any rights in Collateral hereafter arising, absolute title (or leasehold) to each such item of Collateral free and clear of all Liens other than Permitted Encumbrances, (iii) will keep all Collateral free and clear of all Liens other than Permitted Encumbrances, and (iv) will defend the Collateral against all claims or demands (other than claims and demands based on Permitted Encumbrances) of all Persons other than the Lender.  The Grantors will not sell or otherwise dispose of the Collateral or any interest therein except as permitted under the Loan Agreement and the DIP Orders.

(b)     Legal Name; Jurisdiction; Chief Executive Office; Organizational Identification Number.  Each Grantor has only one state of incorporation or organization.  No Grantor will change its name, jurisdiction of organization or chief executive office without thirty (30) calendar days' prior written notice to the Lender.

(c)     Fixtures.  The Grantors will not permit any tangible Collateral to become part of or to be affixed to any real property without first assuring to the reasonable satisfaction of the Lender that the Security Interest will be prior and senior to any Lien then held or thereafter acquired by any mortgagee of such real property or the owner or purchaser of any interest therein other than Permitted Encumbrances.

(d)     Receivables.  Each Receivable is (or will be when arising or issued) the valid, genuine and legally enforceable obligation, subject to no defense, setoff or counterclaim (other than those arising in the ordinary course of business), of the account debtor or other obligor named therein or in the Grantors' records pertaining thereto as being obligated to pay such obligation.  Without the Lender's prior written consent, the Grantors will not

2

agree to (i) any material modification or amendment of, or forbearance, release or cancellation of, any such obligation, or (ii) subordinate their right to payment of any Receivable to claims of other creditors of such account debtor or other obligor.

(e) <u>Evidences of Collateral</u>.  Each Grantor will (i) promptly (upon receipt) deliver to the Lender all certificates or instruments representing or constituting Collateral, if any, and (ii) duly endorse, in blank, each and every certificate or instrument constituting Collateral, if any, by signing on said certificate or instrument or by signing a separate document of assignment or transfer, as required by the Lender.  Prior to any of the foregoing deliveries, each Grantor shall hold all such certificates or instruments, if any, in trust for the benefit of the Lender.

(f) <u>Miscellaneous Covenants</u>.  The Grantors will:

(i) Keep tangible Collateral in good repair, working order and condition, normal depreciation excepted, and will, from time to time, replace any worn, broken or defective parts thereof such as to not have a Material Adverse Effect on such tangible Collateral, taken as a whole.

(ii) Promptly pay all post-petition taxes and other governmental charges levied or assessed upon or against any Collateral or upon or against the creation, perfection or continuance of the Security Interest which is not barred by the Automatic Stay.

(iii) Permit the Lender, or the representatives of the Lender, to examine or inspect any Collateral, wherever located, and to examine, inspect and copy the Grantors' books and records pertaining to the Collateral and their business and financial condition and to send and discuss with account debtors and other obligors requests for verifications of amounts owed to the Grantors.

(iv) Keep accurate and complete records pertaining to the Collateral and pertaining to the Grantors' business and financial condition.

(v) Promptly notify the Lender of any loss of or material damage to any Collateral or of any material adverse change known to any Grantor in the prospect of payment of any sums due on or under any Receivable.

(vi) If the Lender at any time so requests (whether the request is made before or after the occurrence of an Event of Default), promptly deliver to the Lender any chattel paper, document, instrument or investment property constituting Collateral, duly endorsed or assigned by the Grantors.

(vii) At all times keep all tangible Collateral insured against risks of fire (including so-called extended coverage), theft, collision (in case of Collateral consisting of motor vehicles) and such other risks and in such amounts as required by the Loan Agreement, with additional insured, mortgagee and lender loss payable endorsements in favor of the Lender.

(viii) If any Collateral consists of a motor vehicle, execute such documents as may be required to have the Security Interest properly noted on a certificate of title promptly upon request of the Lender, and, if Collateral consists of investment property, electronic chattel paper, deposit accounts or letter-of-credit rights, execute any control or transfer agreement that the Lender may reasonably require

3

to obtain control over such investment property, electronic chattel paper, deposit accounts or letter-of-credit rights.

(ix)    Pay when due or reimburse the Lender on demand for all costs of collection of any of the Obligations and all Lender Expenses, including but not limited to, all other out-of-pocket expenses (including in each case all reasonable attorneys' fees) incurred by the Lender in connection with the creation, perfection, satisfaction, protection, defense or enforcement of the Security Interest or the creation, continuance, protection, defense or enforcement of this Agreement or any or all of the Obligations, including expenses incurred in any litigation or bankruptcy or insolvency proceedings.

(x)    Execute, deliver or endorse any and all assignments, security agreements, Account Control Agreements and other agreements and writings (including but not limited to Intellectual Property Security Agreements) that the Lender may at any time reasonably request in order to secure, continue, protect, perfect or enforce the Security Interest and the Lender's rights under this Agreement.

(xi)    Not use or keep any Collateral, or permit it to be used or kept, for any unlawful purpose or in any material violation of any federal, state or local law, statute or ordinance.

(xii)    Not amend or terminate any financing statement naming the Lender as secured party except upon written prior authorization of the Lender.

**4.**    *Lender's Right to Take Action*. Subject to the DIP Orders, if the Grantors at any time fail to perform or observe any agreement contained in this Agreement, and if such failure continues for a period of ten calendar days after the Lender gives the Grantors written notice thereof (or, in the case of the agreements contained in clauses (vii) and (viii) of Section 3(f), immediately upon the occurrence of such failure, without notice or lapse of time), the Lender may (but need not) perform or observe such agreement on behalf and in the name, place and stead of the Grantors (or, at the Lender's option, in the Lender's own name) and may (but need not) take any and all other actions which the Lender may reasonably deem necessary to cure or correct such failure (including, without limitation, the payment of taxes, the satisfaction of Liens, the performance of obligations under contracts or agreements with account debtors or other obligors, the procurement and maintenance of insurance, the execution of financing statements, the endorsement of instruments, and the procurement of repairs, transportation or insurance); and, except to the extent that the effect of such payment would be to render any loan or forbearance of money usurious or otherwise illegal under any applicable law, the Grantors shall thereupon pay the Lender on demand the amount of all moneys expended and all costs and expenses (including reasonable attorneys' fees) incurred by the Lender in connection with or as a result of the Lender's performing or observing such agreements or taking such actions, together with interest thereon from the date expended or incurred by the Lender at the highest rate then applicable to any of the Obligations. To facilitate the performance or observance by the Lender of such agreements of the Grantors, each Grantor hereby irrevocably appoints (which appointment is coupled with an interest) the Lender, or its delegate, as the attorney-in-fact of that Grantor with the right (but not the duty) from time to time to create, prepare, complete, execute, deliver, endorse or file, in the name and on behalf of that Grantor, any and all instruments, documents, financing statements, applications for insurance and other agreements and writings required to be obtained, executed, delivered or endorsed by the Grantors under Section 3 and Section 7.

**5.**    *Commercial Tort Claims*. Promptly upon obtaining knowledge thereof, the Grantors will deliver to the Lender notice of any commercial tort claim that any Grantor may acquire, including a summary of

4

the facts giving rise to such commercial tort claim, an estimate of the Grantors' damages, copies of any complaint or demand letter submitted by any Grantor, and such other information as the Lender may request.  Upon request by the Lender, the Grantors will grant the Lender a security interest in all commercial tort claims they may have against any Person.

**6.**     *Financing Statements*. The Lender may (and each Grantor hereby authorizes the Lender to) execute and file such financing statements and other documents as the Lender may at any time deem appropriate to perfect the Security Interest.  Without limiting the generality of the foregoing, each Grantor authorizes the Lender to file financing statements designating the collateral as "all personal property" or "all assets" (or such similar description) of that Grantor, and authorizes, ratifies and approves any financing statement filed by the Lender on or prior to the date of this Agreement. Notwithstanding the foregoing or any provision to the contrary herein, pursuant to the DIP Orders, the Lender is not required to take any action, including, without limitation, file any financing statements, record any mortgages or other Security Documents, or take possession of any documents, instruments, certificates or other Collateral, in order to perfect the Security Interest.

**7.**     *Rights of Lender*. Subject to the DIP Orders, the Lender may take any or all of the following actions:

(a)     Account Verification.  At any time and from time to time, whether before or after an Event of Default, the Lender may verify any accounts in the name of the Grantors or in its own name; and, the Grantors, upon request, shall furnish the Lender with duplicate statements of the accounts, which statements may be mailed or delivered by the Lender for that purpose.

(b)     Collateral Account.  At any time and from time to time, whether before or after an Event of Default, the Lender may establish a collateral account for the deposit of checks, drafts and cash payments made by the Grantors' account debtors.  If a collateral account is so established, the Grantors shall promptly deliver to the Lender, for deposit into said collateral account, all payments on Receivables received by them.  All such payments shall be delivered to the Lender in the form received (except for the Grantors' endorsements where necessary).  Until so deposited, all payments on Collateral received by the Grantors shall be held in trust by the Grantors for and as the property of the Lender and shall not be commingled with any funds or property of the Grantors.  All deposits in said collateral account shall constitute proceeds of Collateral and shall not constitute payment of any Obligation.  At its option, the Lender may, at any time, apply finally collected funds on deposit in said collateral account to the payment of the Obligations in such order of application as the Lender may determine, or permit the Grantors to withdraw all or any part of the balance on deposit in said collateral account.

(c)     Lock Box.  At any time and from time to time, whether before or after an Event of Default, the Lender may, by notice to the Grantors, require the Grantors to direct each of their account debtors to make payments due under each Receivable directly to a special lock box to be under the control of the Lender.  Each Grantor hereby authorizes and directs the Lender to deposit all checks, drafts and cash payments received in said lock box into the collateral account established as set forth above.

(d)     Direct Collection.  After the occurrence of an Event of Default, the Lender may notify any account debtor, or any other Person obligated to pay any amount due, that the Receivable giving rise to such obligation has been assigned or transferred to the Lender for security and shall be paid directly to the Lender.  If the Lender so requests at any time, the Grantors will so notify such account debtors and other obligors in writing and

will indicate on all invoices to such account debtors or other obligors that the amount due is payable directly to the Lender.  At any time after the Lender or the Grantors give such notice to an account debtor or other obligor, the Lender may (but need not), in its own name or in the name of the Grantors, demand, sue for, collect or receive any money or property at any time payable or receivable on account of, or securing, any such Receivable, or grant any extension to, make any compromise or settlement with or otherwise agree to waive, modify, amend or change the obligations (including collateral obligations) of any such account debtor or other obligor.

8.     *Assignment of Insurance*. The Grantors hereby assign to the Lender, as additional security for the payment of the Obligations, any and all moneys (including but not limited to proceeds of insurance and refunds of unearned premiums) due or to become due under, and all other rights of the Grantors under or with respect to, any and all policies of insurance covering the Collateral, and the Grantors hereby direct the issuer of any such policy to pay any such moneys directly to the Lender.  After the occurrence of an Event of Default, the Lender may (but need not), in its own name or in the name of the Grantors, execute and deliver proofs of claim, receive all such moneys, endorse checks and other instruments representing payment of such moneys, and adjust, litigate, compromise or release any claim against the issuer of any such policy.

9.     *Remedies upon Event of Default*. Upon the occurrence of an Event of Default and at any time thereafter and subject to the DIP Orders, the Lender may exercise any one or more of the following rights and remedies: (a) declare all unmatured Obligations to be immediately due and payable, and the same shall thereupon be immediately due and payable, without presentment or other notice or demand; (b) to the extent not prohibited by the DIP Orders, exercise and enforce any or all rights and remedies available upon default to a secured party under the UCC, including but not limited to the right to take possession of any Collateral, proceeding without judicial process or by judicial process (without a prior hearing or notice thereof, which each Grantor hereby expressly waives), and the right to sell, lease, license or otherwise dispose of any or all of the Collateral, and in connection therewith, the Lender may require the Grantors to make the Collateral available to the Lender at a place to be designated by the Lender which is reasonably convenient to all applicable parties, and if notice to the Grantors of any intended disposition of Collateral or any other intended action is required by law in a particular instance, such notice shall be deemed commercially reasonable if given (in the manner specified in Section 11) at least ten (10) calendar days prior to the date of intended disposition or other action; (c) enforce Intellectual Property; (d) exercise any and all voting rights related to or arising out of any Equity Interests constituting Collateral; and (e) to the extent not prohibited by the DIP Orders, exercise or enforce any or all other rights or remedies available to the Lender by law or agreement against the Collateral, against the Grantors or against any other Person or property.  The Lender is hereby granted a non-exclusive, worldwide and royalty-free license, with the right to grant sublicenses, to all rights in intellectual property of the Grantors that the Lender deems necessary or appropriate to the disposition of any Collateral; provided, however, that the Lender shall not exercise such license or right prior to the occurrence of an Event of Default.

10.    *Other Personal Property*. Unless at the time the Lender takes possession of any tangible Collateral, or within seven (7) days thereafter, the Grantors give written notice to the Lender of the existence of any goods, papers or other property of the Grantors, not affixed to or constituting a part of such Collateral, but which are located or found upon or within such Collateral, describing such property, the Lender shall not be responsible or liable to the Grantors for any action taken or omitted by or on behalf of the Lender with respect to such property without actual knowledge of the existence of any such property or without actual knowledge that it was located or to be found upon or within such Collateral.

11.    *Notices*. All notices and other communications hereunder shall be in writing and shall be delivered, and deemed delivered, in accordance with the Loan Agreement.

6

12.     *Waiver by the Grantors*. Each Grantor expressly waives the benefit of any and all defenses and discharges available to a guarantor, surety, endorser or accommodation party dependent on an obligor's character as such.  Without limiting the generality of the foregoing, the liability of the Grantors hereunder shall not be affected or impaired in any way by any of the following acts or things (which the Lender is hereby expressly authorized to do, omit or suffer from time to time without notice to or consent of any Grantor): (i) any acceptance of collateral security, guarantors, accommodation parties or sureties for any of the Obligations; (ii) one or more extensions or renewals of any of the Obligations (whether or not for longer than the original period) or any modification of the principal amounts, interest rates, maturities or other terms of any of the Obligations; (iii) any waiver or indulgence granted to any Grantor or other Person liable with respect to any of the Obligations, any delay or lack of diligence in the enforcement of any of the Obligations, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any of the Obligations; (iv) any full or partial release of, compromise or settlement with, or agreement not to sue, any Grantor or other Person liable with respect to any of the Obligations; (v) any release, surrender, cancellation or other discharge of any of the Obligations or the acceptance of any instrument in renewal or substitution for any instrument evidencing any of the Obligations; (vi) any failure to obtain collateral security (including rights of setoff) for any of the Obligations, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to preserve, protect, insure, care for, exercise or enforce any collateral security for any of the Obligations; (vii) any modification, alteration, substitution, exchange, surrender, cancellation, termination, release or other change, impairment, limitation, loss or discharge of any collateral security for any of the Obligations; (viii) any collection, sale, lease or other disposition of, or foreclosure or other enforcement or realization on, any collateral security; (ix) any assignment, sale, pledge or other transfer of any of the Obligations; (x) any manner, order or method of application of any payments or credits on any of the Obligations; or (xi) any election by the Lender under Section 1111(b) of the United States Bankruptcy Code.

13.     *Lender's Obligations*. The Lender's duty of care with respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if the Lender exercises reasonable care in physically safekeeping such Collateral or, in the case of Collateral in the custody or possession of a bailee or other third Person, exercises reasonable care in the selection of the bailee or other third Person, and the Lender need not otherwise preserve, protect, insure or care for any Collateral.  Subject to the DIP Orders, the Lender shall not be obligated to preserve any rights the Grantors may have against prior parties, to realize on the Collateral at all or in any particular manner or order, or to apply any cash proceeds of Collateral in any particular order of application.  To the extent that applicable law imposes duties on the Lender to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it would be commercially reasonable for the Lender (i) to fail to incur expenses deemed significant by the Lender to prepare Collateral for disposition or otherwise to transform raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against any account debtor or other obligor or to remove Liens on or any adverse claims against Collateral, (iv) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (v) to dispose of assets in wholesale rather than retail markets, or (vi) to disclaim disposition warranties, such as title, possession or quiet enjoyment.  Each Grantor acknowledges that this Section 13 is intended to provide non-exhaustive indications of actions or omissions by the Lender that would be commercially reasonable in the Lender's exercise of remedies against the Collateral, and that other actions or omissions by the Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 13.  Nothing contained in this Section 13 shall be construed to grant any rights to any Grantor or to impose any duties on the Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 13.

US.363432680.03

14.     *Waiver; Cumulative Remedies*. This Agreement can be waived, modified, amended, terminated or discharged, and the Security Interest can be released, only explicitly in a writing signed by the Lender.  A waiver signed by the Lender shall be effective only in the specific instance and for the specific purpose given.  Mere delay or failure to act shall not preclude the exercise or enforcement of any of the Lender's rights or remedies.  All rights and remedies of the Lender shall be cumulative and may be exercised singularly or concurrently, at the Lender's option, and the exercise or enforcement of any one such right or remedy shall neither be a condition to nor bar the exercise or enforcement of any other.

15.     *Binding Effect*. This Agreement has been duly and validly authorized by all necessary action of the Grantors.  This Agreement shall be binding upon and inure to the benefit of the Grantors and the Lender and their respective successors and assigns and shall take effect when signed by the Grantors and delivered to the Lender.  The Grantors waive notice of the Lender's acceptance hereof.

16.     *Governing Law*. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

17.     *Severability*. If any provision or application of this Agreement is held unlawful or unenforceable in any respect, such illegality or unenforceability shall not affect other provisions or applications which can be given effect and this Agreement shall be construed as if the unlawful or unenforceable provision or application had never been contained herein or prescribed hereby.

18.     *Survival*. All representations and warranties contained in this Agreement shall survive the execution, delivery and performance of this Agreement and the creation and payment of the Obligations.

19.     *Counterparts*. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by e-mail transmission of a PDF or similar copy shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart signature page to this Agreement by e-mail transmission shall also deliver an original executed counterpart of this Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability or binding effect of this Agreement.

20.     *No Marshalling*. In no event shall the Lender be subject to the equitable doctrine of marshaling or any similar doctrine.

21.     *DIP Orders Govern*. Each Grantor and the Lender agree that any reference contained herein to any DIP Order shall include all terms, conditions, and provisions of such DIP Order and that such DIP Order is incorporated herein for all purposes. To the extent there is any inconsistency between the terms of this Agreement or any other Loan Document and the terms of the DIP Orders, the terms of the DIP Orders shall govern.

*Signature pages follow.*

8

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

**MILLENKAMP CATTLE, INC.**

By: _____
Name: _____
Title: _____

**BLACK PINE CATTLE LLC**

By: _____
Name: _____
Title: _____

**EAST VALLEY CATTLE, LLC**

By: _____
Name: _____
Title: _____

**GOOSE RANCH LLC**

By: _____
Name: _____
Title: _____

**IDAHO JERSEY GIRLS, LLC**

By: _____
Name: _____
Title: _____

**IDAHO JERSEY GIRLS JEROME DAIRY LLC**

By: _____
Name: _____
Title: _____

**MILLENKAMP ENTERPRISES LLC**

By: _____
Name: _____
Title: _____

**MILLENKAMP FAMILY LLC**

By: _____
Name: _____
Title: _____

**MILLENKAMP PROPERTIES LLC**

By: _____
Name: _____
Title: _____

**MILLENKAMP PROPERTIES II LLC**

By: _____
Name: _____
Title: _____

*Signature page to Security Agreement*

**SANDTON CAPITAL SOLUTIONS MASTER FUND VI, LP**

By: _____

Name: _____

Title: _____

*Signature page to Security Agreement*

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re | |
| | Case No. 24-40158-NGH |
| MILLENKAMP CATTLE, INC., *et. al.*, | |
| | Chapter 11 |
| Debtors. | |

**INTERIM ORDER AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING; (B) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDERS; AND (C) SETTING A FINAL HEARING**

Upon the motion, dated April 2, 2024 (the "Motion"), of Millenkamp Cattle, Inc. ("Millenkamp Cattle") and its affiliated debtors and debtors in possession (collectively, the "Debtors")[1] in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), seeking, pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and the Local Bankruptcy Rules (the "Local Rules" or "LBR"), entry of an interim order (this "Interim Order"); the Court having jurisdiction to consider the matters raised in the Motion pursuant to 28 U.S.C. § 1334; and the Court having authority to hear the matters raised in the Motion pursuant to 28 U.S.C. § 157; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and consideration of the Motion and the requested relief being a core proceeding that the Court can determine pursuant to 28 U.S.C. § 157(b)(2); and due and proper notice of the Motion and opportunity for a hearing on the Motion having been given, and it appearing that no other or

---

[1] The Debtors in the Chapter 11 Cases are: Millenkamp Cattle, Inc.; Idaho Jersey Girls LLC; East Valley Cattle, LLC; Millenkamp Properties, L.L.C.; Millenkamp Properties II LLC; Millenkamp Family LLC; Goose Ranch, LLC; Idaho Jersey Girls Jerome Dairy LLC; Black Pine Cattle LLC; and Millenkamp Enterprises LLC.

SUPPLEMENT TO MOTION TO APPROVE POST-PETITION FINANCING – Page 1

further notice need be provided; and the Court having reviewed and considered the Motion, the *Declaration of William John Millenkamp in Support of the First-Day Motions and Relief* (the "Millenkamp Declaration"); and the Court having held a hearing on April 4, 9, 10 and 16, 2024 to consider entry of this Interim Order (the "Interim Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and in the Millenkamp Declaration, and at the Interim Hearing establish just cause for the relief granted herein; and the Court having found the relief requested in the Motion to be fair, reasonable, and in the best interests of the Debtors, their creditors, their estates, their livestock, and all other parties in interest; and the Court having determined that the relief requested in the Motion is essential for the continued operation of the Debtors' businesses and providing for the well-being of their livestock; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and upon all of the proceedings had before the Court; after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]**

A.     **Petition Date.**  On April 2, 2024 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for District of Idaho (the "Court") commencing the Chapter 11 Cases.  The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee, examiner, or official statutory committee of unsecured creditors (such official committee, the "Committee") has yet been appointed in the Chapter 11 Cases.

B.     **Jurisdiction and Venue.**  The Court has jurisdiction over these proceedings,

---

[2]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitutes a core proceeding under 28

U.S.C. § 157(b)(2).  Venue for the Chapter 11 Cases and the proceedings on the Motion is proper

in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  Pursuant to Bankruptcy Rule 7008, the

Debtors consent to the entry of a final order by the Court in connection with the Motion to the

extent that it is later determined that the Court, absent consent of the parties, cannot enter final

orders or judgments consistent with Article III of the United States Constitution.

       C.     **Notice**.  Under the circumstances of the Chapter 11 Cases, proper, timely, adequate

and sufficient notice of the Motion, the Interim Hearing, and the Interim Order has been provided

in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other

or further notice of the Motion, the Interim Hearing, or this Interim Order shall be required.

       D.     **No Control.**  The DIP Lender[3] was not and is not in control of persons or insiders

of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in

connection with, related to, or arising from the DIP Facility.

       E.     **Immediate Need for Postpetition Financing and Use of Cash Collateral.**  Good

cause has been shown for entry of this Interim Order.  The immediate ability of the Debtors to

preserve and maintain the value of their assets, maximize value for creditors and provide for the

well-being of Livestock requires the availability of working capital from the DIP Facility and use

of Cash Collateral, to continue operations, pay the costs and expenses of administering the Chapter

11 Cases, and administer and preserve the value of their businesses and estates.  In the absence of

the continued availability of such funds and liquidity in accordance with the terms hereof

(including access to the DIP Facility and use of Cash Collateral), the continued operation of the

Debtors' businesses would not be possible, and immediate and irreparable harm to the Debtors,

their estates, their creditors and their Livestock would occur.  Further, the possibility for a

---

[3] Capitalized terms used, but not otherwise defined in this Interim Order, shall have the meaning ascribed to such terms in the Motion.

SUPPLEMENT TO MOTION TO APPROVE POST-PETITION FINANCING – Page 3

successful restructuring and other value-maximizing transaction(s) would be jeopardized in the absence of the availability of funds in accordance with the terms of this Interim Order.

F.    **No Credit Available on More Favorable Terms.**  The Debtors have been unable to obtain credit on more favorable terms and conditions than those provided in this Interim Order. The Debtors are unable to obtain credit for borrowed money without granting the DIP Liens and the DIP Superpriority Claim and without granting the adequate protection as and to the extent set forth herein.

G.    **Adequate Protection for Pre-Petition Secured Parties.**

(i)    The Pre-Petition Secured Lenders' interests are  adequately protected through an "equity cushion" on their collateral, and solely to the extent of any diminution in the value of their respective interests in the Pre-Petition Collateral resulting from, among other things, the subordination to the Carve Out and to the DIP Liens the Debtors' use, sale, or lease of such Pre- Petition Collateral, including Cash Collateral, and the imposition of the automatic stay from and after the Petition Date (collectively, and solely to the extent of such diminution in value, the "Diminution in Value") (and subject to the Carve Out and the Debtors' preserved rights, with respect solely to the Pre-Petition Collateral, pursuant to section 506(c) of the Bankruptcy Code), in the form of replacement security interests in and liens on substantially all of the Debtors' assets and property (with certain exclusions) and superpriority claims (in each case, in accordance with their relative priorities, and junior and subject to the liens and superpriority claims granted to the DIP Lender).

(ii)    Accordingly, under the circumstances of the Chapter 11 Cases, the Equity Cushions, together with the substantial benefits associated with the relief granted herein, provide adequate protection pursuant to Bankruptcy Code sections 361, 362, 363, and 364 to the Pre-Petition Secured Lenders.

(iii)    The DIP Loan is critical to the Debtors' ability to preserve the Debtors' assets; is in the best interests of the Debtors and their estates; and necessary to avoid irreparable

harm to the Debtors, their creditors and their assets, businesses, goodwill, reputation, and employees.  Further, access to the proceeds under the DIP Facility is necessary to avoid immediate and irreparable harm to the value of the Debtors' assets and the care of the livestock.

H.    **Extension of Financing.**  The DIP Lender committed to provide financing to the Debtors in accordance with the DIP Term Sheet and the other DIP Loan Documents, and subject to (i) the entry of this Interim Order, the entry of the Final Order, and approval of each provision of the DIP Loan Documents, and (ii) findings by this Court that such financing is essential to the Debtors' estates.

I.    **Business Judgment and Good Faith Pursuant to Section 364(e).**  The terms and conditions of the DIP Facility (including the fees, expenses, and other amounts paid and to be paid thereunder), are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  All obligations incurred, payments made, and transfers or grants of security set forth in this Interim Order and the other DIP Loan Documents by any Debtor are (and were) granted to or for the benefit of the DIP Lender for fair consideration and reasonably equivalent value, and are (and were) granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby.  The DIP Facility was negotiated in good faith and at arm's length among the Debtors, the DIP Lender, and, as applicable, their respective professionals.  The use of the proceeds to be extended under the DIP Facility will be so extended in good faith and for valid business purposes and uses.  The DIP Lender is entitled to the protection and benefits of Bankruptcy Code section 364(e).

J.    **Relief Essential; Best Interests.**  The relief requested in the Motion (and granted or otherwise provided for in this Interim Order), is necessary, essential and appropriate for the

continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and property and satisfies the requirements of Bankruptcy Rule 6003. It is in the best interest of the Debtors' estates and their creditors, and consistent with the Debtors' exercise of their fiduciary duties, that the Debtors be (a) allowed to enter into the DIP Facility, (b) grant the liens and claims contemplated herein and under the DIP Facility to or for the benefit of the DIP Lender, and (c) use Cash Collateral, as contemplated herein.

NOW, THEREFORE, based upon the foregoing, and after due consideration and good cause appearing therefor, **IT IS ORDERED** that:

1. **Motion Granted.** The Motion is granted in accordance with the terms and conditions set forth in this Interim Order. Any objections to the Motion with respect to entry of this Interim Order to the extent not withdrawn, waived or otherwise resolved, and all reservation of rights included therein, are hereby denied and overruled, except as allowed herein.

2. **DIP Facility.**

(a) *DIP Obligations*. The Debtors are expressly and immediately authorized, empowered, and directed, on an interim basis, to enter into the DIP Facility and to continue to incur and to perform all obligations under the DIP Facility in accordance with and subject to this

Interim Order and the DIP Loan.  The Debtors are hereby authorized and directed to pay all principal, interest, fees and expenses, indemnities, as applicable under the DIP Loan, and other amounts described herein and in the other DIP Loan Documents as such shall accrue and become due hereunder or thereunder (collectively, all loans, advances, extensions of credit, financial accommodations, fees, expenses, obligations, and all other Liabilities (including indemnities and similar obligations), as applicable, in respect of the DIP Facility (the "DIP Obligations").  The DIP Facility and all DIP Obligations shall represent, constitute and evidence, as the case may be, valid and binding obligations of the Debtors, enforceable against the Debtors, their estates, and any successors thereto in accordance with their terms.  The failure specifically to identify or refer to any particular provision of any DIP Loan Document or any other agreement in this Interim Order shall not diminish or impair the effectiveness of such provision, it being the intent that the DIP Term Sheet approved by this Interim Order is approved in its entirety and, together with this Interim Order, shall govern any advance, loan or other DIP Obligations until the DIP Loan Documents are finalized and approved on a final basis by this Court.

(b)     *Authorization to Borrow*.  In order to enable the Debtors to continue to operate their businesses, subject to the terms and conditions of this Interim Order and the DIP Facility, the Debtors are hereby authorized to enter into the DIP Facility and, subject to any conditions or limitations set forth in the DIP Term Sheet, to borrow under the DIP Facility.

(c)     *DIP Collateral*.  As used herein, "DIP Collateral" shall refer to and mean, all of the existing and after-acquired real property and personal, tangible and intangible, assets of the Debtors and all "property of the estate" (as that term is utilized in the Bankruptcy Code) including, without limitation, all cash, cash equivalents, bank deposit and securities accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights,

general intangibles, investment property, supporting obligations, tax refunds, securities, franchise

rights, letter of credit rights, commercial tort claims, causes of action (other than avoidance actions)

and all substitutions, accessions and proceeds of the foregoing, wherever located, including

insurance or other proceeds, patents, tradenames, trademarks, copyrights, intellectual property and

all substitutions, accessions and proceeds of such intellectual property, wherever located, including

insurance or other proceeds.

(d)     *DIP Liens*. Effective immediately upon entry of the Interim Order, and

subject to the Carve-Out, and as set forth more fully in this Interim Order, and the DIP Facility, the

DIP Lender is hereby granted, pursuant to and in accordance with Sections 364(c) and (d) of the Bankruptcy

Code, valid, perfected, continuing, enforceable, non-avoidable first priority liens and security

interests on the DIP Collateral of each Debtor (the "DIP Liens"), and shall prime all other liens

and security interests on the DIP Collateral, including any liens and security interests in existence

on the Petition Date, and any other current or future liens granted on the DIP Collateral, including

any adequate protection or replacement liens granted on the DIP Collateral (the "Primed Liens").

The DIP Liens shall be effective and perfected as of the entry of this Interim Order, without need

for any additional filings or documentation, except to the extent requested by the DIP Lender in its

sole discretion.  The DIP Liens, DIP Superpriority Claim (defined below) and other rights and

remedies granted under this Interim Order to the DIP Lender shall continue in these Chapter 11

Cases and any successor case(s), and shall be valid and enforceable against any trustee appointed

in any or all of the Debtors' Chapter 11 Cases and upon the dismissal of any or all of the Debtors'

Chapter 11 Cases, or in any successor case(s), and such liens and security interests shall maintain

their priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly

paid in full in cash and the DIP Lender's commitments have been terminated in accordance with

the DIP Loan Documents and this Interim Order.  The DIP Liens shall not have priority, but shall

have second priority, solely with respect to (i) any purchase money security interest liens ("PMSI

Liens") held by any financing party holding a valid first-priority, non-avoidable PMSI lien on any equipment or other asset of the Debtors as of the Petition Date and (ii) any valid, first-priority, non-avoidable statutory lien held by feed or other suppliers existing as of the Petition Date. Further, with regard to the real property identified by the parties as the "German Dairy" (in which Conterra as servicer currently holds a first-priority perfected lien), the DIP Liens shall not have super-priority lien status to the extent Conterra has a valid first-priority, non-avoidable lien against the German Dairy, but shall be a second-priority lien behind Conterra's existing first-position lien.

(e)      *DIP Superpriority Claim*.  Effective immediately upon entry of this Interim Order, pursuant to Bankruptcy Code section 364(c)(1), and subject in each case to the Carve-Out, the DIP Loan shall be entitled to superpriority administrative expense claim status in the Chapter 11 Cases of each Borrower (the "DIP Superpriority Claims"), which DIP Superpriority Claims in respect of the DIP Facility shall have priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which shall be payable from and have recourse to all assets and properties of the Debtors, and which shall be against each of the Debtors who are Debtors (jointly and severally), with priority over any and all other administrative expenses, adequate protection claims, diminution in value claims, and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever (whether secured or unsecured), subject only to the Carve-Out.

3.      **Authorization and Approval to Use DIP Facility Proceeds.**  Subject to the terms and conditions of this Interim Order, the DIP Facility, and the DIP Budget, each Debtor is authorized to use the DIP Facility proceeds.

4.      **Adequate Protection for Pre-Petition Secured Lenders.** The Pre-Petition
Secured Lenders are provided adequate protection through an "equity cushion" on their collateral,
and solely to the extent of any diminution in the value of their respective interests in the Pre-
Petition Collateral resulting from, among other things, the subordination to the Carve Out and to
the DIP Liens the Debtors' use, sale, or lease of such Pre-Petition Collateral, including Cash
Collateral, and the imposition of the automatic stay from and after the Petition Date (collectively,
and solely to the extent of such diminution in value, the "Diminution in Value") (and subject to
the Carve Out and the Debtors' preserved rights pursuant to section 506(c) of the Bankruptcy
Code), in the form of replacement security interests in and liens on substantially all of the Debtors'
assets and property (with certain exclusions) and superpriority claims (in each case, in accordance
with their relative priorities, and junior and subject to the liens and superpriority claims granted to
the DIP Lender).

(ii)     Accordingly, under the circumstances of the Chapter 11 Cases, the equity
cushion, together with the substantial benefits associated with the relief granted herein, provide
adequate protection pursuant to Bankruptcy Code sections 361, 362, 363, and 364 to the Pre-
Petition Secured Lenders.

5.      **DIP Lien and Adequate Protection Lien Perfection.** This Interim Order shall be
sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens
without the necessity of filing or recording any financing statement, deed of trust, mortgage, or
other instrument or document that may otherwise be required under the law of any jurisdiction or
the taking of any other action to validate or perfect the DIP Liens or to entitle the DIP Liens and
to the priorities granted herein. Notwithstanding the foregoing:

(a)     The DIP Lender may file such financing statements, deeds of trust, mortgages,
security agreements, notices of liens and other similar documents, and is hereby granted relief from the
automatic stay of Bankruptcy Code section 362 in order to do so, and all such financing statements, deeds of

trust, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded as of the Petition Date and no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder;

(b)     The Debtors shall execute and deliver to the DIP Lender all such financing statements, deeds of trust, mortgages, security agreements, notices and other documents as the DIP Lender may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of the DIP Liens; and

(c)     In lieu of obtaining such consents or filing any mortgages, financing statements, notices of lien or similar instruments, the DIP Lender may, in its sole discretion, choose to file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of the DIP Collateral, and such filing shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded as of the Petition Date.

6.     **Carve-Out.**

The DIP Liens, DIP Superpriority Claim, the Prepetition Liens, the Prepetition Replacement Liens, and the Prepetition Superiority Claims are subordinate only to the Carve Out. The Carve Out shall mean a carve-out in an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code *plus* interest at the statutory rate; (ii) all reasonable and documented fees and expenses incurred by a trustee under Bankruptcy Code section 726(b), in an aggregate amount not to exceed $250,000; (iii) to the extent allowed by the Court at any time, whether by interim order, procedural order or otherwise (unless subsequently disallowed), all unpaid fees and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to Bankruptcy Code sections 327, 328, or 363 or by the Committee, pursuant to Bankruptcy Code sections 328 and 1103 (collectively, the "Professional Persons").

7.    **Other Rights and Obligations.**

(a)    *Expenses.*  The Debtors will be responsible for the DIP Lender's out of pocket reasonable fees and expenses incurred by the DIP Lender to put the DIP Loan in place, to manage the DIP Loan, and to enforce the terms of the DIP Loan (absent an event of default)..

(b)    *Binding Effect.*  The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender and the Pre-Petition Secured Lenders, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in the Chapter 11 Cases, in any successor cases, or upon dismissal of any such chapter 11 or chapter 7 cases.

(c)    *Limitation on Surcharge.* Without limiting the terms of the Carve-Out and subject to the entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any successor case(s) at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against the DIP Lender or the DIP Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender. No action, inaction or acquiescence by the DIP Lender shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the DIP Lender or the DIP Collateral.

(d)    *Application of Collateral Proceeds.* To the extent required by this Interim Order and the DIP Loan Documents, unless otherwise ordered by the Court, after (a) an Event of Default and (b) the receipt by the Debtors of written notice that the DIP Lender will no longer fund the Debtors through the proceeds of the DIP Loans, the Debtors are hereby authorized to remit to the DIP Lender, subject to the payment of the Carve-Out, one hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral until the DIP Obligations are paid in full, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit

the DIP Lender to retain and apply all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Loan Documents. In furtherance of the foregoing, (a) all cash, securities, investment property and other items of any Debtor deposited with any bank or other financial institution shall be subject to a perfected, first priority security interest in favor of the DIP Lender, (b) upon the occurrence and during the continuance of a Termination Event (as defined in the DIP Loan Documents), each bank or other financial institution with an account of any Debtor is hereby authorized to (i) comply at all times with any instructions originated by the DIP Lender to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of any Debtor, including, without limitation, any instruction to send to the DIP Lender by wire transfer (to such account as the DIP Lender shall specify, or in such other manner as the DIP Lender shall direct) all such cash, securities, investment property and other items held by it, and (ii) waive any right of set off, banker's lien or other similar lien, security interest or encumbrance that is or may be invoked against the DIP Lender and (c) any deposit account or securities account control agreement executed and delivered by any bank or other financial institution or any Debtor prior to the Petition Date shall establish co-control in favor of the DIP Lender of any and all accounts subject thereto and any and all cash, securities, investment property and other items of any Debtor deposited therein to secure the DIP Obligations (provided that primary control rights shall vest in the DIP Lender), and all rights thereunder in favor of any pre-petition party shall inure also to the benefit of, and shall be exercisable exclusively by, the DIP Lender, until all of the DIP Obligations have been paid in full in cash.

(e)     *No Marshaling*. In no event shall the Lender be subject to the equitable doctrine of marshaling or any similar doctrine.

(f)     *Collateral Rights.* Subject to any order of the Bankruptcy Court entered without the objection of the DIP Lender authorizing the Debtors to make payments to prepetition

creditors, if any party who holds a lien or security interest in DIP Collateral that is junior or otherwise subordinate to the DIP Liens in such DIP Collateral receives or is paid the proceeds of such DIP collateral, or receives any other payment with respect thereto from any other source prior to the indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations under the DIP Loan Documents and termination of the commitments thereunder in accordance with the DIP Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral in trust for the DIP Lender and shall immediately turn over such proceeds to the DIP Lender for application to repay the DIP Obligations in accordance with the DIP Loan Documents and this Interim Order until the DIP Obligations are indefeasibly paid in full in cash.

(g)    *Injunction*. Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall be enjoined and prohibited from, at any time during these Chapter 11 Cases, granting liens on DIP Collateral or any portion thereof to any other party, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are senior to or *pari passu* with the liens granted to the DIP Lender except in accordance with the DIP Loan Documents and this Interim Order.

(h)    *No Third Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

(i)    *Limits on Lenders' Liability.* Nothing in this Interim Order or in any of the DIP Loan Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts.  In (a) administering the DIP Facility and the DIP Loans, (b) extending other financial

accommodations to the Debtors under the DIP Loan Documents, and (c) making the decision to collect the indebtedness and obligations of the Debtors, the DIP Lender shall not (x) owe any fiduciary obligation to the Debtors or any other party with respect to their exercise of any consent or other rights afforded them under the DIP Loan Documents or this Interim Order or (y) be exercising control over any operations of the Debtors or acting in any way as a responsible person.

(j)      *Amendment*.  The Debtors and the DIP Lender may amend, modify, supplement or waive any provision of the DIP Loan Documents without further notice to or approval of the Court (but upon two (2) Business Days' prior notice, solely to the extent reasonably practicable under the circumstances, having been given to Committee Counsel (if any) and the U.S. Trustee of any amendment or modification; *provided* that such notice shall not be deemed to create any Committee or U.S. Trustee approval rights), unless such amendment, modification, supplement or waiver (a) increases the interest rate or fees (other than consent fees in connection with such amendment, modification, supplement or waiver) charged in connection with the DIP Facility; or (b) increases the commitments of the DIP Lender to make extensions of credit under the DIP Facility. Except as otherwise provided herein, no other waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by, or on behalf of, all the Debtors and the DIP Lender and approved by the Court after notice to parties in interest.

(k)      *Priority of Terms*.  To the extent of any conflict between or among (i) the express terms or provisions of any of the other DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (ii) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "defined in" or "as set forth in" the DIP Facility, the terms and provisions of this Interim Order shall govern.

(l)      *Survival of Interim Order*.  Except to the extent approved by the DIP Lender and as may be set forth in the Final Order, the provisions of this Interim Order and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, any order which may be entered (i) confirming any chapter 11 plan in the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, (iv) terminating the joint administration of the Chapter 11 Cases, (v) withdrawing of the reference of any of the Chapter 11 Cases from this Court, or (vi) providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases in this Court.  Except to the extent approved by the DIP Lender and as may be set forth in the Final Order (if entered), the terms and provisions of this Interim Order, including all the rights, remedies, powers, privileges, liens, priorities, the DIP Liens and DIP Superpriority Claim granted pursuant to this Interim Order or the Final Order, and any protections granted to or for the benefit of the Pre-Petition Secured Lenders (including any adequate protection, if applicable), shall continue in full force and effect notwithstanding the entry of such order, or in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, and such DIP Liens and DIP Superpriority Claim shall maintain their priorities as provided by this Interim Order and the other DIP Loan Documents, until all of the DIP Obligations have been indefeasibly paid and fully satisfied in accordance with the DIP Loan Documents, as the case may be, and discharged.

(m)      *Dismissal and Conversion.* If an order dismissing or converting any of these Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise, or appointing a chapter 11 trustee or a responsible officer or examiner with expanded powers, is at any time entered, such order shall provide that (a) the DIP Liens and the DIP Superpriority Claim, granted hereunder and in the DIP Loan Documents, shall continue in full force and effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Interim Order and the DIP Documents; and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for

purposes of enforcing the DIP Liens and the DIP Superpriority Claim. Any order dismissing any of these Chapter 11 Cases shall not be effective until the DIP Liens on the DIP Collateral are fully perfected under applicable non-bankruptcy law.

(n)    *Subsequent Reversal or Modification*.    This Interim Order is entered pursuant to section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP Lender all protections and benefits afforded by section 364(e) of the Bankruptcy Code.

(o)    *Enforceability*.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

(p)    *Waiver of any Applicable Stay*.  Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order and this Interim Order shall be immediately effective and enforceable upon its entry.

8.    **Final Hearing.**  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for May 8, 2024, at 9:00 **a** .m. (Mountain Time) at the United States Bankruptcy Court for the District of Idaho.  The Debtors shall promptly mail copies of this Interim Order on the Notice Parties and to any other party that has filed a request for notices with this Court prior thereto and to any Committee after the same has been appointed, or Committee Counsel, if the same shall have been appointed.  Any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than May 1, 2024, which objections shall be served so that the same are received on or before such date by: (a) counsel for the Debtors;(b) counsel to the DIP Lender; (c) counsel for Rabo (d) counsel for MetLife; (e) counsel to Conterra; (f) counsel to any Committee; and (g) the U.S. Trustee.

9.    **Retention of Jurisdiction.**    The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

// End of Text //

Order submitted by:

Matthew T. Christensen, attorney for the Debtors